# EXHIBIT 1



**Evangelical Council for Financial Accountability**

440 West Jubal Early Drive, Suite 100 • Winchester, VA 22601

*Enhancing Trust*

September 2, 2015

Dr. K. P. Yohannan, President
Gospel for Asia
1800 Golden Trail Ct
Carrollton, TX 75010-4649

Dear Dr. Yohannan,

We have been in conversation with Gospel for Asia (GFA) representatives since May 6, 2015 regarding various allegations relating to ECFA Standards, including conducting an on-site visit on June 3, meetings with David Carroll and you in our office on July 1 and at Dulles Airport on July 27, and a meeting with David, Danny Yohannan, and Teresa Chupp in Winchester on August 12, 2015, plus numerous communications by phone and email.

The following is a summary of the most significant GFA compliance issues we reviewed:

1. **Use of field-generated funds to satisfy designated foreign contributions**. During our meeting on July 1, ECFA first learned that GFA and its field partners have engaged in a multi-year practice whereby field partners at least partially satisfied the designations on foreign contributions (primarily from U.S. donors, restricted for field use in India) by using locally generated field income (contributions from donors in India, profits from an India-based rubber plantation, hospitals, etc.).

   GFA staff indicated that the purpose of this practice was to retain foreign contributions in Indian Foreign Contribution (FC) accounts to earn a higher interest rate while expending locally generated funds that would not earn the higher interest rate. At this point, it is important to note that GFA disclaims that it exercises any control over field partners (see #10 below).

   GFA staff also indicated that amounts in FC accounts would be used eventually for their original designation, as well, with the ultimate result that the purpose of the foreign contributions would be more than fulfilled.

   To be clear, GFA solicited funds from donors, primarily gifts with donor restrictions, and transferred the funds to field partners in India, depositing them in FC accounts. While certain amounts were expended from the FC accounts in fulfillment of donor designations, significant amounts were retained in FC accounts over a period of years (see #2 below).

   ECFA staff observed to GFA that it is not a normative practice to hold donor-restricted gifts and fulfill donor restrictions using other funds. Especially with respect to funds sent to

Dr. K. P. Yohannan
September 2, 2015
Page 2

international partners, it is extremely difficult for GFA to demonstrate that it has exercised appropriate control of the funds. Further, ECFA observed that this practice may not comply with ECFA Standard 7.2 because of the lack of clarity regarding the satisfaction of donor restrictions on gifts solicited by and given to GFA.

Our review of the board minutes did not indicate the GFA board had approved, or even been notified of, the practice of using field generated funds to satisfy restrictions on foreign contributions.

Subsequent to ECFA learning of this practice on July 1, GFA represented to ECFA that GFA's field partners have ceased the practice of satisfying the designation on foreign contributions with field-generated funds.

2. **Excessive cash balances held in partner field accounts.** Allegations were made that GFA had upwards of $150 million in partner field accounts, far more than necessary to provide appropriate operating reserves. During our visit on June 3, ECFA was informed that GFA field partner cash reserves were approximately $7 million. After ECFA requested detailed documentation of cash balances held by foreign field offices, on June 29, we discovered that GFA's field partners had $259,437,098 on hand at March 31, 2014 and approximately $186 million in June 2015.

ECFA staff questioned the appropriateness of the high levels of cash being held in partner field accounts. We were told that GFA partners felt it was important to maintain the high balances in case the Indian government decided to block funds being transferred into the country.

The source of the balances was primarily from donor-restricted gifts to GFA, often raised in response to gift solicitations that communicated urgent field needs (see #4 below). ECFA staff expressed concern that the high reserves may not comply with ECFA Standards 4 and 7.1. Subsequent to our conversation on this matter on July 27, GFA provided ECFA with a plan to reduce partner field account reserves to $72 Million, and then amended the plan on August 27 to reduce reserves down to $11 Million. Again, GFA staff disclaimed that GFA exercises any control over field partners (see #10 below).

In our meeting on July 1, ECFA staff asked you what the GFA board would think if they knew of the high balances in partner field accounts. You indicated that neither the board nor you were aware of the magnitude of the balances. You responded, "They would be as surprised as I am." Subsequently, the GFA board was notified, during their July 13 board meeting, of the balances held by field partners.

3. **Delay in sending funds to the field**. It was not until the meeting on August 12 that we learned that $47,898,342, or approximately 82%, of gifts received by GFA in 2014 designated for India were not sent to the field until the last two days of the calendar year. To be clear, nearly $50 million of gifts were raised from January to December, with only modest amounts sent to the field until the end of the year.

Dr. K. P. Yohannan
September 2, 2015
Page 3

ECFA staff expressed concern over failing to send gifts to the field on a timely basis, raising compliance issues under ECFA Standards 4, 7.1, and 7.2, particularly given the urgent nature of many GFA gift solicitations. Subsequent to this discovery, GFA staff indicated that field partners requested the delay of sending the funds to the field due to challenges in transmitting funds into India. ECFA could not confirm if the delay in transferring the funds was justified.

Based on ECFA's review of GFA's internal financial statements as of June 30, 2015, GFA had a cash balance of $28,338,841 in funds designated for foreign field partners, or more than the total of all funds received for the field in the first half of 2015. In other words, the practice of sending funds to the field on a significantly delayed basis was not only followed for 2014 but also during the first half of 2015.

GFA staff informed ECFA on August 12 that part of the cash balances held by GFA on June 30 were transferred to field partners during the month of July. On August 21, GFA staff indicated there is now a plan to send funds to field partners on the 15th of each month.

When ECFA staff asked if the board was apprised of the delays in transferring funds to the field, GFA staff indicated the board was informed of this fact because the board received periodic financial statements. However, the internal financial statements erroneously reflected field funds as a liability and as an expense immediately upon receiving the funds. Thus, it would have been very difficult for the board to learn of the delays in sending funds to the field because the interim financial statements indicated the funds had been sent to the field when they had not. Therefore, ECFA found no indication that the board had approved, or even been clearly informed, of the questionable practice of delaying sending funds to the field.

4. **The level of urgency communicated in GFA donor appeals contrasted with reserves held by foreign field partners and delays in sending funds to the field.** In light of the significant cash balances held by field partners and the delay in sending funds to the field, ECFA staff raised concerns about the appropriateness of communicating urgency in many donor appeals. This includes appeals indicating "When we share with you about the urgency to reach the untold, lost millions—and the opportunities to win them to Jesus—it is not done to produce feelings of guilt or manipulate." One appeal we reviewed indicated "One blanket, like the one Hetaksh received, will literally make the difference between life and death for them and especially for their small children and elderly relatives."

The delay between when a donor gives a gift and when the funds are actually made available for designated purposes on the field is inconsistent with the level of urgency in many appeals and the timeliness of using donor-restricted funds as required by ECFA Standards 7.1 and 7.2. On August 12, GFA staff indicated that despite the delay in making foreign contributions available to carry out programmatic work, at least some designated funds were disbursed on a timely basis through the use of field-generated income.

Dr. K. P. Yohannan
September 2, 2015
Page 4

Our review of the board minutes did not indicate the GFA board had approved, or even been notified, of GFA's practice of soliciting funds based on urgency with a corresponding delay in disbursing funds to the field.

5. **Lack of discretion and control over funds granted to foreign entities.** During our review on June 3, ECFA staff raised questions regarding GFA's oversight and control of funds sent to foreign field partners. GFA's staff indicated that the foreign field partners are completely independent organizations and therefore GFA did not exercise any direct control over field partners. GFA staff also indicated that they did not have a foreign grant process in place to oversee the use of funds.

Given legal requirements on tax-exempt entities to have appropriate discretion and control over the use of funds sent to foreign entities, ECFA staff indicated that GFA's lack of a grant process appears to violate ECFA Standard 4's requirement to follow applicable laws. Subsequent to these conversations, on August 21, GFA staff indicated a new foreign grant process was developed with the assistance of its new audit firm and will be in effect as of September 1, 2015.

Our review of the board minutes did not indicate the GFA board had approved, or even been notified, of GFA's minimal oversight of funds provided to field partners.

6. **GFA solicits funds for narrower purposes than the eventual expenditure of the funds.** During ECFA's review on August 12, GFA staff provided a document to demonstrate the flow of funds from GFA to field partners. ECFA learned that donor-restricted donations are appropriately tracked by particular revenue classifications. However, we also discovered, and it was confirmed by GFA staff, that the disbursement of the gifts are tracked in much broader categories. For example, donations were received and tracked for 38 different specific items including kerosene lanterns, bio sand filters, chickens, manual sewing machines, blankets, bicycle rickshaws, and others, but related expenses were only tracked as "community development." In other words, donations were raised for 38 specific items, with the donations pooled for expenditure purposes instead of expending them specifically for the purposes raised.

ECFA did not find any evidence that donors to the 38 different giving categories had awareness that their gifts were grouped and used in a broader category than the specific categories in which the gifts were raised. ECFA's staff raised concerns regarding GFA's compliance with ECFA Standard 4, 7.1, and 7.2 in raising funds for a particular purpose but then failing to document the actual use of those funds by the particular donor-restricted purpose.

Subsequent to this conversation, on August 16, GFA staff indicated that GFA field partners will begin tracking expenditures by specific item accounts to provide adequate transparency as to the use of designated funds.

Dr. K. P. Yohannan
September 2, 2015
Page 5

Our review of the board minutes did not indicate the GFA board had approved, or even been notified, that gifts solicited for very specific purposes were not being expended with the same specificity as the gifts were raised.

7. **GFA's financial statements do not appropriately report transactions with foreign partners.** During our review on June 3, GFA staff indicated that funds transferred to GFA India were actually transferred to a number of related entities instead of the single entity reflected in the 2013 audited financial statements. Additionally, on August 24 we learned that GFA received a $19,778,613 donation from GFA India, which was classified as a related party elsewhere on the 2013 audited financial statements (also see #8 below).

On August 27, GFA staff confirmed that this donation was neither disclosed in the footnotes of the 2013 financial statements as a related-party transaction nor to the GFA board of directors. This inconsistency within the financial statements and lack of disclosure to the GFA board of directors about a significant related-party transaction appears to violate ECFA Standards 2, 3, and 6. On July 20, ECFA was informed that GFA engaged a new audit firm and they are in the process of reviewing related-party transactions.

8. **Use of funds restricted for the field for other purposes.** On June 3, ECFA discussed GFA's claim that 100 percent of field funds are sent and used in the field. GFA staff confirmed that this was accurate.

On August 24, ECFA was informed that GFA India made a gift to GFA of $19,778,613 in 2013 to complete GFA's new office. On August 27, GFA's staff confirmed that the funds relating to this donation were originally received by GFA as gifts restricted for the field and GFA transferred to field partners to fulfill donor restrictions.

Two important issues are raised:

A. Reallocating gifts donated for field purposes and using them to pay for headquarters construction appears to be a violation of ECFA's Standards 7.2. GFA staff stated in a recorded GFA staff meeting that you approached the field partner and explained that GFA could borrow the funds in the U.S., at less than desirable terms, for the headquarters construction. However, a gift from the field partner, in lieu of GFA borrowing the funds, would allow GFA to complete the new headquarters and thereby save interest. Therefore, GFA would be able to send more money to the field in future years.

ECFA believes that the potential savings resulting from the GFA India gift is an inadequate basis to reallocate gifts donated for field purposes.

B. Reallocating gifts donated for field purposes contradicts GFA's claim that 100 percent of funds are sent to the field. In fact, a significant amount of donations restricted for the field made a circuitous trip back to GFA and were used for the headquarters construction, as though they had never gone to the field. This appears to be a violation of Standard 7.1.

Dr. K. P. Yohannan
September 2, 2015
Page 6

In a GFA staff meeting, GFA indicated the field partner took out a loan to cover the use of the $19,778,613 gift and GFA staff confirmed on August 27 that India-generated income was used to repay the loan.

Our review of the board minutes did not indicate the GFA board had approved, or even been notified, of the $19,778,613 reallocation of donor-restricted gifts.

9. **GFA's financial statements presentation of restricted funds.** On August 12, it was noted that GFA reported accrued field support on its 2013 audited financial statements as a liability instead of classifying those funds as temporarily restricted net assets. This appears to be a departure from Generally Accepted Accounting Principals (GAAP) as required by ECFA Standard 3. GFA staff has confirmed that this matter was also highlighted by GFA's new audit firm as a departure from GAAP and will be corrected on the 2014 audited financial statements.

10. **GFA's control with respect to field partners.** At several points in our review, GFA staff has disclaimed any control over field partners, including Believer's Church in India, which oversees all other field partners. Whether GFA has control or does not have control over its field partners has a significant relationship to a number of issues, including disclosures of related-party transactions in the audited financial statements, oversight of the use of resources of field partners, board approval of related-party transactions, and truthfulness in communications. Additionally, this control issue appears to relate to GFA's compliance with ECFA Standards 3, 4, 6, and 7.1.

On August 21, GFA's staff stated that your responsibilities and powers as the Metropolitan Bishop of Believer's Church, as included in the Believer's Church Constitution adopted February 6, 2003, include the following:

"1. The Metropolitan Bishop is the spiritual head and chief shepherd of the Believer's Church, under the Lordship of Jesus Christ, THE HEAD of the church."

"4. He provides directions to the Bishops, pastors and all other church workers on all matters and in regard to the spiritual life and mission of the Church."

"5. The Metropolitan is responsible to give general and pastoral oversight of all members, Pastors, Priests and Church works and the Spiritual activities of that Church."

"10. He appoints Bishops according the Constitution."

"12. He functions as the president of the Synod, the Conference of Bishops, General Assembly, institutions, and every other official body of the Church as may be established or constituted from time to time...."

Dr. K. P. Yohannan
September 2, 2015
Page 7

Therefore, it appears that GFA staff has significant influence on the operations and decisions of GFA field partners. This influence has been evidenced in the announcement of vast revisions in maintaining or spending down cash balances held by field partners, the change in tracking expenditures for consistency with how funds were solicited, and ceasing the use of local funds to partially cover donor restrictions.

Based on this level of oversight and control as well observed during our review, ECFA staff questions whether GFA has a sound basis to disclaim any control over the activities of field partners.

11. **Failure to report funds hand-carried by trip participants.** ECFA received concerns regarding GFA's lack of disclosure with the U.S. Department of Homeland Security regarding a total of $287,500 of cash sent with trip participants that exceeded federal mandatory reporting during the years 2013, 2014, and 2015. On June 3, ECFA reviewed this issue regarding compliance with ECFA Standard 4. When ECFA staff queried GFA concerning the reason that excessive cash was carried out of the U.S., GFA staff said the practice was used to avoid reporting the incoming cash in India.

ECFA observes that GFA has been transferring approximately $50 million from the U.S. to India per year. Thus, carrying in a few hundreds of thousands of dollars in cash to avoid reporting in India does not seem to be a sound basis for the practice.

While ECFA cannot conclusively determine if there was a sound basis to carry cash into India, we are clear that there is no justification to disobey U.S. law with respect to reporting cash carried out of the U.S.

On July 20, GFA staff reported the failure to properly disclose cash carried into India during the years 2013, 2014, and 2015 to the Department of Homeland Security. On July 27 and in subsequent meetings, GFA staff indicated that GFA has not received and does not anticipate any further follow-up from the Department of Homeland Security on this matter.

12. **Failure of the GFA board to exercise adequate governance oversight.** During ECFA's review, there were several significant practices that prompted us to inquire whether the GFA board was aware of such practices. As observed in items #1, 2, 3, 4, 5, 6, and 8 above, GFA board minutes do not indicate board oversight of significant governance matters.

On July 27, you informed ECFA staff that board meetings usually last two to three hours. It is difficult to reconcile these relatively brief board meetings with the board engagement necessary to provide independent oversight of a ministry with the complexity and magnitude of GFA.

These matters raise serious questions regarding GFA's compliance with ECFA Standards 2, 3, and 6, requiring the board to provide independent oversight and governance of the ministry, including the approval of any related-party transactions.

Dr. K. P. Yohannan
September 2, 2015
Page 8

13. **Source of funds relating to for-profit field operations.** ECFA received concerns alleging inappropriate investment of foreign contributions in India-based for-profit ventures. ECFA reviewed this in regard to GFA's compliance with ECFA Standards 4, 7.1, and 7.2. On June 3, GFA staff indicated that any funds invested in for-profit ventures have been fully sourced from field-generated income and not from foreign contributions.

14. **Child sponsorship fundraising practices differ between GFA and GFA India**. ECFA received concerns regarding differences in fundraising practices for child sponsorship between GFA and GFA India. On June 3 and July 1, ECFA reviewed these concerns in relation to ECFA Standard 7.1. On July 27, GFA staff indicated that there was confusion caused by the fact that while GFA raises funds in a one-to-one ratio in the U.S., GFA India raises sponsorships by securing three sponsors per child, each sponsor covering a third of the costs.

15. **Alleged missing funds according to Indian FC6 forms.** ECFA received allegations that a significant amount of funds were missing based on attempts to reconcile GFA's audited financial statements and field partner's Indian FC6 forms. ECFA reviewed this matter to determine compliance with ECFA Standard 4. On July 20, GFA staff provided ECFA with a reconciliation of these amounts, which reflected a transfer of $29,300,000 to a GFA India account in Hong Kong. GFA staff reported that this transfer was not required to be reported on Indian FC6 forms and that this amount along with fiscal year timing differences led to the allegations of significant missing funds.

16. **Claims of inappropriate use of funds under an Indian tax assessment.** ECFA received concerns that an Indian Tax Court case indicates that GFA India misused funds for purposes other than what they were intended. ECFA reviewed this matter for compliance with ECFA Standard 4. On July 27, GFA's staff indicated that this matter was a false charge that was later remanded and that GFA India was absolved of any wrongdoing in this matter. GFA's staff was not able to provide any documentation other than reports from field partners on this matter.

17. **GFA's 2015 renewal does not include audited financial statements for the year ended December 31, 2014, as required under Standard 3.** ECFA received a request to extend the due date of the audited financial statements for the year ended December 31, 2014 due to engagement of your new audit firm. Given the nature of the timing and the extenuating circumstances, ECFA staff granted an extension to December 31, 2015 to provide the audit, provided that quarterly financial statements are provided to ECFA within 45 days of each quarter end. To date, GFA's staff has provided all requisite quarterly financial reports.

Finally, we feel compelled to observe our concern, in general, about the following in addition to the above ECFA compliance-related issues:

- Certain information provided to ECFA by GFA that was crucial to our review was, at least initially, inaccurate.

Dr. K. P. Yohannan
September 2, 2015
Page 9

- Our review process has covered nearly four months. Certain pertinent information about the compliance issues was not revealed to ECFA by GFA until late in the review process.

- We have learned significant information from sources unrelated to GFA that we should have learned directly from GFA.

If you desire to provide a formal response, we respectfully request that response by September 15, 2015. All references in this letter to GFA refer to GFA U.S. unless otherwise identified.

On October 2, 2015, we anticipate the ECFA board of directors will receive and discuss a report from the ECFA staff resulting from the ECFA compliance review of GFA. The board will determine whether any action and, if so, what action, is appropriate regarding GFA's membership with ECFA.

As with previous letters sent to GFA, this letter confirms that a review of GFA's compliance with ECFA Standards is ongoing. Enclosed is a copy of the ECFA Publication of Membership Status Policy affirmed by members via the ECFA Bylaws on each renewal cycle. ECFA's compliance review is focused on ECFA Standards 2, 3, 4, 6, 7.1, and 7.2. A copy of applicable ECFA Standards and the related Commentaries is enclosed with this letter.

Should there be any intervening issues or concerns raised, we request that GFA proactively provide responses on these concerns.

Respectfully,

John C. Van Drunen
Executive Vice President

CC:  Mr. David Carroll, COO and Mr. Robert Felder, Board Secretary

Enclosures:  ECFA Publication of Membership Status Policy
ECFA Standards and Commentaries