1

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF ARKANSAS
 2                 FAYETTEVILLE DIVISION
     GARLAND D. MURPHY, III, M.D. and    )
 3   PHYLLIS MURPHY, Individually and    )
     on behalf of all others            )
 4   similarly situated,                )
                                        )
 5      Plaintiffs,                     ) CASE NO.
                                        ) 5:17-CV-5035
 6   VS.                                )
                                        )
 7   GOSPEL FOR ASIA, INC., GOSPEL      )
     FOR ASIA-INTERNATIONAL, K.P.       )
 8   YOHANNAN, GISELA PUNNOSE, DANIEL   )
     PUNNOSE, DAVID CARROLL, and PAT    )
 9   EMERICK,                           )
                                        )
10      Defendant.                      )

11

12          TRANSCRIPT OF CASE MANAGEMENT HEARING

13         BEFORE THE HONORABLE TIMOTHY L. BROOKS

14             May 16, 2017; 1:36 p.m.

15             FAYETTEVILLE, ARKANSAS

16

17

18

19

20

21

22   Proceedings recorded in realtime via machine shorthand.
     _____
23
                 Dana Hayden, CCR, RMR, CRR
24          Federal Official Court Reporter
                 35 East Mountain Street
25          Fayetteville, Arkansas 72701
```

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFFS:

 3        Messrs. Woody Bassett and James M. Graves
          Bassett Law Firm
 4        221 North College Avenue
          Fayetteville, Arkansas 72701
 5        (479) 521-9996
          (479) 521-9600 Fax
 6        wbassett@bassettlawfirm.com
          jgraves@bassettlawfirm.com
 7
          Messrs. Marc R. Stanley and Martin Woodward
 8        Stanley Law Group
          6116 North Central Expressway, Suite 1500
 9        Dallas, Texas 75206
          (214) 443-4300
10        (214) 443-0358 Fax
          marcstanley@mac.com
11        mwoodward@stanleylawgroup.com

12
     FOR THE DEFENDANTS:
13
          Mr. Steven T. Shults
14        Shults & Brown, LLP
          200 West Capitol Avenue, Suite 1600
15        Little Rock, Arkansas 72201-3637
          (501) 375-2301
16        (501) 375-6861 Fax
          sshults@shultslaw.com
17
          Messrs. Robert Thompson Mowrey and Paul F. Schuster
18        Ms. Harriet Ellan Miers and Mr. Matt Davis
          Locke Lord LLP
19        2200 Ross Avenue, Suite 2800
          Dallas, Texas 75230
20        (214) 740-8450
          (214) 756-8450 Fax
21        hmiers@lockelord.com
          rmowrey@lockelord.com
22        pschuster@lockelord.com

23

24

25
```

1          THE COURT:  The matter of Garland D. Murphy,

2   III and Phyllis Murphy individually and on behalf of

3   others similarly situated versus Gospel for Asia, Inc.

4   and other entities and individuals is the next matter to

5   come before the Court this afternoon.  Our docket number

6   in this case is 5:17-CV-5035.

7          The matter comes before the Court today for

8   purposes of a Rule 16 initial case management

9   conference.  Appearing on behalf of the plaintiffs today

10  is James Graves and Woody Bassett, also Marc Stanley and

11  Martin Woodward.

12         Appearing on behalf of the defendants

13  collectively today is Steve Shults, Harriet Miers,

14  Robert Mowrey, Paul Schuster, and Matt Davis.

15         In preparing for our hearing today, the Court

16  has reviewed the pleadings that have been filed to date,

17  as well as the parties' joint Rule 26 report.  I could

18  tell that a lot of time has gone into the preparation of

19  the joint report.  That is very much appreciated.

20         For my review of these materials, I understand

21  that the plaintiffs were donors to the charitable

22  organization Gospel for Asia.  The Court understands

23  Gospel for Asia and some of the related entities is a

24  501(c)(3) entity.  Among other things, it purports to

25  raise money for world missions; in particular in Asia,

1    and the bulk of that seems to be geared towards or

2    focused on India.

3         The various individually named defendants the

4    Court understands would be the founder of Gospel for

5    Asia, as well as certain family members that hold

6    positions of responsibility within the defendant

7    organizations, as well as perhaps some other members of

8    the board of Gospel for Asia.

9         The Court understands that the essence of the

10   allegations here are that certain aspects of the

11   defendants' fundraising activities were, in one respect

12   or another, fraudulent, which is to say that

13   representations that were made to the plaintiffs about

14   what the proceeds would be used for, according to the

15   plaintiffs, are not accurate.

16        The defendants deny those allegations and

17   contend that all of the monies raised were used

18   consistent with its mission and charitable intentions

19   and purposes.

20        A little more specifically, the causes of

21   action using these facts that has been alleged would

22   include, as I mentioned, fraud in various forms,

23   including common law fraud, including fraud via the

24   Arkansas Deceptive Trade Practices Act, and including

25   various forms of fraud as the predicate for a civil RICO

1   cause of action.  There are also causes of action for

2   unjust enrichment and maybe others.  That's all that I

3   can recite off the top of my head at the moment.

4          The defendants, as I said, deny that there is a

5   basis for these causes of action.  They contend that the

6   complaint fails to state a claim for which relief may be

7   granted, although no such motion has yet been made.

8   They also raise a number of affirmative defenses,

9   including statute of limitations, standing, and some

10  other defenses.

11         So what I would like to accomplish today is to

12  give each side an opportunity to state any other facts

13  or defenses that they might feel are pertinent; and by

14  that, I mean pertinent to us agreeing on a discovery

15  plan today.

16         It is evident that the parties have thought

17  through the best way to litigate the case in terms of

18  how to deal with the purported class allegations.  The

19  complaint does seek to, at some point, seek class

20  certification under Rule 23.  The parties have somewhat

21  different ideas about the best way to reach the

22  certification phase and basically whether there is a

23  need to bifurcate merits discovery from class discovery.

24  The plaintiffs do not necessarily agree with that.

25         Overall time frames involved, however, I think

1  everyone is, generally, within speaking, are within a

2  certain range on the same page.

3          So let's begin there.  I understand that

4  Mr. Stanley is going to speak on behalf of the

5  plaintiffs.  Mr. Stanley, would you like to add to or

6  correct the Court, if I misspoke about your contentions,

7  and kind of lead that discussion towards why you think

8  that the discovery plan needs to be more in line with

9  what you have proposed in the report?

10          MR. STANLEY:  Sure.

11          MR. SHULTS:  Your Honor, may I raise one matter

12  preliminarily?

13          THE COURT:  Sure.

14          MR. SHULTS:  Thank you.  Do I need to stand

15  over there, or may I do it from there?

16          THE COURT:  Well, depends how long you're going

17  to be standing, Mr. Shults.

18          MR. SHULTS:  I won't be long.

19          THE COURT:  You can do it from there.

20          MR. SHULTS:  The case involves potentially some

21  very sensitive and confidential information, and the

22  Court has entered a protective order that the parties

23  agreed on which provides for designating certain

24  information confidential and other information

25  attorneys' eyes only.

1          It doesn't provide that transcripts of hearings

2     like this will be confidential for a time until the

3     parties have a chance to designate whether any parts

4     should be confidential.

5          THE COURT:  It does or does not?

6          MR. SHULTS:  Does not.

7          THE COURT:  Okay.

8          MR. SHULTS:  I believe that's correct.  And so

9     I was going to ask if any transcript of this hearing is

10    prepared, if it could be maintained as confidential for

11    a period of time to give the parties an opportunity to

12    designate anything confidential that needed to be.

13         THE COURT:  That's fine.  I think that that is

14    essentially our standard practice.  I think it's like

15    seven days after the transcript has been made available

16    on the docket for either party to raise by motion or by

17    pointing to the agreement as to why it should be sealed

18    or sealed in part; and until such time as that period

19    has expired and/or the Court has resolved the issue,

20    access to that transcript remains locked from

21    nonattorneys of record.

22         That said -- and I don't know exactly what all

23    we will be getting into at different steps along the

24    way -- but this is a public courtroom.  Anyone is free

25    to come in.  Likewise, anyone should be free to order a

1  transcript and read a transcript if they desire to do

2  so, again, absent some compelling reason supported in

3  the law to seal the proceedings or to seal the matters

4  made known in this public proceeding.

5        MR. SHULTS:  Thank your Honor.  And that gets

6  to the other issue.  I don't know but anything may come

7  of today that is sensitive enough to be attorneys' eyes

8  only.  If it does, just so that everyone could

9  anticipate that, we may ask that the Court have a bench

10 conference effectively or something like that to

11 preserve the confidentiality of anything that's

12 particularly sensitive.  I don't really anticipate that

13 but just wanted to raise the issue now.

14       THE COURT:  I'm scanning the crowd.  I see

15 three nonattorneys here, one of which is a party.  The

16 other two I don't know for sure, but I believe they said

17 their last name was Dickinson, and I recognize that name

18 as being associated with another matter that's at the

19 Eighth Circuit.

20       I can't add two and two.  I'm not going to make

21 any firm commitments there, but I surmise that they are

22 plaintiffs in a different case against the same or

23 substantially similar defendants.

24       So again, I don't know where all we're headed

25 to today, and I can't recall offhand the attorney eyes

1   only provisions of your protective order, but obviously

2   if you think we're about to run this thing into the

3   ditch, I'll look to you to jump up and let me know.

4         MR. SHULTS:  Thank you, your Honor.

5         THE COURT:  All right.  Mr. Stanley, you may

6   proceed.

7         MR. STANLEY:  Would you like me to proceed from

8   here or --

9         THE COURT:  Mr. Stanley, we do these fairly

10  informally.  So if you're more comfortable there at the

11  table or sitting down, that's fine.  I find that some

12  lawyers can't speak unless they are standing up, in

13  which case you're free to use the podium, and using a

14  microphone I think in this large of a group would be

15  appropriate.

16        MR. STANLEY:  Thank you.

17        Thank your Honor.  I think the Court summarized

18  the case pretty well, and what I thought would be

19  important for today is sort of defining the different

20  approaches of the two sides in discovery and where we're

21  trying to go with the case based on the allegations.

22        From our case, it's pretty simple.  It's what

23  did the defendants promise the plaintiffs.  So, for

24  instance, "Will you give me a thousand dollars for a

25  Jesus Well?"  "Yes, I'll give you a thousand dollars for

1    for a Jesus Well."  That's the first one.

2         What did the plaintiffs give and then what did

3    the defendants do with the money?  "I give you a

4    thousand dollars; show me it went to a Jesus Well."  Not

5    hard to figure out.  Either it did or it didn't; either

6    they can show it or they can't.

7         And then, third, we've alleged a RICO

8    conspiracy and fraud because what we allege happened is

9    that a lot of this money did not even go to the field

10   and a lot of this money went into for-profit enterprises

11   like a hospital, a chain of hospitals, chain of

12   educational facilities, a media empire, a soccer team in

13   Myanmar, a railroad plantation.  For a long time, there

14   was $287 million on deposit in banks in India; there was

15   $130 million in deposit in Hong Kong.  And so what's

16   going on there?

17        We allege a RICO conspiracy.  The kingpin is

18   K.P. Yohannan, who is the chairman of Gospel for ASIA,

19   Inc., but he's also the metropolitan of Believers

20   Church, and the metropolitan is sort of like a pope

21   there.

22        The constitution's very clear -- the

23   constitution of the church -- that the metropolitan, by

24   virtue of his office, is the president and final

25   authority of the church government, including the

1   managing trustee, the president of all trusts and

2   societies of Believers Church, and the custodians of

3   Believers Church at large.

4          And it goes on and on to say he has the

5   ultimate authority of everything that goes on with the

6   church.

7          The properties are in his name, K.P. Yohannan's

8   name, a lot of the businesses and the properties there.

9   It's not just Believers Church.  There's also Gospel for

10  Asia-India.  There's also Bridge of Hope Trust.  There

11  are a whole bunch of folks that we're just finding"

12  Gospel for Asia 75 LLC, Gospel for Asia 275 LLC, there's

13  Way of Hope LLC.  We've got entities all over.  It's

14  almost like the Enron transactions that we're trying to

15  unravel.

16         There's -- we've got entities in Germany that

17  formed an alliance with Canada.  We've got money

18  allegedly going to Sri Lanka and other places.  And so

19  what we're trying to find out is what did the plaintiffs

20  give, what was promised, what did they give and what did

21  defendants do with it.  Did it line someone's pockets;

22  and if that's the case, then we want them to give it

23  back.

24         Now, you also said, you mentioned that the

25  defendants' contention was that all monies were used as

1    the donors specified.  If that's the case, we lose.

2    This is an easy case.  Just show us that the money that

3    came in to Gospel for Asia -- right now.  I mean, they

4    can -- if that's the case, they could show us tomorrow:

5    The money that came in for Gospel for Asia was spent

6    exactly as the donors said -- "we dug this many wells,

7    we bought this many camels, we did whatever else" -- and

8    we lose.

9         It's not a hard case for that kind of discovery

10   to do it.  They should have records of showing, as

11   fiduciaries of the money, what they did with the money.

12        THE COURT:  Let me ask you a few questions

13   about that.  First of all, I wasn't entirely clear, or

14   perhaps I just couldn't recall from reading the

15   complaint.  There are certain representations that you

16   allege about the 100 percent, what you call a guarantee,

17   that all money will be sent to the field for the

18   purposes that were designated.

19        At some point along the way -- I thought in

20   2016 -- you indicated that the language on the website

21   had kind of been parsed a little bit to absorb the

22   concept that maybe it was only a 96 percent guarantee

23   because there could be situations where they had

24   received so much money for one particular goal that they

25   needed to redirect it to some other project; and in that

1   sense, they weren't necessarily completely totally

2   guaranteeing that the money would be used for the

3   purpose designated, but it would be used for some other

4   good purpose.

5         Initially I thought that that was something

6   that was changed in the wording on the website after a

7   certain point in time, but then I saw similar language

8   on what you call a receipt, or an annual contribution

9   statement or something like that, that your clients

10  received, and it had similar language in it.

11        So help me understand the 100 percent guarantee

12  and the circumstances in which there was this carveout

13  about, "Well, what we're really going to do is use our

14  best efforts to make sure that it goes to these things."

15        MR. STANLEY:  So that's one of the things that

16  I believe you'll find were criticized by the ECFA and by

17  the independent charities and everybody else about.  The

18  solicitations -- and 100 percent of the solicitations,

19  until this time after the ECFA decertified them, 100

20  percent of them said, "We promise you we will use it

21  exactly as you designate.  The Lord's taking care of us.

22  We don't need help for administrative expenses.  We

23  don't take any overhead.  It goes straight to the field

24  as promised."

25        I don't recall what the Court's referring to in

1   Dr. Murphy's receipt, and maybe there was one for 2016.

2   Do we have that as an exhibit there?

3          THE COURT:  This was 2012, I think.

4          MR. STANLEY:  Yeah, I don't recall that exact

5   language and whether or not that put him on notice is

6   really the point that it wasn't going that way, but

7   the -- I think the jury will conclude that the vast

8   majority of representations -- and I'm talking about

9   99.999 percent -- at the time of solicitation, was that

10  "The money I'm giving goes directly to the charity I

11  promise or the cause that I promised -- I was promised

12  it would go," and that never swayed until after the ECFA

13  undesignated them.

14          Now, we're still in the early parts of

15  discovery, so I don't have the documents yet from Gospel

16  for Asia that talk about the change that they made or

17  any disclosures they made, but certainly that's an area

18  that we'll have to go through because they have an

19  affirmative defense that we somehow ratified.  So that

20  is an area of discovery.  We're going to have to find

21  out what were the policies and procedures and when did

22  they make these changes and did they try to sneak these

23  in on tax statements or something else.  I'm unaware of

24  that.

25          THE COURT:  All right.  I'm looking at your

1    Exhibit 4.

2           MR. STANLEY:  Exhibit 4?

3           THE COURT:  Yeah.

4           MR. STANLEY:  Okay.

5           THE COURT:  "All contributions to Gospel for

6    Asia are income tax deductible to the extent allowed by

7    law and are made with the understanding that GFA has

8    complete discretion and control over use of all donated

9    funds."

10          MR. STANLEY:  Yes, sir.  In the next sentence:

11   "However, we are committed to apply your gifts according

12   to your preference."  We are committed to that.

13          I mean, I think a reasonable jury would say

14   they agreed to apply that there.

15          THE COURT:  So the 100 percent guarantee has a

16   little bit of an asterisk next to it?

17          MR. STANLEY:  I don't think so.  I think that

18   they are required under federal tax laws to have this

19   statement.  I'm willing to bet they are, the first part

20   of the statement.  I think that they are required to say

21   that once you give money to this charity -- I don't know

22   this for a fact, but I'll bet you that's a tax

23   statement, IRS statement, to comply with that.

24          But then when you follow with, "However, we are

25   committed to apply your gifts according to your

1    preferences."

2           And then this other next statement is a common

3    tax statement that I get on mine:  "Other than reflected

4    in the statement, no goods or services, in part or in

5    whole, were provided in exchange for these gifts," and,

6    "The value of noncash donations are not included."

7           I think this is a common tax statement that's

8    required by the U.S. Government but then they added, on

9    their own, "We are committed to apply your gifts

10   according to your preferences."

11          THE COURT:  All right.

12          MR. STANLEY:  So I don't think that changes

13   anything, to be honest.

14          THE COURT:  All right.  The other question I

15   had was there are some allegations in the complaint

16   about the monies that were designated to be sent to the

17   field or that were sent to the field were -- I'm not

18   sure if the proper word's "diverted" but were channeled

19   into these for-profit businesses or institutions that

20   you've identified:  The rubber plantation, the

21   for-profit school, what sounds like a for-profit

22   hospital, things of that nature.

23          Is the -- is there a specific allegation that

24   the profits that were raised by these for-profit

25   entities -- well, let me ask my question this way:

1  Where did those profits go to?  Did they go back into

2  the missions in the field, or did they go somewhere

3  else, or at this point do you know?

4          MR. STANLEY:  No clue.  Our forensic people so

5  far tell us money's missing.  I believe GFA's position,

6  as we've talked to counsel -- and I don't want to

7  misrepresent what they say -- is that, in fact, it does,

8  they say, eventually will go back into the field, but

9  nobody lined their pockets with this.  That's one of the

10  big questions that we need to resolve in this case.

11          Our -- even no matter what happened, okay --

12  I'm very interested in knowing what happened.  I think

13  that's really interesting to me.  But if you promise

14  me -- if you ask me for money to be used for this and

15  you use it for something else, then no matter what your

16  intentions are, you didn't use it for the purposes that

17  you said you were going to use it; and when the jury

18  sees the urgent appeals that people need this money

19  right away for a well or for the child or for whatever

20  else, earthquake relief and, in fact, none of it's

21  making it -- for two, two and a half years, I think no

22  money made it to India -- that the money's not being

23  used as specified.

24          You know, the notion of, "Hey, haven't we done

25  you a favor.  If we take your dollar and we invest it in

1   a for-profit and we make a dollar-fifty out of it; we're

2   doing you a favor; now we're able to use more for this

3   charity," that's not what our people signed up for.

4           Our people didn't sign up for you to take this

5   money and put it in a for-profit vehicle which, by the

6   way, you might have lost money in.  Who knows, right?  I

7   don't know if it's for -- I don't know if they are

8   making a profit or not, but we didn't agree to put it

9   into a business enterprise; we agreed to use it for a

10  well or a camel or a motorcycle or whatever, sponsor a

11  child, earthquake relief.  Whatever we agreed to, that's

12  what we as good Christians wanted to give the money to,

13  to help for our evangelical mission.

14          Buying a hospital, buying -- even though it may

15  have done great work -- educating kids, great thing.  If

16  the solicitation was "Give us money for our school," I

17  don't have a beef for that.  Or give it to a hospital, a

18  for-profit hospital and someone wants to donate money to

19  it, I don't really care.  But that's not what this case

20  is about.  This case its about specific appeals for

21  specific causes that people gave their money to and it

22  never made it there.

23          THE COURT:  All right.  Thank you.

24          MR. STANLEY:  And can I raise a few more

25  things?

1          THE COURT:  You may.

2          MR. STANLEY:  Okay.  I wanted to understand how

3   the Court prefers to handle discovery sort of disputes.

4   One of the things I think we're going to come up on --

5   and we've already started these discussions a little

6   bit.

7          By the way, Mr. Mowrey and I -- and Ms. Miers

8   and I've had cases before, years ago.  We get along

9   fine.  They are great lawyers.  We have different

10  approaches on some things.

11         They are representing Gospel for Asia, Inc. and

12  several other individuals.  One of those individuals is

13  K.P. Yohannan, who happens to be the metropolitan of

14  this church and who we allege controls this business

15  empire.

16         We're getting documents so far from Gospel for

17  Asia, Inc.  I think that we're going to run into a

18  problem when we say, "This property that's in your name,

19  K.P. Yohannan" -- the rubber plantation or the hospital,

20  whatever else -- "where did the money come from; show us

21  the books and all that stuff"; I anticipate we're going

22  to have problems there on whether or not that's

23  appropriate or et cetera and so we'll have to come back

24  to the Court for, I'm sure, some conferences, some

25  issues.

1      I was just going to get an idea from the Court

2   of how we're going to deal with those things.

3      THE COURT:  Well, I think the first thing that

4   we need to resolve today is whether discovery is going

5   to be class only, whether it's going to be bifurcated;

6   and if it's bifurcated, how much overlap is there going

7   to be and then try to define the very fuzzy edges of

8   where the overlap between class and merits begins and

9   ends.

10      Assuming that we do not bifurcate discovery,

11   and should there be a discovery disagreement, just as a

12   general procedure, you will find in our scheduling order

13   that you're required to first meet and discuss, and that

14   can't just be perfunctory but really try to work through

15   whatever the issue is.

16      If you've made a very good faith effort to

17   amicably work it out but can't, then notify the Court

18   that you would like a telephone conference with the

19   Court prior to filing any discovery motion.

20      We will likely ask you to file some sort of

21   letter -- I mean, depending on what it is.  If it's

22   super simple, we may not need that; but if we get the

23   sense that it's a little more complicated, we may have

24   you -- the parties submit a joint letter that kind of

25   outlines the issue and the parties' positions in a very

1  concise fashion.

2        And then we'll have a -- either we'll have a

3  hearing, typically by telephone, to take that up; and if

4  it is something that the Court can -- you know, it's

5  straightforward enough that the Court can kind of

6  discern what the issues are and give you guidance on how

7  to resolve that, that's what we'll do.  If it's

8  something that, just out of a matter of necessity, is

9  going to require motion practice, then we will authorize

10  you to file a motion to compel.

11        All that said, I strongly encourage the

12  attorneys to work together on this.  You've got a

13  confidentiality agreement in place.  The parties need to

14  be thinking about proportionality and the needs of the

15  case.

16        That said -- well, discovery's pretty broad.  I

17  think the current direction is the Court must look to

18  proportionality.  So I think that about nine-tenths of

19  that is common sense.  So I don't know how else to kind

20  of preview my thoughts and practices, but I'd rather

21  focus on doing what's productive as opposed to really

22  long discovery motions and briefs in support.

23        MR. STANLEY:  And you hear those yourself; you

24  don't do a magistrate judge?

25        THE COURT:  There has been occasions, I call it

 1   being required to go sit next to the teacher's desk, and

 2   I will get Magistrate Judge Wiedemann involved -- and

 3   I've had to do this before -- and literally require the

 4   attorneys to designate members to what I call executive

 5   committee, and the executive committee has to meet on

 6   telephone calls or in person on a regular basis and with

 7   the Court in person or by phone calls on a regular basis

 8   until we can resolve whatever the discovery dispute is.

 9        You don't want to go sit next to the teacher's

10   desk.

11        MR. STANLEY:  I've had a lot of experience with

12   that before becoming a lawyer.

13        I also admit a bit of a failure on one more

14   thing and that is the notion of bifurcation.  I've been

15   doing this 25 years, class actions and, you know, I

16   understand the term "bifurcation," but rarely have I

17   ever seen it be very meaningful because it does bleed

18   over, as the Court knows.

19        In this case -- and we have to prove numerosity

20   unless they stipulate to that, which is how many class

21   members are there.  How many gave donations; that's

22   easy.  We have to talk about a little bit of our case,

23   sort of a prima facie, talk about being able to do some

24   discovery to prove the RICO allegations and prove where

25   the money went.  Again, if they can prove that -- if

1   they can show us that the money went exactly as

2   designated, that's great.

3           I will tell you, by the way, forensically right

4   now we can show 14 percent of the money went as

5   designated, not 98, not 99, but about 14 percent.  But

6   if they were at 99 percent and said, you know, "We

7   screwed up on 1 percent," probably not going to waste my

8   time on it and, you know, we've got other stuff we'd

9   like to do too.

10          But on the bifurcation, most of the stuff that

11  we're going to have to prove for trial, we're going to

12  have to for class cert, and it does bleed over.  This is

13  really complex because, you know, I think the rules call

14  for maybe 10 depositions or whatever.

15          We have, just alone, 12 shell companies that

16  are taking money from Gospel for Asia and sending it to

17  either Hong Kong or -- this was in the United States,

18  all controlled by GFA, and even on their balance sheet

19  now, but they're separate companies, where these wire

20  transfers, money comes in and money goes out, ostensibly

21  so that the Indian government wouldn't understand that

22  it was all coming from Gospel for Asia.  So they used

23  different names to do this so that it would be make it

24  more difficult.

25          We have at least 12 different entities in India

1    that are receiving the money that are all controlled by

2    K.P. Yohannan in other countries.  We have money

3    that's -- it is really, really complex.  I have charts

4    just going everywhere.  So we have to kind of un- --

5    pull it apart to understand where the money went.  And

6    forensically, again, it shouldn't be hard if we got all

7    the bank statements.  It's a pretty -- I'm an

8    accountant -- I have a degree in accounting -- it's a

9    pretty easy thing to do is to go through and follow the

10   money, but the question is whether or not we get the

11   recipient side of it.

12          You know, I've been toying with the notion in

13   my mind.  If they say, "We can't tell you where the

14   money went," I almost think we won our case, right?  "We

15   took your money and we sent it; we don't know where it

16   went," you know, maybe that is good enough.  I don't

17   know.  I don't -- I'd rather be able to track it and see

18   where it all went; but if I gave them the money and they

19   said they were going to apply it towards this and they

20   promise 100 percent is there and they said, "We have no

21   control over it and we can't tell you because we gave it

22   to third parties who have no control over it," maybe we

23   win that way.  I don't know.  But --

24          THE COURT:  Well, to what extent were there --

25   were any of the defendant entities regularly audited?

1          MR. STANLEY:  So that's a great question.  The

2     U.S. entity was audited every year -- well, the years in

3     question -- mostly by Bland Garvey and then this firm

4     out of North Carolina we just discovered, and the

5     audits -- we're trying to meet with them now to see

6     whether or not they're a possible target defendant

7     because they improperly did not handle related party

8     transactions as should be required in the audits.

9          We have a tolling agreement with Bland Garvey

10    right now.  The North Carolina firm we haven't talked to

11    yet.  Gospel for Asia-Canada had an audit firm; and

12    there was an audit firm in India, but it's questionable

13    whether that was even an audit.  I don't know what

14    standards they applied, but they have been resoundingly

15    criticized for the work that they did.

16          THE COURT:  And what sort of information is

17    required on a -- is any detail required on a 501(c)(3)

18    report?

19          MR. STANLEY:  So that's a good question.  I

20    can't figure out why they are not filing what's called a

21    990.  Churches don't file 990s, as I understand, but

22    this really isn't a church.  I'm trying to figure this

23    out in my own mind.  I haven't done discovery on it.

24          They're a fundraising vehicle for a religious

25    cause, but they're not, in and of themselves, a church.

1    I don't know if they got --

2              THE COURT:   One aspect is a church, is it not?

3              MR. STANLEY:   I guess Catholic Charities is a

4    church, and I just don't understand whether the IRS

5    would require --

6              THE COURT:   What is Believers Church?

7              MR. STANLEY:   Believers Church is in India,

8    although there is a Believers Church in Texas, right?

9              MR. WOODWARD:   Believers Eastern Church of

10   Wills Point.

11             MR. STANLEY:   There's a Believers Eastern

12   Church of Wills Point.  Believers Church is not an

13   American entity.  It is an Indian entity; and even

14   though it's controlled by K. P. Yohannan as a

15   metropolitan, they don't have a duty to the Americans.

16   They do have a duty to file FC-4s and FC-6s in India

17   reflecting the receipt and use of foreign donations.

18   I'm not sure what other requirements they have in India,

19   and I'm trying to figure that out on my own also.

20             THE COURT:   All right.

21             MR. STANLEY:   But that's what I want to ask

22   Dr. Yohannan, "What did you do with the money and what

23   kind of books are."

24             You know, you raise a really good question

25   about something else when you mention the auditors

1  because ostensibly both the ECFA, which ostensibly

2  conducted audits and gave a Good Housekeeping seal of

3  approval -- and Bland Garvey -- in order to do that,

4  they would have had to have all the books and records

5  handed over to them.  Certainly a competent CPA firm, if

6  they are doing an audit, has to test everything.  So

7  there might be a way to get some stuff if they don't

8  have it.  We haven't let loose on that.

9      We're planning on -- if ECFA won't cooperate, I

10 guess we have to go to the court in Virginia and get

11 authority to serve discovery.

12     THE COURT:  And you've sued an entity called

13 Gospel for Asia-International.  Defendants contend that

14 that is a nonexistent -- currently nonexistent entity.

15 What is your knowledge of this entity?

16     MR. STANLEY:  You know, it's really befuddling

17 to us.  We see correspondence and everything that shows

18 it still exists.  Mr. Mowrey has represented to us it no

19 longer exists.  We don't know whether it was ever

20 formally recognized by any governmental entity.  It

21 appears to be a joint venture of sorts between Gospel

22 for Asia-Germany and Canada and some others.

23     MR. WOODWARD:  And U.S.

24     MR. STANLEY:  And U.S., but never formally

25 filed to our notice.

1         I don't know.  It's one of the issues we've got

2    to handle in discovery.  They had not appeared by

3    counsel, and I just don't know how to answer that.

4         THE COURT:  All right.  Well, I think that the

5    point of where you were going is that you contend that

6    the proceeding should not -- discovery should not be

7    bifurcated because the overlap would be -- the overlap

8    would swallow any efficiencies to be gained by

9    bifurcating?

10        MR. STANLEY:  I truly can't tell the Court much

11   more than I'm going to be able to prove at trial that I

12   don't need to have a good handle on for class

13   certification at some point.  I mean -- well, yeah --

14   I'm sorry, that's not true.

15        There would be some stuff that we can go ahead

16   and get more discovery on after class certification,

17   that is true.  I'm not sure the areas that we need for

18   class certification will differ that dramatically.

19        May I raise one more point in that regard?

20        THE COURT:  Sure.

21        MR. STANLEY:  I was going to -- I told

22   Mr. Mowrey and counsel that I wanted to call an audible

23   on one thing that we put in the Schedule F, I think, on

24   class certification.  We picked dates for filing a class

25   cert brief and a response in a reply.  I'd like to

1    suggest that that be the final date to file a motion for

2    class cert.

3          It doesn't make sense to limit ourselves to

4    wait until December if, for instance, we can file in

5    September or in July.  And then I'd like to keep the

6    same time periods 30 days later to file a response, so

7    long as it's not on a holiday -- right, Mr. Mowrey? --

8    and 30 days later to file a reply.

9          And the same thing with the designation of

10   class experts for cert; if we designate an expert, then

11   rebuttal within 30 days.  So in other words, I would

12   like the final time period to file for class cert in

13   December of 2017 -- I'm sorry.  January, January 19 of

14   2018, but leave to file earlier and then set up that

15   time period.

16         I think those are the main issues.  I think we

17   covered pretty well.  We really wanted the Court to

18   understand the breadth of this discovery.  This is not

19   an easy case -- well, it could be an easy case if we

20   just got the information we needed, but it may not be an

21   easy case to get the information and find out where this

22   money's gone.  There have been lots of people trying to

23   track this money for years.

24         I encourage the Court to read the ECFA letter

25   that's attached as Exhibit A, I think, to our -- Exhibit

1  1 to our complaint, and they really detail a lot of

2  these issues that we're facing.

3        THE COURT:  All right.  Thank you.

4        MR. STANLEY:  Thank you.

5        THE COURT:  All right.  Mr. Mowrey, I'll give

6  you an opportunity to put into context the defendants'

7  collectively position as to these allegations; and if I

8  have misstated something, be sure and point that out to

9  me and then all that kind of geared towards why it is

10  that you contend that this would be a good case for

11  bifurcating discovery phases.

12        MR. MOWREY:  Your Honor, I'll take you up on

13  sitting, if that's okay with you.

14        THE COURT:  All right.

15        MR. MOWREY:  I'd probably rather stand but I

16  think I will sit, if that's okay with you.

17        THE COURT:  That's fine with me if Mr. Shults

18  will move because I can't see through him.

19        MR. MOWREY:  So, your Honor, obviously

20  Mr. Stanley covered a lot of ground, and I don't want to

21  go point by point, but I do want to make a couple of

22  points.

23        You read the complaint, and you're shocked by

24  the complaint, but what the complaint doesn't say is

25  probably the most important fact in this case and that

1   is that -- and you heard Mr. Stanley say today, two or

2   three times, line their pockets, that sort of -- that

3   sort of wording.  The ECFA, when they came in and did

4   their report, they did not say one thing about money

5   that was missing, stolen, lining pockets.

6           We have produced already --

7           THE COURT:  Well, there was $20 million that

8   they said had been misappropriated from -- that's not

9   the right word -- redirected from contributions that

10  were intended to be used on the field that the field

11  then sent to the United States to go towards the down

12  payment on this elaborate church.  That's what the --

13          MR. MOWREY:  Well, actually, your Honor, the

14  ECFA, on that point, what they say in their letter --

15          MR. SCHUSTER:  Number 7.

16          MR. MOWREY:  This is Number 7 and Number 8.

17  And there was this allegation that $20 million had been

18  used for the campus, and what is stated in the letter

19  from the ECFA is that ECFA was informed -- this is the

20  second paragraph of Paragraph 8 -- on August 24, ECFA

21  was informed that GFA-India made a gift to GFA of

22  what -- let's call it $20 million -- in 2013 to complete

23  GFA's new office.

24          On August 27, GFA's staff confirmed that the

25  funds relating to the donation were originally received

1    by GFA's gifts restricted for the field, and GFA

2    transferred to field partners to fulfill donor

3    restrictions.

4         The documents -- your Honor, this gets a little

5    complicated, but the documents that we have provided to

6    the plaintiffs show that the $20 million did not come

7    from any U.S. donors.  This was $20 million that

8    GFA-India had.  It was their money.  It was sitting in

9    an account in Canada.

10        There were Canadian donors who had given this

11   money to GFA-India to be used in various purposes.

12   GFA-India directed that money to be given for the campus

13   and then GFA-India fulfilled requests, the specific

14   requests, from internal money in GFA-India to replenish

15   the Canadian account.

16        The bottom line here is that -- and I don't

17   know if the Court followed that, but the bottom line

18   here is that none of that $20 million came from any U.S.

19   donors.

20        THE COURT:  Well, it says in the second

21   sentence that GFA staff confirmed that the funds

22   relating to this donation were originally received by

23   GFA as gifts restricted for the field.

24        I had understood that in the nomenclature used

25   in this letter that they were drawing a distinction

1   between the entity "GFA-India" and the entity "Gospel

2   for Asia, Inc.," and my understanding of how the

3   definition was is that these were contributions to GFA,

4   Inc. that were collected, intended for donations to the

5   field and then transferred back.

6           MR. MOWREY:  What the documents actually

7   show -- and we have a document; there are actually a

8   couple of them --

9           THE COURT:  So the GFA staff was incorrect in

10   their understanding of what the documents show?

11           MR. MOWREY:  I think -- I think it may have

12   been a misinterpretation at the time, your Honor.  The

13   documents show -- I mean, again, this money -- on this

14   particular fact, I mean -- or the allegation, the

15   documents show what they show, and they show that the

16   $20 million came from the Canadian account; and the

17   Canadian account was monies that were for GFA -- they

18   were GFA-India's money but had been originally given by

19   GFA-Canada donors -- or donors in Canada.

20           THE COURT:  The GFA report's nine pages long.

21   Scattered throughout, it sounds like it is drawing

22   assumptions based on information that it has reviewed;

23   but in other places, it specifically says, "We talked to

24   staff, and GFA staff says this; GFA staff says that."

25           How would you characterize the extent to which

1    Gospel for Asia disagrees with the findings or

2    conclusions in the ECFA report?  Is there any part of it

3    that you agree with; half of it's true, half of it's

4    not; or most of it's substantially true?  How would you

5    characterize it?

6               MR. MOWREY:  Your Honor, many of the findings

7    in the report were, in fact, what was happening.  The

8    problem here was really an accounting and the standards

9    for the ECFA.

10              Again, the point here is that they don't say

11   that, well, these funds were taken and spent on boats

12   and planes and properties and all this sort of thing.

13   What they were -- I mean, the very first one here is --

14   and the first couple of points is that there were large

15   monies that were being held, and they thought that to be

16   inappropriate.

17              What's happened since is that money has been --

18   and there's reasons for that, your Honor; but what's

19   happened since, that money has been spent down and has

20   been distributed.

21              Going to the heart of their allegations, we

22   believe that we will be able to show that the monies

23   that were designated went to the particular items that

24   were specified.  What was happening, your Honor, is

25   that -- just to take one example, you have a -- let's

1   say a thousand dollars is given to a Jesus Well, and

2   that thousand dollars went to GFA-India, but it may not

3   have gone to GFA-India direct.  It may have gone to an

4   account in Hong Kong.

5          That money -- this was happening in the past.

6   That money was then sat there.  GFA-India, from its

7   funds, used a thousand dollars of their monies to

8   fulfill the request that had been made by the -- by the

9   U.S. donor.

10         So I believe that we will be able to show that,

11  in fact, the monies that were designated went to all the

12  various things that people gave designations for.  And

13  if I could skip to a -- I say "skip to."  Let me address

14  a point that was discussed a lot here and that's a

15  bifurcation issue.

16         I agree with Mr. Stanley about the bifurcation

17  sort of what -- in one respect in that is what should be

18  bifurcated and what should not.  Our intent here -- and

19  we've already produced approximately 25,000 documents;

20  we intend to produce more certainly in the next nine

21  days, nine or ten days.

22         Much -- many of those documents go to merits.

23  They clearly go to merits.  They don't just deal with

24  class issues.  I do think that there are some areas --

25  if the Court were to certify this case, which, I don't

1   think it will because I think there's too many reasons

2   as to why it shouldn't be certified.  But if it were to

3   certify this case, one of the areas that clearly should

4   be bifurcated are other donors.  Now, they haven't --

5   they have asked in one place for this in the case

6   management plan.  It is mentioned there.

7          We've given them all the information with

8   respect to the Murphys; but when it comes to individual

9   information with respect to all these other donors, that

10  seems to me to be clearly an issue that should be put

11  off, not -- unless this case is certified.

12         With respect to most of these other areas, I'm

13  not sure that we have a disagreement.  We're going to be

14  ending up producing most of the documents that they

15  want.

16         Here is the big issue, and it doesn't really

17  have to do with bifurcation, but I think that the Court

18  should give us some guidance on this today.  If you look

19  at their case management plan, we could go through.

20  They have four pages, and we're going to produce most

21  all the things that they have asked for, except the

22  problem that we have, Mr. Stanley has mentioned over and

23  over how K. P. Yohannan just controls everything.

24         There are many -- there are entities in India:

25  The Believers Church, GFA-India.  K. P. Yohannan is not

1  on the board of those entities.  Is he the metropolitan?

2  Yes, he is the Metropolitan of Believers Church.  Does

3  that mean he has access to all of their records?  No, it

4  doesn't.

5          Now, Mr. Stanley doesn't believe that.

6  Mr. Stanley thinks that whatever K. P. Yohannan wants,

7  he can get; but we have no problem in producing

8  everything we can with respect to the entities that he

9  has sued.  But when it comes to wholly separate entities

10  in India, that's where the rub is.

11          Now, your Honor mentioned, and one of the

12  things that we are prepared to do, they have audits

13  of -- that have been done for GFA-USA for the last --

14  well, for I don't know how long -- when they started,

15  but they have gotten them for a number of years.

16          In the last couple of years, in order for

17  GFA-USA auditors to complete their audit, they requested

18  that there be GAAP audits done of these Indian entities,

19  and we will produce those.

20          And what the plaintiffs are going to say -- I

21  mean, you heard Mr. Stanley say, "Well, they can account

22  for 18 percent of these funds."  I think he knows that

23  that is incorrect.  The FC-6 reports, they only report

24  monies that go into Indian accounts.  They do not report

25  monies that go to GFA-India's accounts in other -- in

1  other locations.  And in order for the GFA-USA to

2  complete their reports, they requested that GAAP audits

3  be done for the various entities that monies were given

4  to.  And we'll provide those.  And we'll provide them --

5  they were given to the U.S. auditors as we understand

6  them and so they -- it seems to me, your Honor, that

7  that should certainly be the first step in satisfying

8  the plaintiffs that these monies went to where they were

9  represented they should go.

10         What I was going to say at the outset is that

11  what is glaringly missing in this case is properties,

12  residences, planes, boats, yachts.  We have provided

13  their tax returns.  I can tell you that Mr. K. P.

14  Yohannan, he receives no income from his -- as I

15  understand it, he receives no income from any source in

16  India.  When he's over there, he stays at a particular

17  house that's a very modest residence, he eats on the

18  campus with other people, but he receives no -- he

19  receives no income there.  And there's -- this is not

20  the kind of situation I think that they would like to

21  portray that we know of -- all of us have seen -- where

22  these TV evangelists and these people come in and they

23  are out living the high life.  That just is not going to

24  be the case here.

25         THE COURT:  Well, Mr. Stanley has alleged to

1   the Court that there's all sorts of real estate and

2   other assets that are in Mr. Yohannan's name personally,

3   and what I hear you saying is that's just not so.

4            MR. MOWREY:  That's just not true.  There may

5   be, your Honor -- and we haven't actually seen any

6   documents yet with properties in his name.  There may be

7   some properties where he is named as a trustee,

8   similarly to -- I don't know how it is here in

9   Fayetteville, but in Dallas, I write a check on my --

10  for my car tax to John Ames, who happens to be the

11  county commissioner.  Well, that doesn't go into John

12  Ames' pocket, but that's the name that it goes to.

13           So there may be some instances where properties

14  are -- where there has to be a name associated, but

15  actually I haven't seen any of those yet, if they are

16  there.  But in terms of properties that he personally

17  owns, no, I think the evidence is going to be that that

18  is just simply not the case.

19           THE COURT:  What about these so-called

20  for-profit entities in India?  I guess that presumes

21  that they make a profit.  But if they were to make a

22  profit, where does that money go?

23           MR. MOWREY:  Well, first of all, your Honor,

24  let's take the rubber plant.  The rubber plant, as I

25  understand it, was purchased back in the early 2000s,

1   way before any of the allegations in this case.  The

2   rubber plant is, again, as I understand it, was

3   funded -- purchased entirely with a loan in India; had

4   nothing to do with U.S. donors.

5          These entities that are, quote, for profit,

6   they use that profit for the charitable purposes.  But I

7   think, your Honor, that the evidence is going to show

8   that perhaps with the exception of the hospital, where

9   people make medical -- where there may be some donations

10  to the hospital and so forth, these entities -- for

11  example, the soccer team.

12         The soccer team is -- has nothing to do with

13  GFA.  Nothing to do with GFA.  It's associated with a

14  particular diocese, I think, in India that's part of the

15  Believers Church.  Again, Believers Church has many,

16  many churches within its umbrella, many diocese, and

17  some of those diocese have certain organizations that

18  they are connected to, but it has nothing to do with the

19  monies that are given by U.S. donors here.  I think

20  that's what the evidence is going to -- is going to

21  show.

22         So this whole idea of monies are being raised

23  for children and they, in fact, don't get to children --

24  I mean, for example, your Honor, the Murphys who are

25  here today, as I understand looking at their records,

1   much of their dol- -- many of their dollars were given

2   to children, and they wrote letters to these children

3   and the children wrote them back.

4         Your Honor pointed out the language that was on

5   the donation slips, and I think the one that's attached

6   in the complaint is 2012, perhaps.  But in looking at

7   the Dicksons' records -- excuse me, the Murphys'

8   records, if you look in the statement for January of

9   2008 -- which you don't have.  I mean, these were

10  produced in the documents that the plaintiffs now have

11  produced by the -- by the Murphys -- it has the same

12  language.  It has the same, "We'll do our best to" --

13        THE COURT:  Is that an IRS-required disclaimer?

14        MR. MOWREY:  Your Honor, Mr. Stanley mentioned.

15  I'm not sure that it is a required disclaimer.  I think

16  certainly the fact that you didn't receive other goods

17  is a -- has to be there because if, in fact, it did

18  receive other, you know, goods, then the cost of those

19  goods has to be deducted from the contribution.  So I

20  think that is a requirement.

21        But when you say that -- this statement that

22  all contributions to Gospel for Asia -- and I'm reading

23  the one here from Jan- -- for the Murphys of January

24  2008:  "All contributions to Gospel for Asia are income

25  tax deductible unless otherwise indicated and are made

1   with the understanding that GFA has complete discretion
2   and control over the use of all donated funds.  However,
3   we are committed to apply your gifts according to your
4   designations."
5           So it has the same -- it's Bates stamped M4,
6   yes, M4.
7           So that language has not been -- that wasn't
8   created after the ECFA came out.  That language has been
9   there.
10          And one of the reasons, your Honor, we think
11  that this case can never be certified is that people
12  give for all sorts of reasons.  I mean, the Murphys in
13  this case, for example, and the Dicksons, which are
14  here, are former employees.  They gave some of their
15  money for that.  There are people, the Murphys, who have
16  given for children and then there's others that give for
17  hospital or medical work.
18          So the reasons that people give are going to be
19  myriad, and --
20          THE COURT:  I take it you would agree that no
21  one gave because they believed they were going to be
22  defrauded?
23          MR. MOWREY:  Of course not, yes.  I mean, of
24  course not, knowing --
25          THE COURT:  Isn't that the thumbs-up or

1  thumbs-down question?  I mean, people can give for lots

2  of different reasons; but if they gave and, if

3  established, if credible and established that monies

4  were not used, then what difference does it make what

5  was, you know, pulling at the heartstrings or what

6  motivated any particular donor?

7       MR. MOWREY:  This is -- this is the -- in the

8  45-page complaint or whatever it is, the crux of the

9  complaint, it's on Paragraph 45 of the complaint.  This

10  is the -- this is the allegation.

11       If you turn to Page 34, Paragraph 45, here's

12  what the plaintiffs have to prove in order to prevail at

13  class cert:  Every single donation, the Murphys -- and

14  you can add in there and every other class member --

15  made to GFA was made only with the understanding based

16  entirely on defendants' representations that 100 percent

17  of the donation would be applied exactly as designated.

18  The defendants misdirected the Murphys' donated to GFA

19  for purposes the Murphys did not designate.

20       Here's the critical sentence:  Had the Murphys

21  known defendants would not apply 100 percent of every

22  donation exactly as they designated, they would not have

23  donated to GFA.

24       Now, your Honor, in my mind it stretches the

25  imagination to believe that that allegation is true to

1   every donor.  What if 90 percent went?  Would some

2   people give and some people not?  Of course.  What if

3   80?  What if 60?  One person gives because they know

4   someone there at the organization; one gives because

5   they have been -- they sponsor a child who has been

6   writing them.

7          We understand that there are people that

8   make -- donors that make trips to India unannounced to

9   the GFA organization to locate their child.  We

10  understand that not one person has ever said, "I

11  couldn't find my child."

12         So in order for the plaintiffs to prevail, that

13  statement that they make, the last sentence of Paragraph

14  45 has to be true for every person in the class, and I

15  think that is just beyond credibility and that's why

16  ultimately I don't think this Court will be able to --

17  just on the certification issue, much less the merits --

18  certify this case.

19         THE COURT:  All right.  Your answer raises

20  standing as an affirmative defense.  Tell me what that's

21  about.

22         MR. MOWREY:  Well, as a general proposition, if

23  you give money to your church or wherever you give it,

24  you do not have standing to sue.  Once the money is

25  given -- and different states handle this in different

1  ways.  Some states would say that is an issue for the

2  attorney general to take up.

3           So the general proposition is that a donor does

4  not have standing once they have given the money.  Now,

5  that is the general proposition.  There are certainly

6  exceptions.

7           If money has been raised -- I mean, they allege

8  fraud -- and this is an area that we will need to

9  develop in terms of just the legal portion -- but it

10  seems to me there is a difference in saying we want you

11  to give money for a specific purpose, and we get that

12  $100 from a donor and then we put it in our pocket.

13  That is one situation, which I don't think they will be

14  able to prove.

15           The other situation is, we want $100 for a

16  specific situation and we didn't get the $100 to the

17  particular situation as quickly as we should; or, we got

18  it done in a manner that isn't according to what the

19  plaintiffs would like it to be done.  Because, again,

20  what was done here and -- historically was that when

21  money was given here, the request was fulfilled in

22  India, with funds in India, so that when the Murphys

23  gave money to a child or when monies were given to --

24  those requests were fulfilled.

25           I mean, money is fungible, your Honor.  Even if

1  the monies -- even if you could trade -- even if the

2  monies were given directly, they're going to be

3  collected in an account and money -- you know, there's

4  going to be a check written on an account.

5           I mean, it's not like the $100 that a person

6  gives, you know, has ink on it and you can -- when it

7  leaves you and the hundred dollars ends up -- that same

8  hundred dollars ends up somewhere, where it's supposed

9  to be.

10          The important thing is that if $100,000 was

11  raised for children that $100,000 went to those

12  children.  Seems to me that is the -- that's what the

13  donors expected, and that's what I think we'll be able

14  to prove.

15          THE COURT:  So it's not Article III standing

16  that you're premising this on?

17          MR. MOWREY:  No.

18          THE COURT:  All right.

19          MR. MOWREY:  No, it's not Article III standing,

20  your Honor.

21          THE COURT:  All right.  You also raise statute

22  of limitations.

23          MR. MOWREY:  Right.

24          THE COURT:  What is the statute of limitations

25  and what is the accrual date?

1          MR. MOWREY:  I'm actually glad you raised that

2    question, your Honor, because it relates to a dispute

3    that we have with the plaintiffs with respect to

4    discovery.  I think they have asked for the past ten

5    years, or something of that sort.  We have offered to go

6    back to 2012.  We think that four years from -- back

7    from the date the Dicksons filed their lawsuit -- the

8    Dicksons filed their lawsuit in -- I believe in February

9    of '16 and so limitations would be tolled during that

10   time.

11          So we think that four years is an appropriate

12   time to go back.  RICO is four years.  Of course, they

13   implicate their unjust enrichment claims, their fraud

14   claims.  States -- different states have different

15   statute of limitations.  So we think that four years is

16   going to catch most of the claims that they would have.

17          Now, with respect to -- they would say, "Well,

18   we didn't know about this fraud.  We didn't know about

19   this."  First of all, I heard Mr. Stanley just say today

20   that people have been looking at this for years; and in

21   their own complaint, they take public information to

22   prove the -- prove their case.  It's on one of their

23   exhibits it goes back to -- it's Exhibit 5 in their

24   complaint.

25          If you look at their complaint, Exhibit 5, this

1   is the document that they put together from public

2   sources, I suppose, and it goes back to 2007.

3        So the point is here this was not a -- being

4   liberal to the plaintiffs.  If it was a fraud, it wasn't

5   a fraud that was covered up because they've got

6   information in their own complaint that goes back to

7   2007.

8        So we think that the statute of limitations,

9   your Honor, there needs to be some reasonable time for

10  discovery and then we believe that they are not going to

11  go behind the -- be longer than the statute of

12  limitations; for example, the discovery rule is just not

13  going to apply here because of admissions they have

14  already made in their own complaint.

15       THE COURT:  Did Gospel for Asia use its

16  certification by ECFA as part of its, for lack of a

17  better word, marketing or appeal to donors?

18       MR. MOWREY:  Well, the ECFA, your Honor, Gospel

19  for Asia was a founding member of the ECFA.  What Gospel

20  for Asia was doing in terms of a number of the points

21  that were raised by ECFA, ECFA looked at them every

22  year.

23       So it wasn't until 2015 or whenever it was that

24  they come up with this laundry list of items.  Our folks

25  had many meetings with them about this, and as you can

1   see from the letter itself, many of these items they

2   have begun to change their procedures, and there's no

3   question but that ultimately the GFA would like to get

4   back in the good graces of ECFA.

5          There are -- there are many religious

6   organizations that are part -- say they are a part of

7   the ECFA, and it is clearly an important aspect to their

8   ministry, and their ministry has been hurt because they

9   are not part of the ECFA.

10          So the fact is that, as I understand it -- and

11  I think the discovery will bear out -- is that even

12  though we wanted to continue to work with ECFA, ECFA

13  wrote the letter -- and they had the right, I suppose,

14  to do that -- but again, you know, when you get behind

15  what is in the ECFA letter, it really has to do with

16  accounting and certain things that they were doing; for

17  example, holding these large amounts of money that the

18  ECFA did not like.

19          There was nothing in there about, "Well,

20  there's millions of dollars that are lining the pockets"

21  or they are just, they can't be accounted for.  And

22  that's why, your Honor, we have -- we would like to

23  think that if, once we produce these GAAP audits, that

24  that will tie the -- sort of the loose ends for the

25  plaintiffs.

1    THE COURT:  All right.  On the concealment

2    issue, though, to the extent that Gospel for Asia was

3    using the certification symbol, kind of like somebody

4    that makes toasters might put the UL symbol on the box

5    of their toaster, when they advertise it for sale, do

6    you think that noncompliance and findings in subsequent

7    years that Gospel for Asia -- and again, I realize this

8    is one-sided, but if the idea is that they were, at the

9    same time, in effect, representing to donors that they

10   were complying with all of the provisions required by

11   the ECFA when, in fact, they weren't, is that evidence

12   of concealment that would at least warrant discovery

13   back beyond what you would contend to be a bar date set

14   by the filing of a complaint in 2016?

15        MR. MOWREY:  Your Honor, ECFA looked at I don't

16   know -- I think it was an annual basis.  They looked

17   regularly at GFA and had no issues with them until this

18   came up.

19        All of the facts that were -- that ECFA came up

20   with, these were not concealed by anyone.  I mean, these

21   were --

22        THE COURT:  So were these issues that had

23   developed within the fiscal year of the audit?

24        MR. MOWREY:  Well, some of these had been going

25   on before and ECFA had not had an issue with them.

1  Again, this was not -- this was not someone coming in

2  and discovering something that was hidden from them.

3  It's just that it wasn't until this time that ECFA came

4  up with these findings.

5            Now, your Honor, this gets a little -- this

6  will be developed in discovery, and you'll hear this.

7  There has been quite a bit of turmoil within the GFA

8  organization on the, what I'll call the ecclesiastical

9  side.  There are a number of disgruntled employees.

10  There were issues over governance.  There is a blogger

11  that regularly blogs.  I'm certain that there will be

12  something about this hearing on his blog because he

13  follows the PACER regularly in everything that comes

14  out, and there are a group of people that are -- they --

15  it's a little bit of a family feud between these

16  ex-employees and GFA.

17            This all happened around the time that the ECFA

18  issues came up.  So again, the issues that are involved

19  in the ECFA letter, none of these were hidden from ECFA.

20  These were -- all these facts were available to them at

21  any -- the years before or whatever.  It's just that at

22  that particular time, they decided that they would raise

23  these as issues.  And I think that's what the facts are

24  going to -- our facts are going to bear out.

25            THE COURT:  All right.  The Dickinsons are here

1  today.  I only looked at their complaint very -- on a

2  very, very cursory basis, and I understand that there

3  was a -- they were employees of some sort, and there was

4  an arbitration clause in some sort of employment

5  agreement or something like that and that there was a

6  motion to compel arbitration, and Judge Holmes denied

7  that and the Eighth Circuit accepted an interlocutory

8  appeal and stayed discovery in that case.

9         Just so I understand -- and that's all I know

10  about it.  Supposing that the Eighth Circuit were to

11  affirm Judge Holmes, are the causes of action in that

12  complaint substantially similar to the allegations in

13  this complaint such that y'all would be looking to

14  consolidate these matters, or do you view -- from your

15  perspective, do you view these as two separate sets of

16  allegations?

17         MR. MOWREY:  So two responses for that.  First

18  of all, the allegations are substantially similar.  I

19  mean, the individual facts with respect to the Murphys

20  are different than the Dicksons, the most glaring one

21  being that there is not an arbitration provision.  But

22  there's also differences, I'm sure, once we get into

23  discovery as to why they each gave and why they gave

24  funds.

25         But with respect to the causes of action, they

1  are identical; and all the various color that the

2  plaintiffs put around their allegations, they are

3  identical.

4         In response to your question about would we be

5  looking to consolidate, I don't have an answer for that,

6  your Honor.  I haven't thought about it really.  The

7  Eighth Circuit -- I don't know if you saw this on the

8  docket -- they have accepted all the briefing is done,

9  and they -- oh, there's a reply.  They've indicated it

10  will be set for oral argument.  So there will be an oral

11  argument.  So I assume that there will be a decision

12  sometime in the future.

13         Now, by the time that decision comes down,

14  whenever that may be, given our pretty aggressive

15  discovery schedule here, we're going to be pretty far

16  into discovery in this case.

17         THE COURT:  Well, would the Dicksons be members

18  of the class that the plaintiffs are seeking to certify,

19  such that it wouldn't make a difference?

20         MR. MOWREY:  They would be.  They would be a

21  member.  I mean, as the plaintiffs have defined their

22  class, they would be -- they would be members.  Again,

23  another reason as to why a case can't be certified.

24         I mean, if you look at these ex-employees, they

25  have employment -- they have arbitration agreements.

1          THE COURT:  All right.  Well, that was very

2     enlightening, Mr. Mowrey.  I appreciate that.

3          Mr. Stanley, we kind of need to get to dates

4     and deadlines, but I'll give you just a couple moments

5     to respond if you'd like.

6          MR. STANLEY:  And I actually had what I think

7     is either a hair brain idea or a brilliant idea, one of

8     the two.

9          As I say, I've worked with Rob Mowrey before,

10    and I think he's a great lawyer.  And I think that if

11    what he's saying is right, there's just an easy solution

12    to this.

13         He said that all the money was deployed as

14    specified, and what you should know -- you don't know --

15    is that they had ledger accounts.  So if you gave to a

16    donkey, there's a ledger account, said "donkey"; and if

17    you gave to a Jesus Well, it went there.  There are

18    hundreds of these ledger accounts with specific dollar

19    amounts per year as to what came in, okay?  So this is

20    empirically very easy.

21         He said the important thing is that if 100,000

22    is raised for children, then 100,000 went to children,

23    and that's their position.  And I said to the Court, and

24    I'll say it right now:  If that's the case, we lose; we

25    have a terrible case.

1          It seems to me empirically if what they are

2    saying is true, why don't we have the Court appoint an

3    accountant, we'll split the cost, they give the

4    information and let the Court get an independent

5    accountant to come out and look at this and just say,

6    "Give them all the information; you have the proof that

7    the money went as raised went exactly as it said.  Give

8    it to the accountant for those years."

9          The accountant says, "Judge, they're right,

10   pour the plaintiffs out," I'll offer a judgment right

11   now; and if it's wrong, then we have the independent

12   accountant that's done the look, and we save time and

13   money for both sides.

14         THE COURT:  So, in effect, appoint a special

15   master --

16         MR. STANLEY:  Yes, sir.

17         THE COURT:  -- who would employ forensic

18   accountants and dig into this.  I tell you what.  I will

19   let you visit with Mr. Mowrey on your time about that.

20         MR. STANLEY:  Well, and if they don't agree,

21   maybe we'll still file a motion for the appointment of a

22   special master because I think that might be the most

23   efficient way since empirically that's really the rub

24   here.

25         It's not whether someone lined their pockets or

1    he's not as bad as Tilton or he didn't have a big

2    airplane or whatever else.  It's exactly what we said

3    here:  If 100,000 was raised for children and it went

4    for children, great; but if it didn't, then that's what

5    our complaint is.

6            And so we're doing a -- we disagree with a lot

7    of the stuff that they said, but I don't want to go

8    piecemeal with that, but it just seems to me that that's

9    the easiest solution.  Put your money where your mouth

10   is; and if it went exactly as said, just give us the

11   proof and let's let a special master figure it out.

12           THE COURT:  All right.  Well --

13           MR. MOWREY:  Your Honor -- well --

14           THE COURT:  Mr. Mowrey, you want to --

15           MR. MOWREY:  I didn't want to really address

16   that, your Honor, but what I would -- could we look for

17   a minute at the case management?  The case management

18   report sets forth, has four pages of items they want.

19   We have no problem in giving them most of what they

20   want.

21           The rub is -- and this is where I think we need

22   guidance from the Court.  The rub is that they want --

23   they say QuickBooks backup files, complete quarterly

24   year-end financial statements, yearly tax filings and so

25   forth, and they list Believers Church, Gospel for

1   Asia-India, Last Hour Ministries.

2           These are all entities that are not defendants

3   in this case.  They're Indian entities.  He's going to

4   be asking for documents from those.  He says K. P.

5   Yohannan can just snap his fingers and get them, and we

6   say that is not the case.

7           And Mr. Stanley and I, we do have a history.

8   We absolutely don't want to burden the Court with petty

9   disputes.  We've been at this long enough for that.  But

10  on this issue, we're going to have -- we have a -- we're

11  going to have a dispute about this.

12          THE COURT:  Well, did funds from U.S. donors --

13  well, did Gospel for Asia send money, provide money,

14  give money to these Indian entities?

15          MR. MOWREY:  Yes, and that's why we have said

16  we think that these audits that were done for the

17  American auditors should satisfy Mr. Stanley on this.

18  He's got --

19          MR. STANLEY:  May I ask a question, your Honor?

20          MR. MOWREY:  What he is going to -- what he's

21  saying is that, "No, we want the bank statements from

22  all these entities, we want the QuickBooks, the backup

23  files, all of their documents."  And we can't -- our

24  position is we can't give those.

25          THE COURT:  Well, would you --

1          MR. MOWREY:  They're not under our control.

2          THE COURT:  Would you produce the auditors for

3    deposition?

4          MR. MOWREY:  We're certainly going to

5    produce -- we're going to produce their reports, and I'm

6    not even sure -- were these Indian auditors that did

7    them?  I'm not sure they're under our control.

8          I mean, if --

9          THE COURT:  I mean, the problem is in the

10   United States we have, you know, certifications for

11   public accounting and there's GAAP and so on and so

12   forth.

13         MR. MOWREY:  Exactly.

14         THE COURT:  Maybe you know.  I don't know

15   what -- are you saying that these foreign entities were

16   audited based on GAAP?

17         MR. MOWREY:  Exactly, your Honor.  As I

18   understand it, in order for the new accountant -- GFA

19   had new accountants the last couple of years; and in

20   order for those accountants to give an unqualified

21   audit, they requested that there be GAAP audits done of

22   these entities that monies were given to from GFA-USA

23   and that was what was done.  These were audits that were

24   done in order to satisfy the auditors here.

25         THE COURT:  But isn't that kind of a whole -- I

1    mean, the -- well, I don't know what level of access

2    that the United States auditors had to the actual

3    documents by the Indian entities.  So maybe it's good or

4    maybe it's bad, but it sounds kind of like a garbage

5    in/garbage out sort of deal potentially.

6          If the source of their information can't be

7    tested, perhaps they took it at face value; perhaps the

8    plaintiffs will not.

9          MR. MOWREY:  Well, your Honor, I'm not saying

10   they -- I mean, the auditors, in order for them to

11   produce an audit or give an unqualified opinion, they

12   requested this; it was apparently done.  I don't think

13   those auditors would put their name on the line unless

14   they thought that what was given them was sufficient,

15   unless I'm not understanding.

16         THE COURT:  Well, perhaps I need to let y'all

17   visit about that because I'm not fully understanding and

18   appreciating some of the nuances here.

19         I thought you were saying that the auditors of

20   Gospel for Asia requested information in the course of

21   conducting an audit for Gospel for Asia.  What I didn't

22   hear you say was that there is an audit for these Indian

23   entities.

24         MR. MOWREY:  No, no, that is -- there are --

25   there is an audit for these Indian entities.  That's the

1  point.

2          THE COURT:  That the U.S. auditors audited the

3  Indian entities?

4          MR. MOWREY:  They did not audit the entities,

5  but they requested audits by -- to be done by Indian

6  auditors according to GAAP, and they had to certify it

7  in India in order for the U.S. auditors to sign off.  So

8  these were done by Indian -- yes, these were -- these

9  are Indian chartered accountants.

10          THE COURT:  All right.

11          MR. STANLEY:  Your Honor -- sorry.

12          THE COURT:  I was going to say this is --

13  that's probably a little bit beyond the scope that I'm

14  able to absorb and make rulings on today.

15          MR. MOWREY:  Yes, I understand.

16          MR. STANLEY:  I do want to add one more

17  confession, since I made some earlier.

18          THE COURT:  All right.

19          MR. STANLEY:  When I -- I have a lead foot, but

20  when I'm driving next to a policeman, I usually try not

21  to pass the policeman.  The audits that they are talking

22  about in the last two years, after they got in a fight

23  with Bland Garvey and they had to get their new

24  accountant, all of that is relatively new.  So I

25  wouldn't -- I don't know if I'd put much into that, but

1    it's certainly not for the years in dispute here.

2            Regardless of that, the point that Mr. Mowrey

3    raised is interesting.  If the only defendant was Gospel

4    for Asia, it might be harder for us to say, "Yeah, give

5    us these -- all these books and records."

6            So if the only hat he was wearing is "I

7    represent Gospel for Asia," it might be a tougher case

8    for us.  But he represents, and they appeared without

9    qualification, for K. P. Yohannan, and we've offered

10   evidence in here -- and it's in the ECFA report and then

11   we'll offer -- we've got tons of evidence -- that the

12   property is in his name, that we say came from our

13   donations; that the entities are controlled by him.

14           Notwithstanding what Mr. Mowrey says, I've got

15   tons of evidence that he still controls these entities

16   and that he signs off on major transactions.  And if he

17   has that kind of control, the rules of discovery says if

18   it's in your custody or control.  And if those documents

19   are in his control, then we want them.

20           If they are not in his control, you know, we'll

21   have to take that up on -- if he swears and he sits in

22   that witness stand and swears he has no control, he may

23   be subject to perjury but we'll see what happens.  I

24   can't do anything about that.

25           THE COURT:  All right.  Mr. Stanley also said

1  that they may not be willing, for class purposes, to

2  provide you with information and documents that is

3  donor-specific.  What is your position on that?

4        MR. STANLEY:  The issue is really, to prove

5  class certification, we have to prove numerosity.  If

6  they'll stipulate to that, we don't need it.

7        It's commonality and typicality, if they are

8  saying it's all the same or they are saying they're

9  different, then we may need to get into it to see what

10  the donors gave.

11        I think there's a way that we can work with

12  them without getting necessarily donor specific to show

13  that donors gave to these categories that he enunciated

14  earlier.  That may be a shortcut for that.

15        My goal is not to take -- my understanding is

16  there's 100,000 donors roughly per year.  I don't really

17  want to talk about all -- go down and take depositions

18  and get all their stories.  I'm really trying to look in

19  the aggregate to go for class certification; what's this

20  case about.

21        THE COURT:  All right.  Anything else?

22        MR. STANLEY:  No, sir.

23        THE COURT:  All right.

24        MR. MOWREY:  Your Honor?

25        THE COURT:  Yes, sir.

1          MR. MOWREY:  Can I bring up one other point?

2          THE COURT:  Sure.

3          MR. MOWREY:  That has to do with search terms

4    and custodians.  Yesterday we -- well, back at our

5    conference a few -- month or two ago, whenever it was,

6    when we discussed this, plaintiffs said that they were

7    not prepared at that time to give us custodians or

8    terms; they wanted to see some documents.

9          We produced some documents.  Of course, they

10   got a number of documents.  Yesterday we sent them a

11   letter with proposed custodians, as well as some search

12   terms and then we received back from them a list of 35

13   or so terms.

14         And also, even though they didn't give any

15   other custodians, the specific names, they said, "We

16   believe there are custodians at Believers Church and

17   GFA-India who should be included in the initial

18   custodian list."

19         So there are a couple of issues here.  We

20   haven't really had a chance to examine all of their

21   search terms but, for example, we listed ten custodians,

22   or purported custodians, and we gave terms such as

23   audit, F-6, designation report, transfer within five

24   words of wire or cash transfer, that sort of thing.

25         In their thirty terms, we have things like

1  Jesus Wells, Bridge of Hope, Believers Chapel,

2  GFA-India.

3        If you'll look at the totality of their terms,

4  essentially 100 percent or near 100 percent of every

5  e-mail that all these people have written would be

6  caught in these terms, and it seems to me that the idea

7  of the terms is to try to, best you can, to narrow the

8  group of documents that have to be gone through to

9  determine what are relevant.

10        And again, I realize this is a little bit of

11  the weeds, but I wanted some -- I'm bringing this up to

12  get some guidance, if possible, because otherwise, we're

13  going to have a huge amount of documents that will be

14  captured by these searches, and a great number of them,

15  a huge number of them will have nothing at all to do

16  with the issues in this lawsuit.

17        THE COURT:  All right.  I think I got it.

18        Well, I have reviewed all the materials.  I

19  think I have, from a high altitude anyway, understanding

20  of each side's position.

21        I think because of the nature of the

22  allegations and the causes of action being fraud of a

23  level involving diversions, alleged diversions of

24  donated money in the context of many, many entities and

25  subentities, I think that there is going to be a

1    tremendous overlap between class discovery and merits

2    discovery.  And, of course, the Court's required to wade

3    into the merits to a certain extent in performing its

4    rigorous analysis at the class certification level.

5        This is one of those cases that I think that if

6    we attempted to bifurcate discovery, then defining the

7    boundaries where the overlap ends would consume much

8    more of our time fighting about it than would make any

9    efficiencies to be gained worth it.  So I'm going to put

10   in place a scheduling order that envisions combined

11   class and merits discovery.

12       I am sensitive to the issue, if the concern is

13   that there's not, at the certification phase, a need to

14   identify names, the actual names of donors who may have

15   been under the impression that, you know, their names

16   would not be disclosed.  And in the absence of a good

17   reason why the plaintiffs would need to know the actual

18   names, then I can certainly see why that would not be

19   appropriate at this point.

20       So what I'm going to throw out here is two

21   things.  First, I'm going to give you some dates and

22   deadlines that I would propose, and if you'd kind of

23   write these down, and then if you have a major heartburn

24   about the approach or any particular deadline or time

25   frame in between these deadlines, then we can talk about

1  them, but I've got to put something on the board to

2  begin with.

3          And then I want to take up my thoughts on

4  discovery and proportionality, and I don't know that I'm

5  going to be able to resolve any of the specific things

6  that you've raised, but at least generally we can talk

7  about it.

8          So I would propose that the -- that there be a

9  deadline for plaintiffs filing of any motion for class

10 certification to be no later than January 19th of 2018.

11 Of course, "no later than" does not preclude you from

12 filing it earlier.

13          The defendants' response would be due six weeks

14 after the filing of the class certification motion, and

15 the plaintiffs would be given advance permission to file

16 a reply not later than three weeks after the filing of

17 defendants' response.

18          I would propose that we set a hearing on the

19 motion for class certification tentatively for April

20 13th of 2018, and that date, if the briefing -- that

21 date kind of contemplates that the motion for class

22 certification is filed on January 19th.

23          If it's filed substantially earlier than that,

24 then we would pull that date down and find a date closer

25 to when the briefing is completed.

1          Contemplating that the deadline or that the

2    date that the class certification motion would be filed

3    on January 19th, I set some deadlines for class

4    certification disclosures.  If you're going to file

5    sooner than that, then I'll have to figure out a way to

6    articulate that, but I was going to suggest October 15th

7    of this year for plaintiffs' class certification expert

8    disclosures and that the defense provide their

9    disclosures on November 30th.  That's 45 -- effectively

10   45 days later.

11         I was going to propose an overall discovery

12   deadline of November 16th of 2018, followed by a

13   dispositive motion deadline of December 7th of 2017 for

14   dispositive motions and/or, to the extent applicable,

15   motions to decertify; and then I was going to propose

16   that we set the matter for a three-week trial to begin

17   on April 15th of 2019.

18         Let me ask the plaintiffs first, Mr. Stanley,

19   your thoughts.

20         MR. STANLEY:  Your Honor, that would be fine.

21   On the expert thing, that's something we can work out

22   with each other if we file early.  And we may not even

23   have an expert for class cert; so that may obviate the

24   need for that, but we'll work that out with Mr. Mowrey

25   if we do that earlier.  But I generally understand that

1   what the Court's saying is they should have at least 45

2   days for rebuttal expert.

3            THE COURT:  Right.

4            Mr. Mowrey?

5            MR. MOWREY:  Your Honor, we are fine with those

6   dates.  There is one other date I wanted to bring to the

7   Court's attention that was in the case management plan

8   and that is the date by which plaintiffs are required to

9   amend their complaint.

10           Your standard order has -- states whether 90

11  days is sufficient.  They have asked for 180, and we

12  think 90 is sufficient.

13           The problem with 180 is that we'll be

14  substantially into discovery, if not about the end of

15  discovery, when they could amend their complaint and so

16  it would throw the dates off that the Court has just

17  specified.

18           MR. STANLEY:  Your Honor, the problem we have

19  is we don't know what we don't know; and while

20  Mr. Mowrey is correct and gave us 10,088 documents,

21  7,035 of them -- or 70 percent -- were checks and

22  deposit slips that we can do nothing with.

23           So we don't know what we don't know; and if

24  other documents come up that might better -- in

25  discovery that might better inform how we amend our

1  pleading, that's what we're really looking for.

2         I don't know how else to deal with it.

3         THE COURT:  Can you live with five months?

4         MR. STANLEY:  Yes, sir.

5         THE COURT:  All right.  So motion to amend or

6  add parties, I'll back that up a couple days and make it

7  October 13th.

8         MR. STANLEY:  I assume we're saying that's

9  without leave and that later if something is discovered,

10  then we can always seek leave?

11         THE COURT:  Well, actually that's not right.  I

12  think you still need to seek leave.

13         MR. STANLEY:  Oh, for that?

14         THE COURT:  Yeah.

15         MR. STANLEY:  Yes, sir.

16         THE COURT:  Because you don't want to deprive

17  the defendants of the ability to object for whatever

18  reason may be germane.

19         MR. SHULTS:  Your Honor, excuse me.

20         When you were talking about dates and

21  deadlines, the December 7 date after the discovery

22  cutoff, is that dispositive motions?

23         THE COURT:  Dispositive motions and/or, if

24  appropriate, based on the posture of the issues at that

25  time, a motion for decertification.

1      MR. SHULTS:  I think you may have said 2017,

2  but we're talking about 2018; is that correct?

3      THE COURT:  If I said 2017, I was mistaken.

4  2018, yes.

5      MR. SHULTS:  Thank your Honor.

6      THE COURT:  All right.  Let's take up some of

7  the other issues.  I think that defendants had agreed,

8  or perhaps the parties had agreed to complete the

9  production of agreed -- the agreed document exchange

10  with the initial disclosures by May 25th.  Are we still

11  on track for that date?

12      MR. MOWREY:  Yes, your Honor.

13      THE COURT:  All right.  Very, very much

14  appreciate that.

15      There's also a reference to, that y'all have

16  already -- or were getting ready to set a date for an

17  early mediation.  Have y'all -- is that right?

18      MR. STANLEY:  No, sir.  We have a mediator

19  picked out.

20      MR. MOWREY:  We have a mediator picked out and

21  we've discussed mediation.  That's a discussion we need

22  to have in terms of when we do that.  I think the

23  thinking was, when we met, was that we do have a

24  mediation sooner rather than later.

25      THE COURT:  Okay.  With regard to discovery

1   limitations or restrictions, I just don't have enough --

2   of enough nuanced knowledge about the heartland of the,

3   categorically, the types of evidence that exist to give

4   y'all any specific direction.

5          Generally speaking, it would be my view that if

6   Gospel for Asia gave money, paid money, whatever the

7   proper term is, to some other entity, then -- let me put

8   it this way:  If a forensic accountant would need to

9   check off an account for that money in order to see the

10  whole picture, then my view would be that is

11  discoverable, to the extent that Gospel for Asia owns or

12  controls those entities, or if any of the individual

13  defendants owns or controls those entities.

14         My understanding from looking at the -- I'm not

15  sure where I saw it, but it was quoted about

16  Mr. Yohannan, it sounds like he's kind of the hub, and

17  there's a whole bunch of spokes that go out from there.

18  But if he, in effect, has de facto ability to control

19  the finances, deposits, disbursements from these

20  entities, then I'm likely to conclude that that's fair

21  game.

22         MR. MOWREY:  And, your Honor, I fully

23  appreciate that.  I must say it is our position that he

24  does not, and I don't think there will be evidence that

25  he does.  So that is a -- that is a major point of

1   dispute between us and the plaintiffs.  The plaintiffs'

2   position is that he does, and our position is that he

3   does not.  So that's clearly a --

4            THE COURT:  Well, sounds like you've got to get

5   a 30(b)(6) witness or Mr. Yohannan under oath and go

6   from there.

7            MR. MOWREY:  Right.  I agree, your Honor.

8            THE COURT:  With regard to temporal scope,

9   again, I don't really kind of have an appreciation for

10  the significance of when certain facts took place, to

11  the extent that these allegations can be called a scheme

12  to defraud, when the scheme began, when different

13  defendants began their participations.  I just don't

14  have that sort of information.  But for purposes of

15  discovery, the Court would not believe in a case such as

16  this that the discovery date would be coexistent with

17  the latest arguable bar date.

18           By the sake token, I don't know that going back

19  ten years is necessary.  So, you know, if y'all could

20  find something that makes sense, I don't think that I'm

21  going to dictate that today because I just don't

22  understand the nuances of where we're playing here.

23  But, you know, certainly something closer to ten years

24  would be my impression today rather than four years, but

25  I'll leave that to y'all to discuss.

1          With regard to mechanical limitations on the

2    quantity of discovery, this is a case where I think that

3    an amount of interrogatories, more than 25 per side

4    would be appropriate.  I don't know what other documents

5    or questions that the defendants may have for the

6    plaintiffs that have not been taken care of in initial

7    exposures, but -- I'm not going to envision how it may

8    be.

9          What I am going to do is I am going to allow 25

10   interrogatories per party, or defendant; and to the

11   extent that that is insufficient, then you can move for

12   leave to request more.  And if the Court finds that

13   you've made judicious use of all 25 for each defendant,

14   then perhaps we'll authorize more, but I would ask you

15   to make good use of that.  The same will apply for

16   requests for admissions.

17         As it relates to depositions, I'm going to

18   initially allow 20 nonparty depositions.  So in total,

19   you will have 20 depositions, plus the named individual

20   defendants, plus 30(b)(6) depositions of each entity.

21   And to the extent that they designate more than one

22   deponent for 30(b)(6) purposes, that still counts as

23   one.

24         Then let's see where you are, and if you're

25   still plowing fertile ground, and you can establish that

1   to the Court's satisfaction, then the Court will

2   entertain more.  If the Court believes that you're just

3   burdening the defendants and you're not really plowing

4   ground, you're just trying to harass or embarrass

5   people, that's different.  So that will be the Court's

6   order on depositions.

7           With regard to discovery in general, if the

8   defendants perceive that there's a lack of

9   proportionality, then you need to talk to the plaintiffs

10  about that and express to them what the problems are,

11  quantify what the problems are.

12          I mean, it makes perfect sense to me that you'd

13  call up Mr. Stanley and say, "Do you realize that if we

14  put in 'Jesus' into one of our search terms, you're

15  going to basically capture 90 percent of everything that

16  we have sent or received, that doesn't make a whole lot

17  of sense to me.  It's going to cause us a lot of work to

18  find all that, and it's going to cause you a bunch of

19  work that's not meaningful."  That's just kind of common

20  sense.

21          So certainly anywhere where you think that,

22  even if it's discoverable, the way it's being asked for

23  is not proportional, then that's a very valid basis and

24  that's something that y'all need to use common sense.

25  There's a whole roomful of very seasoned, skilled

1  lawyers, and y'all know what makes sense and what

2  doesn't.  I mean, you may have reasonable differences,

3  but I fully trust that y'all can work out something; and

4  if all else fails, you know, agree to two phases.  Agree

5  to some more low-hanging fruit first.

6          You know, if you contend there's nothing there

7  in all these search terms but you can agree, then go

8  ahead and get started on the first batch.  You see

9  what's there; after you see what's there, you may

10  withdraw something that's in your Phase 2 set.  But use

11  common sense and if you can't, you know, agree to it,

12  then obviously get us on the phone and we will make a

13  relevance and a proportionality consideration.

14          Sometimes, Mr. Stanley, if I think it's

15  relevant but they tell me what the cost is and I just

16  think that that sounds credible and you're trying to get

17  to Nth degree and it's just kind of out of proportion

18  and you really want to do it, I may ask you to pull your

19  checkbook out and show me how much you want it and pay

20  them to produce it.  So we've got a lot of different

21  tools that we can use.

22          I think that that is all the territory that I

23  wanted to cover today.  I'm happy to answer any other

24  questions that you may have about our local procedures

25  or any other issues that you think are imperative to

1    take up today.

2             Mr. Stanley?

3             MR. STANLEY:  No, sir.

4             THE COURT:  Mr. Mowrey?

5             MR. MOWREY:  No, your Honor.

6             THE COURT:  All right.  I want to thank all of

7    y'all for personally attending today.  I think it is

8    very, very helpful in complex cases such as this to

9    actually meet in the same room and at least -- of

10   course, you guys know each other, being from Dallas, but

11   it's always nice to see the face and shake the hand of

12   some person before you start litigation in earnest.  It

13   might make you not say bad words to them over the phone.

14   There's something about it being harder to cuss somebody

15   if you've shaken their hands, but sometimes.

16            MR. STANLEY:  Plus, he's my neighbor.  I've got

17   to be really careful.

18            THE COURT:  There you have it.  All right.

19   Again, and thank you to the -- Mr. Murphy for attending

20   today, and we're adjourned.

21            (Proceedings adjourned at 3:34 p.m.)

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Dana Hayden, Federal Official Realtime Court

4    Reporter, in and for the United States District Court

5    for the Western District of Arkansas, do hereby certify

6    that pursuant to Section 753, Title 28, United States

7    Code that the foregoing is a true and correct transcript

8    of the stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page

10   format is in conformance with the regulations of the

11   Judicial Conference of the United States.

12          Dated this 18th day of May, 2017.

13

14

15

16          _____

17          Dana Hayden, CCR, RMR, CRR
            Federal Official Court Reporter

18

19

20

21

22

23

24

25

## $

**$100** [4] - 45:12, 45:15, 45:16, 46:5
**$100,000** [2] - 46:10, 46:11
**$130** [1] - 10:15
**$20** [7] - 31:7, 31:17, 31:22, 32:6, 32:7, 32:18, 33:16
**$287** [1] - 10:14

## '

**'16** [1] - 47:9
**'Jesus'** [1] - 74:14

## 1

**1** [2] - 23:7, 30:1
**10** [1] - 23:14
**10,088** [1] - 68:20
**100** [10] - 12:16, 13:11, 13:18, 13:19, 15:15, 24:20, 43:16, 43:21, 64:4
**100,000** [4] - 54:21, 54:22, 56:3, 62:16
**12** [2] - 23:15, 23:25
**13th** [2] - 66:20, 69:7
**14** [2] - 23:4, 23:5
**1500** [1] - 2:8
**15th** [2] - 67:6, 67:17
**16** [2] - 1:14, 3:8
**1600** [1] - 2:14
**16th** [1] - 67:12
**18** [1] - 37:22
**180** [2] - 68:11, 68:13
**18th** [1] - 77:12
**19** [1] - 29:13
**19th** [3] - 66:10, 66:22, 67:3
**1:36** [1] - 1:14

## 2

**2** [1] - 75:10
**20** [2] - 73:18, 73:19
**200** [1] - 2:14
**2000s** [1] - 39:25
**2007** [2] - 48:2, 48:7
**2008** [2] - 41:9, 41:24
**2012** [3] - 14:3, 41:6, 47:6
**2013** [1] - 31:22
**2015** [1] - 48:23
**2016** [3] - 12:20, 14:1, 50:14
**2017** [6] - 1:14, 29:13, 67:13, 70:1, 70:3,

77:12
**2018** [6] - 29:14, 66:10, 66:20, 67:12, 70:2, 70:4
**2019** [1] - 67:17
**214** [4] - 2:9, 2:10, 2:20, 2:20
**2200** [1] - 2:19
**221** [1] - 2:4
**23** [1] - 5:20
**24** [1] - 31:20
**25** [4] - 22:15, 73:3, 73:9, 73:13
**25,000** [1] - 35:19
**25th** [1] - 70:10
**26** [1] - 3:17
**27** [1] - 31:24
**275** [1] - 11:12
**28** [1] - 77:6
**2800** [2] - 2:19

## 3

**30** [3] - 29:6, 29:8, 29:11
**30(b)(6** [3] - 72:5, 73:20, 73:22
**30th** [1] - 67:9
**34** [1] - 43:11
**35** [2] - 1:24, 63:12
**375-2301** [1] - 2:15
**375-6861** [1] - 2:16
**3:34** [1] - 76:21

## 4

**4** [2] - 15:1, 15:2
**443-0358** [1] - 2:10
**443-4300** [1] - 2:16
**45** [6] - 43:9, 43:11, 44:14, 67:9, 67:10, 68:1
**45-page** [1] - 43:8
**479** [2] - 2:5, 2:5

## 5

**5** [2] - 47:23, 47:25
**501** [2] - 2:15, 2:16
**501(c)(3** [2] - 3:24, 25:17
**521-9600** [1] - 2:5
**521-9996** [1] - 2:5
**5:17-CV-5035** [2] - 1:5, 3:6

## 6

**60** [1] - 44:3
**6116** [1] - 2:8

## 7

**7** [3] - 31:15, 31:16, 69:21
**7,035** [1] - 68:21
**70** [1] - 68:21
**72201-3637** [1] - 2:15
**72701** [2] - 1:25, 2:4
**740-8450** [1] - 2:20
**75** [1] - 11:12
**75206** [1] - 2:19
**75230** [1] - 2:19
**753** [1] - 77:6
**756-8450** [1] - 2:20
**7th** [1] - 67:13

## 8

**8** [2] - 31:16, 31:20
**80** [1] - 44:3

## 9

**90** [4] - 44:1, 68:10, 68:12, 74:15
**96** [1] - 12:22
**98** [1] - 23:5
**99** [2] - 23:5, 23:6
**99.999** [1] - 14:9
**990** [1] - 25:21
**990s** [1] - 25:21

## A

**ability** [2] - 69:17, 71:18
**able** [18] - 18:2, 22:23, 24:17, 28:11, 34:22, 35:10, 44:16, 45:14, 46:13, 60:14, 66:5
**above-entitled** [1] - 77:9
**absence** [1] - 65:16
**absent** [1] - 8:2
**absolutely** [1] - 57:8
**absorb** [2] - 12:21, 60:14
**accepted** [2] - 52:7, 53:8
**access** [3] - 7:20, 37:3, 59:1
**accomplish** [1] - 5:11
**according** [7] - 4:14, 15:11, 15:25, 16:10, 42:3, 45:18, 60:6
**account** [10] - 32:9, 32:15, 33:16, 33:17, 35:4, 37:21, 46:3, 46:4, 54:16, 71:9
**accountant** [9] - 24:8,

55:3, 55:5, 55:8, 55:9, 55:12, 58:18, 60:24, 71:8
**accountants** [4] - 55:18, 58:19, 58:20, 60:9
**accounted** [1] - 49:21
**accounting** [4] - 24:8, 34:8, 49:16, 58:11
**accounts** [4] - 37:24, 37:25, 54:15, 54:18
**accrual** [1] - 46:25
**accurate** [1] - 4:15
**Act** [1] - 4:24
**action** [7] - 4:21, 5:1, 5:5, 52:11, 52:25, 64:22
**actions** [1] - 22:15
**activities** [1] - 4:11
**actual** [3] - 59:2, 65:14, 65:17
**add** [6] - 6:5, 8:20, 43:14, 60:16, 60:16, 69:6
**added** [1] - 16:8
**address** [2] - 35:13, 56:15
**adjourned** [2] - 76:20, 76:21
**administrative** [1] - 13:22
**admissions** [2] - 48:13, 73:16
**admit** [2] - 22:13
**advance** [1] - 66:15
**advertise** [1] - 50:5
**affirm** [1] - 52:11
**afternoon** [1] - 3:5
**aggregate** [1] - 62:19
**aggressive** [1] - 53:14
**ago** [2] - 19:8, 63:5
**agree** [11] - 5:24, 18:8, 34:3, 35:16, 42:20, 55:20, 72:7, 75:4, 75:7, 75:11
**agreed** [8] - 6:23, 15:14, 18:9, 18:11, 70:7, 70:8, 70:9
**agreeing** [1] - 5:14
**agreement** [4] - 7:17, 21:13, 25:9, 52:5
**agreements** [1] - 53:25
**ahead** [2] - 28:15, 75:8
**airplane** [1] - 56:2
**allegation** [5] - 16:23, 31:17, 33:14, 43:10, 43:25
**allegations** [15] - 4:10, 4:16, 5:18, 9:21, 16:15, 22:24, 30:7,

34:21, 40:1, 52:12, 52:16, 52:18, 53:2, 64:22, 72:11
**allege** [5] - 10:8, 10:17, 12:16, 19:14, 45:7
**alleged** [4] - 4:21, 10:7, 38:25, 64:23
**allegedly** [1] - 11:18
**alliance** [1] - 11:17
**allow** [2] - 73:9, 73:18
**allowed** [1] - 15:6
**almost** [2] - 11:14, 24:14
**alone** [1] - 23:15
**altitude** [1] - 64:19
**amend** [4] - 68:9, 68:15, 68:25, 69:5
**American** [2] - 26:13, 57:17
**Americans** [1] - 26:15
**Ames** [1] - 39:10
**Ames'** [1] - 39:12
**amicably** [1] - 20:17
**amount** [2] - 64:13, 73:3
**amounts** [2] - 49:17, 54:19
**analysis** [1] - 65:4
**annual** [2] - 13:8, 50:16
**answer** [4] - 28:3, 44:19, 53:5, 75:23
**anticipate** [3] - 8:9, 8:12, 19:21
**anyway** [1] - 64:19
**apart** [1] - 24:5
**appeal** [2] - 48:17, 52:8
**appeals** [2] - 17:18, 18:20
**APPEARANCES** [1] - 2:1
**appeared** [2] - 28:2, 61:8
**appearing** [2] - 3:9, 3:12
**applicable** [1] - 67:14
**applied** [2] - 25:14, 43:17
**apply** [9] - 15:11, 15:14, 15:25, 16:9, 24:19, 42:3, 43:21, 48:13, 73:15
**appoint** [2] - 55:2, 55:14
**appointment** [1] - 55:21
**appreciate** [3] - 54:2, 70:14, 71:23

**appreciated** [1] - 3:19
**appreciating** [1] - 59:18
**appreciation** [1] - 72:9
**approach** [1] - 65:24
**approaches** [2] - 9:20, 19:10
**appropriate** [6] - 9:15, 19:23, 47:11, 65:19, 69:24, 73:4
**approval** [1] - 27:3
**April** [2] - 66:19, 67:17
**arbitration** [4] - 52:4, 52:6, 52:21, 53:25
**area** [3] - 14:17, 14:20, 45:8
**areas** [4] - 28:17, 35:24, 36:3, 36:12
**arguable** [1] - 72:17
**argument** [2] - 53:10, 53:11
**ARKANSAS** [2] - 1:1, 1:15
**Arkansas** [5] - 1:25, 2:4, 2:15, 4:24, 77:5
**Article** [2] - 46:15, 46:19
**articulate** [1] - 67:6
**Asia** [37] - 3:3, 3:22, 3:23, 3:25, 4:5, 4:8, 11:10, 11:12, 12:3, 12:5, 14:16, 15:6, 19:11, 19:17, 23:16, 23:22, 25:11, 27:13, 27:22, 33:2, 34:1, 41:22, 41:24, 48:15, 48:19, 48:20, 50:2, 50:7, 57:1, 57:13, 59:20, 59:21, 61:4, 61:7, 71:6, 71:11
**ASIA** [3] - 1:7, 1:7, 10:18
**Asia-Canada** [1] - 25:11
**Asia-Germany** [1] - 27:22
**Asia-India** [2] - 11:10, 57:1
**ASIA-INTERNATIONAL** [1] - 1:7
**Asia-international** [1] - 27:13
**aspect** [2] - 26:2, 49:7
**aspects** [1] - 4:10
**assets** [1] - 39:2
**associated** [3] - 8:18, 39:14, 40:13
**assume** [2] - 53:11, 69:8

**assuming** [1] - 20:10
**assumptions** [1] - 33:22
**asterisk** [1] - 15:16
**attached** [2] - 29:25, 41:5
**attempted** [1] - 65:6
**attending** [2] - 76:7, 76:19
**attention** [1] - 68:7
**attorney** [2] - 8:25, 45:2
**attorneys** [2] - 21:12, 22:4
**attorneys'** [2] - 6:25, 8:7
**audible** [1] - 28:22
**audit** [13] - 25:11, 25:12, 25:13, 27:6, 37:17, 50:23, 58:21, 59:11, 59:21, 59:22, 59:25, 60:4, 63:23
**audited** [4] - 24:25, 25:2, 58:16, 60:2
**auditors** [14] - 26:25, 37:17, 38:5, 57:17, 58:2, 58:6, 58:24, 59:2, 59:10, 59:13, 59:19, 60:2, 60:6, 60:7
**audits** [12] - 25:5, 25:8, 27:2, 37:12, 37:18, 38:2, 49:23, 57:16, 58:21, 58:23, 60:5, 60:21
**August** [2] - 31:20, 31:24
**authority** [3] - 10:25, 11:5, 27:11
**authorize** [2] - 21:9, 73:14
**available** [2] - 7:15, 51:20
**Avenue** [3] - 2:4, 2:14, 2:19

**B**

**backup** [2] - 56:23, 57:22
**bad** [3] - 56:1, 59:4, 76:13
**balance** [1] - 23:18
**bank** [2] - 24:7, 57:21
**banks** [1] - 10:14
**bar** [2] - 50:13, 72:17
**based** [5] - 9:21, 33:22, 43:15, 58:16, 69:24
**basis** [6] - 5:5, 22:6,

22:7, 50:16, 52:2, 74:23
**Bassett** [3] - 2:3, 2:3, 3:10
**batch** [1] - 75:8
**Bates** [1] - 42:5
**bear** [2] - 49:11, 51:24
**becoming** [1] - 22:12
**beef** [1] - 18:17
**BEFORE** [1] - 1:13
**befuddling** [1] - 27:16
**began** [2] - 72:12, 72:13
**begin** [3] - 6:3, 66:2, 67:16
**begins** [1] - 20:8
**begun** [1] - 49:2
**behalf** [5] - 1:3, 3:2, 3:9, 3:12, 6:4
**behind** [2] - 48:11, 49:14
**Believers** [17] - 10:19, 11:2, 11:3, 11:9, 26:6, 26:7, 26:8, 26:9, 26:11, 26:12, 36:25, 37:2, 40:15, 56:25, 63:16, 64:1
**believes** [1] - 74:2
**bench** [1] - 8:9
**best** [5] - 5:17, 5:21, 13:14, 41:12, 64:7
**bet** [2] - 15:19, 15:22
**better** [3] - 48:17, 68:24, 68:25
**between** [7] - 20:8, 27:21, 33:1, 51:15, 65:1, 65:25, 72:1
**beyond** [3] - 44:15, 50:13, 60:13
**bifurcate** [2] - 5:23, 20:10, 65:6
**bifurcated** [5] - 20:5, 20:6, 28:7, 35:18, 36:4
**bifurcating** [2] - 28:9, 30:11
**bifurcation** [6] - 22:14, 22:16, 23:10, 35:15, 35:16, 36:17
**big** [3] - 17:10, 36:16, 56:1
**bit** [9] - 12:21, 15:16, 19:6, 22:13, 22:22, 51:7, 51:15, 60:13, 64:10
**Bland** [4] - 25:3, 25:9, 27:3, 60:23
**bleed** [2] - 22:17, 23:12
**blog** [1] - 51:12

**blogger** [1] - 51:10
**blogs** [1] - 51:11
**board** [3] - 4:8, 37:1, 66:1
**boats** [2] - 34:11, 38:12
**books** [4] - 19:21, 26:23, 27:4, 61:5
**bottom** [2] - 32:16, 32:17
**bought** [1] - 12:7
**boundaries** [1] - 65:7
**box** [1] - 50:4
**brain** [1] - 54:7
**breadth** [1] - 29:18
**Bridge** [2] - 11:10, 64:1
**brief** [1] - 28:25
**briefing** [3] - 53:8, 66:20, 66:25
**briefs** [1] - 21:22
**brilliant** [1] - 54:7
**bring** [2] - 63:1, 68:6
**bringing** [1] - 64:11
**broad** [1] - 21:16
**BROOKS** [1] - 1:13
**Brown** [1] - 2:14
**bulk** [1] - 4:1
**bunch** [3] - 11:11, 71:17, 74:18
**burden** [1] - 57:8
**burdening** [1] - 74:3
**business** [2] - 18:9, 19:14
**businesses** [2] - 11:8, 16:19
**buying** [1] - 18:14

**C**

**camel** [1] - 18:10
**camels** [1] - 12:7
**campus** [2] - 31:18, 32:12, 38:18
**Canada** [6] - 11:17, 25:11, 27:22, 32:9, 33:19
**Canadian** [4] - 32:10, 32:15, 33:16, 33:17
**Capitol** [1] - 2:14
**capture** [1] - 74:15
**captured** [1] - 64:14
**car** [1] - 39:10
**care** [3] - 13:21, 18:19, 73:6
**careful** [1] - 76:17
**Carolina** [2] - 25:4, 25:10
**CARROLL** [1] - 1:8
**carveout** [1] - 13:12

**CASE** [2] - 1:5, 1:12
**case** [53] - 3:6, 3:8, 5:17, 6:20, 8:22, 9:13, 9:18, 9:21, 9:22, 11:22, 12:1, 12:2, 12:4, 12:9, 17:10, 18:19, 18:20, 21:15, 22:19, 22:22, 24:14, 29:19, 29:21, 30:10, 30:25, 35:25, 36:3, 36:5, 36:11, 36:19, 38:11, 38:24, 39:18, 40:1, 42:11, 42:13, 44:18, 47:22, 52:8, 53:16, 53:23, 54:24, 54:25, 56:17, 57:3, 57:6, 61:7, 62:20, 68:7, 72:15, 73:2
**cases** [3] - 19:8, 65:5, 76:8
**cash** [1] - 63:24
**catch** [1] - 47:16
**categorically** [1] - 71:3
**categories** [1] - 62:13
**Catholic** [1] - 26:3
**caught** [1] - 64:6
**causes** [7] - 4:20, 5:1, 5:5, 18:21, 52:11, 52:25, 64:22
**CCR** [2] - 1:23, 77:17
**Central** [1] - 2:8
**cert** [7] - 23:12, 28:25, 29:2, 29:10, 29:12, 43:13, 67:23
**certain** [11] - 4:5, 4:10, 6:2, 6:23, 12:15, 13:7, 40:17, 49:16, 51:11, 65:3, 72:10
**certainly** [11] - 14:17, 27:5, 35:20, 38:7, 41:16, 45:5, 58:4, 61:1, 65:18, 72:23, 74:21
**CERTIFICATE** [1] - 77:1
**certification** [20] - 5:20, 5:22, 28:13, 28:16, 28:18, 28:24, 44:17, 48:16, 50:3, 62:5, 62:19, 65:4, 65:13, 66:10, 66:14, 66:19, 66:22, 67:2, 67:4, 67:7
**certifications** [1] - 58:10
**certified** [4] - 36:2, 36:11, 42:11, 53:23
**certify** [6] - 35:25,

36:3, 44:18, 53:18, 60:6, 77:5
**cetera** [1] - 19:23
**chain** [2] - 10:11
**chairman** [1] - 10:18
**chance** [2] - 7:3, 63:20
**change** [2] - 14:16, 49:2
**changed** [1] - 13:6
**changes** [2] - 14:22, 16:12
**channeled** [1] - 16:18
**Chapel** [1] - 64:1
**characterize** [2] - 33:25, 34:5
**charitable** [3] - 3:21, 4:18, 40:6
**Charities** [1] - 26:3
**charities** [1] - 13:17
**charity** [3] - 14:10, 15:21, 18:3
**chartered** [1] - 60:9
**charts** [1] - 24:3
**check** [3] - 39:9, 46:4, 71:9
**checkbook** [1] - 75:19
**checks** [1] - 68:21
**child** [6] - 17:19, 18:11, 44:5, 44:9, 44:11, 45:23
**children** [12] - 40:23, 41:2, 41:3, 42:16, 46:11, 46:12, 54:22, 56:3, 56:4
**Christians** [1] - 18:12
**church** [11] - 10:20, 10:23, 10:25, 11:6, 19:14, 25:22, 25:25, 26:2, 26:4, 31:12, 44:23
**Church** [15] - 11:2, 11:3, 11:9, 26:6, 26:7, 26:8, 26:9, 26:12, 36:25, 37:2, 40:15, 56:25, 63:16
**churches** [2] - 25:21, 40:16
**Circuit** [4] - 8:19, 52:7, 52:10, 53:7
**circumstances** [1] - 13:12
**civil** [1] - 4:25
**claim** [1] - 5:6
**claims** [3] - 47:13, 47:14, 47:16
**class** [36] - 5:18, 5:19, 5:23, 20:5, 20:8, 22:15, 22:20, 23:12, 28:12, 28:16, 28:18, 28:24, 29:2, 29:10,

29:12, 35:24, 43:13, 43:14, 44:14, 53:18, 53:22, 62:1, 62:5, 62:19, 65:1, 65:4, 65:11, 66:9, 66:14, 66:19, 66:21, 67:2, 67:3, 67:7, 67:23
**clause** [1] - 52:4
**clear** [2] - 10:22, 12:13
**clearly** [5] - 35:23, 36:3, 36:10, 49:7, 72:3
**clients** [1] - 13:9
**closer** [2] - 66:24, 72:23
**clue** [1] - 17:4
**Code** [1] - 77:7
**coexistent** [1] - 72:16
**collected** [2] - 33:4, 46:3
**collectively** [2] - 3:13, 30:7
**College** [1] - 2:4
**color** [1] - 53:1
**combined** [1] - 65:10
**comfortable** [1] - 9:10
**coming** [2] - 23:22, 51:1
**commissioner** [1] - 39:11
**commitments** [1] - 8:21
**committed** [5] - 15:11, 15:12, 15:25, 16:9, 42:3
**committee** [2] - 22:5
**common** [7] - 4:23, 16:2, 16:7, 21:19, 74:19, 74:24, 75:11
**commonality** [1] - 62:7
**companies** [2] - 23:15, 23:19
**compel** [2] - 21:10, 52:6
**compelling** [1] - 8:2
**competent** [1] - 27:5
**complaint** [24] - 5:6, 5:19, 12:15, 16:15, 30:1, 10:23, 30:24, 41:6, 43:8, 43:9, 47:21, 47:24, 47:25, 48:6, 48:14, 50:14, 52:1, 52:12, 52:13, 56:5, 68:9, 68:15
**complete** [7] - 15:8, 31:22, 37:17, 38:2, 42:1, 56:23, 70:8
**completed** [1] - 66:25
**completely** [1] - 13:1

**complex** [3] - 23:13, 24:3, 76:8
**complicated** [2] - 20:23, 32:5
**comply** [1] - 15:23
**complying** [1] - 50:10
**concealed** [1] - 50:20
**concealment** [2] - 50:1, 50:12
**concept** [1] - 12:22
**concern** [1] - 65:12
**concise** [1] - 21:1
**conclude** [2] - 14:7, 71:20
**conclusions** [1] - 34:2
**conducted** [1] - 27:2
**conducting** [1] - 59:21
**conference** [4] - 3:9, 8:10, 20:18, 63:5
**Conference** [1] - 77:11
**conferences** [1] - 19:24
**confession** [1] - 60:17
**confidential** [6] - 6:21, 6:24, 7:2, 7:4, 7:10, 7:12
**confidentiality** [2] - 8:11, 21:13
**confirmed** [2] - 31:24, 32:21
**conformance** [1] - 77:10
**connected** [1] - 40:18
**consideration** [1] - 75:13
**consistent** [1] - 4:18
**consolidate** [2] - 52:14, 53:5
**conspiracy** [2] - 10:8, 10:17
**constitution** [1] - 10:23
**constitution's** [1] - 10:22
**consume** [1] - 65:7
**contemplates** [1] - 66:21
**contemplating** [1] - 67:1
**contend** [7] - 4:17, 5:5, 27:13, 28:5, 30:10, 50:13, 75:6
**contention** [1] - 11:25
**contentions** [1] - 6:6
**context** [2] - 30:6, 64:24
**continue** [1] - 49:12
**contribution** [2] - 13:8, 41:19

**contributions** [5] - 15:5, 31:9, 33:3, 41:22, 41:24
**control** [12] - 15:8, 24:21, 24:22, 42:2, 58:1, 58:7, 61:17, 61:18, 61:19, 61:20, 61:22, 71:18
**controlled** [4] - 23:18, 24:1, 26:14, 61:13
**controls** [5] - 19:14, 36:23, 61:15, 71:12, 71:13
**cooperate** [1] - 27:9
**correct** [5] - 6:6, 7:8, 68:20, 70:2, 77:7
**correspondence** [1] - 27:17
**cost** [3] - 41:18, 55:3, 75:15
**counsel** [3] - 17:6, 28:3, 28:22
**countries** [1] - 24:2
**counts** [1] - 73:22
**county** [1] - 39:11
**couple** [8] - 30:21, 33:8, 34:14, 37:16, 54:4, 58:19, 63:19, 69:6
**course** [9] - 42:23, 42:24, 44:2, 47:12, 59:20, 63:9, 65:2, 66:11, 76:10
**COURT** [92] - 1:1, 3:1, 6:13, 6:16, 6:19, 7:5, 7:7, 7:13, 8:14, 9:5, 9:9, 12:12, 14:3, 14:25, 15:3, 15:5, 15:15, 16:11, 16:14, 18:23, 19:1, 20:3, 21:25, 24:24, 25:16, 26:2, 26:6, 26:20, 27:12, 28:4, 28:20, 30:3, 30:5, 30:14, 30:17, 31:7, 32:20, 33:9, 33:20, 38:25, 39:19, 41:13, 42:20, 42:25, 44:19, 46:15, 46:18, 46:21, 46:24, 48:15, 50:1, 50:22, 51:25, 53:17, 54:1, 55:14, 55:17, 56:12, 56:14, 57:12, 57:25, 58:2, 58:9, 58:14, 58:25, 59:16, 60:2, 60:10, 60:12, 60:18, 61:25, 62:21, 62:23, 62:25, 63:2, 64:17, 68:3, 69:3, 69:5, 69:11, 69:14, 69:16,

69:23, 70:3, 70:6, 70:13, 70:25, 72:4, 72:8, 76:4, 76:6, 76:18
**Court** [42] - 1:24, 3:5, 3:7, 3:15, 3:22, 4:4, 4:9, 6:6, 6:22, 7:19, 8:9, 9:17, 19:3, 20:1, 20:17, 20:19, 21:4, 21:5, 21:17, 22:7, 22:18, 28:10, 29:17, 29:24, 32:17, 35:25, 36:17, 39:1, 44:16, 54:23, 55:2, 55:4, 56:22, 57:8, 68:16, 72:15, 73:12, 74:1, 74:2, 77:3, 77:4, 77:17
**court** [2] - 19:24, 27:10
**Court's** [6] - 13:25, 65:2, 68:1, 68:7, 74:1, 74:5
**courtroom** [1] - 7:24
**cover** [1] - 75:23
**covered** [3] - 29:17, 30:20, 48:5
**CPA** [1] - 27:5
**created** [1] - 42:8
**credibility** [1] - 44:15
**credible** [2] - 43:3, 75:16
**critical** [1] - 43:20
**criticized** [2] - 13:16, 25:15
**crowd** [1] - 8:14
**CRR** [2] - 1:23, 77:17
**crux** [1] - 43:8
**current** [1] - 21:17
**cursory** [1] - 52:2
**cuss** [1] - 76:14
**custodian** [1] - 63:18
**custodians** [8] - 11:2, 63:4, 63:7, 63:11, 63:15, 63:16, 63:21, 63:22
**custody** [1] - 61:18
**cutoff** [1] - 69:22

# D

**Dallas** [4] - 2:9, 2:19, 39:9, 76:10
**Dana** [1] - 1:23, 77:3, 77:17
**DANIEL** [1] - 1:8
**date** [17] - 3:16, 29:1, 46:25, 47:7, 50:13, 66:20, 66:21, 66:24, 67:2, 68:6, 68:8,

69:21, 70:11, 70:16, 72:16, 72:17
**Dated** [1] - 77:12
**dates** [6] - 28:24, 54:3, 65:21, 68:6, 68:16, 69:20
**DAVID** [1] - 1:8
**Davis** [2] - 2:18, 3:14
**days** [10] - 7:15, 29:6, 29:8, 29:11, 35:21, 67:10, 68:2, 68:11, 69:6
**de** [1] - 71:18
**deadline** [5] - 65:24, 66:9, 67:1, 67:12, 67:13
**deadlines** [5] - 54:4, 65:22, 65:25, 67:3, 69:21
**deal** [5] - 5:18, 20:2, 35:23, 59:5, 69:2
**December** [4] - 29:4, 29:13, 67:13, 69:21
**Deceptive** [1] - 4:24
**decertification** [1] - 69:25
**decertified** [1] - 13:19
**decertify** [1] - 67:15
**decided** [1] - 51:22
**decision** [2] - 53:11, 53:13
**deducted** [1] - 41:19
**deductible** [2] - 15:6, 41:25
**defendant** [7] - 1:10, 4:6, 24:25, 25:6, 61:3, 73:10, 73:13
**defendants** [20] - 3:12, 4:3, 4:16, 5:4, 8:23, 9:23, 10:3, 11:21, 27:13, 43:18, 43:21, 57:2, 69:17, 70:7, 71:13, 72:13, 73:5, 73:20, 74:3, 74:8
**DEFENDANTS** [1] - 2:12
**defendants'** [6] - 4:11, 11:25, 30:6, 43:16, 66:13, 66:17
**defense** [3] - 14:19, 44:20, 67:8
**defenses** [3] - 5:8, 5:10, 5:13
**define** [1] - 20:7
**defined** [1] - 53:21
**defining** [2] - 9:19, 65:6
**definition** [1] - 33:3
**defraud** [1] - 72:12

**defrauded** [1] - 42:22
**degree** [2] - 24:8, 75:17
**denied** [1] - 52:6
**deny** [2] - 4:16, 5:4
**deployed** [1] - 54:13
**deponent** [1] - 73:22
**deposit** [3] - 10:14, 10:15, 68:22
**deposition** [1] - 58:3
**depositions** [7] - 23:14, 62:17, 73:17, 73:18, 73:19, 73:20, 74:6
**deposits** [1] - 71:19
**deprive** [1] - 69:16
**designate** [7] - 7:3, 7:12, 13:21, 22:4, 29:10, 43:19, 73:21
**designated** [9] - 12:18, 13:3, 16:16, 23:2, 23:5, 34:23, 35:11, 43:17, 43:22
**designating** [1] - 6:23
**designation** [2] - 29:9, 63:23
**designations** [2] - 35:12, 42:4
**desire** [1] - 8:1
**desk** [2] - 22:1, 22:10
**detail** [2] - 25:17, 30:1
**determine** [1] - 64:9
**develop** [1] - 45:9
**developed** [2] - 50:23, 51:6
**Dickinson** [1] - 8:17
**Dickinsons** [1] - 51:25
**Dicksons** [5] - 42:13, 47:7, 47:8, 52:20, 53:17
**Dicksons'** [1] - 41:7
**dictate** [1] - 72:21
**differ** [1] - 28:18
**difference** [3] - 43:4, 45:10, 53:19
**differences** [2] - 52:22, 75:2
**different** [17] - 5:21, 7:23, 8:22, 9:19, 19:9, 23:23, 23:25, 43:2, 44:25, 47:14, 52:20, 62:9, 72:12, 74:5, 75:20
**difficult** [1] - 23:24
**dig** [1] - 55:18
**diocese** [3] - 40:14, 40:16, 40:17
**direct** [1] - 35:3
**directed** [1] - 32:12
**direction** [2] - 21:17,

71:4
**directly** [2] - 14:10, 46:2
**disagree** [1] - 56:6
**disagreement** [2] - 20:11, 36:13
**disagrees** [1] - 34:1
**disbursements** [1] - 71:19
**discern** [1] - 21:6
**disclaimer** [2] - 41:13, 41:15
**disclosed** [1] - 65:16
**disclosures** [5] - 14:17, 67:4, 67:8, 67:9, 70:10
**discoverable** [2] - 71:11, 74:22
**discovered** [2] - 25:4, 69:9
**discovering** [1] - 51:2
**discovery** [49] - 5:14, 5:23, 6:8, 9:20, 12:9, 14:15, 14:20, 19:3, 20:4, 20:10, 20:11, 20:19, 21:22, 22:8, 22:24, 25:23, 27:11, 28:2, 28:6, 28:16, 29:18, 30:11, 47:4, 48:10, 48:12, 49:11, 50:12, 51:6, 52:8, 52:23, 53:15, 53:16, 61:17, 65:1, 65:2, 65:6, 65:11, 66:4, 67:11, 68:14, 68:15, 68:25, 69:21, 70:25, 72:15, 72:16, 73:2, 74:7
**discovery's** [1] - 21:16
**discretion** [2] - 15:8, 42:1
**discuss** [2] - 20:13, 72:25
**discussed** [3] - 35:14, 63:6, 70:21
**discussion** [2] - 6:7, 70:21
**discussions** [1] - 19:5
**disgruntled** [1] - 51:9
**dispositive** [4] - 67:13, 67:14, 69:22, 69:23
**dispute** [5] - 22:8, 47:2, 57:11, 61:1, 72:1
**disputes** [2] - 19:3, 57:9
**distinction** [1] - 32:25
**distributed** [1] - 34:20
**DISTRICT** [2] - 1:1, 1:1

**District** [2] - 77:4, 77:5
**ditch** [1] - 9:3
**diversions** [2] - 64:23
**diverted** [1] - 16:18
**DIVISION** [1] - 1:2
**docket** [3] - 3:5, 7:16, 53:8
**document** [3] - 33:7, 48:1, 70:9
**documents** [26] - 14:15, 19:16, 32:4, 32:5, 33:6, 33:10, 33:13, 33:15, 35:19, 35:22, 36:14, 39:6, 41:10, 57:4, 57:23, 59:3, 61:18, 62:2, 63:8, 63:9, 63:10, 64:8, 64:13, 68:20, 68:24, 73:4
**dol** [1] - 41:1
**dollar** [1] - 17:25, 18:1, 54:18
**dollar-fifty** [1] - 18:1
**dollars** [10] - 9:24, 9:25, 10:4, 35:1, 35:2, 35:7, 41:1, 46:7, 46:8, 49:20
**donate** [1] - 18:18
**donated** [5] - 15:8, 42:2, 43:18, 43:23, 64:24
**donation** [6] - 31:25, 32:22, 41:5, 43:13, 43:17, 43:22
**donations** [6] - 16:6, 22:21, 26:17, 33:4, 40:9, 61:13
**done** [18] - 17:24, 18:15, 25:23, 37:13, 37:18, 38:3, 45:18, 45:19, 45:20, 53:8, 55:12, 57:16, 58:21, 58:23, 58:24, 59:12, 60:5, 60:8
**donkey** [2] - 54:16
**donor** [8] - 32:2, 35:9, 43:6, 44:1, 45:3, 45:12, 62:3, 62:12
**donor-specific** [1] - 62:3
**donors** [21] - 3:21, 12:1, 12:6, 32:7, 32:10, 32:19, 33:19, 36:4, 36:9, 40:4, 40:19, 44:8, 46:13, 48:17, 50:9, 57:12, 62:10, 62:13, 62:16, 65:14
**down** [8] - 9:11, 31:11, 34:19, 43:1, 53:13,

62:17, 65:23, 66:24
**Dr** [2] - 14:1, 26:22
**dramatically** [1] - 28:18
**drawing** [2] - 32:25, 33:21
**driving** [1] - 60:20
**due** [1] - 66:13
**dug** [1] - 12:6
**during** [1] - 47:9
**duty** [2] - 26:15, 26:16

### E

**e-mail** [1] - 64:5
**early** [4] - 14:14, 39:25, 67:22, 70:17
**earnest** [1] - 76:12
**earthquake** [2] - 17:20, 18:11
**easiest** [1] - 56:9
**East** [1] - 1:24
**Eastern** [2] - 26:9, 26:11
**easy** [8] - 12:2, 22:22, 24:9, 29:19, 29:21, 54:11, 54:20
**eats** [1] - 38:17
**ecclesiastical** [1] - 51:8
**ECFA** [35] - 13:16, 13:19, 14:12, 27:1, 27:9, 29:24, 31:3, 31:14, 31:19, 31:20, 34:2, 34:9, 42:8, 48:16, 48:18, 48:19, 48:21, 49:4, 49:7, 49:9, 49:12, 49:15, 49:18, 50:11, 50:15, 50:19, 50:25, 51:3, 51:17, 51:19, 61:10
**edges** [1] - 20:7
**educating** [1] - 18:15
**educational** [1] - 10:12
**effect** [3] - 50:9, 55:14, 71:18
**effectively** [2] - 8:10, 67:9
**efficiencies** [2] - 28:8, 65:9
**efficient** [1] - 55:23
**effort** [1] - 20:16
**efforts** [1] - 13:14
**Eighth** [4] - 8:19, 52:7, 52:10, 53:7
**either** [6] - 7:16, 10:5, 21:2, 23:17, 54:7
**elaborate** [1] - 31:12
**Ellan** [1] - 2:18

**embarrass** [1] - 74:4
**EMERICK** [1] - 1:9
**empire** [2] - 10:12, 19:15
**empirically** [3] - 54:20, 55:1, 55:23
**employ** [1] - 55:17
**employees** [5] - 42:14, 51:9, 51:16, 52:3, 53:24
**employment** [2] - 52:4, 53:25
**encourage** [2] - 21:11, 29:24
**end** [2] - 56:24, 68:14
**ending** [1] - 36:14
**ends** [5] - 20:9, 46:7, 46:8, 49:24, 65:7
**enlightening** [1] - 54:2
**enrichment** [2] - 5:2, 47:13
**Enron** [1] - 11:14
**entered** [1] - 6:22
**enterprise** [1] - 18:9
**enterprises** [1] - 10:10
**entertain** [1] - 74:2
**entirely** [3] - 12:13, 40:3, 43:16
**entities** [33] - 3:4, 3:23, 11:13, 11:16, 16:25, 23:25, 24:25, 36:24, 37:1, 37:8, 37:9, 37:18, 38:3, 39:20, 40:5, 40:10, 57:2, 57:3, 57:14, 57:22, 58:15, 58:22, 59:3, 59:23, 59:25, 60:3, 60:4, 61:13, 61:15, 64:24, 71:12, 71:13, 71:20
**entitled** [1] - 77:9
**entity** [12] - 3:24, 25:2, 26:13, 27:12, 27:14, 27:15, 27:20, 33:1, 71:7, 73:20
**enunciated** [1] - 62:13
**envision** [1] - 73:7
**envisions** [1] - 65:10
**essence** [1] - 4:9
**essentially** [2] - 7:14, 64:4
**establish** [1] - 73:25
**established** [1] - 43:3
**estate** [1] - 39:1
**et** [1] - 19:23
**evangelical** [1] - 18:13
**evangelists** [1] - 38:22
**eventually** [1] - 17:8
**everywhere** [1] - 24:4
**evidence** [9] - 39:17,

40:7, 40:20, 50:11, 61:10, 61:11, 61:15, 71:3, 71:24
**evident** [1] - 5:16
**ex** [2] - 51:16, 53:24
**ex-employees** [2] - 51:16, 53:24
**exact** [1] - 14:4
**exactly** [11] - 7:22, 12:6, 13:21, 23:1, 43:17, 43:22, 55:7, 56:2, 56:10, 58:13, 58:17
**examine** [1] - 63:20
**example** [7] - 34:25, 40:11, 40:24, 42:13, 48:12, 49:17, 63:21
**except** [1] - 36:21
**exception** [1] - 40:8
**exceptions** [1] - 45:6
**exchange** [2] - 16:5, 70:9
**excuse** [2] - 41:7, 69:19
**executive** [2] - 22:4, 22:5
**exhibit** [1] - 14:2
**Exhibit** [6] - 15:1, 15:2, 29:25, 47:23, 47:25
**exhibits** [1] - 47:23
**exist** [1] - 71:3
**exists** [2] - 27:18, 27:19
**expected** [1] - 46:13
**expenses** [1] - 13:22
**experience** [2] - 22:11
**expert** [5] - 29:10, 67:7, 67:21, 67:23, 68:2
**experts** [1] - 29:10
**expired** [1] - 7:19
**exposures** [1] - 73:7
**express** [1] - 74:10
**Expressway** [1] - 2:8
**extent** [1] - 15:6, 24:24, 33:25, 50:2, 65:3, 67:14, 71:11, 72:11, 73:11, 73:21
**eyes** [3] - 6:25, 8:7, 8:25

**F**

**F-6** [1] - 63:23
**face** [2] - 59:7, 76:11
**facie** [1] - 22:23
**facilities** [1] - 10:12
**facing** [1] - 30:2
**fact** [12] - 15:22, 17:7,

17:20, 30:25, 33:14, 34:7, 35:11, 40:23, 41:16, 41:17, 49:10, 50:11
**facto** [1] - 71:18
**facts** [8] - 4:21, 5:12, 50:19, 51:20, 51:23, 51:24, 52:19, 72:10
**fails** [2] - 5:6, 75:4
**failure** [1] - 22:13
**fair** [1] - 71:20
**fairly** [1] - 9:9
**faith** [1] - 20:16
**family** [2] - 4:5, 51:15
**far** [3] - 17:5, 19:16, 53:15
**fashion** [1] - 21:1
**favor** [2] - 17:25, 18:2
**Fax** [4] - 2:5, 2:10, 2:16, 2:20
**FAYETTEVILLE** [2] - 1:2, 1:15
**Fayetteville** [3] - 1:25, 2:4, 39:9
**FC-4s** [1] - 26:16
**FC-6** [1] - 37:23
**FC-6s** [1] - 26:16
**February** [1] - 47:8
**federal** [1] - 15:18
**Federal** [3] - 1:24, 77:3, 77:17
**fertile** [1] - 73:25
**feud** [1] - 51:15
**few** [3] - 12:12, 18:24, 63:5
**fiduciaries** [1] - 12:11
**field** [13] - 10:9, 12:17, 13:23, 16:17, 17:2, 17:8, 31:10, 32:1, 32:2, 32:23, 33:5
**fifty** [1] - 18:1
**fight** [1] - 60:22
**fighting** [1] - 65:8
**figure** [6] - 10:5, 15:20, 25:22, 26:19, 26:11, 67:5
**file** [14] - 20:20, 21:10, 25:21, 26:16, 29:1, 29:4, 29:6, 29:8, 29:12, 29:14, 55:21, 66:15, 67:4, 67:22
**filed** [7] - 3:16, 27:25, 47:7, 47:8, 66:22, 66:23, 67:2
**files** [2] - 56:23, 57:23
**filing** [8] - 20:19, 25:20, 28:24, 50:14, 66:9, 66:12, 66:14, 66:16
**filings** [1] - 56:24

**final** [3] - 10:24, 29:1, 29:12
**finances** [1] - 71:19
**financial** [1] - 56:24
**findings** [4] - 34:1, 34:6, 50:6, 51:4
**fine** [6] - 7:13, 9:11, 19:9, 30:17, 67:20, 68:5
**fingers** [1] - 57:5
**firm** [6] - 8:21, 25:3, 25:10, 25:11, 25:12, 27:5
**Firm** [1] - 2:3
**first** [15] - 10:1, 12:13, 15:19, 20:3, 20:13, 34:13, 34:14, 38:7, 39:23, 47:19, 52:17, 65:21, 67:18, 75:5, 75:8
**fiscal** [1] - 50:23
**five** [2] - 63:23, 69:3
**focus** [1] - 21:21
**focused** [1] - 4:2
**folks** [2] - 11:11, 48:24
**follow** [2] - 15:24, 24:9
**followed** [2] - 32:17, 67:12
**follows** [1] - 51:13
**foot** [1] - 60:19
**FOR** [4] - 1:7, 1:7, 2:2, 2:12
**for-profit** [9] - 10:10, 16:19, 16:21, 16:24, 18:1, 18:5, 18:18, 39:20
**foregoing** [1] - 77:7
**foreign** [2] - 26:17, 58:15
**forensic** [3] - 17:4, 55:17, 71:8
**forensically** [2] - 23:3, 24:6
**formally** [1] - 27:20, 27:24
**format** [1] - 77:10
**formed** [1] - 11:17
**former** [1] - 42:14
**forms** [2] - 4:22, 4:25
**forth** [4] - 40:10, 56:18, 56:25, 58:12
**founder** [1] - 4:4
**founding** [1] - 48:19
**four** [7] - 36:20, 47:6, 47:11, 47:12, 47:15, 56:18, 72:24
**frame** [1] - 65:25
**frames** [1] - 5:25
**fraud** [11] - 4:22, 4:23, 4:25, 10:8, 45:8,

47:13, 47:18, 48:4, 48:5, 64:22
**fraudulent** [1] - 4:12
**free** [3] - 7:24, 7:25, 9:13
**fruit** [1] - 75:5
**fulfill** [2] - 32:2, 35:8
**fulfilled** [2] - 32:13, 45:21, 45:24
**fully** [3] - 59:17, 71:22, 75:3
**funded** [1] - 40:3
**fundraising** [2] - 4:11, 25:24
**funds** [10] - 15:9, 31:25, 32:21, 34:11, 35:7, 37:22, 42:2, 45:22, 52:24, 57:12
**fungible** [1] - 45:25
**future** [1] - 53:12
**fuzzy** [1] - 20:7

**G**

**GAAP** [7] - 37:18, 38:2, 49:23, 58:11, 58:16, 58:21, 60:6
**gained** [2] - 28:8, 65:9
**game** [1] - 71:21
**garbage** [1] - 59:4
**GARLAND** [1] - 1:2
**Garland** [1] - 3:1
**Garvey** [4] - 25:3, 25:9, 27:3, 60:23
**geared** [2] - 4:1, 30:9
**general** [6] - 20:12, 44:22, 45:2, 45:3, 45:5, 74:7
**generally** [4] - 6:1, 66:6, 67:25, 71:5
**germane** [1] - 69:18
**Germany** [2] - 11:16, 27:22
**GFA** [44] - 15:7, 23:18, 31:21, 32:1, 32:8, 32:11, 32:12, 32:13, 32:14, 32:21, 32:23, 33:1, 33:3, 33:9, 33:17, 33:18, 33:19, 33:20, 33:24, 35:2, 35:3, 35:6, 36:25, 37:13, 37:17, 37:25, 38:1, 40:13, 42:1, 43:15, 43:18, 43:23, 44:9, 49:3, 50:17, 51:7, 51:16, 58:18, 58:22, 63:17, 64:2
**GFA's** [4] - 17:5, 31:23, 31:24, 32:1
**GFA-Canada** [1] -

33:19
**GFA-India** [13] - 31:21, 32:8, 32:11, 32:12, 32:13, 32:14, 33:1, 35:2, 35:3, 35:6, 36:25, 63:17, 64:2
**GFA-India's** [2] - 33:18, 37:25
**GFA-USA** [4] - 37:13, 37:17, 38:1, 58:22
**gift** [1] - 31:21
**gifts** [7] - 15:11, 15:25, 16:5, 16:9, 32:1, 32:23, 42:3
**GISELA** [1] - 1:8
**given** [19] - 32:10, 32:12, 33:18, 35:1, 36:7, 38:3, 38:5, 40:19, 41:1, 42:16, 44:25, 45:4, 45:21, 45:23, 46:2, 53:14, 58:22, 59:14, 66:15
**glad** [1] - 47:1
**glaring** [1] - 52:20
**glaringly** [1] - 38:11
**goal** [2] - 12:24, 62:15
**goods** [4] - 16:4, 41:16, 41:18, 41:19
**GOSPEL** [2] - 1:7
**Gospel** [37] - 3:3, 3:22, 3:23, 4:4, 4:8, 10:18, 11:9, 11:12, 12:3, 12:5, 14:15, 15:5, 19:11, 19:16, 23:16, 23:22, 25:11, 27:13, 27:21, 33:1, 34:1, 41:22, 41:24, 48:15, 48:18, 48:19, 50:2, 50:7, 56:25, 57:13, 59:20, 59:21, 61:3, 61:7, 71:6, 71:11
**governance** [1] - 51:10
**government** [2] - 10:25, 23:21
**Government** [1] - 16:8
**governmental** [1] - 27:20
**graces** [1] - 49:4
**granted** [1] - 5:7
**graves** [1] - 3:10
**Graves** [1] - 2:3
**great** [8] - 18:15, 19:9, 23:2, 25:1, 54:10, 56:4, 64:14
**ground** [3] - 30:20, 73:25, 74:4
**group** [3] - 9:14,

51:14, 64:8
**Group** [1] - 2:8
**guarantee** [4] - 12:16, 12:22, 13:11, 15:15
**guaranteeing** [1] - 13:2
**guess** [3] - 26:3, 27:10, 39:20
**guidance** [4] - 21:6, 36:18, 56:22, 64:12
**guys** [1] - 76:10

## H

**hair** [1] - 54:7
**half** [3] - 17:21, 34:3
**hand** [1] - 76:11
**handed** [1] - 27:5
**handle** [5] - 19:3, 25:7, 28:2, 28:12, 44:25
**hands** [1] - 76:15
**hanging** [1] - 75:5
**happy** [1] - 75:23
**harass** [1] - 74:4
**hard** [3] - 10:5, 12:9, 24:6
**harder** [2] - 61:4, 76:14
**Harriet** [2] - 2:18, 3:13
**hat** [1] - 61:6
**Hayden** [3] - 1:23, 77:3, 77:17
**head** [1] - 5:3
**headed** [1] - 8:24
**hear** [4] - 21:23, 39:3, 51:6, 59:22
**heard** [3] - 31:1, 37:21, 47:19
**HEARING** [1] - 1:12
**hearing** [6] - 3:15, 7:9, 21:3, 51:12, 66:18
**hearings** [1] - 7:1
**heart** [1] - 34:21
**heartburn** [1] - 65:23
**heartland** [1] - 71:2
**heartstrings** [1] - 43:5
**held** [2] - 34:15, 77:8
**help** [3] - 13:11, 13:22, 18:13
**helpful** [1] - 76:8
**hereby** [1] - 77:5
**hidden** [2] - 51:2, 51:19
**high** [2] - 38:23, 64:19
**historically** [1] - 45:20
**history** [1] - 57:7
**hmiers@lockelord. com** [1] - 2:21
**hold** [1] - 4:5

**holding** [1] - 49:17
**holiday** [1] - 29:7
**Holmes** [2] - 52:6, 52:11
**honest** [1] - 16:13
**Hong** [3] - 10:15, 23:17, 35:4
**Honor** [47] - 6:11, 8:5, 9:4, 9:17, 30:12, 30:19, 31:13, 32:4, 33:12, 34:6, 34:18, 34:24, 37:11, 38:6, 39:5, 39:23, 40:7, 40:24, 41:4, 41:14, 42:10, 43:24, 45:25, 46:20, 47:2, 48:9, 48:18, 49:22, 50:15, 51:5, 53:6, 56:13, 56:16, 57:19, 58:17, 59:9, 60:11, 62:24, 67:20, 68:5, 68:18, 69:19, 70:5, 70:12, 71:22, 72:7, 76:5
**HONORABLE** [1] - 1:13
**Hope** [3] - 11:10, 11:13, 64:1
**hospital** [9] - 10:11, 16:22, 18:14, 18:17, 18:18, 19:19, 40:8, 40:10, 42:17
**hospitals** [1] - 10:11
**Hour** [1] - 57:1
**house** [1] - 38:17
**Housekeeping** [1] - 27:2
**hub** [1] - 71:16
**huge** [2] - 64:13, 64:15
**hundred** [2] - 46:7, 46:8
**hundreds** [1] - 54:18
**hurt** [1] - 49:8

## I

**idea** [6] - 20:1, 40:22, 50:8, 54:7, 64:6
**ideas** [1] - 5:21
**identical** [2] - 53:1, 53:3
**identified** [1] - 16:20
**identify** [1] - 65:14
**III** [4] - 1:2, 3:2, 46:15, 46:19
**imagination** [1] - 43:25
**imperative** [1] - 75:25
**implicate** [1] - 47:13
**important** [5] - 9:19,

30:25, 46:10, 49:7, 54:21
**impression** [2] - 65:15, 72:24
**improperly** [1] - 25:7
**in/garbage** [1] - 59:5
**inappropriate** [1] - 34:16
**Inc** [6] - 3:3, 10:19, 19:11, 19:17, 33:2, 33:4
**INC** [1] - 1:7
**include** [1] - 4:22
**included** [2] - 16:6, 63:17
**including** [5] - 4:23, 4:24, 5:9, 10:25
**income** [5] - 15:6, 38:14, 38:15, 38:19, 41:24
**incorrect** [2] - 33:9, 37:23
**independent** [3] - 13:17, 55:4, 55:11
**India** [33] - 4:2, 10:14, 11:10, 17:22, 23:25, 25:12, 26:7, 26:16, 26:18, 31:21, 32:8, 32:11, 32:12, 32:13, 32:14, 33:1, 35:2, 35:3, 35:6, 36:24, 36:25, 37:10, 38:16, 39:20, 40:3, 40:14, 44:8, 45:22, 57:1, 60:7, 63:17, 64:2
**India's** [2] - 33:18, 37:25
**Indian** [14] - 23:21, 26:13, 37:18, 37:24, 57:3, 57:14, 58:6, 59:3, 59:22, 59:25, 60:3, 60:5, 60:8, 60:9
**indicated** [3] - 12:20, 41:25, 53:9
**individual** [4] - 36:8, 52:19, 71:12, 73:19
**Individually** [1] - 1:3
**individually** [2] - 3:2, 4:3
**individuals** [3] - 3:4, 19:12
**inform** [1] - 68:25
**informally** [1] - 9:10
**information** [17] - 6:21, 6:24, 25:16, 29:20, 29:21, 33:22, 36:7, 36:9, 47:21, 48:6, 55:4, 55:6, 59:6, 59:20, 62:2,

72:14
**informed** [2] - 31:19, 31:21
**initial** [4] - 3:8, 63:17, 70:10, 73:6
**ink** [1] - 46:6
**instance** [2] - 9:24, 29:4
**instances** [1] - 39:13
**institutions** [1] - 16:19
**insufficient** [1] - 73:11
**intend** [1] - 35:20
**intended** [2] - 31:10, 33:4
**intent** [1] - 35:18
**intentions** [2] - 4:18, 17:16
**interested** [1] - 17:12
**interesting** [2] - 17:13, 61:3
**interlocutory** [1] - 52:7
**internal** [1] - 32:14
**international** [1] - 27:13
**INTERNATIONAL** [1] - 1:7
**interrogatories** [2] - 73:3, 73:10
**invest** [1] - 17:25
**involved** [3] - 5:25, 22:2, 51:18
**involves** [1] - 6:20
**involving** [1] - 64:23
**IRS** [3] - 15:23, 26:4, 41:13
**IRS-required** [1] - 41:13
**issue** [15] - 7:19, 8:6, 8:13, 20:15, 20:25, 35:15, 36:10, 36:16, 44:17, 45:1, 50:2, 50:25, 57:10, 62:4, 65:12
**issues** [17] - 19:25, 21:6, 28:1, 29:16, 30:2, 35:24, 50:17, 50:22, 51:10, 51:18, 51:23, 63:19, 64:16, 69:24, 70:7, 75:25
**items** [4] - 34:23, 48:24, 49:1, 56:18
**itself** [1] - 49:1

## J

**James** [2] - 2:3, 3:10
**Jan** [1] - 41:23
**January** [7] - 29:13, 41:8, 41:23, 66:10,

66:22, 67:3
**Jesus** [6] - 9:25, 10:1, 10:4, 35:1, 54:17, 64:1
**jgraves@ bassettlawfirm. com** [1] - 2:6
**John** [2] - 39:10, 39:11
**joint** [4] - 3:17, 3:19, 20:24, 27:21
**judge** [1] - 21:24
**Judge** [4] - 22:2, 52:6, 52:11, 55:9
**judgment** [1] - 55:10
**Judicial** [1] - 77:11
**judicious** [1] - 73:13
**July** [1] - 29:5
**jump** [1] - 9:3
**jury** [3] - 14:7, 15:13, 17:17

**K**

**K.P** [6] - 1:7, 10:18, 11:7, 19:13, 19:19, 24:2
**keep** [1] - 29:5
**kids** [1] - 18:15
**kind** [21] - 6:7, 12:9, 12:21, 20:24, 21:5, 21:19, 24:4, 26:23, 30:9, 38:20, 50:3, 54:3, 58:25, 59:4, 61:17, 65:22, 66:21, 71:16, 72:9, 74:19, 75:17
**kingpin** [1] - 10:17
**knowing** [2] - 17:12, 42:24
**knowledge** [2] - 27:15, 71:2
**known** [2] - 8:4, 43:21
**knows** [3] - 18:6, 22:18, 37:22
**Kong** [3] - 10:15, 23:17, 35:4

**L**

**lack** [2] - 48:16, 74:8
**language** [8] - 12:20, 13:7, 13:10, 14:5, 41:4, 41:12, 42:7, 42:8
**lanka** [1] - 11:18
**large** [4] - 9:14, 11:3, 34:14, 49:17
**Last** [1] - 57:1
**last** [6] - 8:17, 37:13,

37:16, 44:13, 58:19, 60:22
**latest** [1] - 72:17
**laundry** [1] - 48:24
**Law** [2] - 2:3, 2:8
**law** [4] - 4:23, 8:3, 15:7
**laws** [1] - 15:18
**lawsuit** [3] - 47:7, 47:8, 64:16
**lawyer** [2] - 22:12, 54:10
**lawyers** [3] - 9:12, 19:9, 75:1
**lead** [2] - 6:7, 60:19
**least** [5] - 23:25, 50:12, 66:6, 68:1, 76:9
**leave** [6] - 29:14, 69:9, 69:10, 69:12, 72:25, 73:12
**leaves** [1] - 46:7
**ledger** [3] - 54:15, 54:16, 54:18
**legal** [1] - 45:9
**less** [1] - 44:17
**letter** [11] - 20:21, 20:24, 29:24, 31:14, 31:18, 32:25, 49:1, 49:13, 49:15, 51:19, 63:11
**letters** [1] - 41:2
**level** [3] - 59:1, 64:23, 65:4
**liberal** [1] - 48:4
**life** [1] - 38:23
**likely** [2] - 20:20, 71:20
**likewise** [1] - 7:25
**limit** [1] - 29:3
**limitations** [9] - 5:9, 46:22, 46:24, 47:9, 47:15, 48:8, 48:12, 71:1, 73:1
**line** [6] - 6:8, 11:21, 31:2, 32:16, 32:17, 59:13
**lined** [2] - 17:9, 55:25
**lining** [2] - 31:5, 49:20
**list** [4] - 48:24, 56:25, 63:12, 63:18
**listed** [1] - 63:21
**literally** [1] - 22:3
**litigate** [1] - 5:17
**litigation** [1] - 76:12
**live** [1] - 69:3
**living** [1] - 38:23
**LLC** [3] - 11:12, 11:13
**LLP** [2] - 2:14, 2:18
**loan** [1] - 40:3

**local** [1] - 75:24
**locate** [1] - 44:9
**locations** [1] - 38:1
**Locke** [1] - 2:18
**locked** [1] - 7:20
**look** [11] - 9:3, 21:17, 36:18, 41:8, 47:25, 53:24, 55:5, 55:12, 56:16, 62:18, 64:3
**looked** [4] - 48:21, 50:15, 50:16, 52:1
**looking** [8] - 14:25, 40:25, 41:6, 47:20, 52:13, 53:5, 69:1, 71:14
**loose** [2] - 27:8, 49:24
**Lord** [2] - 2:18
**Lord's** [1] - 13:21
**lose** [3] - 12:1, 12:8, 54:24
**lost** [1] - 18:6
**low** [1] - 75:5
**low-hanging** [1] - 75:5

**M**

**M.D** [1] - 1:2
**M4** [2] - 42:5, 42:6
**machine** [1] - 1:22
**magistrate** [1] - 21:24
**Magistrate** [1] - 22:2
**mail** [1] - 64:5
**main** [1] - 29:16
**maintained** [1] - 7:10
**major** [3] - 61:16, 65:23, 71:25
**majority** [1] - 14:8
**management** [6] - 3:8, 36:6, 36:19, 56:17, 68:7
**MANAGEMENT** [1] - 1:12
**managing** [1] - 11:1
**manner** [1] - 45:18
**Marc** [2] - 2:7, 3:10
**marcstanley@mac. com** [1] - 2:10
**marketing** [1] - 48:17
**Martin** [2] - 2:7, 3:11
**master** [3] - 55:15, 55:22, 56:11
**materials** [3] - 3:20, 64:18
**Matt** [2] - 2:18, 3:14
**matter** [10] - 3:1, 3:4, 3:7, 6:11, 8:18, 17:11, 17:15, 21:8, 67:16, 77:9
**matters** [2] - 8:3, 52:14

**mean** [28] - 5:14, 12:3, 15:13, 20:21, 28:13, 33:13, 33:14, 34:13, 37:3, 37:21, 40:24, 41:9, 42:12, 42:23, 43:1, 45:7, 45:25, 46:5, 50:20, 52:19, 53:21, 53:24, 58:8, 58:9, 59:1, 59:10, 74:12, 75:2
**meaningful** [2] - 22:17, 74:19
**mechanical** [1] - 73:1
**media** [1] - 10:12
**mediation** [3] - 70:17, 70:21, 70:24
**mediator** [2] - 70:18, 70:20
**medical** [2] - 40:9, 42:17
**meet** [4] - 20:13, 22:5, 25:5, 76:9
**meetings** [1] - 48:25
**member** [3] - 43:14, 48:19, 53:21
**members** [6] - 4:5, 4:7, 22:4, 22:21, 53:17, 53:22
**mention** [1] - 26:25
**mentioned** [6] - 4:22, 11:24, 36:6, 36:22, 37:11, 41:14
**merits** [8] - 5:23, 20:8, 35:22, 35:23, 44:17, 65:1, 65:3, 65:11
**Messrs** [2] - 2:3, 2:7, 2:17
**met** [1] - 70:23
**Metropolitan** [1] - 37:2
**metropolitan** [6] - 10:19, 10:20, 10:23, 19:13, 26:15, 37:11
**microphone** [1] - 9:14
**Miers** [3] - 2:18, 3:13, 19:7
**might** [10] - 5:13, 18:6, 27:7, 50:4, 55:22, 61:4, 61:7, 68:24, 68:25, 76:13
**million** [9] - 10:14, 10:15, 31:7, 31:17, 31:22, 32:6, 32:7, 32:18, 33:16
**millions** [1] - 49:20
**mind** [3] - 24:13, 25:23, 43:24
**mine** [1] - 16:3
**Ministries** [1] - 57:1
**ministry** [2] - 49:8

**minute** [1] - 56:17
**misappropriated** [1] - 31:8
**misdirected** [1] - 43:18
**misinterpretation** [1] - 33:12
**misrepresent** [1] - 17:7
**missing** [3] - 17:5, 31:5, 38:11
**mission** [2] - 4:18, 18:13
**missions** [2] - 3:25, 17:2
**misspoke** [1] - 6:6
**misstated** [1] - 30:8
**mistaken** [1] - 70:3
**modest** [1] - 38:17
**moment** [1] - 5:3
**moments** [1] - 54:4
**money** [73] - 3:25, 10:3, 10:9, 10:10, 11:17, 12:2, 12:5, 12:11, 12:17, 12:24, 13:2, 14:10, 15:21, 17:14, 17:18, 17:22, 18:5, 18:6, 18:12, 18:16, 18:18, 18:21, 19:20, 22:25, 23:1, 23:4, 23:16, 23:20, 24:1, 24:2, 24:5, 24:10, 24:14, 24:15, 24:18, 26:22, 29:23, 31:4, 32:8, 32:11, 32:12, 32:14, 33:13, 33:18, 34:17, 34:19, 35:5, 35:6, 39:22, 42:15, 44:23, 44:24, 45:4, 45:7, 45:11, 45:21, 45:23, 45:25, 46:3, 49:17, 54:13, 55:7, 55:13, 56:9, 57:13, 57:14, 64:24, 71:6, 71:9
**money's** [3] - 17:5, 17:22, 29:22
**monies** [9] - 4:17, 11:25, 16:16, 33:17, 34:15, 34:22, 35:7, 35:11, 37:24, 37:25, 38:3, 38:8, 40:19, 40:22, 43:3, 45:23, 46:1, 46:2, 58:22
**month** [1] - 63:5
**months** [1] - 69:3
**most** [10] - 23:10, 30:25, 34:4, 36:12, 36:14, 36:20, 47:16, 52:20, 55:22, 56:19

**mostly** [1] - 25:3
**motion** [16] - 5:7,
7:16, 20:19, 21:9,
21:10, 29:1, 52:6,
55:21, 66:9, 66:14,
66:19, 66:21, 67:2,
67:13, 69:5, 69:25
**motions** [5] - 21:22,
67:14, 67:15, 69:22,
69:23
**motivated** [1] - 43:6
**motorcycle** [1] - 18:10
**Mountain** [1] - 1:24
**mouth** [1] - 56:9
**move** [2] - 30:18,
73:11
**Mowrey** [17] - 2:17,
3:14, 19:7, 27:18,
28:22, 29:7, 30:5,
54:2, 54:9, 55:19,
56:14, 61:2, 61:14,
67:24, 68:4, 68:20,
76:4
**MOWREY** [44] - 30:12,
30:15, 30:19, 31:13,
31:16, 33:6, 33:11,
34:6, 39:4, 39:23,
41:14, 42:23, 43:7,
44:22, 46:17, 46:19,
46:23, 47:1, 48:18,
50:15, 50:24, 52:17,
53:20, 56:13, 56:15,
57:15, 57:20, 58:1,
58:4, 58:13, 58:17,
59:9, 59:24, 60:4,
60:15, 62:24, 63:1,
63:3, 68:5, 70:12,
70:20, 71:22, 72:7,
76:5
**MR** [102] - 6:10, 6:11,
6:14, 6:18, 6:20, 7:6,
7:8, 8:5, 9:4, 9:7,
9:16, 13:15, 14:4,
15:2, 15:4, 15:10,
15:17, 16:12, 17:4,
18:24, 19:2, 21:23,
22:11, 25:1, 25:19,
26:3, 26:7, 26:9,
26:11, 26:21, 27:16,
27:23, 27:24, 28:10,
28:21, 30:4, 30:12,
30:15, 30:19, 31:13,
31:15, 31:16, 33:6,
33:11, 34:6, 39:4,
39:23, 41:14, 42:23,
43:7, 44:22, 46:17,
46:19, 46:23, 47:1,
48:18, 50:15, 50:24,
52:17, 53:20, 54:6,
55:16, 55:20, 56:13,

56:15, 57:15, 57:19,
57:20, 58:1, 58:4,
58:13, 58:17, 59:9,
59:24, 60:4, 60:11,
60:15, 60:16, 60:19,
62:4, 62:22, 62:24,
63:1, 63:3, 67:20,
68:5, 68:18, 69:4,
69:8, 69:13, 69:15,
69:19, 70:1, 70:5,
70:12, 70:18, 70:20,
71:22, 72:7, 76:3,
76:5, 76:16
**MURPHY** [2] - 1:2, 1:3
**murphy** [1] - 3:1
**Murphy** [2] - 3:2,
76:19
**Murphy's** [1] - 14:1
**Murphys** [11] - 36:8,
40:24, 41:11, 41:23,
42:12, 42:15, 43:13,
43:19, 43:20, 45:22,
52:19
**Murphys'** [2] - 41:7,
43:18
**must** [2] - 21:17,
71:23
**mwoodward@
stanleylawgroup.
com** [1] - 2:11
**Myanmar** [1] - 10:13
**myriad** [1] - 42:19

## N

**name** [11] - 8:17, 11:7,
11:8, 19:18, 39:2,
39:6, 39:12, 39:14,
59:13, 61:12
**named** [3] - 4:3, 39:7,
73:19
**names** [6] - 23:23,
63:15, 65:14, 65:15,
65:18
**narrow** [1] - 64:7
**nature** [2] - 16:22,
64:21
**near** [1] - 64:4
**necessarily** [3] - 5:24,
13:1, 62:12
**necessary** [1] - 72:19
**necessity** [1] - 21:8
**need** [24] - 5:23, 6:14,
13:22, 17:10, 17:18,
20:4, 20:22, 21:13,
28:12, 28:17, 45:8,
54:3, 56:21, 59:16,
62:6, 62:9, 65:13,
65:17, 67:24, 69:12,
70:21, 71:8, 74:9,

74:24
**needed** [3] - 7:12,
12:25, 29:20
**needs** [3] - 6:8, 21:14,
48:9
**neighbor** [1] - 76:16
**never** [4] - 14:12,
18:22, 27:24, 42:11
**new** [5] - 31:23, 58:18,
58:19, 60:23, 60:24
**next** [8] - 3:4, 15:10,
15:16, 16:2, 22:1,
22:9, 35:20, 60:20
**nice** [1] - 76:11
**nine** [4] - 21:18, 33:20,
35:20, 35:21
**nine-tenths** [1] - 21:18
**NO** [1] - 1:5
**nobody** [1] - 17:9
**nomenclature** [1] -
32:24
**nonattorneys** [2] -
7:21, 8:15
**noncash** [1] - 16:6
**noncompliance** [1] -
50:6
**none** [3] - 17:20,
32:18, 51:19
**nonexistent** [2] -
27:14
**nonparty** [1] - 73:18
**North** [4] - 2:4, 2:8,
25:4, 25:10
**nothing** [8] - 40:4,
40:12, 40:13, 40:18,
49:19, 64:15, 68:22,
75:6
**notice** [2] - 14:5,
27:25
**notify** [1] - 20:17
**notion** [3] - 17:24,
22:14, 24:12
**notwithstanding** [1] -
61:14
**November** [2] - 67:9,
67:12
**Nth** [1] - 75:17
**nuanced** [1] - 71:2
**nuances** [2] - 59:18,
72:22
**Number** [3] - 31:15,
31:16
**number** [8] - 3:5, 5:8,
37:15, 48:20, 51:9,
63:10, 64:14, 64:15
**numerosity** [2] -
22:19, 62:5

## O

**oath** [1] - 72:5
**object** [1] - 69:17
**obviate** [1] - 67:23
**obviously** [3] - 9:1,
30:19, 75:12
**occasions** [1] - 21:25
**October** [2] - 67:6,
69:7
**OF** [3] - 1:1, 1:12, 77:1
**offer** [2] - 55:10, 61:11
**offered** [2] - 47:5, 61:9
**offhand** [1] - 8:25
**office** [2] - 10:24,
31:23
**OFFICIAL** [1] - 77:1
**Official** [3] - 1:24,
77:3, 77:17
**once** [5] - 15:21,
44:24, 45:4, 49:23,
52:22
**one** [41] - 4:11, 6:11,
8:15, 10:1, 12:24,
13:15, 14:1, 17:9,
19:4, 19:12, 22:13,
26:2, 28:1, 28:19,
28:23, 31:4, 34:13,
34:25, 35:17, 36:3,
36:5, 37:11, 41:5,
41:23, 42:10, 42:21,
44:3, 44:4, 44:10,
45:13, 47:22, 50:8,
52:20, 54:7, 60:16,
63:1, 65:5, 68:6,
73:21, 73:23, 74:14
**one-sided** [1] - 50:8
**opinion** [1] - 59:11
**opportunity** [3] - 5:12,
7:11, 30:6
**opposed** [1] - 21:21
**oral** [2] - 53:10
**order** [18] - 6:22, 7:25,
9:1, 20:12, 27:3,
37:16, 38:1, 43:12,
44:12, 58:18, 58:20,
58:24, 59:10, 60:7,
65:10, 68:10, 71:9,
74:6
**organization** [4] -
3:22, 44:4, 44:9,
51:8
**organizations** [3] -
4:7, 40:17, 49:6
**originally** [3] - 31:25,
32:22, 33:18
**ostensibly** [3] - 23:20,
27:1
**otherwise** [2] - 41:25,
64:12

**ourselves** [1] - 29:3
**outlines** [1] - 20:25
**outset** [1] - 38:10
**overall** [2] - 5:25,
67:11
**overhead** [1] - 13:23
**overlap** [6] - 20:6,
20:8, 28:7, 65:1,
65:7
**own** [6] - 16:9, 25:23,
26:19, 47:21, 48:6,
48:14
**owns** [3] - 39:17,
71:11, 71:13

## P

**p.m** [2] - 1:14, 76:21
**PACER** [1] - 51:13
**Page** [1] - 43:11
**page** [2] - 6:2, 77:9
**pages** [3] - 33:20,
36:20, 56:18
**paid** [1] - 71:6
**paragraph** [5] - 31:20,
43:9, 43:11, 44:13
**parsed** [1] - 12:21
**part** [9] - 7:18, 15:19,
16:4, 34:2, 40:14,
48:16, 49:6, 49:9
**participations** [1] -
72:13
**particular** [10] - 3:25,
12:24, 33:14, 34:23,
38:16, 40:14, 43:6,
45:17, 51:22, 65:24
**particularly** [1] - 8:12
**parties** [10] - 5:16,
5:20, 6:22, 7:3, 7:11,
20:24, 21:13, 24:22,
69:6, 70:8
**parties'** [2] - 3:17,
20:25
**partners** [1] - 32:2
**parts** [2] - 7:3, 14:14
**party** [4] - 7:16, 8:15,
25:7, 73:10
**pass** [1] - 60:21
**past** [2] - 35:5, 47:4
**PAT** [1] - 1:8
**Paul** [2] - 2:17, 3:14
**pay** [1] - 75:19
**payment** [1] - 31:12
**people** [21] - 17:4,
17:18, 18:3, 18:4,
18:21, 29:22, 35:12,
38:18, 38:22, 40:9,
42:11, 42:15, 42:18,
43:1, 44:2, 44:7,
47:20, 51:14, 64:5,

74:5
**per** [4] - 54:19, 62:16, 73:3, 73:10
**perceive** [1] - 74:8
**percent** [20] - 12:16, 12:22, 13:11, 13:18, 13:20, 14:9, 15:15, 23:4, 23:5, 23:6, 23:7, 24:20, 37:22, 43:16, 43:21, 44:1, 64:4, 68:21, 74:15
**perfect** [1] - 74:12
**performing** [1] - 65:3
**perfunctory** [1] - 20:14
**perhaps** [9] - 4:7, 12:14, 40:8, 41:6, 59:7, 59:16, 70:8, 73:14
**period** [4] - 7:11, 7:18, 29:12, 29:15
**periods** [1] - 29:6
**perjury** [1] - 61:23
**permission** [1] - 66:15
**person** [7] - 22:6, 22:7, 44:3, 44:10, 44:14, 46:5, 76:12
**personally** [1] - 39:2, 39:16, 76:7
**perspective** [1] - 52:15
**pertinent** [2] - 5:13, 5:14
**petty** [1] - 57:8
**Phase** [1] - 75:10
**phase** [2] - 5:22, 65:13
**phases** [2] - 30:11, 75:4
**phone** [3] - 22:7, 75:12, 76:13
**PHYLLIS** [1] - 1:3
**Phyllis** [1] - 3:2
**picked** [3] - 28:24, 70:19, 70:20
**picture** [1] - 71:10
**piecemeal** [1] - 56:8
**place** [4] - 21:13, 36:5, 65:10, 72:10
**places** [2] - 11:18, 33:23
**PLAINTIFFS** [1] - 2:2
**plaintiffs** [34] - 3:9, 3:21, 4:13, 4:15, 5:24, 6:5, 8:22, 9:23, 10:2, 11:19, 32:6, 37:20, 38:8, 41:10, 43:12, 44:12, 45:19, 47:3, 48:4, 49:25, 53:2, 53:18, 53:21, 55:10, 59:8, 63:6,

65:17, 66:9, 66:15, 67:18, 68:8, 72:1, 73:6, 74:9
**Plaintiffs** [1] - 1:5
**plaintiffs'** [2] - 67:7, 72:1
**plan** [5] - 5:15, 6:8, 36:6, 36:19, 68:7
**planes** [2] - 34:12, 38:12
**planning** [1] - 27:9
**plant** [3] - 39:24, 40:2
**plantation** [3] - 10:13, 16:20, 19:19
**playing** [1] - 72:22
**pleading** [1] - 69:1
**pleadings** [1] - 3:16
**plowing** [2] - 73:25, 74:3
**plus** [3] - 73:19, 73:20, 76:16
**pocket** [2] - 39:12, 45:12
**pockets** [6] - 11:21, 17:9, 31:2, 31:5, 49:20, 55:25
**podium** [1] - 9:13
**point** [20] - 5:19, 12:19, 13:7, 14:6, 17:3, 28:5, 28:13, 28:19, 30:8, 30:21, 31:14, 34:10, 35:14, 48:3, 60:1, 61:2, 63:1, 65:19, 71:25
**Point** [2] - 26:10, 26:12
**pointed** [1] - 41:4
**pointing** [1] - 7:17
**points** [3] - 30:22, 34:14, 48:20
**policeman** [2] - 60:20, 60:21
**policies** [1] - 14:21
**pope** [1] - 10:20
**portion** [1] - 45:9
**portray** [1] - 38:21
**position** [9] - 17:5, 30:7, 54:23, 57:24, 62:3, 64:20, 71:23, 72:2
**positions** [2] - 4:6, 20:25
**possible** [2] - 25:6, 64:12
**posture** [1] - 69:24
**potentially** [2] - 6:20, 59:5
**pour** [1] - 55:10
**practice** [2] - 7:14, 21:9

**practices** [1] - 21:20
**Practices** [1] - 4:24
**preclude** [1] - 66:11
**predicate** [1] - 4:25
**preference** [1] - 15:12
**preferences** [2] - 16:1, 16:10
**prefers** [1] - 19:3
**preliminarily** [1] - 6:12
**premising** [1] - 46:16
**preparation** [1] - 3:18
**prepared** [3] - 7:10, 37:12, 63:7
**preparing** [1] - 3:15
**preserve** [1] - 8:11
**president** [2] - 10:24, 11:1
**presumes** [1] - 39:20
**pretty** [8] - 9:18, 9:22, 21:16, 24:7, 24:9, 29:17, 53:14, 53:15
**prevail** [2] - 43:12, 44:12
**preview** [1] - 21:20
**prima** [1] - 22:23
**problem** [8] - 19:18, 34:8, 36:22, 37:7, 56:19, 58:9, 68:13, 68:18
**problems** [3] - 19:22, 74:10, 74:11
**procedure** [1] - 20:12
**procedures** [3] - 14:21, 49:2, 75:24
**proceed** [2] - 9:6, 9:7
**proceeding** [2] - 8:4, 28:6
**Proceedings** [1] - 1:22
**proceedings** [3] - 8:3, 76:21, 77:8
**proceeds** [1] - 4:14
**produce** [9] - 35:20, 36:20, 37:19, 49:23, 58:2, 58:5, 59:11, 75:20
**produced** [5] - 31:6, 35:19, 41:10, 41:11, 63:9
**producing** [2] - 36:14, 37:7
**production** [1] - 70:9
**productive** [1] - 21:21
**profit** [14] - 10:10, 16:19, 16:21, 16:24, 18:1, 18:5, 18:8, 18:18, 39:20, 39:21, 39:22, 40:5, 40:6
**profits** [2] - 16:24, 17:1

**project** [1] - 12:25
**promise** [5] - 9:23, 13:20, 14:11, 17:13, 24:20
**promised** [4] - 11:20, 13:24, 14:11
**proof** [2] - 55:6, 56:11
**proper** [2] - 16:18, 71:7
**properties** [8] - 11:7, 11:8, 34:12, 38:11, 39:6, 39:7, 39:13, 39:16
**property** [2] - 19:18, 61:12
**proportion** [1] - 75:17
**proportional** [1] - 74:23
**proportionality** [5] - 21:14, 21:18, 66:4, 74:9, 75:13
**propose** [5] - 65:22, 66:8, 66:18, 67:11, 67:15
**proposed** [2] - 6:9, 63:11
**proposition** [3] - 44:22, 45:3, 45:5
**protective** [2] - 6:22, 9:1
**prove** [13] - 22:19, 22:24, 22:25, 23:11, 28:11, 43:12, 45:14, 46:14, 47:22, 62:4, 62:5
**provide** [6] - 7:1, 38:4, 57:13, 62:2, 67:8
**provided** [3] - 16:5, 32:5, 38:12
**provides** [1] - 6:23
**provision** [1] - 52:21
**provisions** [2] - 9:1, 50:10
**pschuster@ lockelord.com** [1] - 2:22
**public** [5] - 7:24, 8:4, 47:21, 48:1, 58:11
**pull** [3] - 24:5, 66:24, 75:18
**pulling** [1] - 43:5
**PUNNOSE** [2] - 1:8, 1:8
**purchased** [2] - 39:25, 40:3
**purported** [2] - 5:18, 63:22
**purports** [1] - 3:24
**purpose** [3] - 13:3, 13:4, 45:11

**purposes** [10] - 3:8, 4:19, 12:18, 17:16, 32:11, 40:6, 43:19, 62:1, 72:14, 73:22
**pursuant** [1] - 77:6
**put** [17] - 14:5, 18:5, 18:8, 28:23, 30:6, 36:10, 45:12, 48:1, 50:4, 53:2, 56:9, 59:13, 60:25, 65:9, 66:1, 71:7, 74:14

## Q

**qualification** [1] - 61:9
**quantify** [1] - 74:11
**quantity** [1] - 73:2
**quarterly** [1] - 56:23
**questionable** [1] - 25:12
**questions** [4] - 12:12, 17:10, 73:5, 75:24
**QuickBooks** [2] - 56:23, 57:22
**quickly** [1] - 45:17
**quite** [1] - 51:7
**quote** [1] - 40:5
**quoted** [1] - 71:15

## R

**railroad** [1] - 10:13
**raise** [10] - 3:25, 5:8, 6:11, 7:16, 8:13, 18:24, 26:24, 28:19, 46:21, 51:22
**raised** [12] - 4:17, 16:24, 40:22, 45:7, 46:11, 47:1, 48:21, 54:22, 55:7, 56:3, 61:3, 66:6
**raises** [1] - 44:19
**range** [1] - 6:2
**rarely** [1] - 22:16
**rather** [5] - 21:20, 24:17, 30:15, 70:24, 72:24
**ratified** [1] - 14:19
**reach** [1] - 5:21
**read** [3] - 8:1, 29:24, 30:23
**reading** [2] - 12:14, 41:22
**ready** [1] - 70:16
**real** [1] - 39:1
**realize** [1] - 50:7, 64:10, 74:13
**really** [30] - 8:12, 13:13, 14:6, 17:13, 18:19, 20:14, 21:21,

23:13, 24:3, 25:22,
26:24, 27:16, 29:17,
30:1, 34:8, 36:16,
49:15, 53:6, 55:23,
56:15, 62:4, 62:16,
62:18, 63:20, 69:1,
72:9, 74:3, 75:18,
76:17
**Realtime** [1] - 77:3
**realtime** [1] - 1:22
**reason** [4] - 8:2,
53:23, 65:17, 69:18
**reasonable** [3] -
15:13, 48:9, 75:2
**reasons** [6] - 34:18,
36:1, 42:10, 42:12,
42:18, 43:2
**rebuttal** [2] - 29:11,
68:2
**receipt** [3] - 13:8,
14:1, 26:17
**receive** [2] - 41:16,
41:18
**received** [6] - 12:24,
13:10, 31:25, 32:22,
63:12, 74:16
**receives** [4] - 38:14,
38:15, 38:18, 38:19
**receiving** [1] - 24:1
**recipient** [1] - 24:11
**recite** [1] - 5:3
**recognize** [1] - 8:17
**recognized** [1] - 27:20
**record** [1] - 7:21
**recorded** [1] - 1:22
**records** [7] - 12:10,
27:4, 37:3, 40:25,
41:7, 41:8, 61:5
**redirect** [1] - 12:25
**redirected** [1] - 31:9
**reference** [1] - 70:15
**referring** [1] - 13:25
**reflected** [1] - 16:3
**reflecting** [1] - 26:17
**regard** [5] - 28:19,
70:25, 72:8, 73:1,
74:7
**regardless** [1] - 61:2
**regular** [2] - 22:6, 22:7
**regularly** [4] - 24:25,
50:17, 51:11, 51:13
**regulations** [1] - 77:10
**related** [2] - 3:23, 25:7
**relates** [2] - 47:2,
73:17
**relating** [2] - 31:25,
32:22
**relatively** [1] - 60:24
**relevance** [1] - 75:13
**relevant** [2] - 64:9,

75:15
**relief** [3] - 5:6, 17:20,
18:11
**religious** [2] - 25:24,
49:5
**remains** [1] - 7:20
**replenish** [1] - 32:14
**reply** [4] - 28:25, 29:8,
53:9, 66:16
**report** [12] - 3:17,
3:19, 6:9, 25:18,
31:4, 34:2, 34:7,
37:23, 37:24, 56:18,
61:10, 63:23
**report's** [1] - 33:20
**reported** [1] - 77:8
**Reporter** [3] - 1:24,
77:4, 77:17
**REPORTER** [1] - 77:1
**reports** [3] - 37:23,
38:2, 58:5
**represent** [1] - 61:7
**representations** [4] -
4:13, 12:15, 14:8,
43:16
**represented** [2] -
27:18, 38:9
**representing** [2] -
19:11, 50:9
**represents** [1] - 61:8
**request** [3] - 35:8,
45:21, 73:12
**requested** [6] - 37:17,
38:2, 58:21, 59:12,
59:20, 60:5
**requests** [4] - 32:13,
32:14, 45:24, 73:16
**require** [3] - 21:9,
22:3, 26:5
**required** [13] - 15:18,
15:20, 16:8, 20:13,
22:1, 25:8, 25:17,
41:13, 41:15, 50:10,
65:2, 68:8
**requirement** [1] -
41:20
**requirements** [1] -
26:18
**residence** [1] - 38:17
**residences** [1] - 38:12
**resolve** [5] - 17:10,
20:4, 21:7, 22:8,
66:5
**resolved** [1] - 7:19
**resoundingly** [1] -
25:14
**respect** [10] - 4:11,
35:17, 36:8, 36:9,
36:12, 37:8, 47:3,
47:17, 52:19, 52:25

**respond** [1] - 54:5
**response** [5] - 28:25,
29:6, 53:4, 66:13,
66:17
**responses** [1] - 52:17
**responsibility** [1] - 4:6
**restricted** [2] - 32:1,
32:23
**restrictions** [2] - 32:3,
71:1
**returns** [1] - 38:13
**review** [1] - 3:20
**reviewed** [3] - 3:16,
33:22, 64:18
**RICO** [5] - 4:25, 10:7,
10:17, 22:24, 47:12
**rigorous** [1] - 65:4
**rmowrey@lockelord.
com** [1] - 2:21
**RMR** [2] - 1:23, 77:17
**Rob** [1] - 54:9
**Robert** [2] - 2:17, 3:14
**Rock** [1] - 2:15
**room** [1] - 76:9
**roomful** [1] - 74:25
**Ross** [1] - 2:19
**roughly** [1] - 62:16
**rub** [4] - 37:10, 55:23,
56:21, 56:22
**rubber** [5] - 16:20,
19:19, 39:24, 40:2
**rule** [1] - 48:12
**Rule** [3] - 3:8, 3:17,
5:20
**rules** [2] - 23:13,
61:17
**rulings** [1] - 60:14
**run** [2] - 9:2, 19:17

**S**

**sake** [1] - 72:18
**sale** [1] - 50:5
**sat** [1] - 35:6
**satisfaction** [1] - 74:1
**satisfy** [2] - 57:17,
58:24
**satisfying** [1] - 38:7
**save** [1] - 55:12
**saw** [3] - 13:7, 53:7,
71:15
**scanning** [1] - 8:14
**scattered** [1] - 33:21
**schedule** [2] - 28:23,
53:15
**scheduling** [2] -
20:12, 65:10
**scheme** [2] - 72:11,
72:12
**school** [2] - 16:21,

18:16
**Schuster** [2] - 2:17,
3:14
**SCHUSTER** [1] -
31:15
**scope** [2] - 60:13, 72:8
**screwed** [1] - 23:7
**seal** [3] - 8:3, 27:2
**sealed** [2] - 7:17, 7:18
**search** [5] - 63:3,
63:11, 63:21, 74:14,
75:7
**searches** [1] - 64:14
**seasoned** [1] - 74:25
**second** [2] - 31:20,
32:20
**Section** [1] - 77:6
**see** [15] - 8:14, 24:17,
25:5, 27:17, 30:18,
49:1, 61:23, 62:9,
63:8, 65:18, 71:9,
73:24, 75:8, 75:9,
76:11
**seek** [4] - 5:19, 69:10,
69:12
**seeking** [1] - 53:18
**sees** [1] - 17:18
**send** [1] - 57:13
**sending** [1] - 23:16
**sense** [11] - 13:1,
20:23, 21:19, 29:3,
72:20, 74:12, 74:17,
74:20, 74:24, 75:1,
75:11
**sensitive** [4] - 6:21,
8:7, 8:12, 65:12
**sent** [7] - 12:17, 16:16,
16:17, 24:15, 31:11,
63:10, 74:16
**sentence** [4] - 15:10,
32:21, 43:20, 44:13
**separate** [3] - 23:19,
37:9, 52:15
**September** [1] - 29:5
**serve** [1] - 27:11
**services** [1] - 16:4
**set** [8] - 29:14, 50:13,
53:10, 66:18, 67:3,
67:16, 70:16, 75:10
**sets** [2] - 52:15, 56:18
**seven** [1] - 7:15
**several** [1] - 19:12
**shake** [1] - 76:11
**shaken** [1] - 76:15
**sheet** [1] - 23:18
**shell** [1] - 23:15
**shocked** [1] - 30:23
**shortcut** [1] - 62:14
**shorthand** [1] - 1:22
**show** [20] - 10:4, 10:6,

12:2, 12:4, 19:20,
23:1, 23:4, 32:6,
33:7, 33:10, 33:13,
33:15, 34:22, 35:10,
40:7, 40:21, 62:12,
75:19
**showing** [1] - 12:10
**shows** [1] - 27:17
**Shults** [5] - 2:13, 2:14,
3:13, 6:17, 30:17
**SHULTS** [11] - 6:11,
6:14, 6:18, 6:20, 7:6,
7:8, 8:5, 9:4, 69:19,
70:1, 70:5
**side** [4] - 5:12, 24:11,
51:9, 73:3
**side's** [1] - 64:20
**sided** [1] - 50:8
**sides** [2] - 9:20, 55:13
**sign** [2] - 18:4, 60:7
**signed** [1] - 18:3
**significance** [1] -
72:10
**signs** [1] - 61:16
**similar** [5] - 8:23,
13:7, 13:10, 52:12,
52:18
**similarly** [3] - 1:4, 3:3,
39:8
**simple** [2] - 9:22,
20:22
**simply** [1] - 39:18
**single** [1] - 43:13
**sit** [3] - 22:1, 22:9,
30:16
**sits** [1] - 61:21
**sitting** [3] - 9:11,
30:13, 32:8
**situated** [2] - 1:4, 3:3
**situation** [5] - 38:20,
45:13, 45:15, 45:16,
45:17
**situations** [1] - 12:23
**six** [1] - 66:13
**skilled** [1] - 74:25
**skip** [2] - 35:13
**slips** [2] - 41:5, 68:22
**snap** [1] - 57:5
**sneak** [1] - 14:22
**so-called** [1] - 39:19
**soccer** [3] - 10:12,
40:11, 40:12
**societies** [1] - 11:2
**solicitation** [2] - 14:9,
18:16
**solicitations** [2] -
13:18
**solution** [2] - 54:11,
56:9
**someone** [4] - 18:18,

44:4, 51:1, 55:25
**sometime** [1] - 53:12
**sometimes** [2] - 75:14, 76:15
**somewhat** [1] - 5:20
**somewhere** [2] - 17:2, 46:8
**sooner** [2] - 67:5, 70:24
**sorry** [3] - 28:14, 29:13, 60:11
**sort** [17] - 9:19, 10:20, 19:3, 20:20, 22:23, 25:16, 31:2, 31:3, 34:12, 35:17, 47:5, 49:24, 52:3, 52:4, 59:5, 63:24, 72:14
**sorts** [3] - 27:21, 39:1, 42:12
**sounds** [6] - 16:21, 33:21, 59:4, 71:16, 72:4, 75:16
**source** [2] - 38:15, 59:6
**sources** [1] - 48:2
**speaking** [2] - 6:1, 71:5
**special** [3] - 55:14, 55:22, 56:11
**specific** [12] - 16:23, 18:20, 18:21, 32:13, 45:11, 45:16, 54:18, 62:3, 62:12, 63:15, 66:5, 71:4
**specifically** [2] - 4:20, 33:23
**specified** [5] - 12:1, 17:23, 34:24, 54:14, 68:17
**spent** [3] - 12:5, 34:11, 34:19
**split** [1] - 55:3
**spokes** [1] - 71:17
**sponsor** [2] - 18:10, 44:5
**Sri** [1] - 11:18
**sshults@shultslaw. com** [1] - 2:16
**staff** [6] - 31:24, 32:21, 33:9, 33:24
**stamped** [1] - 42:5
**stand** [3] - 6:14, 30:15, 61:22
**standard** [2] - 7:14, 68:10
**standards** [2] - 25:14, 34:8
**standing** [8] - 5:9, 6:17, 9:12, 44:20, 44:24, 45:4, 46:15,

46:19
**STANLEY** [44] - 6:10, 9:7, 9:16, 13:15, 14:4, 15:2, 15:4, 15:10, 15:17, 16:12, 17:4, 18:24, 19:2, 21:23, 22:11, 25:1, 25:19, 26:3, 26:7, 26:11, 26:21, 27:16, 27:24, 28:10, 28:21, 30:4, 54:6, 55:16, 55:20, 57:19, 60:11, 60:16, 60:19, 62:4, 62:22, 67:20, 68:18, 69:4, 69:8, 69:13, 69:15, 70:18, 76:3, 76:16
**Stanley** [25] - 2:7, 2:8, 3:10, 6:4, 6:5, 9:5, 9:9, 30:20, 31:1, 35:16, 36:22, 37:5, 37:6, 37:21, 38:25, 41:14, 47:19, 54:3, 57:7, 57:17, 61:25, 67:18, 74:13, 75:14, 76:2
**start** [1] - 76:12
**started** [3] - 19:5, 37:14, 75:8
**state** [2] - 5:6, 5:12
**statement** [12] - 13:9, 15:19, 15:20, 15:23, 16:2, 16:3, 16:4, 16:7, 41:8, 41:21, 44:13
**statements** [4] - 14:23, 24:7, 56:24, 57:21
**States** [7] - 23:17, 31:11, 58:10, 59:2, 77:4, 77:6, 77:11
**states** [5] - 44:25, 45:1, 47:14, 68:10
**STATES** [1] - 1:1
**statute** [6] - 5:9, 46:21, 46:24, 47:15, 48:8, 48:11
**stayed** [1] - 52:8
**stays** [1] - 38:16
**stenographically** [1] - 77:8
**step** [1] - 38:7
**steps** [1] - 7:23
**Steve** [1] - 3:13
**Steven** [1] - 2:13
**still** [8] - 14:14, 27:18, 55:21, 61:15, 69:12, 70:10, 73:22, 73:25
**stipulate** [2] - 22:20, 62:6

**stolen** [1] - 31:5
**stories** [1] - 62:18
**straight** [1] - 13:23
**straightforward** [1] - 21:5
**Street** [1] - 1:24
**stretches** [1] - 43:24
**strongly** [1] - 21:11
**stuff** [6] - 19:21, 23:8, 23:10, 27:7, 28:15, 56:7
**subentities** [1] - 64:25
**subject** [1] - 61:23
**submit** [1] - 20:24
**subsequent** [1] - 50:6
**substantially** [6] - 8:23, 34:4, 52:12, 52:18, 66:23, 68:14
**sue** [1] - 44:24
**sued** [2] - 27:12, 37:9
**sufficient** [3] - 59:14, 68:11, 68:12
**suggest** [2] - 29:1, 67:6
**Suite** [3] - 2:8, 2:14, 2:19
**summarized** [1] - 9:17
**super** [1] - 20:22
**support** [1] - 21:22
**supported** [1] - 8:2
**suppose** [2] - 48:2, 49:13
**supposed** [1] - 46:8
**supposing** [1] - 52:10
**surmise** [1] - 8:21
**swallow** [1] - 28:8
**swayed** [1] - 14:12
**swears** [2] - 61:21, 61:22
**symbol** [2] - 50:3, 50:4

---

# T

**table** [1] - 9:11
**target** [1] - 25:6
**tax** [10] - 14:23, 15:6, 15:18, 15:22, 16:3, 16:7, 38:13, 39:10, 41:25, 56:24
**teacher's** [2] - 22:1, 22:9
**team** [3] - 10:12, 40:11, 40:12
**telephone** [3] - 20:18, 21:3, 22:6
**temporal** [1] - 72:8
**ten** [5] - 35:21, 47:4, 63:21, 72:19, 72:23
**tentatively** [1] - 66:19
**tenths** [1] - 21:18

**term** [2] - 22:16, 71:7
**terms** [17] - 5:17, 39:16, 45:9, 48:20, 63:3, 63:8, 63:12, 63:13, 63:21, 63:22, 63:25, 64:3, 64:6, 64:7, 70:22, 74:14, 75:7
**terrible** [1] - 54:25
**territory** [1] - 75:22
**test** [1] - 27:6
**tested** [1] - 59:7
**Texas** [3] - 2:9, 2:19, 26:8
**THE** [94] - 1:13, 2:2, 2:12, 3:1, 6:13, 6:16, 6:19, 7:5, 7:7, 7:13, 8:14, 9:5, 9:9, 12:12, 14:3, 14:25, 15:3, 15:5, 15:15, 16:11, 16:14, 18:23, 19:1, 20:3, 21:25, 24:24, 25:16, 26:2, 26:6, 26:20, 27:12, 28:4, 28:20, 30:3, 30:5, 30:14, 30:17, 31:7, 32:20, 33:9, 33:20, 38:25, 39:19, 41:13, 42:20, 42:25, 44:19, 46:15, 46:18, 46:21, 46:24, 48:15, 50:1, 50:22, 51:25, 53:17, 54:1, 55:14, 55:17, 56:12, 56:14, 57:12, 57:25, 58:2, 58:9, 58:14, 58:25, 59:16, 60:2, 60:10, 60:12, 60:18, 61:25, 62:21, 62:23, 62:25, 63:2, 64:17, 68:3, 69:3, 69:5, 69:11, 69:14, 69:16, 69:23, 70:3, 70:6, 70:13, 70:25, 72:4, 72:8, 76:4, 76:6, 76:18
**themselves** [1] - 25:25
**they've** [2] - 48:5, 53:9
**thinking** [2] - 21:14, 70:23
**thinks** [1] - 37:6
**third** [2] - 10:7, 24:22
**thirty** [1] - 63:25
**Thompson** [1] - 2:17
**thoughts** [3] - 21:20, 66:3, 67:19
**thousand** [6] - 9:24, 9:25, 10:4, 35:1, 35:2, 35:7
**three** [4] - 8:15, 31:2, 66:16, 67:16

**three-week** [1] - 67:16
**throughout** [1] - 33:21
**throw** [2] - 65:20, 68:16
**thumbs** [2] - 42:25, 43:1
**thumbs-down** [1] - 43:1
**thumbs-up** [1] - 42:25
**tie** [1] - 49:24
**Tilton** [1] - 56:1
**TIMOTHY** [1] - 1:13
**Title** [1] - 77:6
**toaster** [1] - 50:5
**toasters** [1] - 50:4
**today** [22] - 3:7, 3:9, 3:13, 3:15, 5:11, 5:15, 8:7, 8:25, 9:19, 20:4, 31:1, 36:18, 40:25, 47:19, 52:1, 60:14, 72:21, 72:24, 75:23, 76:1, 76:7, 76:20
**together** [2] - 21:12, 48:1
**token** [1] - 72:18
**tolled** [1] - 47:9
**tolling** [1] - 25:9
**tomorrow** [1] - 12:4
**tons** [2] - 61:11, 61:15
**took** [3] - 24:15, 59:7, 72:10
**tools** [1] - 75:21
**top** [1] - 5:3
**total** [1] - 73:18
**totality** [1] - 64:3
**totally** [1] - 13:1
**tougher** [1] - 61:7
**towards** [5] - 4:1, 6:7, 24:19, 30:9, 31:11
**toying** [1] - 24:12
**track** [3] - 24:17, 29:23, 70:11
**Trade** [1] - 4:24
**trade** [1] - 46:1
**transactions** [3] - 11:14, 25:8, 61:16
**TRANSCRIPT** [1] - 1:12
**transcript** [7] - 7:9, 7:15, 7:20, 8:1, 77:7, 77:9
**transcripts** [1] - 7:1
**transfer** [2] - 63:23, 63:24
**transferred** [2] - 32:2, 33:5
**transfers** [1] - 23:20
**tremendous** [1] - 65:1
**trial** [3] - 23:11, 28:11,

67:16
**trips** [1] - 44:8
**true** [9] - 28:14, 28:17, 34:3, 34:4, 39:4, 43:25, 44:14, 55:2, 77:7
**truly** [1] - 28:10
**trust** [2] - 11:10, 75:3
**trustee** [2] - 11:1, 39:7
**trusts** [1] - 11:1
**try** [5] - 14:22, 20:7, 20:14, 60:20, 64:7
**trying** [10] - 9:21, 11:14, 11:19, 25:5, 25:22, 26:19, 29:22, 62:18, 74:4, 75:16
**turmoil** [1] - 51:7
**turn** [1] - 43:11
**TV** [1] - 38:22
**two** [14] - 8:16, 8:20, 9:20, 17:21, 31:1, 52:15, 52:17, 54:8, 60:22, 63:5, 65:20, 75:4
**types** [1] - 71:3
**typicality** [1] - 62:7
**typically** [1] - 21:3

## U

**U.S** [13] - 16:8, 25:2, 27:23, 27:24, 32:7, 32:18, 35:9, 38:5, 40:4, 40:19, 57:12, 60:2, 60:7
**UL** [1] - 50:4
**ultimate** [1] - 11:5
**ultimately** [2] - 44:16, 49:3
**umbrella** [1] - 40:16
**unannounced** [1] - 44:8
**unaware** [1] - 14:23
**under** [6] - 5:20, 15:18, 58:1, 58:7, 65:15, 72:5
**understood** [1] - 32:24
**undesignated** [1] - 14:13
**United** [7] - 23:17, 31:11, 58:10, 59:2, 77:4, 77:6, 77:11
**UNITED** [1] - 1:1
**unjust** [2] - 5:2, 47:13
**unless** [6] - 9:12, 22:20, 36:11, 41:25, 59:13, 59:15
**unqualified** [2] - 58:20, 59:11

**unravel** [1] - 11:15
**up** [29] - 9:3, 9:12, 18:3, 18:4, 19:4, 21:3, 23:7, 29:14, 30:12, 36:14, 42:25, 45:2, 46:7, 46:8, 48:5, 48:24, 50:18, 50:19, 51:4, 51:18, 61:21, 63:1, 64:11, 66:3, 68:24, 69:6, 70:6, 74:13, 76:1
**urgent** [1] - 17:18
**USA** [4] - 37:13, 37:17, 38:1, 58:22

## V

**valid** [1] - 74:23
**value** [2] - 16:6, 59:7
**various** [7] - 4:3, 4:22, 4:25, 32:11, 35:12, 38:3, 53:1
**vast** [1] - 14:7
**vehicle** [2] - 18:5, 25:24
**venture** [1] - 27:21
**versus** [1] - 3:3
**via** [2] - 1:22, 4:23
**view** [4] - 52:14, 52:15, 71:5, 71:10
**Virginia** [1] - 27:10
**virtue** [1] - 10:24
**visit** [2] - 55:19, 59:17
**VS** [1] - 1:6

## W

**wade** [1] - 65:2
**wait** [1] - 29:4
**wants** [2] - 18:18, 37:6
**warrant** [1] - 50:12
**waste** [1] - 23:7
**ways** [1] - 45:1
**wbassett@ bassettlawfirm. com** [1] - 2:6
**wearing** [1] - 61:6
**website** [2] - 12:20, 13:6
**weeds** [1] - 64:11
**week** [1] - 67:16
**weeks** [2] - 66:13, 66:16
**wells** [1] - 12:6
**Wells** [1] - 64:1
**West** [1] - 2:14
**Western** [1] - 77:5
**WESTERN** [1] - 1:1
**whole** [8] - 11:11, 16:5, 40:22, 58:25,

71:10, 71:17, 74:16, 74:25
**wholly** [1] - 37:9
**Wiedemann** [1] - 22:2
**willing** [2] - 15:19, 62:1
**Wills** [2] - 26:10, 26:12
**win** [1] - 24:23
**wire** [2] - 23:19, 63:24
**withdraw** [1] - 75:10
**witness** [2] - 61:22, 72:5
**won** [1] - 24:14
**Woodward** [2] - 2:7, 3:11
**WOODWARD** [2] - 26:9, 27:23
**Woody** [2] - 2:3, 3:10
**word** [2] - 31:9, 48:17
**word's** [1] - 16:18
**wording** [2] - 13:6, 31:3
**words** [3] - 29:11, 63:24, 76:13
**world** [1] - 3:25
**worth** [1] - 65:9
**write** [2] - 39:9, 65:23
**writing** [1] - 44:6
**written** [2] - 46:4, 64:5
**wrote** [3] - 41:2, 41:3, 49:13

## Y

**y'all** [11] - 52:13, 59:16, 70:15, 70:17, 71:4, 72:19, 72:25, 74:24, 75:1, 75:3, 76:7
**yachts** [1] - 38:12
**year** [7] - 25:2, 48:22, 50:23, 54:19, 56:24, 62:16, 67:7
**year-end** [1] - 56:24
**yearly** [1] - 56:24
**years** [22] - 17:21, 19:8, 22:15, 25:2, 29:23, 37:15, 37:16, 47:5, 47:6, 47:11, 47:12, 47:15, 47:20, 50:7, 51:21, 55:8, 58:19, 60:22, 61:1, 72:19, 72:23, 72:24
**yesterday** [2] - 63:4, 63:10
**Yohannan** [14] - 10:18, 19:13, 19:19, 24:2, 26:14, 26:22, 36:23, 36:25, 37:6, 38:14, 57:5, 61:9,

71:16, 72:5
**YOHANNAN** [1] - 1:8
**Yohannan's** [2] - 11:7, 39:2
**yourself** [1] - 21:23