1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF ARKANSAS
2                        FAYETTEVILLE DIVISION
      GARLAND D. MURPHY, III, M.D. and    )
3     PHYLLIS MURPHY, Individually and    )
      on behalf of all others            )
4     similarly situated,                )
                                         )
5         Plaintiffs,                    ) CASE NO.
                                         ) 5:17-CV-5035
6     VS.                                )
                                         )
7     GOSPEL FOR ASIA, INC., GOSPEL      )
      FOR ASIA-INTERNATIONAL, K.P.       )
8     YOHANNAN, GISELA PUNNOSE, DANIEL   )
      PUNNOSE, DAVID CARROLL, and PAT    )
9     EMERICK,                           )
                                         )
10        Defendant.                     )

11

12                   TRANSCRIPT OF HEARING

13          BEFORE THE HONORABLE TIMOTHY L. BROOKS

14              February 16, 2018; 1:39 p.m.

15                  FAYETTEVILLE, ARKANSAS

16

17

18

19

20

21

22    Proceedings recorded in realtime via machine shorthand.
      _____
23
                     **Dana Hayden, CCR, RMR, CRR**
24               **Federal Official Court Reporter**
                   **35 East Mountain Street**
25               **Fayetteville, Arkansas 72701**

```
 1                          APPEARANCES

 2   FOR THE PLAINTIFFS:

 3        Mr. James M. Graves
          Bassett Law Firm
 4        221 North College Avenue
          Fayetteville, Arkansas 72701
 5        (479) 521-9996
          (479) 521-9600 Fax
 6        jgraves@bassettlawfirm.com

 7        Messrs. Marc R. Stanley and Martin Woodward
          Stanley Law Group
 8        6116 North Central Expressway, Suite 1500
          Dallas, Texas 75206
 9        (214) 443-4300
          (214) 443-0358 Fax
10        marcstanley@mac.com
          mwoodward@stanleylawgroup.com
11

12   FOR THE DEFENDANTS:

13        Mr. Steven T. Shults
          Mr. John T. Adams (via telephone)
14        Shults & Adams, LLP
          200 West Capitol Avenue, Suite 1600
15        Little Rock, Arkansas 72201-3637
          (501) 375-2301
16        (501) 375-6861 Fax
          sshults@shultslaw.com
17        jadams@shultslaw.com

18        Messrs. Robert Thompson Mowrey and Paul F. Schuster
          Ms. Harriet Ellan Miers and Mr. Matt Davis
19        Locke Lord LLP
          2200 Ross Avenue, Suite 2800
20        Dallas, Texas 75230
          (214) 740-8450
21        (214) 756-8450 Fax
          hmiers@lockelord.com
22        rmowrey@lockelord.com
          pschuster@lockelord.com
23        mdavis@lockelord.com

24

25
```

1          THE COURT:  The next matter before the Court

2   today is the case of Garland D. Murphy, III, and Phyllis

3   Murphy, plaintiffs, versus Gospel For Asia,

4   K. P. Yohannan, Gisela Punnose -- and I apologize if I'm

01:39PM   5   not getting that correct -- Daniel Punnose, David

6   Carroll, and Pat Emerick.  Our case number is

7   5:17-CV-5035.

8          The matter comes before the Court today for

9   purposes of a hearing on a pending discovery dispute

01:39PM   10   that has been fully briefed and is ripe for a decision.

11   In setting this matter for a hearing today, the Court

12   required at least one lead counsel for each party to

13   appear, and it also required each of the named parties

14   to appear, both plaintiffs and defendants; and I see a

01:40PM   15   courtroom full of people, so it looks like that part of

16   my order's been complied with, but let me see if we

17   can't introduce everyone.

18          Appearing today -- well, let me introduce the

19   plaintiffs first.  I see that we have Mr. and

01:40PM   20   Mrs. Murphy seated back there.  Good afternoon.

21          MR. MURPHY:  Good afternoon, Judge.

22          THE COURT:  Then on the other side of the

23   aisle -- well, in representing Murphys, we have here

24   today Mr. Marc Stanley.  I see Mr. Stanley; we have

01:40PM   25   James Graves and Martin Woodward.  Good afternoon to you

1    as well.

2              MR. WOODWARD:  Good afternoon.

3              THE COURT:  And do we have a corporate

4    represent here today for Gospel For Asia?

01:41PM  5    MR. MOWREY:  That would be Dr. Yohannan.

6              THE COURT:  Dr. Yohannan?

7              MR. MOWREY:  Yes, sir.

8              THE COURT:  Okay.  And then Dr. Yohannan, raise

9    your hand.  I think I -- thank you, sir.

01:41PM  10             And then Gisela?

11             MR. MOWREY:  Gisela.  It's Gisela, your Honor.

12             THE COURT:  Gisela, pronounce your last name

13   for me.

14             MS. PUNNOSE:  Punnose.

01:41PM  15   THE COURT:  Thank you, ma'am.  And Daniel

16   Punnose is here, David Carroll is present, and Patrick

17   Emerick is present.

18             Well, let me say to our parties thank you very

19   much for coming.  I know that the Murphys didn't have

01:41PM  20   very far to travel, and I know that many of the

21   defendants had to travel great distances to be here

22   today, so I very much appreciate that.

23             Representing the --

24             MR. MOWREY:  Your Honor, if I may.  David

01:42PM  25   Carroll is also here today -- I'm sorry.  Steve Coke,

1    who is the acting -- he's outside counsel, but he acts

2    as general counsel for GFA, and I wanted to introduce

3    him as well.

4            THE COURT:  All right.  And how do we spell

01:42PM   5    Coke?

6            MR. COKE:  C-o-k-e.

7            THE COURT:  Just like the cola.

8            MR. COKE:  Just like it.

9            THE COURT:  All right.  Thank you very much for

01:42PM  10    being here as well, Mr. Coke.

11           MR. COKE:  Yes.

12           THE COURT:  Representing the defendants, we

13    have Robert Mowrey, and we have Matt Davis, and we have

14    Harriet Miers, and we have Paul Schuster, and then I

01:42PM  15    know we have Mr. Shults here, and I understand that we

16    have John Adams, who is listening from his office back

17    in, I'm assuming Little Rock.

18           MR. ADAMS:  Yes, your Honor.

19           THE COURT:  So, again, thank all the parties

01:43PM  20    for being here I wanted all of the parties to be here so

21    that they could hear, unfiltered, the Court's

22    perspective of where we are on this discovery dispute

23    because for reasons which will become evident throughout

24    this hearing, I want everyone to leave here today being

01:43PM  25    crystal-clear about this Court's views of the discovery

dispute and what its rulings are.  I don't want anything

left to be misunderstood; and if at the end of the

hearing you aren't crystal-clear about what this Court's

directives are, then you need to raise your hand because

01:44PM  I don't want to have to take up this matter again.

So let me tee this up generally in terms of the

procedural history that brings us here today; and then

after I have established a general timeline, I'm going

to go back and spend a little bit more time at what I

01:44PM  think are some significant and specific points on the

timeline that inform part of the Court's views as to why

we're here today.

So the Court's understanding is that all of

this discovery dispute started back on or around August

01:44PM  15th of 2017.  That is when the plaintiffs served their

requests for admissions and production.  In total that

was about 1,072 separate requests for admissions and 178

line item requests for production.

The defendants, upon receiving that, asked

01:45PM  plaintiffs' counsel to withdraw the discovery because it

was in violation of the Court's local rules and was in

violation of the Court's instructions at the case

management hearing.  On Saturday, September 9th of 2017,

counsel for both sides conferred but were unable to

01:45PM  reach an agreement.

1          Later that same day, September 9th, Mr. Mowrey

2     e-mailed the Court describing these events and

3     requesting, pursuant to the Court's case management

4     order, requested that the Court schedule a telephone

01:45PM    5     conference.

6          Then on September 12th of 2017, Mr. Stanley

7     sent an e-mail to the Court saying that plaintiffs were

8     going to be withdrawing their discovery request because

9     they had gone back and re-reviewed the Court's

01:46PM   10     instructions and determined that Mr. Mowrey's point was

11     well taken, but he also informed the Court that they

12     would be moving for leave to file more than 25 requests

13     for admissions.

14          So that's what happened.  On September 18th,

01:46PM   15     the plaintiffs filed a motion for leave to serve

16     discovery.  Within a few hours after that motion had

17     been filed, the Court responded and indicated that it

18     would like to set up a telephone conference.  It could

19     sense that it needed to get involved fairly quickly

01:46PM   20     because it understood what the defendants' response was

21     going to be.

22          So both parties were asked to prepare a joint

23     letter to the Court to explain their positions with

24     regard to the dispute about these thousand-plus requests

01:47PM   25     for admissions and other discovery items, and the

1   parties complied with that request.

2          And on September 22nd of 2017, which I think is

3   one of the specific dates that I'll be drilling down on

4   more specifically in a moment, that's the date that the

01:47PM   5   Court held a telephone conference to discuss this

6   dispute about the appropriateness of all of these

7   requests for admissions that the plaintiffs had filed.

8          At the time of the Court's telephone

9   conference, the defendants had not had time to file a

01:48PM   10   formal response; and that's not counsel's fault.  It's

11   just that literally the amount of time that the rules

12   allow them had not yet expired, and the motion was not

13   fully ripe; but nevertheless, the parties had had an

14   opportunity to state their positions in a letter, and

01:48PM   15   the Court was able to hear from them during its

16   telephone conference.

17          A little bit later, the defendants did, in

18   fact, file their response to the plaintiff's motion for

19   leave; and on November 21st, the Court entered its

01:48PM   20   ruling on the motion after it had been fully briefed,

21   and it granted plaintiff's motion for leave to serve all

22   of these requests for admissions and requests for

23   documents.

24          The Court found that the large number of

01:49PM   25   requests for admissions were proper.  They were largely

very repetitive questions, about a half-dozen requests for admissions, but they were geared toward each line item contribution designations.

So in any event, as explained in the Court's order, that's another item that I want to drill down on more deeply here in just a moment.  The Court ruled that the plaintiffs could serve that discovery.  So I believe the very same day, the plaintiffs did formally serve that discovery on defendants.

So the defendants have been aware of this, the nature of this discovery, since August 15th of last year, and it has specifically been ordered that the discovery could be served on November 21st of last year and, in fact, it was served on November 21st last year.

We have 30 days to respond to requests for admissions and so on December 21st of last year, the defendants did serve their responses on the plaintiffs.

The plaintiffs felt like some of those responses were insufficient, so they subsequently asked defendants to revise their responses; and after multiple e-mail exchanges, the defendants refused to compromise much.

On January 8th of 2018, Mr. Stanley contacted the Court to request a phone conference, and that same day the Court inquired as to whether the parties had

01:51PM

01:51PM

01:52PM

01:52PM

01:53PM

1 actually spoken on the phone about this or gotten

2 together in person to review this.  The Court learned

3 that their communications about this dispute had just

4 been through back-and-forth e-mails and so the Court

5 ordered Mr. Mowrey and Mr. Stanley to personally visit,

6 and they did.

7 The Court had instructed that if Mr. Stanley

8 and Mr. Mowrey could not resolve these differences, then

9 the plaintiff should file an appropriate response.

10 My understanding is that Mr. Mowrey and the

11 defendants did revise and make some compromises on how

12 they were wording or the responses they were providing,

13 but as it turns out, the plaintiffs still believed that

14 the responses were insufficient.

15 So the plaintiffs, on January 26th, filed

16 motion for sanctions.  That is the motion that is before

17 the Court today -- that's at Document 55 of the court

18 record -- and the defendants filed their response on

19 February 2nd -- that's found at Document 61 of the Court

20 record -- and the matter was set for a hearing today.

21 So that is the big picture and the procedural history

22 that brings us all here today.

23 I've next got a question for everyone.  Will

24 you please raise your hand if you've ever seen the movie

25 "Groundhog Day."  I feel like I am Phil Connors who was

portrayed by Bill Murray in the movie "Groundhog Day" in

dealing with this discovery dispute; and I am of the

view, having read the motion and the response, that the

defendants, at least in their answers -- their answer to

01:54PM   these requests for admissions, and in their response to

the motion for sanctions, are like all of the people

that Phil Connors was dealing with in the movie

"Groundhog Day."

He woke up every day repeating February 2nd,

01:54PM   over and over again, but the people that he was

interacting with in the plot of this movie didn't

realize that; and I feel like when I read the

defendants' answers and when I read their response that

it is as if this Court had not already addressed and

01:54PM   ruled on some of these same issues at least twice, if

not more and, yet, here we are again.

So because I believe that it is very important

to understand that the Court is not looking at this

motion for sanctions and response in a vacuum but that

01:55PM   it is looking at it in the context of what the Court has

previously heard from the parties, discussed with the

parties, and given guidance to the parties and ruled on,

I'm going to spend some time, before we get to this

motion, to drill down a little bit deeper on what has

01:55PM   transpired before because I don't want to rule in a

1    vacuum like I feel like I'm being asked to.

2         I have a transcript from the September 22nd

3    hearing, and I'm going to be reading excerpts from this

4    transcript.  And the excerpts that I will be reading

01:56PM   5    skip around a lot.  What I have tried to do is just

6    select passages that give the context that I'm wanting

7    to provide.  So please don't think that everything that

8    I'm about to read was said consecutively.  It's not.  It

9    jumps around a little bit.

01:56PM   10        But in any event, the Court, in setting up the

11   purpose of the telephone conference, explained as

12   follows:  "The plaintiff's lawsuit sets forth causes of

13   action sounding in RICO violations, common law fraud,

14   statutory fraud pursuant to the Arkansas Deceptive Trade

10:39AM   15   Practices Act, and a common law claim for unjust

16   enrichment.

17        "The defendants deny that they have

18   fraudulently induced anything and explain that there are

19   completely innocuous explanations to address any and all

10:39AM   20   concerns about the disposition of any donations that it

21   has received."

22        The Court then went on to explain:  "The Court

23   understands that the central, or core, fact issues for

24   the case or for trial is going to be whether the

10:44AM   25   defendants spent the financial and charitable donations

that it had received for the purposes that had been
expressly designated by the defendants' donors; and
through the course of discovery to date, as I understand
it, the defendants have informed the plaintiffs and have
provided a certain amount of information and documents
that establish 179 different donation codes that
categorize various purposes of donations.  And the
plaintiffs report that the defendants have objected to
certain other disclosures on various grounds, including
overbreadth and international law concerns and various
purposes.

   "So as I understand it, the plaintiffs are
seeking, in this third set of discovery, that they would
like to propose requests for admissions.  It is the same
five- or six-part request for admission and document
production that corresponds to each of the 179 different
donation purpose codes that have been -- that they have
been provided a certain amount of information about from
the defendants.

   "The defendants object saying that the sheer
volume of what's being requested is not appropriate.
They also object inasmuch as they contend -- and they
cite a fair amount of authority -- that what the
plaintiffs are seeking to do with these requests for
admissions really goes against the purpose and intent of

the types of discovery to be sought and achieved through
Rule 36 discovery."

        Mr. Stanley was later asked to state his
position, and here is an excerpt where he is quoting
from Mr. Mowrey.  Mr. Stanley says, "On Page 34,
Mr. Mowrey actually agreed with the Court, and what he
said was" -- and he's talking about our initial case
management hearing that had occurred earlier in the
year, and he's quoting Mr. Mowrey as saying this: "Going
to the heart of the allegation, we believe we will be
able to show that the monies that were designated went
to the particular items that were specified."

        And Mr. Mowrey said at that time that they are
going to be able to show that at trial.

        Mr. Stanley goes on to say:  "So the requests
for admissions were simply intended to say, 'Admit that
this was the total amount, admit that you sent it
somewhere, admit you have no evidence as to how it was
spent.  If you do have the evidence, give it to us."
It's very simple, and that's all we want."

        Again Mr. Stanley says, referring to
Mr. Mowrey:  "Mr. Mowrey tells me in phone calls that
they are assembling this information, that they are
working on some report that they might show this -- or
that might show this.  Well, either they have the

1  evidence that they can work on it or they don't, and

2  that's what we want."

3       So then it was Mr. Mowrey's turn to respond.

4  Mr. Mowrey says, "Yes, your Honor.  The point here is

10:50AM  5  that the very issue that Mr. Stanley is getting at is

6  basically to prove his case or to disprove our case

7  through these requests for admissions, and that is just

8  a totally inappropriate use of requests for admissions."

9       Later on in the hearing the Court made this

02:02PM  10  statement:  "Now back to you, Mr. Stanley.  They, being

11  the defendants, have apparently provided information

12  about the amounts of donations that were received and

13  broken that out by codes.  How would you describe or

14  characterize what sort of information has been provided

02:02PM  15  that would go to the issue of matching up expenditures

16  with the designations made by the donors?"

17       Mr. Stanley's response was, "That's exactly my

18  point.  There's zero documents and zero information.  We

19  tried to get this first in our first set of discovery

02:03PM  20  requests, and we got objections saying that requires a

21  forensic accounting and it's beyond what the Murphys

22  spent their money on.  And so we said" -- the plaintiffs

23  -- "rather than bother the Court, they gave us this

24  other document; we'll just break it up ourselves and

02:03PM  25  say, 'Show us how you've spent this money,' and they've

given us zero documents so far and zero information on

it."

The Court then said, "All right, Mr. Mowrey.

You apparently -- your clients apparently track

02:03PM   donations received by these categories.  Help me

understand the methods that they" -- the defendants --

"use to track their disbursements or their expenditures

by purpose."

And Mr. Mowrey gave a very lengthy explanation,

02:04PM   or response anyway; and to kind of get to the point, he

says:  "Now, I have made it clear to Mr. Stanley, and

I'll state to the Court:  We have withheld -- and by

'we,' I'm talking about the defendants in this case --

have withheld no documents based on our objections.

11:04AM   "Yes, we have -- we have provided objections to

his requests, but we have withheld no documents based on

objections.  We have given him the entire general ledger

of our client.  We have produced approximately 50,000

documents.  We have produced documents that we have in

11:05AM   our possession showing where these monies were spent."

Mr. Mowrey continues:  "GFA does not spend the

money.  The money is spent by the foreign entities, and

Mr. Stanley has chosen not to sue the foreign entities.

He has made no attempts to get any information from

02:05PM   these foreign entities.  So we have provided documents.

There are still documents we have.  We continue to find

documents and, frankly, the documents that we're finding

now are not what Mr. Stanley has specifically requested;

but to the extent we have any documents that bear on any

02:06PM  of these issues, we intend to produce them from these

defendants."

And then the Court observed:  "Well, you

receive millions upon millions of dollars in donations.

Your donors, your solicitation allows them to designate

02:06PM  it for specific purposes.  You're describing for me

somewhat of a shell game inasmuch as if a donor were

ever to say, 'How can I know that the money that I

designated for ministry tools actually went to ministry

tools,' and you're, in effect, saying, 'Well, we can't

02:06PM  prove that.  You'd have to ask the people that we gave

it to,' who, by the way, are foreign companies or

foreign entities or foreign individuals.

"So, if that's what the response is, then you

are telling me that there is no accounting or no

02:07PM  accountability mechanism from the people that you

forward money to in Asia to corroborate or verify that

they are spending the money in accordance with your

donors' intentions?"

And that was a question to Mr. Mowrey, and he

02:07PM  responded:  "No, I'm not saying that.  This is not a

shell game.  One of the previous issues were these GAAP

audits, and we have now produced those.  I want to tell

the Court and the plaintiffs' counsel where we are on

this.  GFA-USA has retained one of the big four

accounting firms.  That firm has been working with their

Indian counterpart to obtain documents in India.  The

accounting firm has not yet had access to those

documents.  Only recently have the Indian counterpart

been given access to the documents."

A little bit later, in continuing his answer,

Mr. Mowrey says:  "But at this point we do not have

possession of those, of those documents, and neither

does the U.S. arm of the entity that we have retained --

that we have retained, do they have access to them.

"So, your Honor, I will also say that one of

the categories of documents I don't think that has

specifically been requested, but we recently found out

about that we will be producing to the plaintiffs, these

are not accounting documents but our client has

regularly received information from India regarding the

work that is being done in India, and this is extensive.

And it's done, I think, on a monthly or quarterly, a

quarterly basis, so I don't want the Court to get the

impression that this is some person out there that is

just raising money."

1     Still continuing his response, a little bit

2   later Mr. Mowrey says:  "The work that is being done by

3   GFA-USA and by their Indian counterparts is not a sham.

4   This is real work that people's lives are dependent

02:09PM   5   upon, and it's difficult to prove from an accounting

6   standpoint because of the access, but we intend to do

7   it."

8     A little bit later, the Court observes, or asks

9   Mr. Mowrey:  "Are there any charitable organizations

02:09PM   10   that have no ties whatsoever to Gospel For Asia or any

11   entities that are tied to Mr. Yohannan that is funding

12   the field partners, or do all of their money come from

13   someone that has some connection to Gospel For Asia?"

14     Mr. Mowrey says:  "I don't know the answer to

02:10PM   15   that question."

16     The Court then goes on:  "Where I'm going with

17   this, Mr. Mowrey, is control; and it would seem that if

18   these field partners are dependent upon either the

19   defendants in this case or the principals of the

02:10PM   20   defendants in this case that have been sued directly or

21   indirectly for their financial backing that the power of

22   the pursestrings brings with it some amount of control

23   over the production of documents that would establish

24   how the money is spent.  The allegation here is that a

02:11PM   25   representation is made to your donors that their money

1  will be spent in the field for a specific purpose.

2      "So, given the power of the pursestrings, one

3  would think that there would be some sort of paper trail

4  to establish how the money was actually expended and

02:11PM  5  that that paper trail wouldn't be a document that's kept

6  in a vault by the field partner, but one would think

7  that the field partner would be at all times ready,

8  willing, and able to share that with the source of their

9  funding."

02:11PM  10      The Court went on to say:  "I am very

11  appreciative of what you are saying, that the defendants

12  have engaged a top four international accounting firm to

13  conduct a forensic audit.  I think that that is an

14  incredibly good action for your organization to take;

02:12PM  15  but what you're basically saying is outside of this

16  litigation context, 'We're sincerely and genuinely

17  looking into all of this.  We've hired really, really

18  smart people to genuinely and sincerely look into this,

19  and as soon as we have more information, we're going to

02:12PM  20  let you know; stay tuned.'"

21      The Court explained:  "But that's not how

22  litigation works.  The plaintiffs have sued these

23  defendants for fraud.  They have a right to acquire the

24  paper trail documents independently of the accountants

02:13PM  25  that have been engaged by the defendants; and to the

extent that you don't have the documentation and/or you
do not have a right or ability to control the production
of the documents that have been requested, then I get
it; but if that's the case, then that must be your

02:13PM  response.

"Here's what I'm going to do.  I think that a
formal ruling by the Court is premature.  There is a
pending motion on the table.  I think that the defendant
should have the right to file a fulsome response.  I

02:13PM  would ask, when you file a response, that you either do
so in a manner or include alternative language to seek a
protective order over any documents that you believe
there is a legal basis for nondisclosure or privilege or
whatever the case may be so that we can take up that

02:14PM  issue on the front end as well; and once you have filed
your response, the Court will take a deeper dive into
the issue and examine the documents more thoroughly and
will issue an opinion.

"But having said that, let me tell you where

02:14PM  the Court's -- what the Court's current thoughts are.
First of all, the issue in this case is whether the
proceeds of these donations have been spent as
designated by the donors or not; and it occurs to me
that discovery aimed at the amounts of donations

02:15PM  received, broken down by those designated purposes, is

wholly appropriate discovery; and the other side of the

equation being how donations received were spent is a

wholly appropriate area for discovery too.

         "I don't think that the rules of federal

02:15PM  procedure contemplate your ability to say, 'We object

based on this, we object based on that, we object based

on this; but subject to those objections, we're going to

do our best to look for and give you something.'  You

either have an objection or you don't, and the rules

02:15PM  require that, to the extent that you have documents

outside the objection, you have to produce them; and to

the extent you want to object, you need to file a motion

for a protective order.

         "It just seems to the Court that you're

02:16PM  objecting to the format of requests for admissions when

you have raised all of these objections to providing

information when they were previously propounded as

interrogatories and requests for documents, and you've

done so in such a manner of, 'well, we object, but we're

02:16PM  going to do so, stay tuned, 'and I just don't think that

that is an appropriate objection.

         "So, as the defendants contemplate their

response to the defendant's motion, I would ask that you

keep in the back of your mind that the Court is very

02:17PM  likely to allow some form or fashion of discovery as the

plaintiffs currently seek; and if the Court, in your

response, believes that you are putting up illegitimate

barriers to that discovery or providing evasive answers,

then you might potentially be looking at the Court

02:17PM   appointing a special master to get to the bottom of

this.

"And, again, if your point is you don't have

documents and you can't provide something that you don't

have, then that is your response; but if you have

02:17PM   documents or, because you control the pursestrings, you

are in a position of control over the documents, I would

suggest that you try a little bit harder."

So that's how we left things.  And I'm sorry to

take up so much of everyone's time, but there was a lot

02:18PM   of context.  There was a lot of explanation.  There was

a lot of discussion about what the Court viewed as being

appropriate, and it's kind of a black-or-white

situation:  Either you have it, and if you have it,

produce it; if you don't, just say you don't have it,

02:18PM   and that's fine too.

So the defendants did not have, at that time of

that telephone conference, an opportunity to fully

respond, and the Court gave them that opportunity.  And

Mr. Mowrey filed an excellent response, the Court

02:18PM   considered that response, and it issued a written

opinion and order.  And that was filed on November 21st;
that can be found at Document 44 of the case file.

And again, so that you understand the context
of today's hearing, I want to read part of the Court's
order from November 21st:  "The matter currently before
the Court concerns a discovery dispute that has arisen
between the parties regarding information central to
this case; namely, information regarding where donated
monies were sent and for what purposes they were used.

"As is obvious, given the nature of this case,
plaintiffs' theory of fraud is premised on demonstrating
that defendants and their international partners did not
spend the donated money in accordance with their donors'
wishes and, in doing so, violated promises allegedly
made to these donors doing -- to do exactly that.

"In order to demonstrate that these donations
were not spent in conformity with these alleged
promises, plaintiffs served two prior sets of discovery
on defendants.  Both of these sets, which included
interrogatories and, by the Court's count, at least 75
requests for production, sought to obtain information
and documents that would either establish or refute
plaintiffs' theory about where the donated money went.

"It is clear that plaintiffs' prior attempts to
discover this crucial information were only partially

successful.  In short, these interrogatories and requests for production provided a wealth of information that illustrate how much money was collected by the defendants, but this discovery information did nothing to clear up the confusion as to how this accumulated money was subsequently spent.

"Plaintiffs now once again seek answers to the same questions that they've been asking for months:  Was donated money diverted to other causes and do defendants have information or documents that would prove how the money was spent.

"In an effort to come at this problem from a different angle, plaintiffs now seek to serve on the defendant what amounts to over 1,000 requests for admissions.  While startling upon first read, the sizable number of requests for admissions consists entirely of the same six requests for admissions repeated for each of 179 different codes, representing different categories of donations; for example, a code for pigs and a separate code for bicycles:

"Each of these sets of requests for admissions is accompanied by a request for production asking for any documents in the defendants' possession that would reflect how this earmarked money was spent.

"In their response in opposition, defendants

object to this proposed discovery on several grounds,

including the sheer number of requests, the improper

nature of these requests, given the purposes of Rule 36,

and the lack of need for these requests now that

02:22PM   defendants' field partners have recently committed to

providing information relevant to plaintiffs' inquiries.

The Court finds these reasons unpersuasive."

      The Court ruled, "There is nothing per se

improper about these requests for admissions.  The Court

02:22PM   will not deny these requests solely because they concern

facts which may be matters for trial.  If defendants

deny the facts that they are asked to admit or, after

reasonable inquiry, if they do not have information by

which to either admit or deny these facts, then that is

02:23PM   the answer that should be provided."

      The Court noted that "Defendants object to

these requests for admissions because they argue they

have been rendered unnecessary by recent commitments by

some of the defendants' international field partners to

02:23PM   provide information related to plaintiffs' questions and

because they personally do not have control over what

their international field partners do.  These objections

are also unpersuasive to the Court.

      "The fact that defendants might now have the

02:24PM   ability to provide a supplemented answer to previously

served interrogatories does not alter the Court's view

that these requests for admissions are proper, given the

information that has been submitted to it by the

parties.  Moreover, defendants contend that the

02:24PM  requested information is largely in the hands of third

parties over whom defendants exercise no control.

"As the Court advised during the telephone

conference, if, after reasonable inquiry, defendants do

not have within their possession information by which

02:24PM  they could honestly admit or deny these requests for

admissions, then that is the answer that should be

provided.

"If, in fact, it turns out that defendants are

correct that they do not have the means by which to

02:25PM  document how their international field partners spent

the money, then the replies to plaintiffs' requests for

admissions will be very similar and simple.  It is,

therefore, ordered that the plaintiffs' motion for leave

to serve this discovery be granted."

02:25PM  And that was November 21st; the Court

understands that the discovery was served formally that

same day.  The Court understands that the defendants

timely responded a month later.  The Court understands,

as I explained earlier, that the plaintiffs took

02:25PM  exception with the sufficiency of the defendants

1  'answers, and that brings us to the instant motion for

2  sanctions and to the defendants' response.

3  What the plaintiffs are, as a matter of

4  predicate, asking the Court to find is that the

02:26PM  5  defendants' responses are insufficient, and I believe

6  that that is a predicate finding that the Court would

7  have to make before sanctions would be appropriate.

8  In response -- and I've read the entirety of

9  the response several times now and so please don't think

02:26PM  10  that my summary of the response is intended to ignore

11  multiple different reasons and explanations that are

12  advanced, but my overall takeaway is that the defendants

13  believe that they have responded to these requests for

14  admissions in a manner that is exactly proper and

02:27PM  15  exactly as the Court has previously directed.

16  And I will tell you this:  The defense lawyers

17  in this case are extremely good and skillful lawyers,

18  and they write extremely well, and they have parsed

19  their responses to these requests for admissions

02:27PM  20  probably better than any other lawyer or law firm I know

21  of if you tried really, really hard, okay?  They have

22  done a good job; but in the Court's view -- and I'm

23  going to hear from Mr. Mowrey in a moment -- we're still

24  back to the same things that we were talking about last

02:28PM  25  September.

1          The Court is being told that, "We've produced
2     lots and lots of documents," and when the plaintiffs ask
3     us whether we've produced everything we have, we explain
4     how we have produced all of these documents and then we
02:28PM   5     say, "And we're still looking.  We're still gathering.
6     Stuff is still coming in.  You don't understand.  These
7     foreign partners are outside the United States, and it's
8     difficult."
9          It's the same thing this Court was being told
02:28PM  10     last September.  The defendants' response says,
11     "Plaintiffs are making this way too complicated.  It's
12     not that complicated."  Well, in my view the defendants
13     are the ones that are making this way too complicated.
14          In response to these same five or six
02:29PM  15     questions -- and actually only three or four are in
16     dispute -- the sole focus is was the money spent as
17     designated.  There's either "Yes, it was" or, "No, it
18     wasn't."
19          If the answer is, "Yes, it was," and that is,
02:30PM  20     in effect, the answer that has been given, then the
21     response to the remaining questions can only fall into
22     about one of four groups.
23          One would be something to the effect of, "We
24     only have documents that show expenditures in the field
02:30PM  25     generally, and we do not have any documents that show

how any specific line items such as bicycles or water
buffaloes were procured or paid for."

Another possibility would be, on the complete
opposite end of the spectrum, "We have specific
documentation for each of the 179 different designated
items, including bicycles and water buffaloes, and here
are the Bates-numbered pages for the receipts or
checks," or whatever it is that specifically documents
it.

Then there are a couple of areas or responses
or possibilities that are in between those two extremes.
One would be, "We have specific documents that partially
establish the total dollar amount that was designated
for a given category -- for example, $100,000 that might
have been designated by donors for water buffaloes --
but we only have receipts totaling $50,000, and we're
going to have to rely on witness testimony or something
else to explain the difference."  That would be one
possibility.

A fourth possibility is, "We don't have any
documents to specifically establish that any particular
donation was funded in the field as designated, but we
can rely on other things such as witness testimony or
the fact that we can prove that money was actually spent
in the field, and we can prove that at trial."

1          That's about as complex as this case is, and

2     the defense is "This money was spent as designated."  If

3     you only have general proof of that, then just own up to

4     that and say, "We only have general proof.  We don't

02:33PM   5     have anything -- we don't have receipts, we don't have

6     checks, we don't have bills of sale.  We don't have

7     anything specific."  That's fine, but if that's what

8     your defense is going to be at trial, the plaintiffs are

9     entitled to know that.

02:33PM  10          Knowing what you don't have is sometimes as

11     important as knowing what you do have and what they have

12     been, in effect, asking.  As defined through this entire

13     history that I have reviewed ad nauseam with you today,

14     that is the point that we have been getting at.

02:34PM  15          Your answers and your response in the briefing

16     numerous times, numerous times I think in some shape,

17     form, or fashion, it's in every one of the responses,

18     and it's repeated no less than a half-dozen times in

19     your response brief:  "We know this information is out

02:34PM  20     there, and they have agreed to provide it to us, and

21     we're going to go -- we're going to go collect that and

22     we're going to give it to you."

23          Well, when?  And the rules require, with

24     respect to requests for production, that the documents

02:35PM  25     be produced within 30 days.  This discovery was

1   propounded last summer on some of these items.  The

2   specific requests that were accompanied with these

3   requests for admissions were first given to you back in

4   August, they were formally served on November 21st, and

02:35PM   5   we're now two and a half months down the road from then.

6           In September the Court was told not to fear,

7   "We're working on this.  We've hired some really, really

8   smart accountants with a really, really big

9   international accounting firm to help us.  Not to fear;

02:36PM   10   we're going to provide it."  And, yet, in your response

11   brief you say, "We're still collecting that stuff.

12   We've given lots of it to them, and we're going to give

13   them more as soon as we give it -- as soon as we get

14   it."

02:36PM   15           As I said back in September, that is not the

16   Court's view of how discovery works under the federal

17   rules.  Your response is akin to attempting to nail

18   Jell-O to the wall.  Until they get these documents,

19   they are not going to be able to take a very

02:36PM   20   well-informed deposition of the defendants or the

21   representatives of the defendant entity.

22           If the deal is you only have general records of

23   expenditures in the whole and not records of specific

24   line item expenditures, they have the right to know that

02:37PM   25   going into the deposition process.  If you need more

time to gather documents, more than the 30 days allowed

under the rules, there's a mechanism for getting more

time.  You file a motion with the Court.

02:37PM

Back in September, the Court discussed, "If you

need a protective order, come see the Court on the front

end."  And so to the extent that this is about a

complicated process and a need for more time to visit

with these field partners, then ask the Court for more

time; but in the Court's view, it is simply

02:38PM

inappropriate to, in effect and substance, tell the

plaintiffs, "We're working on it; we'll get back to

you."

I have -- of the attachments that have been

provided to the motion and response, there are examples

02:39PM

and admittedly not everything, not nearly everything

that the defendants have provided to plaintiffs, but

they have attached examples of the types of information

that they have provided to the plaintiffs.  And I want

to say to the individual defendants that are here, I

02:39PM

know that a lot of work has been put into this, and I

don't think you to think for a minute that your lawyers

haven't been working very, very hard.

Lots of information has been gathered.  Lots of

information has been provided to the plaintiffs, but

02:39PM

litigation should not be like a hog searching in the

1    woods for truffles, and that is, in effect, what your

2    responses are.

3          To the parties that are here today, I want to

4    read to you one of the rules of procedure that govern a

02:40PM   5    civil case. All the lawyers here can quote this rule,

6    but maybe you're unaware of it. It's an often

7    overlooked rule, but it's a very important rule. It

8    says, "These rules," referring to the Rules of Civil

9    Procedure, "govern civil actions. They should be

02:41PM  10    construed, administered, and employed by the Court and

11    the parties to secure the just, speedy, and inexpensive

12    determination of every action and proceeding."

13          Litigation is not a game. Litigation should

14    not be viewed as something that we're going to run up

02:41PM  15    the costs on the other side, which sometimes plaintiffs'

16    lawyers in class action cases are prone to do, but nor

17    should it be throwing a haystack full of paper and

18    parsing your answers to somehow give the illusion that

19    there's been technical compliance with the rules when,

02:42PM  20    in substance, you're not saying anything.

21          And I think that, at bottom, the requests that

22    have been made are very simple and that the responses

23    have been extremely well crafted by very skillful

24    lawyers, but they basically are evasive.

02:42PM  25          My takeaway, in trying to read through and

1  parse through everything, is that the defendants do not

2  presently have documentary proof to show how these 179

3  different designated contributions -- contribution

4  categories were spent.  You don't have receipts, you

02:43PM  5  don't have bills of sale, et cetera, et cetera, et

6  cetera; and if that is your answer, then just say that.

7       What you have said is that you have lots of

8  documents and you have lots of proof and you have lots

9  of bank records that you've received from these foreign

02:44PM  10  partners to show that they were given money and that

11  they spent it in the field; and if you're going to use

12  the fact that money was sent and received and was

13  generally spent in the field, if that's the defense,

14  that's fine, but the plaintiffs have a right to know

02:44PM  15  that that's what your defense is; and where you have

16  specific evidence as to any given line item, they have a

17  right to know what that consists of.

18       Now, having said all of that, I have one

19  question for Mr. Mowrey, maybe two, and then I'm going

02:45PM  20  to hear whatever Mr. Mowrey would like to say in support

21  of the defendants' response.  My question is I could not

22  tell whether, when sending money to the field partners,

23  whether there was any sort of transmittal correspondence

24  and, if so, whether that actually says, "Dear friends in

02:46PM  25  this part of India, enclosed please find $50,000 which

1  has been donated for water buffaloes and must be spent

2  on water buffaloes," or whatever the transmittal letter

3  would say.

4       So I guess my question is, is there transmittal

02:46PM  5  correspondence; and, if so, is it specific to donor

6  designations; and, I guess thirdly, has any such

7  documentation, is that part of what has already been

8  provided to the plaintiffs?

9       Mr. Mowrey?

02:46PM  10       MR. MOWREY:  Yes, your Honor.  The designation

11  reports which were produced -- that was one of the first

12  things that had been produced -- those are sent to India

13  and those designation reports are Exhibit A, I think, to

14  our response, break down the monies within each of the

02:47PM  15  designated -- within each of the designated categories.

16       THE COURT:  Well, so what you're saying is a

17  report that reflects total donations and how those were

18  designated, that's sent to the field partners?

19       MR. MOWREY:  Yes, sir.  Yes, sir.

02:47PM  20       THE COURT:  There are dozens or hundreds of

21  field partners?

22       MR. MOWREY:  Well, your Honor, the monies are

23  all sent to one location.  There are separate Indian

24  trusts.  There are a number of trusts, but essentially

02:47PM  25  those trusts are centered in Thiruvalla, at the main

1   headquarters at the synod and so all the monies are sent

2   to the trust which are maintained there at the

3   headquarters.

4         THE COURT:  Well, how does Trust A know how

02:48PM   5   much Trust Z is going to spend on water buffaloes and

6   vice versa?

7         MR. MOWREY:  The trusts, your Honor, is just a

8   mechanism to receive the money.  Once the money is in

9   India, then they will then disburse money in a -- some

02:48PM   10   of it is sent directly, for example, to missionaries

11   that are paid directly by the synod; other monies are

12   disbursed to the numerous diocese; and then there's many

13   other monies that are purchased and given to the synod.

14   It's a very diverse way of disbursing the money once it

02:48PM   15   hits India.

16         THE COURT:  Okay.  Well, with that added

17   context, then I'm going to, I guess, to refine my

18   question is when the diocese sends out the money, is

19   there a transmittal letter or information that goes with

02:49PM   20   that that says, "This group, you must spend $20,000 on

21   water buffaloes and this group over here, you must spend

22   $25,000 on bicycles?  Is there some attachment to the

23   money that says you must use it for this purpose?

24         MR. MOWREY:  Your Honor, they have designation

02:49PM   25   codes, but the way that it works is more what I would

consider bottom up.  In other words, the diocese make

requests.  They say, "We need" -- which come from their

church.  "We need so many dollars for water buffalo, we

need dollars for bicycles" or whatever, and the requests

02:49PM  are made.

The money then flows from Thiruvalla to the

diocese and then the records are disbursed from there.

Records are kept with respect to all of those monies,

both the disbursements, as well as the monies that are

02:50PM  spent.

THE COURT:  I'm sorry.  One more time.

MR. MOWREY:  Okay.

THE COURT:  You send out a request to raise

money for bicycles, for example.  You get donations for

02:50PM  bicycles.

MR. MOWREY:  Correct.

THE COURT:  According to the plaintiffs'

allegations, these donors are promised that if they give

money for bicycles, they will be used to buy bicycles.

02:50PM  So my -- I guess my question is this:  Does the

particular missionary, or whatever the proper term would

be, that receives money from the diocese in India, do

they know that they are supposed to spend this month's

check or money on bicycles and, if so, is that in a

02:50PM  letter, is it in an e-mail?  How do they know it and

1   where is the record and has it been provided?

2       MR. MOWREY:  Well, there's a lot of action on

3   the question.  To get right to your -- to the bottom

4   line here, your Honor, is -- and there's many things

02:51PM  5   here to say, but we have said in our -- let me back up,

6   if I could.

7       I'll answer your question.  There is not a

8   transmittal letter that I'm aware of that says, "We

9   raised $100,000 for bicycles; here's the $100,000.  Go

02:51PM  10  buy the bicycles."  There's nothing like that, okay?  It

11  doesn't work that way.

12      The way it works is that these various diocese

13  say, "These are things that we need," and then they will

14  get monies, and they spend that money for those items.

02:51PM  15      And I need to correct one thing, your Honor.

16  The promise is not -- the promise that was made and the

17  promise that is primarily in the complaint was that all

18  this money would go to India.  You make a donation; all

19  of your money goes to the field.

02:52PM  20      The promise is not that you give money for a

21  bicycle as a designated purpose and that all of your

22  money is going to go to that bicycle.  That's not the

23  promise.  There is a commitment, first of all -- I mean,

24  it can't be.  It's not a designated -- it's not a

02:52PM  25  restricted designation.

1    THE COURT:  Well, let me parse that a little

2  bit.  I meant to say, if I didn't, the word "alleged" in

3  front of promise, the alleged promise is.  I'm not

4  trying --

02:52PM    5    MR. MOWREY:  I understand.

6    THE COURT:  -- in any manner to assume that

7  that's what the promise was -- and Mr. Stanley will

8  correct me if I'm wrong in stating what the allegation

9  is -- but that, again, is beyond the point.

02:53PM   10    If that is your position, then why not just

11  say, "We don't have any receipts or bills of sale or

12  checks to give you because we only promised to use these

13  monies in the field, and we received $3 million in this

14  month or this year, and here is proof that we sent it to

02:53PM   15  the field"; and if that's the defense, that's fine.

16    MR. MOWREY:  Your Honor, there are receipts.

17  There are receipts.  What we have given to the

18  plaintiffs this week -- and let me -- when the Court had

19  the hearing in September, we got a transcript, provided

02:53PM   20  it to our clients, sent it to India.

21    I've been to India twice and told them what we

22  need; and we, before this motion was filed, we had

23  gotten bank statements, of which there are numerous

24  because there's numerous bank statements over -- in

02:54PM   25  numerous accounts.

1        We have been working on, and this week they now

2   have the general ledgers for the trusts at the synod

3   level, which is the administrative level, as well as the

4   diocese level.  Over 40 diocese, and each of these

02:54PM   5   diocese, they keep separate books and records.  It

6   doesn't all go into the -- all up into administration.

7   You have to look at them all.  And they now have what

8   are called cash books and bank books.  The bank books

9   show the deposits in the cash books and they show the

02:54PM   10   receipts out.

11        It's a ledger, and unfortunately this

12   organization has used a software program that was never

13   meant for this kind of organization.  It's an

14   off-the-shelf program that was used for, I think for

02:55PM   15   retail, and it is very rudimentary.  They are in the

16   process of changing that now because it doesn't show the

17   sorts of -- it doesn't have the type of flexibility that

18   they should have in their software.

19        But this is the ledger that shows the

02:55PM   20   expenditures; and the fact of the matter is if you look

21   at the specific designations over the relevant time

22   period, it's about $375 million.  I mean, and I don't

23   think there will be any dispute about that.  That's the

24   number, if you look at the designations that are in

02:55PM   25   dispute.  It's about $375 million over this time period.

Those expenditures, just the expenditures, show well in

excess of that amount, spent in the ministry.

Now, there are three levels.  The first

level -- the way I look at this, your Honor, the first

02:56PM   level is did these folks send money over there and just

say it's sent over and just relied on it, okay?

They received reports -- they were produced in

the initial disclosure.  They received reports from

India, from an India accountant that shows -- and it's

02:56PM   bucketed differently.  It wasn't broken down into 179

buckets.  It was broken down into about ten categories,

but essentially -- and so many of those categories would

be lumped together.  But it shows that monies were spent

over there.  They got that evidence.

02:56PM   They also got evidence, as we have produced to

the plaintiffs, of the work that was being done.  I

mean, one of the -- for example, the one designation

that they used in their motion was water buffaloes

thinking that, well, surely you don't have any evidence

02:56PM   that money that was spent on water buffaloes.  Well, in

fact, the document that we showed shows, yes, here's

some personal stories about what was spent on water

buffaloes.

So from the ministry standpoint, your Honor,

02:57PM   they are in daily contact with people over there.  They

1  are getting stories sent.  They are getting an annual --

2  they get these certifications from the India

3  accountants, and they are over there.  They have got

4  people over there.  They are actually, they see the

02:57PM  5  minutes or they see it happen.

6         Now the plaintiffs have filed a lawsuit.  It's

7  like, well, okay, we've got a -- and we also received,

8  your Honor -- it's in these documents -- a sheaf of

9  documents from India where they went through each

02:57PM  10  designation and said, "These are the way the monies have

11  been spent."  Does it have backup?  No, it doesn't have

12  backup.  It was a document they sent us, but it showed

13  the monies that have been spent.

14         Now we have a lawsuit.  Are those documents

02:57PM  15  sufficient to show that the money was actually spent in

16  that way?  No.  They are just one piece of it.  If you

17  were to call the YMCA and ask them, "Hey, I want to know

18  about the contribution I made, did it go to a certain

19  place, they may send me a report and say, how do I know

02:58PM  20  that it actually went there.

21         So my next point is now they have the ledgers.

22  Now they have the ledgers.  And I realize they probably

23  haven't had time -- maybe they have had time to at least

24  to look at them a little bit.  They just got it in the

02:58PM  25  last couple of days.

1          THE COURT:  My understanding is that the

2    ledgers are going to have categories, but because they

3    don't refer to it the same way as the donations were

4    designated, there's not going to be a one-on-one

02:58PM   5    correlation; is that right?

6          MR. MOWREY:  That is correct in many respects.

7    Now, for example, a missionary, a missionary's a

8    missionary, so that's an easy one.  You can map those

9    directly.  But, for example, your Honor, you give

02:58PM  10    $100 -- let's say a million dollars is raised for

11    bicycles.  So it's not like a million dollars goes to

12    India for bicycles.  You wouldn't necessarily expect to

13    see a receipt for a million dollars for bicycles because

14    you've got distribution, you've got costs to purchase a

02:59PM  15    bicycle, to get it to where it needs.  Those are costs

16    that are associated with -- it all goes to India, but

17    it's not like there's going to be $100 to go to a

18    bicycle shop in India.  It's got to be distributed.  The

19    point is that the bank -- the ledgers that they have

02:59PM  20    now, the cash books and the bank books are going to show

21    that level of detail.

22          Now, the next step is they are going to look at

23    that and they are going to say, well, how do I know that

24    that money was actually spent?  And, your Honor, that's

02:59PM  25    where India comes in.

1          THE COURT:  That's where what?

2          MR. MOWREY:  That's where India comes in.

3     These documents are in hardcopy.  They are not

4     electronic.  I've seen many of them.  They are in these

02:59PM  5     notebooks, hundreds of them, hundreds of them, of

6     receipts, hardcopy receipts.

7          And so when they see -- when the plaintiffs

8     start looking at this information and they want proof of

9     where these monies, "Okay.  I see it in your ledger;

03:00PM  10    show me how it was actually" -- those documents are in

11    India.  And that's where our accountants have -- I mean,

12    it's not like these are documents we're keeping from

13    them, and they can come and look at them.  We've offered

14    that.

03:00PM  15         So, your Honor, I want to say --

16         THE COURT:  So you have or have not provided

17    these notebooks that have the actual receipts?

18         MR. MOWREY:  Well, they're available.  They're

19    in India but, I mean, we don't have them.  I mean, they

03:00PM  20    are in -- the actual receipts.  We have given them the

21    ledgers that show the expenditures, but no one can

22    possibly give them every -- I mean, you couldn't collect

23    on them.  It would be -- it would be impossible to

24    collect all the documents, receipts for every

03:01PM  25    expenditure that was made when they are not in

```
 1   electronic form, your Honor.  They're hardcopies.

 2            THE COURT:  Well, I mean --

 3            MR. MOWREY:  We are not objecting --

 4            THE COURT:  You and I both have been practicing

 5   long enough to know that there's a way to get pieces of

 6   paper into evidence.  They don't have to be in

 7   electronic form.

 8            MR. MOWREY:  Yes, your Honor.  My point here is

 9   that we are not -- we are not objecting to making them

10   available.  We will -- at this point I'm not sure what

11   else the plaintiffs -- as I understand the Court's

12   frustration, it's like, "Look, you say you don't have

13   control, you just sent the money over there, and now you

14   can't show me that it was actually spent."

15            And that's when I went to India, twice, and

16   said, "Look."  And the folks over there, your Honor, you

17   can get on the Internet and see.  I mean, these

18   organizations have been shut down, many of them, these

19   NGOs over there because if the India government believes

20   that there is control by an outside entity, and

21   particularly in the U.S., they close these places down.

22   So they're very protective over there.

23            But I said, "Look, it's this way.  You can read

24   this transcript.  You either get these documents to show

25   how this money was spent or that's going to be the end
```

of the case."  And so they understood, okay, this is
what we have to do and so that's what they have been
doing and we have now given them these ledgers for each
of these trusts over this period of time.

03:02PM   5        THE COURT:  So I'm not sure that I understand
the answer to my -- or to my earlier question.  Have the
notebooks with the receipts been provided to the
plaintiffs?

MR. MOWREY:  They are available, your Honor.
03:02PM  10  They are available in India.  They are welcome to come
and look at -- once they identify transactions that they
want to test, they are welcome to come and look at those
transactions just like our accountants are looking at
these transactions.

03:03PM  15        THE COURT:  So have you told the plaintiffs
that if they want actual receipts, they are going to
have to go to India?  Because what I've seen is you've
got requests out there and you're working on it, and
when it comes in, you're going to provide it, and I
03:03PM  20  don't know how Mr. Stanley would know what is in the
works, when it's going to come and whether that will be
receipts or not.

MR. MOWREY:  Receipts, no, your Honor, because
these receipts are not in electronic form.  What is --
03:03PM  25        THE COURT:  What difference does that make?  I

1  don't understand the significance of the fact they're

2  hardcopy.

3       MR. MOWREY:  Because there are millions and

4  millions of transactions, and how would you -- how do

03:03PM  5  you trust a transaction without getting every -- I mean,

6  I don't know what their accountants might want to test

7  that transaction.

8       THE COURT:  When I ordered you and Mr. Stanley

9  to stop putting words on paper and just communicate with

03:04PM  10  each other verbally, did you explain that to

11  Mr. Stanley?

12       MR. MOWREY:  We have -- your Honor, I have told

13  Mr. Stanley, just as I have told the Court at every

14  turn, that we are -- and I realize these have just been

03:04PM  15  words in the past, but the fact is after that -- after

16  the hearing in September, we have been making all these

17  efforts and, yes, we've told Mr. Stanley that we are

18  working on getting these documents.

19       THE COURT:  I'm talking about more recently

03:04PM  20  when I ordered y'all -- before they filed their motion

21  to get on the phone, did you explain to him that there

22  are notebooks with receipts in them, millions of them,

23  that you can't reasonably bring those back to the United

24  States but he's welcome to go to India and look at them?

03:05PM  25  Did you explain that to him on the phone?

1          MR. MOWREY:  Your Honor, I can't recall

2    specifically.  I mean, clearly in our papers that we

3    have said we would make that -- make those available to

4    him.

03:05PM   5          Your Honor, the discovery dispute, if I may,

6    when the -- first of all, there were two sets of

7    discovery requests that went out at the very beginning.

8    Mr. Stanley never -- and we did -- we made objections,

9    your Honor.  We made objections.  Mr. Stanley never

03:05PM   10   contacted us about those at all.

11         We then received the thousand admissions, and

12   that was the first time that we had -- and we were the

13   ones that first contacted, that we tried to follow

14   Court's procedures and so forth.

03:05PM   15         When the Court ordered the admissions to be

16   sent, we then responded to those admissions.

17   Mr. Stanley had some objections to the way we responded.

18   We thought our responses -- we were trying to give more

19   information to explain our responses.  Mr. Stanley said,

03:05PM   20   "No, I don't want that."

21         So as your Honor knows, if you look at our

22   admissions, we made no objections.  We do exactly what

23   the rules tell us to do.  We admit, we deny, and one of

24   them said we had insufficient information to admit or

03:06PM   25   deny; and that, on the one that we had insufficient

1    information, that really goes to the heart of this

2    lawsuit, your Honor.

3         THE COURT:  Well, but -- and, you know, I

4    looked at that particular -- how you worded your

03:06PM  5    response to D, and I took a highlighter; and all of the

6    insufficient evidence to admit or deny, that language

7    does, in fact, appear in your response to D, but it also

8    has this "like nailing Jell-O to a wall" characteristic

9    to it because it says that you have provided, and will

03:07PM  10   provide, and will continue to provide these documents.

11        So if you're on the other side of that case

12   trying to understand what documents they are supposed to

13   use to establish that the monies donated for a specific

14   purpose were, in fact, used for that, you have to

03:07PM  15   cross-reference ultimately a dozen different documents,

16   general ledgers, and you also just kind of have to

17   accept in good faith that there's more on the way.

18        MR. MOWREY:  Your Honor, when you say there's

19   more on the way, I mean, we have given them the

03:07PM  20   documents that show the expenditures.  At this point --

21   again, if you look at it from different levels, at the

22   level that we will be at, at this point, it will be the

23   plaintiffs looking at the documents they have been

24   provided and saying, "We need proof of these particular

03:07PM  25   transactions."

1        THE COURT:  Defendants have made, and will

2   continue to make, a reasonable inquiry.  The defendants

3   have made reasonable inquiry and are continuing to

4   inquire.  I mean --

03:08PM    5        THE COURT:  Well, your Honor, let me -- first

6   of all, your Honor, we are here in February.  We have a

7   certification hearing coming up in April.  We -- our

8   response is due in a couple of weeks.

9        Merits discovery is not until -- we're talking

03:08PM   10   about merits here.  We are talking about full-on,

11   full-blown merits; and even in the case management

12   order, I mean, as I read the order, it says the scope of

13   discovery may include both class and merits discovery,

14   which we had a discussion about at the first hearing.

03:09PM   15   That said, discovery which clearly has no purpose other

16   than full merits issues should be deferred until after

17   the Court rules on class certification.

18        What the plaintiffs are saying at this point

19   is, look, if you've got evidence that these monies were

03:09PM   20   spent on designated purposes, just give it to us and

21   that's -- and if you don't have it, then just tell us

22   you don't.

23        We are in the process of providing, and have

24   now provided, the information that they can show that

03:09PM   25   monies were spent.  Really the issue at this point will

be to see what documents they -- because they are not

going to look at -- no accountant would look at every

document received behind every expenditure.  They will

choose certain things that they want to look at.  That's

03:09PM  the way it will be tested.  That's the way any person

would test when you're dealing with so much material.

And so that's where we are at this point.  I

don't know what else we can do at this point, your

Honor.  We do intend -- the fact, the reason, when it

03:10PM  said admit you don't have evidence to show that X amount

was spent is that that's exactly what we're working on

right now because you've got 179 designations in India.

The fact is they kept their accounting more for the

foreign contribution accounts than they did in terms of

03:10PM  matching.

Does that mean they didn't spend the money on

these items?  No.  It doesn't mean they didn't spend the

money at all; and that's what we're in the process of

showing now, which I think we will be able to show,

03:10PM  that, generally speaking, that monies that went for

designated purposes were spent in that way.

There may be some -- there may be some that

there is less in some categories, but frankly, your

Honor, I don't think that is a -- if the monies were

03:10PM  spent on the ministry, frankly I think that's all

1  that -- legitimately spent on the ministry, I think

2  that's all a donor could really ask, and that's what was

3  represented to them.

4         So again, missionaries are an easy one.  We can

03:11PM  5  track the payments right to missionaries.  It gets more

6  difficult when you're talking about a Bridge of Hope

7  home, for example, because there you have children that

8  are sponsored, and there's a lot of different types of

9  expenses that go into a Bridge of Hope center.

03:11PM  10        THE COURT:  Did you tell me earlier that these

11  missionaries who are the end recipient of these

12  designated donations, that they do or do not get a piece

13  of paper that says, "With this month's allotment, you

14  need to use X dollars to buy bicycles"?

03:11PM  15        MR. MOWREY:  Well, the -- your Honor, I don't

16  know the answer to that.  The missionaries get a -- they

17  get a -- there's an amount that a missionary -- and by

18  missionary, some of these people are what we think of as

19  missionaries.  Others are actually pastors in these

03:12PM  20  12,000 churches and people to work in these churches,

21  and that's their pay.  That's their salaries that they

22  are paid.

23        Whether they use some of that money for their

24  money to purchase certain items, I don't know the answer

03:12PM  25  to that.

1          THE COURT:  Well, I guess that's my point is

2     why would there be a receipt if the end user who is

3     going to buy a buffalo or a bicycle didn't know that

4     they were to use proceeds that they received at a

03:12PM    5     specific point in time for that purpose?

6          MR. MOWREY:  Well, again, what happens is the

7     churches, these churches make known within their diocese

8     the needs that they have.  The diocese then makes their

9     needs known to the synod, and the synod will then send

03:13PM   10     money to the diocese who, then the diocese will

11     distribute the money, purchase items, get the items down

12     to the churches.

13          THE COURT:  So does the individual pastor, for

14     example, that requested bicycles or the pastor that

03:13PM   15     requested water buffaloes, their requests for those

16     items, I mean, is that in writing; is it maintained; has

17     that been produced?

18          MR. MOWREY:  There will be records of

19     purchases, but I don't know that there would be a

03:13PM   20     transmittal request for it.  I mean --

21          THE COURT:  In other words -- in other words,

22     if it turns out that there were one or two or three

23     pastors that identified a need for bicycles and they

24     sent a letter to the diocese and said, "Could you please

03:13PM   25     send out a request to our donors to fulfill this need?"

1   Then Mr. Stanley could say, "Well, that is pastor A,

2   pastor B, and pastor C.  I'm going to go to India.  I'm

3   going to visit with pastors A, B, and C to see if, in

4   fact, they received money for bicycles and whether they

03:14PM   5   did or not."

6       But if there's no documentation of who made the

7   request and there's no documentation coming back the

8   other direction of, "Here's the fulfillment of your

9   request; go spend it on bicycles," then all you're left

03:14PM   10   with is the general ledger and the testimony of

11   witnesses who say, "All of the money was spent in the

12   field; we can't guarantee that it was spent on bicycles

13   or water buffaloes."  And when we get down to the

14   representations that were made, maybe that's all you

03:15PM   15   represented and everything is great and this lawsuit is

16   junk.  I don't know.

17       MR. MOWREY:  Your Honor, when it comes to

18   bicycles or blankets, there are going to be receipts.  I

19   mean, the issue is not how the request was made.  I

03:15PM   20   mean, isn't the issue if a million dollars goes for

21   blankets and we can show receipts for a million dollars,

22   then hasn't the request been fulfilled?

23       THE COURT:  Well, perhaps so, but my point was

24   this:  It gets back to this "nailing Jell-O on the wall"

03:15PM   25   idea.  You say there are receipts and then you -- and

1    then I ask, "Well, have you produced those?"

2         "Well, Judge, no.  I mean, you're talking about

3    millions of receipts.  How could we have produced those?

4    Mr. Stanley is welcome to go to India and look at these

03:15PM  5    notebooks."

6         So my question was let's start with a set of

7    documents that won't be quite so burdensome to produce.

8    Let's start with pieces of paper that flow up and these

9    are our requests for bicycles or buffaloes; and then

03:16PM  10   correspondence, transmittal information that would be

11   going back to those people that you can match up

12   requests with fulfillments to, and say, "Here's $10,000

13   that we were able to raise for your bicycles."

14        I mean, that proof may be difficult to obtain

03:16PM  15   in and of its own, but it seems like it would be a lot

16   less difficult to obtain than the receipts from the

17   villages because it should be documentation that would

18   be in one centralized offer.  It's the request and the

19   fulfillment of the request; and all I'm asking is, does

03:16PM  20   that exist?

21        MR. MOWREY:  Well, your Honor, I don't know if

22   there are transmittal letters back and forth.  I don't

23   know the answer to that.  I mean, and we can -- to the

24   extent that they are available, we have no objection in

03:17PM  25   producing, and we will produce them, but I don't think

1  that it works that way.  I think it's more -- and these

2  receipts, some of them could be at the church level,

3  many of them are going to be at the diocese level, and

4  many are at the synod level.

03:17PM  5        We have no objection to producing them, your

6  Honor.  There's no objection to producing them.  It's

7  just a matter of the sheer volume of these documents.

8        THE COURT:  How far along is your top four

9  accounting firm with their forensic investigation?

03:17PM  10        MR. MOWREY:  Well, they are in the process,

11  your Honor, of looking at that -- those ledgers and

12  mapping those to the designations.

13        THE COURT:  Well, they were in the process of

14  doing that last September.  My question is where are

03:17PM  15  they?

16        MR. MOWREY:  No, your Honor.  They've only had

17  access to these documents -- I don't know exactly how

18  long they've had access, but they did not have -- I

19  don't think they had access in September, your Honor.

03:18PM  20  This is only -- this has only been relatively recently

21  that they've had the access to the documents to start

22  the mapping.  And that's what the plaintiffs are going

23  to do, and I'm sure there will be disagreement.

24        There will be some -- because it's not a

03:18PM  25  one-to-one.  Our accountants will say, "Well, this

1    dollar should go in this bucket," and they will say,

2    "No, that shouldn't go in that bucket; it ought to go in

3    this bucket," or whatever.  So there may be disagreement

4    about that.

03:18PM   5        That's why -- that's the other piece of this,

6    your Honor.  I don't think -- I think the key in this

7    lawsuit is not -- and again, what was represented was

8    not that every dollar that was designated would go

9    specifically for that designated purpose.

03:18PM   10       THE COURT:  All right.  Thank you, sir.

11       Mr. Stanley?

12       MR. STANLEY:  Thank your Honor.  First of all,

13   like you, Judge, I think words are important; and when

14   Mr. Mowrey just said -- and I wrote it down word for

03:19PM   15   word -- "We have given them the documents to show the

16   expenditures."  That's it.  We win.  I mean, that's all

17   you need to do.  I mean, that's all we asked for.

18       And so this was an easy layout.  That's what we

19   set this up for, an easy layout.  We used the water

03:19PM   20   buffaloes there and they admitted, "Yes, we collected

21   $1.6 million," 1.599, in contributions from donors with

22   donor designations for project code 1507, water

23   buffaloes; and attached to this response are the

24   documents previously produced to these plaintiffs who

03:19PM   25   don't understand these documents.  Here they are showing

1    that we spent the $1.6 million for water buffaloes; here

2    they are, case closed.

3         He is now asking to turn the federal rules on

4    its head.  What he said is, instead of Groundhog Day,

03:19PM  5    it's opposite day.  What he said was we've got to go to

6    India, and there are millions of documents in all kinds

7    of ledgers showing all kinds of expenditures and that

8    what the plaintiffs probably should be able to do is map

9    it out one by one and find out which ones were for water

03:20PM  10   buffaloes and which ones were for bikes and somehow come

11   to -- well, that's not our burden.

12        This is what we're asking them to do, and we

13   asked them.  He just said he's given us all the

14   documents to show the expenditures.  Just tell us which

03:20PM  15   documents in this million dollars -- million documents

16   they said they produced, give us the Bates numbers and

17   we can understand what it is.  That's not what's

18   happening.

19        I think the Court's right that nailing Jell-O

03:20PM  20   on the wall is a different way of saying there's just

21   spin on this.  We've been told two things.  We've been

22   told that all the designations were fulfilled by the

23   field partners.  That was a representation Mr. Mowrey

24   made in May, unequivocally.  I think that's also in

03:20PM  25   other pleadings.  And then we were told that the

1    defendants have relative -- have no relationship or

2    control with the field partners.

3         Both of those are simply not true.  What the

4    truth is, is that field partners do not track spending

03:21PM    5    and the GFA considers the designations fulfilled when it

6    descends to the field.  This is what Mr. Carroll told

7    ECFA -- let me get my water.  Excuse me.

8         Mr. Carroll -- and I have the document right

9    here.  Mr. Carroll told ECFA, "We consider the

03:21PM    10    designations fulfilled when we send it to the field,"

11    not when they spend it.  It's fulfilled when we send it

12    to the field."  That's what's happening.

13         Now what's happening is they are trying to put

14    the toothpaste back in the tube.  ECFA busted them for

03:21PM    15    this; it got in the blogs, in the press and everything

16    like that.  It turns out -- and Mr. Mowrey just used a

17    number.  $376 million.

18         If I may show the Court, if I can do the ELMO

19    right.  Let me try.

03:22PM    20         CLERK CRAIG:  One moment.

21         MR. STANLEY:  Of course, when you show up, you

22    don't have the right documents in front of you.  One

23    second.

24         Oh, yeah.  Okay.  One second.  Here it is.

03:22PM    25         So this is what we attached to the requests for

1  admissions, and this is not a dispute.  A few dollars

2  here, a few dollars there, they corrected it in the

3  answers.  But the bottom line here is there were $376

4  million in contributions designated from 2009 to the

03:22PM  5  first quarter in 2016.

6         By interesting coincidence, it turns out that

7  GFA was -- that the field partners were hoarding this

8  same amount of money, $376 million in cash reserves.

9  This is a 2015 document from Siny Punnose.  Siny

03:23PM  10  Punnose, when Mr. Mowrey says the money goes to

11  Thiruvalla, it goes to Siny Punnose.  Siny Punnose is

12  K. P. Yohannan's niece.  She's the one in charge of all

13  of this.

14         It says, "The reserves of the group rose to

03:23PM  15  $376 million at 31 March 2014.  There were $313 million

16  at March 2013."

17         That's the truth is that they were hoarding the

18  money.  Even K. P. admits to ECFA -- and I have the

19  letter in front of me -- K. P. Yohannan says, "We didn't

03:23PM  20  send any money to the field in 2013 or 2014.  We sent to

21  it Hong Kong."  They were holding this money.  They then

22  told ECFA we'll do this massive spend-out.

23         When Mr. Mowrey tells you there were

24  accountants in India, the accountants only came after

03:24PM  25  this lawsuit was filed.  For 2015 -- lawsuit was filed

1    in 2016.  The accountants come in, in 2015, to do the

2    2015 audit and the 2016 audit.

3         The documents we saw on water buffaloes

4    yesterday that they produced were expenditures in 2016

03:24PM  5    for water buffaloes.  The toothpaste, they are trying to

6    squeeze it back out, out of the tube, or put it back

7    into the tube.  That's what's going on here.

8         They say that the defendants don't control

9    these third-party entities.  I have two documents, if I

03:24PM  10    might -- let me find them -- showing just the opposite.

11    Here's one.  This document is 2015, April 2015, produced

12    by them from Reverend Dr. K. P. Yohannan, president,

13    asking them to transfer Canadian dollars, or CAD -- I

14    don't know.  CAD, those are cash deposits -- for Gospel

03:25PM  15    For Asia (India), for further credit to Gospel For Asia

16    (India).  These are from -- remitting it to the state

17    bank of India in Canada, and I can show you that account

18    number is Gospel For Asia (India).  I have the accounts

19    for that.  That's K. P. Yohannan doing that.

03:25PM  20         David Carroll says he has no control over it.

21    I've got David Carroll requesting a document -- sorry.

22    There it is.  This is David Carroll who says, "I have no

23    control over the field partners," right?  "We have no

24    control; we have nothing to do with them"; yet, David

03:26PM  25    Carroll sends a letter to Sarah Billings from the Royal

1    Bank of Canada asking them to transfer $20 million from

2    Gospel For Asia (India) to GFA's account in the United

3    States, signed David Carroll, CEO, Gospel For Asia.

4              How could he authorize money coming out of a

03:26PM   5    Gospel For Asia (India) account?  We know it's a Gospel

6    For Asia (India) account because it's account number --

7    489 is the last four digits.  Here it is.  There's a

8    statement from the Royal Bank of Canada, Gospel For Asia

9    (India), care of Teresa Chupp, in Carrollton -- that's

03:26PM   10   their old address before they moved to Wills Point --

11   for Gospel For Asia (India), and there's the account

12   number.

13             So clearly the spin that they have been told

14   that these folks have no control over the field partners

03:26PM   15   is simply not true.  They have control over it.  They

16   have wire instructions, wire authority.  K. P. Yohannan

17   is the metropolitan of that.  You read the constitution

18   from prior hearings.  It talks about all of his roles in

19   the constitution.

03:27PM   20             All of these folks, Mr. Carroll, Reverend

21   Carroll, Mr. Emerick, the Reverend Emerick, all the

22   others have sworn total loyalty to K. P. Yohannan.

23             His niece, Siny Punnose also have sworn loyalty

24   to K. P. Yohannan.  They have absolute control of that.

03:27PM   25             They also -- let me show the reserves.  This

1  whole thing about how they don't make that promise, I

2  agree with you that's a matter for trial, but that's not

3  true.  I can show you instances on instances on

4  instances where they say if you buy -- if you designate

03:27PM  5  for a bike, we'll do a bike.  We've had no documents --

6  THE COURT:  And that is the allegation in the

7  complaint.

8  MR. STANLEY:  That is the allegation in the

9  complaint, and I can have proof of it to you tomorrow.

03:27PM  10  I mean, I have -- we actually put it in the motion for

11  class certification.  It's very clear that it's in

12  there.

13  What's really interesting to me also, if I

14  might just take one second and read pretty much one of

03:28PM  15  the key documents in the case.  This is an e-mail from

16  Reverend Carroll, David Carroll, to K. P. Yohannan, and

17  I think it's really important because it really will put

18  it back into perspective what's going on:  "Sir, I need

19  to share with you where I am over this situation."  I'm

03:28PM  20  right here.  "I will try to summarize for brevity sake.

21  We have a saying in our country:  The numbers don't lie.

22  The published FC-6 reports" -- which they rely on quite

23  a bit in their answers, if you recall -- "show

24  westerners that we have either sent money to the field

03:28PM  25  raised for National Ministries and Bridge of Hope to

1  fund the hospital and the corpus fund, or our FC-6

2  filings are filed wrong.  Either way, this is a huge

3  problem.  It appears to those reading these that we

4  might have been dishonest to the donors (fraud), or been

03:29PM  5  dishonest to the Indian government, (a PR nightmare at

6  least).  Sister Siny's report below will, in my opinion,

7  do little to satisfy those who are printing out and

8  analyzing our FC-6 reports.  I am sorry for not

9  expressing more confidence than this.  I think we may

03:29PM 10  have used money raised for National Ministries and

11  Bridge of Hope for the hospital," which they told us did

12  not happen.

13       "I think that India feels that we raise money

14  and send it" -- by the way, Mr. Mowrey said that in a

03:29PM 15  prior hearing, that none of the money went to the

16  hospital.  "I think that India feels that we raised

17  money and sent it to them and they can legally use it

18  any way they deem fit.  I hope that I am wrong, but I am

19  doubtful."  This doesn't sound like someone who has

03:29PM 20  already got accountability, knowing how they spent the

21  money.

22       "I also don't think that it is an intentional

23  wrong, but if I am correct, it is a huge wrong.  We've

24  spoken at hundreds of churches with tears asking for the

03:30PM 25  National Ministries and Bridge of Hope support, and the

FC-6 that is public says that we sent much of that money

for the hospital and the reserve corpus funds."  Next

page.

MR. MOWREY:  Could he read the rest of that

03:30PM  letter, your Honor?

MR. STANLEY:  I am.

MR. MOWREY:  Okay.  Good.

MR. STANLEY:  "It doesn't matter that we have

now moved the money out of the corpus fund" -- this is

03:30PM  now after the ECFA thing -- "because of public FC-6

reports" -- I'm sorry.  It's backwards.  Sorry.  That's

not right, either.  That's right.

"It doesn't matter that we have now moved the

money out of the corpus fund because according to the

03:30PM  public FC-6 reports, we have been building them up for

years.  Moving the money only serves to confirm the

feelings of guilt to outsiders."

Again, they have not been spending the money.

They have been building up the corpus funds for years.

03:31PM  "I think the only way for us to handle the

inquiries raised by Bruce and others is to refer them to

our Indian office.  Mr. Throckmorton" -- that's the

blogger -- "(unless a miracle happens) will get this

information and may even begin an investigation of us.

03:31PM  We can say all we want that we don't have anything to do

1 with the Believers Church or the field and that you are

2 only the spiritual head of the church and that finances

3 are handled by others but you, but as a practical

4 matter, that will not hold up.  Can the field find a way

03:31PM  5 out of this situation?  I too am very nervous.

6        "I have always believed in total accountability

7 of the field, yet the FC-6 reports provide numbers that,

8 as a former auditor, I cannot just explain away with a

9 simple explanation.  I, and the world, will need

03:31PM 10 numerical proof now, and I do not have the ability to

11 get it from the USA end.  Only the field can explain it,

12 and I am in the hot seat in this crisis and I feel a lot

13 of pressure."

14        I would point out, Judge, this was in 2015, May

03:32PM 15 of 2015, almost three years ago.  You pointed out that

16 our discovery was served in August.  ECFA asked them for

17 this information in May of 2015.  They've had three

18 years to compile this information, and they just don't

19 have it because it doesn't exist.  Nobody ever tracked

03:32PM 20 the designations because they were simply spent out on

21 the -- once they were sent to the field, they were done

22 with it.  There was no accountability.

23        It goes on to say, "If I say, well, it is not

24 my problem, it's a field problem, it's as good as saying

03:32PM 25 we are guilty of misappropriation," which is true.  If I

1    say "The FC-6 reports are filed inaccurately on purpose,

2    due to the hostile environments we work in, it gets the

3    field in trouble and turns the attention to them.  I get

4    the feeling that, although we are not financially

03:33PM    5    dishonest, we are financially reckless.  The stockpiling

6    of money in the RBC -- Royal Bank of India account --

7    and then the hurried transferring of it to the field,

8    the Hong Kong account, et cetera.  Sir, may I please

9    have my name taken off of the RBC account as soon as

03:33PM    10    possible?"

11            It goes on and on and on.

12            MR. MOWREY:  Would you read the rest of it,

13    please?  I thought you were going to read the whole

14    thing.

03:33PM    15            MR. STANLEY:  There's really nothing to read --

16    okay.  I'm happy to.

17            Judge, do you want me to read the rest?  I'd

18    rather he read it.

19            THE COURT:  Well, I'll be happy to have

03:33PM    20    Mr. Mowrey put that on record if he believes that the

21    context is necessary.

22            I mean, what's kind of lost on me -- I mean, I

23    understand that this is kind of a, you know, golden

24    nugget sort of piece of evidence that you have, but what

03:34PM    25    has been dogging the Court are the discovery requests,

1    and that's really the only thing that I want to make a

2    ruling on today.

3            MR. STANLEY:  May I tie together what I was

4    saying?

03:34PM   5            THE COURT:  Please.

6            MR. STANLEY:  What I was saying is for the

7    nailing the Jell-O to the wall has been this is the

8    Indian folks and we have no control over it; and my

9    whole point was they knew all along that they were

03:34PM  10   building up these reserves and not spending it.  They

11   knew it hasn't been spent.  They knew they weren't

12   getting accountable reports and they just simply need to

13   say to us, like what you said is, "We don't have the

14   proof.  I can't prove to you 1.6 million in water

03:34PM  15   buffaloes with receipts.  I will have at trial someone

16   to testify that we spent money on water buffaloes."  I

17   can live -- if that's what it is, like the Court said, I

18   understand that that -- I'll object to the testimony,

19   but there are no receipts there.

03:34PM  20           Mr. Mowrey said a minute ago, "I've given the

21   receipts showing expenditures."  It's simply not true.

22   If it is, I'll put them to the test today, show us

23   $1.599 million in water buffaloes.  Just give it to the

24   Court next week and we'll understand where we are.  It's

03:35PM  25   not out of the materials that you've given us.  It's not

1      there.

2            When the Court says are there documents from

3      Siny Punnose sending it down to the diocese saying,

4      "Hey, you need to spend this on water buffaloes and this

03:35PM   5   on bikes," not a single document that we've gotten shows

6      that.

7            Are the documents from the diocese going

8      upstream to the synod saying, "Hey, we need water

9      buffaloes and bicycles," not a single document.  What we

03:35PM  10   have is the needle in the haystack saying, well, here's

11     our ledgers.  So Mr. -- I don't know -- Jones got $40

12     today.  You need to figure out, Mr. Stanley, that that

13     is either missionary or water buffalo or bike or

14     whatever.  Good luck.  There's nothing supporting it.

03:35PM  15         THE COURT:  So does the ledger information in

16     any way correlate to the 179 designation categories?

17             MR. STANLEY:  Not one iota.  And we've spent

18     hundreds of thousands of dollars on the plaintiffs' side

19     going through the million documents they said that

03:36PM  20   they've given us, out of my pocket, several hundred

21     thousand dollars to try to get this; and like Jell-O to

22     the wall, it could have all been avoided by them simply

23     saying, "Here's the truth.  The truth is when we send

24     the money, we're done with it.  We don't -- and we're

03:36PM  25   not accountable.  We may send them occasionally."

1        Mr. Mowrey added some examples where they did.

2  I will tell you it did not happen in every case, but

3  sometimes they did send designations to the field.

4        "When we send it, we're done.  We don't do

03:36PM    5  anything on the other end to see that the money was

6  spent correctly."  And that's just the truth, and I

7  think the truth is important here, and that's all I'm

8  trying to say.

9        If you've got the receipts for $1.6 million in

03:37PM   10  water buffaloes and you say you've given it to us, just

11  give me the Bates numbers.  If I'm too stupid to see it

12  myself, tell me the numbers.

13        But to say that I have to go to India and look

14  through millions of books and do some testing which is

03:37PM   15  absurd that you would pick a few and say, well, this

16  extrapolates to everything, the whole thing is -- the

17  whole notion is absurd.

18        That turns discovery on its head.  That's not

19  how it's supposed to be done.  I have the right to ask

03:37PM   20  them, "You made this representation.  You agree that you

21  collected this money; do you have any evidence how it

22  was spent?"  Yes or no.  That's all I want.

23        MR. MOWREY:  May I, your Honor?

24        THE COURT:  You may.

03:37PM   25        MR. MOWREY:  A document that was produced --

03:38PM

this is just one document that was produced in the
initial disclosures, Mr. Stanley said show me -- any
document that would show how money was spent.  This is a
document that was prepared every year since before this
discovery period from Indian accountants.  I'm looking
at one -- this one happens to be 2014, and it has
expenses, and it has a bucket for ministry tools,
outreach, training, INIT support -- national
missionaries, I assume -- and it gives a total for
those.  It has those buckets.  Doesn't have 179, but it
has expenditures, large expenditures that are made, and
this is a report that is received from India.

        There is another document that we produced.
They produced it when this lawsuit was in our initial
disclosures that we received from India, where it shows
expenditures for the 179 -- for 179 designations.  It is
-- it was Exhibit G, Exhibit G to our response.  This is
a spreadsheet, and it showed monies that were expended
with respect to these designations.

        So now what we've given Mr. Stanley, when he
says he's spent hundreds of thousands of dollars out of
his own pocket, he couldn't possibly have looked at the
documents or examined the documents very thoroughly that
we've given him here this last week, which are the cash
books showing the expenditures.

1          THE COURT:  Tell me again what Exhibit G shows,

2  or what it is?

3          MR. MOWREY:  Exhibit G, your Honor,

4  unfortunately it's a printout, and it was actually a

03:39PM  5  huge spreadsheet; but as you can see, it has each of the

6  project codes, and these are expenditures -- yeah, the

7  expenditures are at the end.  So each by bucket.

8          So the first one is audiovisual, and these

9  are -- I think if you read it across.  Those would be

03:40PM  10  the -- that's the monies that were sent out.

11          MR. STANLEY:  Sent to the field.

12          MR. MOWREY:  Yeah, if you go to 24676.  So if

13  you look at the -- there's one column that shows the

14  inflow under INR.  It's the word INR -- these are in

03:40PM  15  Rupees -- and then it shows the outflow.

16          MR. STANLEY:  So can I ask Mr. Mowrey, while

17  he's doing that, to go to the water buffalo one and show

18  the outflow?

19          MR. MOWREY:  Water buffaloes, like some of them

03:41PM  20  that you've lumped together.

21          MR. STANLEY:  There we go.

22          MR. MOWREY:  Well, lumped here, that doesn't

23  mean, your Honor, the issue -- that's what's going on --

24  that's what's going on now.  We're going to see receipts

03:41PM  25  from the documents from the ledgers.  Will he be able to

1   show that there is -- that water buffaloes were

2   purchased and how many?  And it may not be in that

3   amount.  We'll have to see.

4          We are in the discovery process, your Honor.

03:41PM   5   They have access to the same documents we do.  That's

6   the bottom line.  There are no documents that the

7   plaintiffs do not have access to that we do not have

8   access to.

9          THE COURT:  What does that mean?

03:41PM   10          MR. MOWREY:  That means exactly that.  We have

11   given them all the documents that -- on the ledger, and

12   with respect to the underlying actual receipts, we will

13   make those available as they are kept in the regular

14   course of business.

03:42PM   15          I don't know another way -- we're not trying to

16   hide the ball on it, your Honor.  They're in India, and

17   that's where our accountants are, and that's where they

18   have been -- they spend weeks here.  I don't -- I think

19   under the rules, your Honor, production means making

03:42PM   20   them available in the regular course of business, and we

21   will do that.

22          MR. STANLEY:  Your Honor, it's been three years

23   they have known this is going on.  The allegation has

24   always been you have not accounted for or disbursed the

03:42PM   25   donations as per the designation.

1           This exhibit they are showing you is also

2    Jell-O on the wall.  It is 38 categories that somehow we

3    might extrapolate that these items were in.  There's

4    nothing tying it to designation codes.  This is a

03:42PM   5    recreation, and most of this work has been done, the

6    metadata, a lot of this work has been done in the last

7    few weeks.

8           MR. MOWREY:  That work has not been done in the

9    last few weeks.

03:43PM   10          But, your Honor, here's the point.  There are

11   admissions asked, "Admit you have no evidence."  How

12   could we possibly admit that when we do have evidence.

13          And then it asks for a certain amount, and the

14   certain amount is what we're about at this point.  That

03:43PM   15   takes work.

16          MR. STANLEY:  I disagree.  The admission was

17   admit you have no evidence.  You said, we do have

18   evidence.  We said, okay, tell us the evidence.  Point

19   us to, out of the million documents you've given, where

03:43PM   20   you just said you gave us all the evidence, show us $1.6

21   million in water buffaloes.  It just doesn't exist.

22          MR. MOWREY:  I don't think that was a question,

23   show us $1.6 million in water buffaloes.  You asked us

24   what evidence we had -- or you asked us what -- you

03:43PM   25   asked us, admit we have no evidence; and then you

asked -- this isn't parsing; we're answering these
questions.  And then you say produce all documents in
your possession, and we gave a list of all the documents
in our possession.

03:44PM  5        MR. STANLEY:  That's --

6        MR. MOWREY:  At that time.  So we -- I don't
7   know how else we would have answered these questions.

8        MR. STANLEY:  If you have evidence -- your
9   Honor.

03:44PM  10       THE COURT:  Stop.  Stop, stop.  Y'all are
11  talking to each other at this point.

12       Mr. Mowrey, I'll come back to you in just a
13  second.

14       You mentioned something, this notion of a
03:44PM  15  theory based on some of the documents that you were
16  reading from that these donations weren't actually being
17  fulfilled in the field contemporaneous with when the
18  donations were received, but they were being
19  accumulated, and only after some of these allegations
03:44PM  20  surfaced did they start spending money on bicycles and
21  water buffaloes.  And you made some reference to 2013
22  and another reference to, maybe it wasn't until 2016
23  that they started spending money; but I'm not sure what
24  the Court is supposed to make of that distinction, given
03:45PM  25  that your requests all go through calendar year 2016.

1    MR. STANLEY:  The requests go to the first

2  quarter -- the discovery requests go to the first

3  quarter of 2016 and end -- that's fair enough.  They

4  still didn't have that even then.  They can't point it

03:45PM  5  to us.

6    What I was saying was that they got busted by

7  ECFA -- and I have the documents here showing it --

8  where they admitted to ECFA the following:  "We consider

9  the designations fulfilled once we send it to them."

03:45PM  10    ECFA said that's not good enough.  So they

11  said, "And why are you holding 280 million at the time

12  in reserves instead of spending this money when you say

13  there's an urgent need in the field to do this."

14    So they came down with a spend-down plan, and

03:46PM  15  Dr. Yohannan writes them a letter on September 15 of

16  2015 saying, "I went and talked to my Indian -- my field

17  partners, and they graciously agreed to reduce the cash

18  balances to $72 million," which is nine months, but then

19  ECFA said that wasn't good enough.

03:46PM  20    So he says, "So I've gone back to them again

21  and now they have reduced it to 11 million and here's

22  our cash spend-out plan."  It doesn't say, "We're going

23  to spend it out matching the designations."  It just

24  said, "We're going to get rid of these cash reserves."

03:46PM  25  There's been no evidence still -- I mean, that could

1    have answered the question.

2         Mr. Mowrey might have said to me on water

3    buffaloes, "Well, we didn't spend it contemporaneously,

4    but we did, after ECFA told us to spend down the money,

03:46PM    5    we spent the $1.6 million on water buffaloes and here's

6    the documents that show it."  They just simply don't

7    exist.  They just went out and allegedly spent down the

8    money.

9         I have no proof that they even did that.

03:47PM    10   That's a different issue.  I don't even want to litigate

11   that.  I want to litigate the issue of, you promised you

12   would spend this money on water buffaloes and you didn't

13   spend it, and you had no proof that you spent it; and if

14   you do have proof you spent it, give it to me.  That's

03:47PM    15   what I want to litigate.  Not how they spent out the

16   rest of their money and go through millions of pages in

17   a language I don't even understand, because I won't

18   understand the entries in the Indian books, and try to

19   piece it all together myself.  I'd like them to show me

03:47PM    20   where they did it.  That's all I'm asking.

21        THE COURT:  Well, another issue in your

22   request, you've described the admissions and your

23   request for production in terms of evidence, not

24   receipts, not bills of sale, not warehouse

03:48PM    25   documentation, not transmittal letters.

1          MR. STANLEY:  I think that's fair.  I have

2     generally, as I've gotten older, gotten away from trying

3     to overdefine because I get more objections than

4     anything like that.  I thought this was pretty simple.

03:48PM    5     But even if there's any evidence, we haven't gotten

6     anything.

7          So it's fair enough to say that there's

8     testimony, it's fair enough to say there's photographs

9     which may or may not be admissible; that doesn't

03:48PM   10     resolve -- that doesn't relieve them of the burden,

11     notwithstanding that, that they have the receipts to

12     show it to give us that.

13          Also, requests for -- the first request for

14     production also was broad enough to bring it all in,

03:49PM   15     show us where you spent all this stuff.  They say we

16     didn't file a motion to compel, but also they didn't

17     withhold any documents anyway.  So, notwithstanding

18     their objections.  But I still think that there's a

19     burden.  There may be more evidence.

03:49PM   20          Mr. Mowrey may have a point that I may have

21     witness testimony and pictures and whatever else.

22     Again, I can go take pictures and I don't know whether

23     it's going to be admissible.  That's a valid point, but

24     it doesn't relieve them of the burden to give us what

03:49PM   25     they have.  And he just testified -- he just said a

minute ago to the Court as affirmative representation, "We've given them these documents," and all I'm saying is tell us where they are because I can't find them.

THE COURT:  All right.  Mr. Mowrey, I'll give you the last word.

MR. MOWREY:  Your Honor, we are committed to producing documents.  We're not objecting.  We're not hiding behind anything.  We had this control issue that -- and the fact is whether we have control or not is irrelevant really because the issue is are we going to be able to get the documents, and that's what I tried to explain to the people in India, and I think they understand that.

They want to -- if they want this case to go forward, then they have to provide the information showing how these monies were spent; and ultimately that's what this case is about is whether the monies that were taken in, how they were spent.

I think there is a serious issue as to it's our burden to show that if we have a million dollars in a designated -- for a designated purpose and that would be, say, bicycles and we can't show that a million dollars was spent, that some less amount was spent but that that money was spent in the ministry, I don't think that that means that we lose and we don't prevail.

1         The Murphys in this case, before they ever gave

2    $1 to India, they supported the Dicksons, who worked

3    here in the United States.  That's not a part of this

4    lawsuit.  And Dr. Yohannan wrote them a letter.  This is

03:51PM  5    in 2007:  "When I think of the ministry of our Asian

6    brothers and sisters as they labor to reach their people

7    with the gospel, I'm incredibly grateful for you, for

8    your recent gift of $150 is for our home staff.  It is

9    if you are in the very villages where these missionaries

03:51PM 10    minister," and so forth.

11         "100 percent" -- this is bold letters:  "100

12    percent of all contributions designated for use on the

13    mission field are sent to the mission field.

14         And then he goes on:  "Gospel For Asia is

03:51PM 15    committed to honor specific designations to the extent

16    they best fulfill the purposes of the mission as set

17    forth by our board of directors.  However, to protect

18    the deductible status, Gospel For Asia must accept

19    contributions without restriction."

03:52PM 20         And so we -- Mr. Stanley and I do agree that we

21    have $376 million at issue here that was sent over for

22    designated purposes.  The documents that we have

23    provided to them this past week show the spend of a

24    greater amount than that; and what we're about -- in now

03:52PM 25    is because we're in -- we're mapping to see how many of

1  those dollars went to those designated purposes.

2          How they actually got there, whether there was

3  a specific request by a church or a letter or an e-mail

4  frankly, your Honor, it seems to me the point is how was

03:52PM  5  the money spent and was it spent in accordance with the

6  purposes of the ministry and generally was it spent for

7  the various reasons that they have raised the money, and

8  I think we're going to be able to show that that's the

9  case.  So when he says we've produced no evidence, it's

03:52PM  10  just not true.  We have.

11          THE COURT:  All right.  Thank you, sir.

12          Well, the Court, having reviewed the motion and

13  the response but also, very importantly, in the context

14  of the several other occasions that this Court has

03:53PM  15  commented on this -- on these same issues and issued

16  directives and orders on these issues, is going to make

17  the following findings.

18          The Court is going to find that certain of the

19  defendants' responses to the requests for admissions are

03:54PM  20  insufficient under 3686, and the Court is going to enter

21  an order that requires the defendants to provide an

22  amended answer in a form and format that the Court

23  believes would be sufficient.

24          With regard to request for admission D, with

03:54PM  25  regard to -- it's the same subpart with regard to 179

1   different donation designations -- the defendants'

2   response varies a little bit from response to response,

3   sometimes because the amount that they have been asked

4   to admit is off by a few dollars here or there.

03:55PM   5        But setting that sort of, what I'm assuming is

6   a Scrivener's error aside, substantively on item D, the

7   defendants may respond by saying that the request is

8   admitted, they may respond by saying that the request is

9   denied, or they may respond as follows:  "Defendants

03:55PM   10   have made a reasonable inquiry, and the information they

11   know or can readily obtain is insufficient to enable

12   them to admit or deny."  Period.

13        The Court would view as improper any of this

14   embellishment which suggests that they might have the

03:56PM   15   ability at some point in the future through ongoing

16   inquiries.  The question is, at a snapshot in time,

17   after a reasonable inquiry has been made, do you admit

18   or deny it, or you're not in a position to admit or

19   deny.

03:57PM   20        The rule would allow you to explain in detail

21   why it is that you can't do that, and I don't want to

22   prevent you from availing -- for you to avail yourself

23   of what the rule would permit, but your answer, as you

24   have stated it, obfuscates the point of the question and

03:57PM   25   one of the three options; and it gets back to this

notion that it's like trying to nail Jell-O to the wall and that is why I'm finding it to be insufficient and that is why I'm ordering you to pick one of those three responses.

03:57PM      And to the extent that you want to explain that in greater detail, and rather than having to burden copying and pasting that explanation 179 times, this Court would find it sufficient, if you like, simply in the preamble to your responses, to make the explanation

03:58PM  similar that you have made today, with the exception of none of this business about there might be stuff to come.

      This isn't a moving target.  It is based on your reasonable inquiry for this historical period that

03:58PM  they have identified:  Do you admit, deny; and if it's true that you've made a reasonable inquiry but you still can't admit or deny, then say that.  But those are your three options.

      If there's some particular reason like, "These

03:59PM  records are maintained in India and we've tried hard but are not able to get them," I mean, you're entitled to give an explanation under the rule, but put that as part of the preamble because, best I can tell, it's the same explanation for every response.

03:59PM      So to the extent that, two months from now, you

1   come up with a photograph taken by Pastor Jones of the

2   water buffaloes that he bought with his money, then

3   there's a procedure under Rule, I think, 36(b) that will

4   allow you to move the Court to amend your answer.

03:59PM  5   Depending on what additional information you come up

6   with and whether there's an explanation for why you

7   shouldn't have discovered that after reasonable inquiry

8   when you first responded, the Court may or may not allow

9   you to amend it.  My point is simply there is a protocol

04:00PM 10   for you to amend, or withdraw, if that is the case, your

11   response.

12        So in Item E, there it asks admit that you have

13   produced to plaintiffs all evidence, and I recognize

14   that there is a little bit of a problem with how

04:01PM 15   all-encompassing that is, but it says admit that you

16   have produced to plaintiffs all evidence that you

17   possess regarding how the $71,468 -- and this is in the

18   case of item number 1 -- designated by donors for

19   ministry tools was spent.

04:01PM 20        You seem to have rather consistently answered

21   Item E as denied, and you're certainly free to deny that

22   on every one.  That is an acceptable response, but it

23   comes with some consequences because if you deny Item E,

24   then in some shape, form, or fashion, you're going to

04:01PM 25   have to explain to the plaintiffs what it is that exists

1  as to ministry tools that you haven't produced.

2      I don't know if there were other previous

3  interrogatory or requests for productions that take that

4  up, but the most likely place that you're going to have

04:02PM  5  to explain that is going to be in response to Item G on,

6  "Produce all documents in your possession that reflect

7  how the $71,000 for ministry tools was actually spent."

8      Item F, I guess, is kind of the opposite of

9  Item E and so the same observation would be made.

04:03PM  10      When you get to Item G, and in your response

11  here -- and I think the -- I mean, I'm not going to

12  compare every single one of these, but it seems to be

13  the exact same response to every Item G.  And again, I

14  will admit that I didn't spend a whole lot of time

04:03PM  15  comparing each one, but it seems like that's the same

16  response.  I think that that is insufficient, and I'm

17  going to order you to file an amended answer.

18      Based on your explanation today and what I

19  gather from your response, you're basically saying, "We

04:03PM  20  have all this proof," whether it be ledgers or bank

21  account statements or what have you, "that money was

22  collected and it was disbursed"; and there's even some

23  specific ledgers like the one you just mentioned that

24  there's some bookkeeping that corresponds to all this.

04:04PM  25  But I also heard you explain that either there may not

be any line item-specific evidence; or if there is,

you're still working to acquire it, and it may be that

in order to defend this case, you're going to have to go

to India and take pictures of water buffalo.  I don't

04:05PM  know what the ultimate defense that you may try to put

on would be, but I find your answer here deficient and

insufficient in the context of -- and if this was the

first time that the Court had ever seen it, I might not

view it this critically; but in the context of the

04:05PM  Court's prior exposure, the Court's prior directives,

the Court's prior order, I'm going to find that it is

insufficient and I'm going to require you to do this:

I'm going to require the defendants to divide

their response to Item G into two parts.  The first part

04:05PM  will be general evidence.  I'm going to define "general

evidence" to mean basically what you've already stated

here, which I understand to be evidence that you can

point to generally to show that money was received and

disbursed in India, but there's not anything specific to

04:06PM  correlate it to each of the 179 different donation

designations.  So that's general evidence.

The second part of your response needs to be

for specific evidence, and here's how I define "specific

evidence."  When it says produce all documents in your

04:06PM  possession, custody or control reflecting how the

$71,468 designated by donors for ministry tools was actually spent, then under "specific evidence," I want to see references to actual documents and corresponding Bates numbers.

04:07PM    So if you have, for example, a transmittal letter that is referencing designation code 1000, or if it's referencing the designation code that corresponds to the women's literacy program, or if it's the designation code that corresponds to water buffaloes or

04:07PM    bicycles or whatever it may be, if it is a specific -- if that document contains a specific reference to that particular donor designation, then list what the document is and the Bates stamp number.

     Now, you say, "Well, there's going to be lots of receipts, but they're in these notebooks in India."

04:08PM    At this point I do not believe that that's the plaintiffs' problem.  They have been asking for this stuff for a long time.  We all know what they are looking for.  They have come at it from three or four

04:09PM    different ways, and you've not responded to it.  Some of your earlier responses had objections.  The Court wasn't called upon to rule on any of those objections.

     What I do know is there was a request for production, Item G, to all 179 of these; and to the

04:09PM    defendants' credit -- and I applaud you for that -- you

1   didn't object, nor did you seek a protective order.

2       I think that there is more than a sufficient

3   basis and expectation by your admission that you

4   received these monies, and by your admissions in the

04:09PM   5   earlier hearing that, to your knowledge, it's not like

6   the recipients have any other donors that they are

7   accountable to.  You have the power of the pursestrings,

8   so to speak.  The Court believes that the named

9   defendants here, including individually named

04:10PM   10   defendants, have the ability to produce these documents

11   in the United States, in the State of Texas where y'all

12   practice, if you want to.

13       Now, if you want to say that it's not worth it

14   to you, to provide that, or that there's some technical

04:10PM   15   reason why you can't, then, you know, I guess that you

16   can explain that to Mr. Stanley, but I can guarantee you

17   that if you don't produce it that your explanation,

18   either in motion practice or your class certification

19   motion practice, summary judgment practice or motion in

04:11PM   20   limine practice is going to be pretty hollow.

21       So, again, requests for production are made at

22   a point in time.  If you have it, provide it, identify

23   the Bates stamp, where it's located; and if Mr. Stanley

24   calls you up and says, "Well, I see that you have

04:11PM   25   provided this transmittal letter and it's supposed to

1    apply to ministry tools; I don't see where on this page

2    it talks about ministry tools," well, then you better

3    help him out on where it's located on that page because

4    if y'all have to bring this back to me and I have to

04:12PM    5    settle a dispute about whether what you're lumping under

6    specific evidence is specific to that category or not,

7    someone is not going to be very happy with what happens

8    at the end.

9         If you come up with additional evidence later,

04:12PM   10    well, then obviously the rules require you to supplement

11    your responses to requests for production; but you can't

12    just say, especially after as long as this issue has

13    been going on, that, "We're looking into that; we'll let

14    you know when we find it."  That's not how the rules

04:13PM   15    work, it's not how this Court construes them, and that

16    is not going to be an acceptable answer to this Court.

17         I do agree with you, Mr. Mowrey, that, you

18    know, there's more than one way to prove things.  You

19    may not necessarily need a receipt or a bill of sale or

04:13PM   20    anything else; but as I mentioned earlier, sometimes

21    knowing what documents don't exist is as important as

22    knowing which documents do exist because it informs the

23    next step of discovery.  It informs how you ask

24    questions at depositions.  It informs how you respond to

04:14PM   25    motions.  So that's why the Court is taking the actions

1    that it is.

2         As to when this amended response is going to be

3    required, my initial reaction is two weeks.  If you make

4    an earnest effort to comply with that and you realize

04:14PM   5    that at this point it's not physically possible for some

6    reason, then pick up the phone and call Mr. Stanley and

7    tell him the logistics of what would prevent you from

8    fully complying within two weeks and work out a time

9    frame on which to provide that to him.  No more e-mails;

04:15PM  10    no more letters.  Pick up the phone and talk to each

11    other.

12         Under Rule 36(a)(6), it says that, "On a

13    finding that an answer does not comply with this rule,

14    the Court may order either that the matter is admitted

04:16PM  15    or that an amended answer is served," and so that's what

16    I'm ordering is that an amended answer is served within

17    two weeks.

18         It also allows, should the Court's order not be

19    complied with that the Court enter -- have the ability

04:16PM  20    to enter the full array of sanctions under Rule

21    37(b)(2), and this is one of the reasons why I wanted to

22    have all of the defendants here today.

23         You've got one more chance to provide the

24    information and amended answer that the Court has

04:17PM  25    ordered.  If you don't do that within the parameters

1 that I have ordered today, then the full range of

2 sanctions available under Rule 37(b)(2) will be on the

3 table.  Potentially that could include -- and I'm not

4 saying that it would -- but it could include striking

04:17PM   5 your answer and entering a default judgment against each

6 of you individually.

7         The Court is also going to permit Mr. Stanley

8 to move for an award of attorney fees related to the

9 making of this motion.  The Court will allow the

04:18PM   10 defendants to respond both to the general

11 appropriateness of the Court entering an order awarding

12 fees, and they may also respond to the reasonableness of

13 any fees that may be requested.

14        The only guidance that I would give is that at

04:18PM   15 this point, Mr. Stanley, I am going to give them one

16 more chance and so the scope of the fees that I would

17 consider to be appropriate are those fees immediately

18 associated with you bringing this motion and appearing

19 in court today.

04:18PM   20        I'm not going to consider the hundreds of

21 thousands of dollars that you've spent reviewing,

22 investigating and all of that, but the fees of making

23 your motion and appearing here today, you may --

24        MR. STANLEY:  Your Honor, at this time we're

04:19PM   25 not going to incur fees.  We work on contingency.

1              THE COURT:  All right.  Well, then that takes

2       care of that.

3              So the Court will be entering a written order

4       that will track its rulings just now.  I would encourage

04:19PM  5       y'all to resolve this issue, to understand that at its

6       essence, the plaintiffs are simply wanting to know

7       whether you can prove -- not prove -- whether you have

8       documents that go to the issue of establishing that

9       money was spent for each of these individual line items.

04:20PM 10              They understand the big scheme of the monies.

11       They're asking for proof and evidence that might exist

12       that goes to each individual line item specifically.

13       And so whatever hurdles that there may be, whatever

14       individual differences that there may be in some of

04:20PM 15       these line items, I think everyone knows, or should know

16       by this point, what the objective is, and I can't think

17       of anything that I haven't said already that I can say

18       to underscore the fact that you have enough

19       understanding to be able to work out any other issues as

04:21PM 20       it relates to this between yourselves.  If you can't,

21       the Court will still be here, but some serious sanctions

22       are going to be issued if the defendants are on the

23       losing side of any subsequent dispute over these issues.

24              Is there anything further today, Mr. Stanley?

04:21PM 25              MR. STANLEY:  No, sir.

1              THE COURT:  Mr. Mowrey?

2              MR. MOWREY:  Your Honor, the only thing I would

3    request, our response to the certification motion is due

4    in two weeks.  Could we have at least another week or so

04:21PM   5    rather than two?  If you say two, then obviously we're

6    going to abide by that, but --

7              THE COURT:  On the certification motion or

8    the --

9              MR. MOWREY:  Our response -- our response is

04:21PM  10    due, I believe two weeks from today.

11             MR. STANLEY:  Are you asking for an extra week

12   of this order?  Three weeks?

13             MR. MOWREY:  Yes.  Of this order, yes.

14             THE COURT:  All right.  Three weeks.

04:21PM  15             MR. MOWREY:  Thank your Honor.

16             THE COURT:  We're adjourned.

17             (Proceedings adjourned at 4:21 p.m.)

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Dana Hayden, Federal Official Realtime Court

4    Reporter, in and for the United States District Court

5    for the Western District of Arkansas, do hereby certify

6    that pursuant to Section 753, Title 28, United States

7    Code that the foregoing is a true and correct transcript

8    of the stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page

10   format is in conformance with the regulations of the

11   Judicial Conference of the United States.

12          Dated this 20th day of February 2018.

13

14

15

16   _Dana Hayden_____

17   Dana Hayden, CCR, RMR, CRR
     Federal Official Court Reporter

18

19

20

21

22

23

24

25