## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**GARLAND D. MURPHY, III, M.D., and**
**PHYLLIS MURPHY, Individually and on**
**behalf of all others similarly situated**
**PLAINTIFFS**

**v.**                    **CASE NO. 5:17-CV-5035**

**GOSPEL FOR ASIA, INC.; GOSPEL FOR ASIA-INTERNATIONAL;**
**K.P. YOHANNAN; GISELA PUNNOSE; DANIEL PUNNOSE;**
**DAVID CARROLL; and PAT EMERICK**          **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

Currently before the Court are:

- A Motion for Protective Order (Doc. 85) and Brief in Support (Docs. 86, 87)[1] filed
  by Defendants Gospel for Asia, Inc., Gospel for Asia-International, K.P. Yohannan,
  Gisela Punnose, Daniel Punnose, David Carroll, and Pat Emerick; and Plaintiff
  Garland D. Murphy's and Phyllis Murphy's Response in Opposition (Doc. 92);

- Plaintiffs' Second Motion for Sanctions (Doc. 94), Statement of Facts (Doc. 95),
  Brief in Support (Docs. 96 and 97), and Declaration (Doc. 98); Defendants'
  Response in Opposition (Docs. 100, 101); and Plaintiffs' Reply (Doc. 103); and

- Plaintiffs' Motion for Sanctions based on Fabricated Documents (Doc. 104),
  Statement of Facts (Docs. 105, 108), and Brief in Support (Docs. 106, 107);
  Defendants' Response in Opposition (Docs. 110, 111); and Plaintiffs' Reply (Docs.
  117, 118).

For the reasons given below, Defendants' Motion for a Protective Order is **DENIED**, and

Plaintiffs' Second Motion for Sanctions is **GRANTED**. However, for reasons that will

become clear below, the Court will defer ruling on Plaintiffs' Motion for Sanctions based

on Fabricated Documents. Finally, the Court gives notice of its intent to appoint a Special

---

[1] Because the briefs accompanying the various motions addressed herein contain
confidential information, the parties have filed both a redacted public version and an
unredacted version under seal.

Master and sets forth an abbreviated briefing schedule to allow the parties to be heard on the appointment of such a master, as required by Federal Rule of Civil Procedure 53.

## I. BACKGROUND[2]

The aforementioned motions all center on a discovery dispute that has plagued the litigation of this case and forestalled its progress since at least September 2017. As this Court has repeated in several orders and conferences since then, the underlying lawsuit concerns Plaintiffs' allegations that Defendants and their international affiliates and partners have defrauded donors by diverting donations that were earmarked for specific purposes to different uses without these donors' knowledge. Given the extent of the Defendants' operations and the number of individuals Plaintiffs claim have been defrauded, Plaintiffs seek to represent a class of such donors and have asserted various causes of action against Defendants, including Civil RICO and fraud.

The fundamental question in this case has always been whether these entities have in fact redirected donated money in violation of promises that were made to their donors around the world. However, Plaintiffs' attempts to discover whether the named Defendants, or organizations that they control, have evidence by which this fundamental question could be answered have largely been stymied by, *inter alia*, renewed versions of previously denied objections, several unsuccessful rounds of discovery and, as the Court has explained elsewhere and again below, Defendants' failure to obey clearly worded directives issued by this Court and to respond in good faith to Plaintiffs' discovery requests. The Court now turns to the pending motions.

---

[2] Additional factual details and the timelines relevant to the specific pending motions are set out in the sections addressing those motions.

## II. DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

The Court has given an extensive review of the procedural history of this case in its prior Order on the Motion for Leave to Serve Discovery (Doc. 44), in the Order setting a hearing on Plaintiffs' First Motion for Sanctions (Doc. 63), and during the hearing on that Motion held on February 16, 2018. Therefore, while the Court will not needlessly spill more ink here and incorporates by reference its prior comments, suffice it so say that it is not ruling in a vacuum on any of these motions. It is *certainly* not ruling in a vacuum on Defendants' current motion for a protective order, which seeks relief as to a request for production ("RFP") that was first included in a discovery set the Court allowed Plaintiffs to serve back on November 21, 2017.

Nevertheless, it does bear repeating why the parties currently find themselves in this predicament. The set of discovery that began this nine-month dispute focused on 179 different categories of items for which donations were solicited by Gospel for Asia and its affiliates. Plaintiffs sought evidence that donations earmarked for these items were actually spent on these items. After their attempts to discover this information through interrogatories and RFPs were hampered by objections, Plaintiffs came at the problem from a different angle by using requests for admission ("RFA") under Rule 36. So, for each of the 179 donation categories, Plaintiffs propounded six separate RFAs and one RFP that asked Defendants to produce all responsive documents in their possession, custody, or control. However, this discovery set was quite voluminous because of the sheer number of donation categories, so Plaintiffs ultimately decided to request leave to serve the discovery. On November 21, 2017, after rejecting several objections from Defendants, the Court granted leave and Plaintiffs served the discovery set on the same

3

day. A month later, Defendants served their responses. After reviewing the responses, Plaintiffs felt that Defendants were giving evasive answers and repeating objections that had already been overruled by the Court. Therefore, they requested that Defendants amend their responses. After multiple email exchanges in January of 2018, Defendants refused to supplement their responses. On January 8, 2018, Plaintiffs' counsel sent an email to the Court requesting a telephone conference to discuss the impasse. Because the parties informed the Court that their communication had so far been limited to emails, the Court instructed the parties to confer in person or by telephone to attempt to resolve the dispute and referred all parties to the Court's prior order allowing the discovery as well as to various provisions of the Rules of Civil Procedure dealing with RFAs, RFPs, and various provisions of Rule 37 concerning sanctions for violating a discovery order. The resulting telephone conference ultimately did not resolve the conflict, so Plaintiffs filed their first Motion for Sanctions (Doc. 54). Defendants responded to the motion on February 2, 2018 (Doc. 61), and the Court ultimately set a hearing (Doc. 63).

After requiring all named parties and at least one lead attorney for each party to appear in person at this hearing, the Court issued an Order (Doc. 67) finding that several parts of the Defendants' discovery responses were evasive and ordering Defendants to amend their responses. In particular, because the Court found that current responses obscured whether Defendants were actually in possession of (or still searching for) responsive documents that would show whether expenditures designated for specific items were actually spent on those items, the Court gave special instructions as it related to the RFPs. In particular, because Defendants had represented to the Court that they

4

had "given [Plaintiffs] the documents that show the expenditures,"[3] (while leaving the door open that other documents *might* exist in the field) the Court ordered that Defendants' responses to each RFP be split into two categories: general evidence and specific evidence. General evidence would be documents showing that donated money had been spent in the field, but it either would not correspond to a particular designation code or would not be a document that was specific in showing how much money was either requested or spent on particular items. Specific evidence, on the other hand, would be for the types of items that had been discussed during the hearing, *e.g.* transmittal letters, receipts, or request letters from the diocese, that would help Plaintiffs track how much money was ultimately spent on particular projects. *See, e.g.*, Doc. 67, p. 9. The Court ordered that the amended responses be served within three weeks. The parties subsequently reached an agreement, ultimately approved by the Court, to extend this response deadline by a week. On March 16, when the Court and the Plaintiffs anticipated that Defendants would finally provide responsive documents or pinpoint documents that had already been produced linking earmarked donations to expenditures, the Court instead received a Motion for a Protective Order (Doc. 85) seeking relief from the alleged burden of responding to the RFPs.

Despite the fact that these RFPs had been included in identical form in the original request for discovery that Plaintiffs served back on November 21, 2017, it was only on the due date to comply with the Court's explicit order, (not at the sanctions hearing or during the four weeks that Defendants had to respond), that Defendants first made the

---

[3] Doc. 65, p. 50: 18-20.

5

argument that the burden of responding to the requests now justified a protective order. Having recited the relevant history, the Court now turns to the merits of the motion.

Rule 26(c) provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Rule 26 adopts a proportionality standard that requires courts to consider whether the requested discovery is warranted in light of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). When faced with a discovery dispute, "[t]he court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." Fed. R. Civ. P. 26 advisory committee's notes.

The Court need not linger long on most of the reasons listed in Defendants' Motion, for many of the stated reasons for seeking the protective order relate to objections that have been repeatedly rejected by this Court beginning as long ago as November 2017 when Plaintiffs were first granted leave to serve the discovery. The Court is no more persuaded by those reasons now than it was then.

However, Defendants do support their motion with a few reasons that bear further comment. Three in particular are especially worth mentioning: that responding to these RFPs would be unduly expensive, that these documents are not in the possession, custody, or control of the named Defendants, and that this is merits-based discovery that should be delayed until after class certification is ruled on.

## A. Added Costs

Initially, the Court rejects, for several reasons, Defendants' untimely assertion that responding to the RFPs would pose unreasonable costs.

First, the Court had already informed Defendants during the infancy of the discovery dispute that any overly-burdensome request should prompt the party to seek a protective order *on the front end.* Therefore, the fact that Defendants waited until long after November 2017 when they were first served with the RFPs to request relief factors against their pursuit of a protective order now. Defendants attempt to justify their tardiness by arguing that the Court greatly increased the burden of responding to the RFPs when it remarked that the fact that responsive documents were abroad was not the Plaintiffs' problem at this point given the Court's finding that Defendants had stymied Plaintiffs' prior discovery efforts by renewing overruled objections and serving evasive responses. To the extent that Defendants now argue that the Court's order is what prompted the additional burden, it is curious that Defendants would renew this objection when the Court had already overruled it during the hearing when it ordered these types of specific documents to be produced and in light of comments that Defendants' counsel made during the hearing.[4] Moreover, that Defendants would wait to renew this objection and *first* seek

---

[4] Doc. 65, pp. 45: 2-6; 47: 5-22; 48:19-25; 49:1-2; 56:21-25; 57:1-7; 80:6-18

MR. MOWREY: That's where India comes in. These documents are in hardcopy. They are not electronic. I've seen many of them. They are in these notebooks, hundreds of them, hundreds of them, of receipts, hardcopy receipts.
. . .

THE COURT: So I'm not sure that I understand the answer to my—or to my earlier question. Have the notebooks with the receipts been provided to the plaintiffs?

protection on this basis *after* the close of business on the due date underscores this

Court's conclusion that this is another example of repeated conduct by Defendants to

evade providing responsive documents going to the heart of this case.

Second, any additional costs Defendants incur by responding to the Court's orders

are justified given the Court's findings that discovery in this case has been severely

hampered by Defendants' abusive conduct. It has long been noted that "the spirit of the

rules is violated when advocates attempt to use discovery tools as tactical weapons rather

---

MR. MOWREY: They are available, your Honor. They are available in India. They are welcome to come and look at—once they identify transactions that they want to test, they are welcome to come and look at those transactions just like our accountants are looking at these transactions."

THE COURT: I'm talking about more recently when I ordered y'all—before they filed their motion to get on the phone, did you explain to him that there are notebooks with receipts in them, millions of them, that you can't reasonably bring those back to the United States but he's welcome to go to India and look at them? Did you explain that to him on the phone?

MR. MOWREY: Your Honor, I can't recall specifically.

. . .

MR. MOWREY: Well, your Honor, I don't know if there are transmittal letters back and forth. I don't know the answer to that. I mean, and we can—to the extent that they are available, we have no objection in producing, and we will produce them, but I don't think that it works that way. I think it's more—and these receipts, some of them could be at the church level, many of them are going to be at the diocese level, and many are at the synod level. We have no objection to producing them, your Honor. There's no objection to producing them.

. . .

MR. MOWREY: "Your Honor, we are committed to producing documents. We're not objecting. We're not hiding behind anything. We had this control issue that—and the fact is whether we have control or not is irrelevant really because the issue is are we going to be able to get the documents, and that's what I tried to explain to the people in India, and I think they understand that. They want to—if they want this case to go forward, then they have to provide the information showing how these monies were spent; and ultimately that's what this case is about is whether the monies that were taken in, how they were spent.

8

than to expose the facts and illuminate the issues by . . . unnecessary use of defensive weapons or evasive responses. All of this results in excessively costly and time-consuming activities that are disproportionate to the nature of the case, the amount involved, or the issues or values at stake." Fed. R. Civ. P. 26 advisory committee's notes.

Finally, given the posture of this putative class action, the amount in controversy, and the fact that this discovery goes to the very heart of the issues for trial, the Court continues to conclude that production of these documents at Defendants' expense is appropriate and proportional under Rule 26. Thus, it rejects the argument that the costs of responding are sufficient to justify a protective order, especially given Plaintiffs' nine-month quest to find answers to the questions they began asking in August 2017.

## B. Control of Documents

Defendants next assert that a protective order should be issued because documents responsive to the RFPs are not within their possession, custody, or control, but rather are in the hands of GFA's foreign affiliates and partners. Although the Court has already granted a Motion to Stage Alter Ego Issues after the Verdict (Doc. 60), on the advice of the parties that such peripheral matters could be deferred until then, this discovery dispute has made clear that the issue of whether the named Defendants effectively control these foreign entities that Defendants contend possess this information is now being used to shield Defendants from answering the central question in this case. The Court is unimpressed by this tactic.

While Defendants insist that the only relevant factor when assessing control is whether the Defendants have the legal ability to obtain these documents, courts around the country have required production of documents allegedly in the hands of a third party

9

where the named parties have the practical ability to control the third party, as holding otherwise, especially in a case like this, would allow a party to evade duly served requests. See, e.g., Ice Corp. v. Hamilton Sundstrand Corp., 245 F.R.D. 513, 516-17 (D. Kan. 2007); Resolution Trust Corp. v. Deloitte & Touche, 145 F.R.D. 108, 110 (D. Colo. 1992) ("Legal ownership is not determinative of whether a party has custody, possession, or control of a document for the purposes of Rule 34."). When addressing an objection based on whether a named party controls documents, courts should "guard against not just fraud and deceit, but also sharp practices, inequitable conduct, or other false and misleading actions whereby corporations try to hide documents or make discovery of them difficult." Uniden Am. Corp. v. Ericsson Inc., 181 F.R.D. 302, 306 (M.D.N.C. 1998).

Thus, courts considering whether a named party has effective control over documents in the hands of a nonparty entity have considered such factors as:

(1) the corporate structure of the party/non-party, 2) the non-party's connection to the transaction at issue in the litigation, (3) the degree that the non-party will benefit from the outcome of the case; (4) whether the related entities exchange documents in the ordinary course of business; (5) whether the nonparty has participated in the litigation; (6) common relationships between a party and its related nonparty entity; (7) the ownership of the non-party; (8) the overlap of directors, officers, and employees; (9) the financial relationship between the entities; (10) the relationship of the parent corporation to the underlying litigation; and (11) agreements among the entities that may reflect the parties' legal rights or authority to obtain certain documents.

Flame S.A. v. Indust. Carriers, Inc., 39 F. Supp. 3d 752, 759 (E.D. Va. 2014).

Applying these factors to the present case, especially considering the documentation provided in the pleadings and briefs on the various motions, the Court finds that the named Defendants exercise the requisite ability to control these foreign affiliates, in particular the Believers' Church. Particularly persuasive to the Court on this

matter are the following facts: 1) K.P. Yohannan holds a position of the highest prominence, the Metropolitan, within this church, 2) documents suggest that the named Defendants have authorized financial transactions, such as wire transfers, by these entities, 3) Defendants have demonstrated in their filings the ability to access and obtain financial and other documents from these entities to respond to the current and prior motions, and 4) there is considerable overlap between Yohannan and his family and these entities.

In sum, the Court's position now is the same as it was in February:

Now, you say "Well, there's going to be lots of receipts, but they're in these notebooks in India." At this point I do not believe that that's the plaintiffs' problem. They have been asking for this stuff for a long time. We all know what they are looking for. They have come at it from three or four different ways, and you've not responded to it. . . .

What I do know is there was a request for production, Item G, to all 179 of these; and to the defendants' credit—and I applaud you for that—you didn't object, nor did you seek a protective order. I think that there is more than a sufficient basis and expectation by your admission that you received these monies, and by your admissions in the earlier hearing that, to your knowledge, it's not like the recipients have any other donors that they are accountable to. You have the power of the pursestrings, so to speak. The Court believes that the named defendants here, including individually named defendants, have the ability to produce these documents in the United States. . . .

(Doc. 65, pp. 88:14-20; 88:23-25; 89:1-11). At bottom, the very simple objective here is to follow the trail of money. Defendants admit that, over the period of time in question, donations totaling around $375 million were received and are at issue. See Doc. 65, p. 41:20-25. Defendants are now merely being required to provide documents showing how the donated money was disbursed. Perhaps Defendants do not have receipts or bills of sale for items like water buffaloes (in which case they must admit that these purchase documents do not exist as they relate to the different line-items). But, if Defendants'

11

posture continues to be that "we believe that we will be able to show that the monies that were designated went to the *particular items that were specified*,"[5] and if they have made disbursements in the field in keeping with these earmarked donations, the Court would be hard-pressed to believe that *no* paper trail or other evidence of transfer of these monies exists. The absence of such a paper trail would seemingly be circumstantial evidence in support of Plaintiffs' allegations. So, the Court simply refuses to allow Defendants to continue to hide behind this façade in order to evade documenting the paper trail. Defendants' task is the same as it was in August: Defendants must provide the specific evidence that exists, or admit that they do not have any such proof. Therefore, the Court rejects Defendants' reliance on a purported lack of control as a basis for the protective order.

## C. Deferral of Merits-Based Discovery

Finally, the Court also finds unpersuasive Defendants' argument that this type of discovery should be delayed until after the Court decides whether to certify a class. The Court remarked, as long ago as the case management hearing, that:

> I think because of the nature of the allegations and the causes of action being fraud of a level involving diversions, alleged diversions of donated money in the context of many, many entities and subentities, I think that there is going to be a tremendous overlap between class discovery and merits discovery. And, of course, the Court's required to wade into the merits to a certain extent in performing its rigorous analysis at the class certification level. This is one of those cases that I think that if we attempted to bifurcate discovery, then defining the boundaries of where the overlap ends would consume much more of our time fighting about it than would make any efficiencies to be gained worth it.

---

[5] Doc. 26, p. 34, Statement of Lead Defendants' Counsel, Mr. Mowrey, at the Case Management Hearing.

(Doc. 26 pp. 64:21-65:9). Moreover, it has taken since September of 2017 to reach this point. Given the discovery deadline of November 2018 and the lack of good faith efforts to comply with the Court's prior orders, the Court will not simply assume that this problem can be kicked down the road until after the pending motion for class certification is resolved. Given the history of Defendants' conduct, the Court is of the opinion that discovery delayed could very well be discovery denied. For these reasons, Defendants' Motion for a Protective Order (Doc. 85) is **DENIED**.

## III. PLAINTIFFS' MOTIONS FOR SANCTIONS

Federal courts' authority to impose sanctions on parties comes both from Federal Rule of Civil Procedure 37 and from the "inherent authority of the court." *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1019 (8th Cir. 1999). Rule 37 is designed to give teeth to the discovery requirements of Rules 26 through 36. 8B Wright & Miller, *Federal Practice & Procedure*, § 2281 (3d ed. 2010). It allows litigants to file motions to compel discovery or force amended responses and provides penalties for the failure to comply with courts' discovery orders. Fed. R. Civ. P. 37(a), (b). In an oft-cited case, the Tenth Circuit remarked that "[t]he administration of the rules lies necessarily within the province of the trial court with power to fashion such orders as may be deemed proper to vouchsafe full discovery for the just, speedy and inexpensive determination of the lawsuit." *Robison v. Transamerica Ins. Co.*, 368 F.2d 37, 39 (10th Cir. 1966). Nevertheless, the Eighth Circuit has stated that "to impose sanctions under Rule 37, there must be an order compelling discovery, a willful violation of that order, and prejudice to the other party." *Carey*, 186 F.3d at 1019 (citing *Baker v. Gen. Motors Corp.*, 86 F.3d 811, 816 (8th Cir. 1996), *rev'd on other grounds*, 522 U.S. 222 (1998)).

13

As the Court's above discussion and its prior Orders and statements from the bench have made clear, nothing about this discovery dispute or the voluminous briefing that it has necessitated has been speedy or inexpensive. The two ripe motions for sanctions are the second and third such motions that have been submitted in this case. The Court set a hearing on the first motion for sanctions, at which time it made findings that Defendants' discovery responses—on the RFAs and RFPs—were evasive. In an effort to give Defendants—and their counsel—another shot at responding in good faith to discovery that the Plaintiffs had been authorized by the Court to serve months earlier, the Court went to great lengths to make sure that everyone was on the same page moving forward. For instance, the undersigned began the hearing by instructing everyone that "if at the end of the hearing you aren't crystal-clear about what this Court's directives are, then you need to raise your hand because I don't want to have to take up this matter again." (Doc. 65, p. 6: 1-5).

The Court then proceeded to lay out in great detail the procedural history that had led to the hearing. It also advised the parties that "I feel like when I read the defendants' answers and when I read their response that it is as if this Court had not already addressed and ruled on some of these same issues at least twice, if not more and, yet, here we are again." *Id.* at p. 11: 12-16. The Court also repeated the concern that some of the responses by Defendants have left the distinct impression of a sort of shell game in that although the Court had been told on many occasions that there were accounting or accountability mechanisms to ensure that donations earmarked for specific items were indeed being spent on those items, it had yet to see any specific evidence of that. Indeed, despite the documentation that had been provided during the hearing on sanctions, the

14

Court remarked that "[m]y takeaway, in trying to read through and parse through everything, is that the defendants do not presently have documentary proof to show how these 179 different designated contributions—contribution categories were spent. You don't have receipts, you don't have bills of sale, et cetera . . . ." (Doc. 65, p. 34:25-35:6).

Because the law is clear that "[d]iscovery is not supposed to be a shell game, where the hidden ball is moved round and round and only revealed after so many false guesses are made and so much money is squandered," *Lee v. Max Intern., LLC*, 638 F.3d 1318, 1322 (10th Cir. 2011) (Gorsuch, J.), the Court felt compelled to issue an Order (Doc. 67) that provided Defendants detailed instructions on how to proceed. The Court believed that Defendants were entitled to one final chance to demonstrate that they had, as they claimed, provided the documentation necessary to match donations to spending or, alternatively, one final chance to state in an unambiguous way that they did not have evidence of this and would be relying more upon general evidence showing spending in the field. That is why the Court ordered Defendants to separate their responses into "general evidence" and "specific evidence."

After the aforementioned four weeks passed, Defendants filed what appeared to be a revised version of both the RFAs and RFPs in accordance with the Court's Order. Nevertheless, after considering the parties' briefs and the attachments thereto, the Court is left with the same impression that gave it pause back in February. In short, the Court finds that Defendants' answers have advanced Plaintiffs no closer to understanding what documentation they have received that links earmarked donations to specific expenditures. As Plaintiffs rightly point out in their renewed motion for sanctions, what the Court classified as "specific evidence"—which again would be items like receipts, bills of

15

sale, transmittal letters, etc.—are almost entirely absent from the Defendants' "specific evidence" sections. Rather, the listed documents in those sections often correspond to advertisements and news releases that, while mentioning certain items, are not the type of specific paper-trail evidence that would link donations to expenditures and provide documentation by which Plaintiffs could assess GFA's fulfillment of its alleged promises to donors. Not every document that mentions "water buffaloes" is specific evidence that money earmarked for bovines has in fact been spent on them, especially when the documents are mere advertisements soliciting donations. Defendants were well-aware of what the Court meant by specific evidence and yet failed to reply in good-faith, obscuring their responses by seemingly including any document mentioning an item within this section.

Moreover, the Court is not persuaded that the items Defendants reference, such as spreadsheets, that *do* purport to show proof of expenditures are what they are represented to be. Indeed, the later briefing on Plaintiffs' Motion for Sanctions based on Fabricated Documents (Doc. 104) suggests that the numbers appearing in these spreadsheets are spending "targets" that, for many of the regions, are identical because of the same number of churches within the region. *See, e.g.*, Doc. 111, p. 7. Of course, an expenditure target is not the same as proof of an expenditure, and Defendants were well-aware of this when they submitted their amended responses.

Given how many times the Court has given what it thought were very precise instructions and explanations,[6] it does not need to repeat *ad nauseam* here all of the

---

[6] As an example, when the Court issued its Order requiring all parties and at least lead Counsel to appear in person for its hearing on the sanctions motion, the Court received a call from Defendants asking whether the phrase "all parties and at least lead Counsel"

16

instances of the discovery conduct in this case that lead the Court to find that Defendants have been willfully evasive with their discovery responses and failed to comply with the Court's directives. In sum, the Court finds that Defendants' answers continue to dodge where they have been asked to admit and obfuscate where the Court ordered them to clarify. In the last nine months, Plaintiffs have been put to the expense of at least three rounds of discovery, three motions for sanctions, two in-person hearings (including one where all named Defendants were required to attend), and an additional telephone hearing (in addition to the numerous email exchanges and phone conversations between the litigants and each other and between all parties and the Court). They have also spent countless hours and dollars digging through what they thought would be the evidence that Defendants claimed would be what they needed to show that expenditures went to their designated purposes. Despite all of this, Plaintiffs are no closer to having an answer.

Therefore, the Court finds that Defendants' abusive conduct in this case since August constitutes a willful violation of its clear discovery orders. Under its inherent authority to regulate proceedings in its Court and under the specific provisions of Rule 37(b), the Court finds that sanctions are appropriate for this abusive conduct and will therefore **GRANT** Plaintiffs' Second Motion for Sanctions (Doc. 94).[7]

---

meant all parties. Given this, the Court knows that Defendants are capable of seeking clarification when they do not understand the Court's orders.

[7] Nevertheless, while the Court will grant Plaintiffs' Second Motion for Sanctions, it does not have evidence before it at this point that would enable it to make findings on Plaintiffs' Motion for Sanctions based on Fabricated Documents. While the evidence the Court has reviewed leads it to conclude that Defendants' representations about these spreadsheets and their proof of expenditures has been misleading, it cannot conclude that these numbers are fabricated. Therefore, the Court will defer ruling on this Motion for the present time.

17

While the Court might be justified in imposing one of the more extreme sanctions that Plaintiffs request, it is also aware that "courts should impose sanctions no more drastic than those actually required to protect the rights of other parties." *Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1127 (5th Cir. 1970), *cert. denied*, 400 U.S. 878. Nevertheless, the scope of sanctions to be assessed is firmly within the trial court's discretion and "overleniency is to be avoided where it results in inadequate protection of discovery." *Id.*

Given the discussion below about the need to appoint a Special Master to conduct a forensic accounting of the evidence that has been produced, to establish the paper trail between donations and expenditures, and to finally get to the bottom of whether records that purportedly exist but that have not yet been produced will finally provide an answer to the central question in this case, the Court finds that a more appropriate sanction given Defendants' conduct throughout this discovery dispute would be to order that the costs of appointing a special master will be borne by the Defendants, as contemplated by Rule 53(g)(3); *see also Good Stewardship Christian Ctr. v. Empire Bank*, 341 F.3d 794, 798 (8th Cir. 2003) (finding that district court did not abuse its discretion in taxing costs of the appointment of a special master to a party that had abused discovery).[8]

## IV. APPOINTMENT OF A SPECIAL MASTER

Under Rule 53(a)(1)(C), a court may appoint a master to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district

---

[8] While Defendants' conduct has necessitated the appointment of a Special Master, the conduct of the parties in this case has obscured whether and to what extent the documents that have been produced were responsive to the discovery requests and what, if anything, remains to be discovered. Therefore, the Court reserves the right to amend the allocation of the Special Master's payment pursuant to the same rule in light of the Special Master's report.

judge or magistrate judge of the district." Courts commonly invoke this rule in two sets of circumstances that are particularly relevant to the present dispute.

First, courts often appoint a Special Master to oversee discovery or accountings when the cases involve extraordinary, complex, or time-consuming discovery disputes. *See, e.g., Lundy v. Hilder,* 289 F. App'x 135, 140 (8th Cir. 2008) (noting that the district court appointed a Special Master to perform an accounting, oversee discovery related to damages, and perform other tasks); *Castle Aero Fla. Int'l, Inc. v. Mktg. & Fin. Servs., Inc.,* 2013 WL 12149691 (D. Minn. Apr. 5, 2013) (appointing a Special Master to oversee the production of concealed bank records); *Omnium Lyonnais D'Etancheite Et Revetement Asphalte v. Dow Chem. Co.,* 73 F.R.D. 114, 117-18 (C.D. Cal. 1977) (appointing a Special Master to oversee discovery in a complicated case involving thousands, perhaps hundreds of thousands, of documents located abroad and parties that grew increasingly suspicious of the veracity of the documents they were receiving).

Additionally, courts have appointed a Special Master where a party or parties exhibit inability or unwillingness to comply with discovery orders issued by the Court. *See, e.g., Moreland v. State Farm Mut. Auto Ins. Co.,* 2007 WL 1033453, at \*4 (D. Colo. Apr. 3, 2007) (appointing a Special Master to oversee discovery when both parties exhibited an inability "to proceed in an orderly fashion in conducting discovery"); *Wachtel v. Health Net, Inc.,* 239 F.R.D. 81, 112-13 (D.N.J. 2006) (appointing a Special Master to "monitor discovery compliance" to ensure that defendants complete required document production and comply with other discovery orders).

This nine-month discovery dispute has needlessly squandered the resources of the parties, prejudiced Plaintiffs' attempts to uncover information central to its claims, and

19

put an "extraordinary drain on the Court's resources." *Wachtel*, 239 F.R.D. at 113. As noted above, the complexity of the case and documents involved and recalcitrance on the part of a party have often been cited as valid justifications for invoking Rule 53(a)(1)(C). Both are present here.

Therefore, pursuant to the provisions of Rule 53(b)(1), the Court hereby gives notice of its intent to appoint a Special Master. The Court envisions the appointment of an attorney and his/her firm to act as a Special Master, and further intends to authorize the Special Master to, if necessary, employ a forensic accountant to trace donations from initial receipt to disbursement to end use(r). The Court intends to order that the Special Master (and forensic accountant, if necessary) be given full access to all books, records, (pertinent and non-privileged) communications, and bank accounts that Defendants possess or reasonably control.

Pursuant to the requirements of Rule 53, the Court will order an abbreviated briefing schedule to allow the parties to express their positions on the appointment of a Special Master. In particular, the Court recommends that the parties use this opportunity to express their views on the following topics: the proposed scope of the Special Master's duties and any recommendations as to particular candidates. Any party wishing to be heard on the appointment of a Special Master should file its brief no later than **June 11, 2018**. The Court will then enter an appropriate Order.

## V. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for a Protective Order (Doc. 85) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Second Motion for Sanctions (Doc. 94) is **GRANTED**. The Court will **DEFER** its ruling on Plaintiffs' Motion for Sanctions based on Fabricated Documents (Doc. 104) until such time as the Court has received a report from the Special Master.

**IT IS FURTHER ORDERED** that the Court hereby gives notice of its intent to appoint a Special Master under Rule 53. By no later than **June 11, 2018**, a party wishing to be heard on the appointment of a Special Master should file an appropriate brief with the Court.

**IT IS SO ORDERED** on this \_\_\_\_ day of June, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE