IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GARLAND D. MURPHY, III, M.D., and
PHYLLIS MURPHY, Individually and on
behalf of all others similarly situated                                    **PLAINTIFFS**

v.                                    **CASE NO. 5:17-CV-5035**

GOSPEL FOR ASIA, INC.; GOSPEL FOR ASIA-INTERNATIONAL;
K.P. YOHANNAN; GISELA PUNNOSE; DANIEL PUNNOSE;
DAVID CARROLL; and PAT EMERICK                                    **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court is Plaintiffs' Motion to Certify Class Action (Doc. 48),

along with Defendants' Response (Doc. 70), Plaintiffs' Reply (Doc. 88), and additional

briefing.[1] Although the motion was initially set for oral argument on June 15, 2018, the

parties notified the Court that they wished to forego a hearing and submit the motion on

the briefs. Having considered the Motion and the Objections, which are now ripe for

decision, the Court **GRANTS IN PART AND DENIES IN PART** the Motion to Certify Class

(Doc. 48). For the reasons explained below, the Court will certify the proposed nationwide

class (as modified) for the Civil RICO claim and will certify the proposed Arkansas

---

[1] The pending Motion to Certify Class Action has been extensively briefed. In support of
Plaintiffs' initial Motion, the Court received a Memorandum Brief in Support (Docs. 49,
50), Declaration (Doc. 51), and a Statement of Facts (Docs. 52, 53). Beyond Defendants'
Response in Opposition, the Court has also received Objections (Doc. 72), Appendices
(Docs. 74-80), and a Notice of Supplemental Authorities (Doc. 113). Reference herein to
multiple versions of the same filing is made because the parties have submitted much of
the material under seal. Thus, the references are to the unredacted and public versions
of the filings.

subclass for the Arkansas Deceptive Trade Practices Act ("ADTPA"), fraud, and unjust enrichment claims.

## I. BACKGROUND

The Court has previously given an exhaustive recounting of the facts of this case in its prior Orders (Docs. 44, 60, 63, 67, 119, and 125) and during several hearings that have been held to resolve a months-long discovery dispute (Docs. 26, 37, and 65). Thus, it repeats here only those facts necessary to establish context for the Court's ruling.

GFA is a Christian missionary organization operating in South Asia, mainly in India. To fulfill its charitable purposes, GFA solicits donations from donors across the world. Each year, according to the Complaint, over one million unique donations are made to GFA from tens of thousands of donors in the United States alone. (Doc. 1, ¶ 15). GFA then works with its overseas agents and international field partners (many of which are entities closely affiliated with and/or controlled by the named Defendants) to ensure that the designated money reaches its intended purposes in Asia ("the field").[2] To maintain its ability to send sufficient funds to the field, GFA arranges fundraising pitches in several mediums, including in-person solicitations at churches in the United States, on its own website, and through advertising efforts on social media and in various mailings and radio broadcasts.

---

[2] As the Court explained in the Order on the Motion to Stage Alter Ego Issues after Verdict (Doc. 60), there are at least 76 different entities that are alleged to be field partners or alter egos of the named Defendants. Although GFA's discovery conduct (the subject of the Order following this one) has severely undermined the Plaintiffs' ability to establish the money trail from initial donation to end user, the allegations in the Complaint (Doc. 1) are that this money is ultimately transmitted to the field with the help of these field partners and then to end users, many of whom are pastors in local churches, for ultimate use on the designated field purposes.

Because the needs of the poor in Asia are so many, GFA allows potential donors to specify for what purpose(s) their field donations will be spent. For instance, donors who give online or in response to catalogues may direct their donations to any of 179 different donation categories, including everything from "Jesus wells" to water buffaloes. Donors make these designations by either checking boxes on order forms or, if ordering online, by adding the item (which lists the corresponding price) to their shopping cart.[3] At other times, GFA directly solicits donations for particular items, including "emergency grams" sent in the wake of natural disasters soliciting donations for items related to disaster relief and advertisements sent around the holidays asking for donations for blankets because "the weather outside is frightful, but this blanket is so delightful." (Doc. 1, pp. 9, 11) (cleaned up).

Plaintiffs allege that throughout the proposed class period, whether the advertisements were made by GFA representatives at in-person church presentations, through catalogue mailings, on GFA's website, or in GFA's radio presentations, GFA included a similar promise to its donors that 100% of the money given by donors would be sent to the field and ultimately spent in accordance with the donor's wishes rather than

---

[3] *E.g.,*



**Camels**
$345 each

Camels feel right at home in Rajasthan, one of the hottest and driest places in India. They can work long hours in the heat with no problem and are used for plowing, transportation and hauling goods. Trucks quickly sink into sand. However, camels can carry up to 330 pounds across a desert with no problem. Camel milk is also part of many diets in Rajasthan, and camel wool can even be woven into cloth.

My Donation $        Add 🛒

(Doc. 1, p. 12).

being applied to cover administrative costs or overhead. In fact, even beyond the alleged promises made in these solicitations, potential donors or casual scrollers who stumbled upon GFA's website could learn in the FAQ section not only that 100% of what you give for chickens goes for chickens but also *how* GFA could ensure that the donated money designated for the field ultimately went there. (Doc. 53-5, pp. 3, 4). Moreover, Defendants acknowledge that every GFA donor received receipts that contained a representation that "[o]ne hundred-percent of all contributions designated for use on the mission field are sent to the mission field." (Beers Decl., Doc. 77-1, pp. 9, 10).

This lawsuit centers on Plaintiffs' claims that, despite these numerous representations, GFA did not, in fact, spend the donated—and designated—money in accordance with the donors' wishes or with GFA's representations. All told throughout the proposed class period, the parties agree that approximately $375 million in donations are at issue.[4] As a result, Plaintiffs have asserted a number of causes of action against GFA, including Civil RICO, fraud, unjust enrichment, and an Arkansas-specific claim under the ADTPA. For the Civil RICO, fraud, and unjust enrichment causes of action, Plaintiffs now seek to certify a nationwide class as follows:

> All persons in the United States who donated money to GFA from January 1, 2009 through the date the Class is certified for Project Codes 1000-4900. Excluded from the Class are unknown donors; Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family.

---

[4] *See, e.g.*, Doc. 65, pp. 41-42 (Mr. Mowrey, Lead Defense Counsel, commenting that "if you look at the specific designations over the relevant time period, it's about $375 million. I mean, and I don't think there will be any dispute about that. That's the number, if you look at the designations that are in dispute. It's about $375 million over this time period.").

(Doc. 49, p. 20). The proposed ADTPA subclass is identical, except that "Arkansas" is substituted for "the United States." They also request that the Court designate Dr. Garland Murphy and Phyllis Murphy as Class Representatives and approve the Stanley Law Group as Lead Class Counsel and the Bassett Law Firm as Class Counsel.

## II. LEGAL STANDARD

The party seeking class certification bears the burden of proving that Rule 23's requirements are satisfied. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The district court retains "broad discretion in determining whether to certify a class, recognizing the essentially factual basis of the certification inquiry and . . . the district court's inherent power to manage and control pending litigation." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (internal quotations and citations omitted). Nevertheless, a district court must undertake "a rigorous analysis" to ensure that the requirements of Rule 23 are met. *Gen. Tel. Co. of the Sw. v. Falcon*, 467 U.S. 147, 161 (1982). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351. The district court may "resolve disputes going to the factual setting of the case" if necessary to the class certification analysis. *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005).

In performing this rigorous analysis, "[a] court is not bound by the proposed definitions of the class, *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 92 n.2 (W.D. Mo. 1997) (citation omitted), and "has the authority to redefine a proposed class in such a way as to allow the class action to be maintained." *In re Zurn Pex Plumbing Prods. Liability Litig.*, 267 F.R.D. 549, 558 (D. Minn. 2010); *see also Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999) (courts have "broad discretion" to "modify the definition"

of the class); *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("[H]olding plaintiffs to the plain language of their definition would ignore the ongoing refinement and give-and-take inherent in class action, particularly in the formation of a workable class definition."). The Court's discretion to redefine the proposed class extends to the ability to create partial class actions as to particular issues and subclasses. *See, e.g.*, *Newberg on Class Actions* § 7:30 (5th ed. 2018); Charles A. Wright and Arthur R. Miller, 7AA *Federal Practice & Procedure* §1790 (3d ed. 2018). But, any such subclass must still meet the requirements for class certification under Rule 23. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982).

An implicit requirement for any class certification inquiry involves a court's assessment as to the ascertainability of the class. The description of a proposed class must be sufficiently definite to permit class members to be identified by objective criteria. *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996–97 (8th Cir. 2016). "The requirement that a class be clearly defined is designed primarily to help the trial court manage the class. It is not designed to be a particularly stringent test, but plaintiffs must at least be able to establish that the general outlines of the membership of the class are determinable at the outset of the litigation." *Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 31 (D.D.C. 2003).

Under Rule 23, certifying a class action requires a two-step analysis. First, the Court must determine whether:

- the class is so numerous that joinder of all members is impracticable ("*numerosity*");

- there are questions of law or fact common to the class ("*commonality*");

6

- the claims or defenses of the representative parties are typical of the claims or defenses of the class ("*typicality*"); and

- the representative parties will fairly and adequately protect the interests of the class ("*fair and adequate representation*").

Rule 23(a)(1)–(4). Second, because Plaintiffs seek to maintain the classes under Rule 23(b)(3), the Court must determine whether:

- questions of law or fact common to class members predominate over questions affecting only individual members ("*predominance*"); and

- a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ("*superiority*").

Rule 23(b)(3).

### III. DISCUSSION

Because the class and any subclass must independently meet the requirements of Rule 23, the Court considers separately whether the proposed nationwide class and Arkansas subclass satisfy the requirements of Rule 23.

### A. Nationwide Class

### 1. Numerosity (Rule 23(a)(1)) and Ascertainability

The Court begins by assessing whether the class is so numerous that joinder of all members is impracticable, and, relatedly, whether the members of the class are readily ascertainable. The Eighth Circuit, "unlike most other courts of appeals, has not outlined a . . . separate, preliminary requirement" of ascertainability that would require plaintiffs to demonstrate a method of identifying class members that is administratively feasible. *See Sandusky Wellness*, 821 F.3d at 996. Rather, the Eighth Circuit simply adheres to a

rigorous analysis of the Rule 23 factors, and while it recognizes that this analysis necessarily entails that a class be "adequately defined and clearly ascertainable," the focus of this threshold inquiry is on whether the proposed class definition identifies class members by objective criteria, rather than on the administrative concerns that are already taken into account by the Rule 23(b)(3) factors of predominance and superiority. *See id.*

GFA does not seriously dispute that the proposed nationwide class is readily ascertainable and so numerous that joinder of all members would be impracticable. After all, by GFA's own count, the proposed nationwide class would consist of 185,414 individual members. (Doc. 80-4, p. 3). Clearly, the class is ascertainable by objective criteria. Additionally, given the size of the putative nationwide class, the numerosity requirement is satisfied as well.

### 2. Commonality (Rule 23(a)(2))

Commonality does not require "that every question of law or fact be common to every member of the class." *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982). In fact, commonality does not even require more than one common question. For, as the Supreme Court noted in *Dukes*, "[e]ven a single [common] question will do." 564 U.S. at 359 (alterations in original, internal quotation marks and citation omitted). To establish commonality, the putative class members must have "suffered the same injury," and "[t]heir claims must depend upon a common contention." *Id.* at 349-50. In other words, the contention must "be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Id.* at 350.

The putative class members in this case share many common questions of law and fact. First, they all assert similar injuries based on the same allegedly fraudulent conduct of the Defendants. In particular, the Court notes the following non-exhaustive list of common questions:

1) What GFA promised throughout the class period;

2) Whether GFA acted in accordance with those promises;

3) Whether GFA committed a pattern of racketeering activities;

4) Whether a RICO enterprise exists; and

5) Whether the named Defendants participated in that enterprise.

The answers to these and other common questions of law and fact are central to the asserted Civil RICO, fraud, and unjust enrichment claims and therefore are likely to drive their resolution. Not surprisingly, courts have held that "the proposed class representative's claims are generally held to be typical of the class members' claims if the allegations can be traced to the same overall fraud." *Robert v. C.R. England, Inc.*, 318 F.R.D. 457, 511 (D. Utah 2017) (quoting 1 William B. Rubenstein, *Newberg on Class Actions* § 3:36 (5th ed. 2012)). Given the common contentions in this case, all of which are shared by each class member and susceptible to proof on a class-wide basis, the Court finds that the commonality requirement is satisfied.

### 3. Typicality (Rule 23(a)(3))

The typicality requirement is satisfied where the proposed class members' claims "are based on the same legal or remedial theory." *Paxton*, 688 F.2d at 561-62. Thus, courts find that the claims can be maintained as a class action and satisfy the typicality requirement "despite factual variations among class members if the claims of the putative

representative and class members advance the same legal theories and challenge the same pattern or practice, or alleged common course of fraudulent conduct." 1 *McLaughlin on Class Actions* § 4:24 (14th ed. 2017) (citing *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1117 (9th Cir. 2017)).

The Court finds that the named Plaintiffs' Civil RICO claims are typical of the Civil RICO claims that would be advanced by the members of the proposed putative nationwide class. All class members would be marshaling the same facts and advancing the same legal theories to demonstrate the existence of an enterprise and the pattern of racketeering activity necessary to trigger liability (*i.e.* the alleged common course of fraudulent conduct and the predicate acts necessary to qualify as a pattern of conduct).[5] Because the legal theories would all be premised on the same pattern or practice, the Court finds that the typicality requirement has been satisfied with respect to this claim.

However, the Court cannot conclude that the typicality requirement has been satisfied with respect to Plaintiffs' fraud and unjust enrichment claims. Unlike with Civil RICO, the elements of fraud and unjust enrichment, the standards of proof, and the scienter requirements vary considerably from state to state. And because these are state common law causes of action, this Court would be duty-bound to conduct a choice-of-law analysis to determine which state(s) law would apply. As Defendants rightly note, that analysis would begin with the forum state's choice-of-law rules. *Winter v. Novartis*

---

[5] As this Court has explained elsewhere, particularly in its Opinion denying Defendants' Motion for Judgment on the Pleadings as to the Civil RICO claim (Doc. 119), the elements of a Civil RICO cause of action are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *See, e.g., Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009) (citing *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

*Pharms. Corp.*, 739 F.3d 405, 410 (8th Cir. 2014). The Arkansas Supreme Court indicated in *Ganey v. Kawasaki Motors Corp., USA,* that Arkansas now relies both upon the doctrine of *lex loci delicti* and the Leflar choice-influencing factors[6] in deciding which state's substantive law to apply. 366 Ark. 238, 251 (2006). The Court is convinced that the application of this Arkansas choice-of-law analysis would lead to the conclusion that the substantive law to be applied on these two causes of action would be the laws of the state where each putative class member resided at the time (s)he received the allegedly fraudulent representations by GFA. *See, e.g., Jarrett v. Panasonic Corp. of N. Am.*, 8 F. Supp. 3d 1074, 1087 (E.D. Ark. 2013).

Thus, if the fraud and unjust enrichment claims were maintained on a nationwide basis, the Court would in effect be applying the laws of each state and territory where the 180,000 class members reside. It would be one matter if the laws on fraud and unjust enrichment were not so variable across state lines. However, the Court's own review of variations in state laws on fraud and unjust enrichment, as reflected in the Defendants' 50-state summary of these differences (*see* Docs. 76-8, 76-9), leads it to conclude that there are insurmountable problems with allowing the proposed nationwide class to be certified with respect to the fraud and unjust enrichment claims.[7] To take but one example,

---

[6] The Leflar choice-influencing factors are: 1) predictability of results, 2) preservation of interstate or international order, 3) simple application by the judiciary, 4) the forum's governmental interests, and 5) application of the better law.

[7] Because of the potential that variations in state laws could swamp common issues and destroy predominance, courts around the country have required the party seeking certification to "provide an extensive analysis of state law variations to reveal whether these pose insuperable obstacles." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 725 (5th Cir. 2007) (internal quotation omitted). Plaintiffs have not provided such an analysis in an effort to persuade the Court that variations in state law would not cause insurmountable

the proposed class representatives, the Murphys, Arkansas residents, would only need to show fraud by a preponderance of the evidence and prove that they justifiably relied on GFA's representations. *See Delanno, Inc. v. Peace*, 237 S.W. 3d 81, 84 (Ark. 2006) (requiring all five elements of fraud—including justifiable reliance—to be proven by a preponderance of the evidence). However, the 842 putative class members in Connecticut would be required to prove some of the elements of fraud by "clear, precise, and unequivocal" evidence, but could show by a fair preponderance of the evidence that they reasonably relied upon the representation(s) to their detriment. *Parker v. Shaker Real Estate, Inc.*, 705 A.2d 210, 213 (Conn. Ct. App. 1998). Many other examples could be given. The overall conclusion, though, is that although these clear differences would lead to considerable management nightmares, they also defeat Plaintiffs' attempts to show that their fraud and unjust enrichment claims are typical of the claims to be asserted by the remaining members of the proposed class. *See Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 556 (D. Idaho 2010) (citing *Falcon*, 457 U.S. at 158) (different legal standards across five jurisdictions make plaintiff's claims atypical of claims of members in other states); *Duchardt v. Midland Nat. Life Ins. Co.*, 265 F.R.D. 436, 445-48 (S.D. Iowa 2009) (finding that typicality was lacking because different legal standards would need to be applied to prospective class claims).

However, although the fraud and unjust enrichment claims cannot be maintained on a nationwide class basis, this does not simply mean that Plaintiffs have no options.

---

management problems. Indeed, Plaintiffs insist only that any management problems caused by differences in the various state laws on these two causes of action could be cured with a single set of jury instructions and alternate questions on the standard of proof. *See* Doc. 88, p. 20. The Court remains unconvinced.

For, as the Court will explain below when assessing the Arkansas subclass, Plaintiffs can maintain their claims of fraud and unjust enrichment as a class action on behalf of the 2,608 Arkansas class members asserting fraud and unjust enrichment under Arkansas law. Doing so would eliminate the problems identified above regarding the typicality of the Murphys' fraud and unjust enrichment claims.

### 4. Adequacy of Representation (Rule 23(a)(4))

In many ways, the inquiry as to the adequacy of the class representation under Rule 23(a)(4) is similar to the inquiry on typicality. The Court must ask "whether the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

The Court finds that the Murphys will fairly and adequately represent the interests of the classes. From the outset of this litigation, they have vigorously prosecuted their own interests, including litigating for the past eleven months whether the named Defendants have abused the discovery process by obfuscating whether they have evidence in their possession that would show whether they failed to, despite their prior representations, spend money in the field and in conformity with the alleged promises they made to donors. There is no good reason to believe that this will change following certification.

Additionally, as evidenced by the submissions in support of the class certification motion, the Court finds that Lead Class Counsel and Class Counsel have the requisite extensive experience and success prosecuting class action cases, and GFA does not challenge or dispute these qualifications.

13

### 5. Requirements of Rule 23(b)(3)

In addition to finding that Rule 23(a) has been satisfied, the Court must also consider whether one of three possible types of class actions, identified in Rule 23(b), has been met prior to certifying a class action. Plaintiffs seek certification under Rule 23(b)(3). That rule requires the Court to determine whether "questions of law or fact common to class members predominate over any questions affecting only individual members" (*"predominance"*) and whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (*"superiority"*). The following factors are pertinent:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

### a. Predominance

"The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The Eighth Circuit has explained that:

> When determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, *if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class.* While limited in scope, this analysis should also be rigorous.

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d at 618 (emphasis added) (internal citations and quotation marks omitted). In assessing whether common issues predominate, a court must ask "whether the common, aggregation-enabling, issues in the case are more prevalent or important that the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1046 (2016) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:49 (5th ed. 2012)). If "one or more of the central issues in the action" are common to the class and can be said to predominate, the class may be certified under Rule 23(b)(3) "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (quoting Wright & Miller, *7AA Federal Practice & Procedure* § 1778 (3d ed. 2005)). Thus, "[p]redominance is determined not by counting the number of common issues, but by weighing their significance." *Lewis*, 265 F.R.D. at 559 (citing *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 627 (5th Cir. 1999)). Because the defendant's conduct is often the central question in fraud cases, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625.

GFA argues that no class can be certified in this case because there are myriad individual questions that would overwhelm any common questions of law or fact. The principal argument on this point is that each individual plaintiff will have to show proof that it relied on GFA's alleged misrepresentations.

For several reasons, the Court is not persuaded that reliance would defeat predominance on any of the claims asserted in this case. As an initial matter, this is a classic case of fraud, where the putative class argues that Defendants solicited monetary

donations after representing that those donations (which were for particular items) would in fact be spent in the field. Thus, the paramount issues in this case center around whether GFA, despite these representations, did not in fact spend this money in the field as designated. If it is ultimately determined that GFA did spend the donated money as promised, the claims asserted by all class members would be extinguished. In short, all other questions pale in comparison. Even Mr. Mowrey, GFA's lead counsel, has consistently maintained that the answer to the questions of what GFA promised to do with the money and what it in fact did with it will, above all other questions, drive the resolution of this case and the class claims.[8] The Court couldn't agree more. The ability—and indeed requirement—that each class member answer these core questions to prevail on any of their claims demonstrates just how predominant these questions are compared to any individual inquiries, such as damages calculations, that would be required. *See, e.g.,* *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 468 U.S. 455, 459 (2013) (noting that predominance was satisfied where the answer to the central question in the case would mean that the class would "prevail or fail in unison").

The Court is also unpersuaded by GFA's more specific arguments that whether each class member relied on GFA's misrepresentations will require extensive individualized inquiries. For, in certain types of consumer fraud cases, courts have held that proof of reliance does not defeat predominance where the reliance could be proven by class-wide proof and where it was logical to infer that the class members relied on

---

[8] *See, e.g.,* Doc. 65, p. 80:

MR. MOWREY: "They want to—if they want this case to go forward, then they have to provide the information showing how these monies were spent; and ultimately that's what this case is about is whether the monies that were taken in, how they were spent."

similar representations made by defendants. For instance, in *Klay v. Humana*, plaintiffs sought to maintain a putative nationwide and global class of physicians who alleged that Humana harmed them by making similar representations claiming that the physicians would be reimbursed for the medically necessary operations they performed and then by failing to reimburse them. 382 F.3d 1241, 1259 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). In rejecting a similar argument that proof of individualized reliance by each physician on these representations would necessarily defeat predominance, the Eleventh Circuit noted first that the substantial number—and importance—of the common issues, such as whether a nationwide conspiracy existed, whether there was an enterprise, and whether a pattern of racketeering activity could be proven would "predominate over all but the most complex individual inquiries." *Id.* at 1258-59. They then noted that the nature of the alleged misrepresentations meant that each physician in the class could prove their reliance on these representations with identical proof. In short, they concluded:

The alleged misrepresentations in the instant case are simply that the defendants repeatedly claimed they would reimburse the plaintiffs for medically necessary services they provide to the defendants' insureds, and sent the plaintiffs various EOB forms claiming that they had actually paid the plaintiffs the proper amounts. While the EOB forms may raise substantial individualized issues of reliance, the antecedent representations about the defendants' reimbursement practices do not. It does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due. A jury could quite reasonably infer that guarantees concerning physician pay—the very consideration upon which those agreements are based—go to the heart of these agreements, and that doctors based their assent upon them . . . Consequently, while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue). For this reason, this is not a case in which individualized issues of reliance predominate over common questions.

17

*Id.* at 1259.

The Second Circuit used similar reasoning in *In re U.S. Foodservice Pricing Litigation*. There, plaintiffs asserted that invoices sent to them for the services rendered by United States Foodservice ("USF") were being fraudulently and artificially inflated by USF. 729 F.3d 108, 113 (2d Cir. 2013). In rejecting USF's argument that individualized inquiries relevant to the underlying fraud would predominate over common questions, the Second Circuit noted that "the thrust of the RICO claim is USF's scheme to create and employ the VASPs to inflate the invoices so as to overbill each class member *in the exact same manner.*" *Id.* at 119 (emphasis in original). As to the reliance and causation elements, the Court, citing *Klay*, found that the entities' payment of these invoices was circumstantial proof that they relied upon an implicit representation that the amount shown on the invoice was actually (and honestly) owed. *Id.* at 120. Because this representation could be shown by circumstantial class-wide proof, the individual reliance components of the plaintiffs' fraud and Civil RICO causes of action did not require the type of individual inquiries that would overwhelm common questions. *See also CGC Holding Co., LLC. V. Broad & Cassel*, 773 F.3d 1076, 1091 (10th Cir. 2014) (collecting other cases and noting that "[w]hen plaintiffs are given the opportunity to present that inference as their theory of causation, reliance, an issue often wrought with individualized inquiries, becomes solvable with a uniform piece of circumstantial evidence.")

In the wake of these decisions, numerous district courts have found that the predominance requirement was satisfied, notwithstanding that reliance is an element that must be proven, where that proof could be made on a class-wide basis as a result of the

nature of the representations made to the putative class and the ability of class-wide proof to establish an inference of reliance and causation.

For instance, in *Roberts v. C.R. England, Inc.*, the Court found that circumstantial evidence of reliance was "abundant" and that the class members could all show, on a class-wide basis, that their decision to sign on for truck driving school was made because of the defendant's representations that such a job would lead to a lucrative career. 318 F.R.D. 457, 514 (D. Utah 2017). In short, reliance did not defeat the predominance requirement because the central questions of the case all centered around the allegation that "members of the class had been exposed, through a variety of mediums, to generally uniform representations that may have been inaccurate." *Id.* Similarly, a district court in the Eighth Circuit in *Huyer v. Wells Fargo & Co.* rejected an identical argument that predominance could not be met after concluding that the payment of money in mortgage statements sent to the putative class was circumstantial proof of reliance upon the accuracy of the information reflected in the statement itself. 295 F.R.D. 332, 348 (S.D. Iowa 2013).

In light of these cases, the Court concludes that plaintiffs may prove their reliance upon the implicit and explicit representations made by GFA on a class-wide basis. Just like the plaintiffs in all the above-cited cases, the evidence submitted before the Court demonstrates that GFA made substantially uniform representations throughout the class period that 100% of what donors gave for sponsorship in the field would in fact be sent to the mission field. These representations were consistently made regardless of the medium in which the solicitations were made (*i.e.* GFA website, radio advertisement, catalogue) and were confirmed when each GFA donor received a receipt containing

similar language. Moreover, when GFA was not specifically requesting money for particular projects (e.g. the blankets in winter or the disaster relief projects in the wake of earthquakes), it is undisputed that it allowed donors to designate, based upon GFA-created categories, where donated funds were being spent, either by checking a box on paper-based order forms or by allowing a donor to see a page that shows individual items and allowing donors to "add" the item to their shopping cart. (Doc. 1, pp. 12).

Thus, regardless of the medium or the way in which the putative class members donated, all putative class members here are individuals who specifically designated that their donations should be directed to the field and to particular field projects. Coupled with GFA's consistent guarantees to send 100% of money designated for field projects to the field and their confirmation of this representation in *each* itemized receipt given to a donor, the Court finds that class members could prove that they gave money and directed that money to be spent on particular projects in the field in reliance upon GFA's numerous implicit and explicit representations that designated money would in fact be spent in the field. In short, just like the above cases, the element of reliance is "subsumed in the definition of the class itself." *CGC Holding*, 773 F.3d at 1092, because the class includes *only* claims for donations that were designated for the field and its many projects.

Defendants contend that the above-cited cases are inapposite and that an inference or presumption of reliance is unwarranted here because GFA is a charity. However, there is no charity exception for fraud, Civil RICO, or unjust enrichment. If indeed GFA made these representations and then subsequently did not send 100% of the money to the field or spend the money in accordance with its commitments to honor donor designations, that is actionable and can be proven on a class-wide basis. In short,

20

the cases adopting an inference of reliance have done so based on the nature of the representations that were made, not on the nature of the entity making them. Moreover, GFA makes much of its argument that donors give for a number of reasons. While that is assuredly true, the Court has been presented with no authority that the law requires that the donors' reliance on GFA's representations be the sole cause of their injuries. For these reasons, the Court finds that reliance is not an impediment to class certification in this case. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 724-25 (11th Cir. 1987) ("In view of the overwhelming number of common factual and legal issues presented by plaintiffs' misrepresentation claims, . . . the mere presence of the factual issue of individual reliance could not render the claims unsuitable for class treatment.")

Defendants' last argument is that proof of individual damages will also require individual inquiries, making the claims unsuitable for class treatment. However, the Advisory Committee rejected this very argument, writing that "a fraud perpetrated on numerous persons by the use of **similar**[9] representations may be an appealing situation

---

[9] GFA includes certain documents where these alleged guarantees were not included or were phrased slightly differently. However, the Court finds that this is insufficient to show that these representations were not uniformly made or that they materially varied throughout the class period. As GFA even admits, the representations were consistently made, regardless of the medium, by GFA when soliciting donations and similar language was included in the receipt sent to *every* donor. Moreover, in proceedings before this Court, GFA, as early as the case management hearing, represented that "[g]oing to the heart of their allegations, we believe that we will be able to show that the monies that were designated went to *the particular items that were specified*." (Doc. 26, p. 34) (emphasis added). It is curious 1) that GFA's lead counsel would have consistently made this representation if that weren't GFA's position and 2) that, given GFA's consistent position on this point, they now try to retreat from the effect of their prior representations.

Given the evidence discussed in the earlier portions of this Opinion, the Court concludes that GFA's representations were similar and did not materially vary throughout the class period. A ruling to the contrary, such that the representations must be 100% identical throughout the period, would eviscerate the class-action device in these cases and

for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class." *See* 39 F.R.D. 69, 103 (1966) (emphasis added). In sum, the Court finds that the common issues of law and fact predominate.

### 6. Superiority

The second and final factor to consider in the Rule 23(b)(3) analysis is whether a class action is a superior means of resolving this dispute as compared to other litigation methods. According to the Supreme Court, the "principal purpose" of a class action is to advance "the efficiency and economy of litigation." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974). In this regard, Rule 23 class actions may be viewed as having been created as a management tool to make litigation easier, not more complicated.

The class action device is clearly superior to other forms of litigation methods for a number of reasons. First, there are over 180,000 putative class members. To the Court's knowledge, only one other case has been filed with similar allegations.[10] Given that each class member would need to prove their claims with similar facts and have similar questions of law and fact to resolve, it is certainly more efficient to achieve a common resolution of these common questions rather than to force 180,000 class members to

---

subvert the purposes of Rule 23. *In re First Alliance Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006) ("The class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims.").

[10] *Dickson v. Gospel for Asia, Inc.*, No. 5:16-cv-05027-PKH. While that case had been stayed pending appeal, the Eighth Circuit recently held that an arbitration provision that the named plaintiffs—and putative class representatives—signed was valid and enforceable and remanded the case to the district court to determine whether the Dicksons' donations to GFA fell within the scope of that agreement. 2018 WL 4165788, at *2-*3 (8th Cir. Aug. 31, 2018).

litigate separately. This is especially the case given that some of the individual class members may be dissuaded from filing individual actions as their amount of damages in each case could make the cost-benefit analysis inherent in litigation weigh against filing suit. This likelihood, and the resulting efficiencies to be gained from class action treatment, are increased because of the severe dilatory discovery tactics that GFA has employed throughout this case. That conduct has been the subject of several prior opinions (in addition to the order filed separately today appointing a Special Master) and will not be rehashed in detail here. Nevertheless, the short version is that, almost a year after first propounding discovery to uncover evidence relevant to the central issues in this case (whether GFA did in fact spend donated money in the field in conformity with donor designations and their own representations), the Murphys still have no answers to this question because GFA continues to dodge duly served requests and obfuscate where the Court ordered it to clarify. Therefore, hoping that 180,000 different class members, many of whom likely have small damage amounts, would have the resources (or patience) to re-litigate these exact same issues would be a fool's errand and, as the undersigned can attest, an enormous waste of judicial resources better deployed elsewhere.

For the above reasons, the Court concludes that the proposed nationwide class meets the requirements of Rule 23 and can be maintained with respect to the Civil RICO claim. Nevertheless, the Court will slightly modify the proposed nationwide class to explicitly exclude GFA employees and members who may be, like the Dicksons, subject to binding arbitration agreements.

## B. Arkansas Subclass[11]

As the Court noted previously, because each class or subclass must independently meet the requirements of Rule 23, the Court now must determine whether the proposed Arkansas subclass complies with the Rule. Before turning to the analysis, the Court would note that while Plaintiffs only expressly asked for certification of the Arkansas subclass with respect to the ADTPA claim, they also implicitly requested to maintain a class action with respect to the Arkansas fraud and unjust enrichment claims as well. That is because, as the Court explained above, for those claims, the state of residency would provide the underlying substantive law for each putative class member's claims. Therefore, in a proposed nationwide class asserting these claims, there would be, by definition, a group of Arkansas residents asserting fraud and unjust enrichment under Arkansas law. Therefore, the Court considers whether the proposed Arkansas subclass could be maintained with respect to all of the asserted claims in this case.

### 1. Rule 23(a)

### a. Ascertainability and Numerosity

The proposed Arkansas subclass is sufficiently ascertainable by the same objective criteria by which the national class was ascertained. Moreover, the Court finds that the 2,608 members of the Arkansas subclass more than meet the requirement that the class be so numerous as to make joinder of all members impracticable. (Doc. 80-4, p. 2).

---

[11] GFA raises many of the same arguments with respect to the Arkansas subclass as it did for the proposed nationwide class. Because the Court has rejected many of these arguments previously, it will not recap those rulings, but will incorporate them herein with respect to the Arkansas subclass.

### b. Commonality, Typicality, and Adequacy of Representation

Clearly, given the discussion above, there are numerous questions of law and fact common to the Arkansas subclass for each of these causes of action. Whether GFA fulfilled its commitments to spend the donated money in the field and for the designated purposes is obviously the question most central to resolution of each of these claims, and "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

The typicality problems discussed above with respect to maintaining a nationwide class asserting fraud and unjust enrichment claims entirely disappear when limiting the fraud and unjust enrichment claims to Arkansas class members. For, the Murphys' claims of unjust enrichment and fraud under Arkansas law are clearly typical of the claims asserted by other Arkansans. *Lafollette v. Liberty Mut. Ins. Co.*, 2016 WL 4083478, at *7 (W.D. Mo. 2016) (finding that class definition satisfied typicality requirement where class was limited to Missouri policyholders to whom the same legal standards and methods of contract interpretation apply). Thus, the additional concerns about different standards of proof and scienter simply are not relevant as the Murphys and the other Arkansas class members would be advancing identical legal theories and proof. *Paxton*, 688 F.2d 552. GFA has not advanced any other persuasive reason why the Murphys' claims would be atypical of the other Arkansas subclass members.

Similarly, the Court finds, for the reasons it did with respect to the nationwide class, that the Murphys would be more than adequate representatives of the Arkansas subclass and that the Stanley Law Group and Bassett Law Firm are capable firms with significant expertise in handling class action litigation.

## 2. Rule 23(b)(3)

### a. Predominance

GFA again argues that individual proof of reliance and proof of damages would defeat predominance as to the Arkansas subclass. The Court rejects those arguments for the same reason it rejected their arguments as to the nationwide class. In short, the common questions of law and fact predominate over any of these individual questions and putative members can establish proof of reliance by class-wide proof given the nature of the alleged misrepresentations.

However, further comment with respect to the ADTPA claim is warranted. First, Arkansas law is clear that "[o]ur law is now well settled that the mere fact that individual issues and defenses may be raised by the defendant cannot defeat class certification where there are common questions concerning the defendant's alleged wrongdoing that must be resolved for all class members." *DIRECTV, Inc. v. Murray*, 423 S.W.2d 555, 565 (Ark. 2012); *see also In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 58 (D.N.H. 2015). Second, the Court is of the view that the question of whether GFA's representations were accurate is of paramount importance to Plaintiffs' ability to succeed under the ADTPA claim, as the law specifically defines an unconscionable trade practice to include "[m]aking a false representation that contributions solicited for charitable purposes shall be spent in a specific manner or for specified purposes." *See* Ark. Code Ann. § 4-88-107(a)(7). Thus, the veracity, or lack thereof, of GFA's numerous representations (both more generally as to sending money to the field and more specifically as to fulfilling donor designations) fall near the very heart of the wrongs the ADTPA was designed to remedy. Finally, as this Court noted recently, amendments to

the ADTPA became effective August 1, 2017, which have the effect of prohibiting individuals from bringing class action lawsuits for violations of anything other than provisions of the Arkansas Constitution. *Mounce v. CHSPSC, LLC.*, 2017 WL 4392048, at *6-7 (W.D. Ark. 2017). However, for the same reasons explained in that opinion, this change to the ADTPA will *not* be given retroactive application, as it is a procedural rule which directly conflicts with Rule 23 and as the actionable conduct in this case began well before this amendment was implemented. *Id.* at *7.

Therefore, the Court concludes that the common questions of law and fact central to each of the claims asserted by the Arkansas subclass predominate over any individual inquiries, such as damages, that may be required.

### b. Superiority

For the reasons explained above with respect to the nationwide class, the Court finds that maintenance of these claims as a class action would be more efficient and superior to other methods of adjudicating the controversy. Moreover, while maintaining the nationwide class with respect to the entire fraud and unjust enrichment claims would have presented numerous management problems, these problems are not present when the claims litigated on a class-wide basis are claims asserted under Arkansas law. In short, resolving these claims on a class-wide basis has all the benefits of a class action without any of the managerial issues that would have been caused by differing standards of proof or conflicting legal theories.

## IV. CONCLUSION

In light of the above discussion, **IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Certify Class (Doc. 48) is **GRANTED IN PART AND DENIED IN PART** as follows:

**IT IS ORDERED** that a nationwide class, defined as follows, is certified to pursue the Civil RICO claim:

> All persons in the United States who donated money to GFA from January 1, 2009 through the date the Class is certified for Project Codes 1000-4900. Excluded from the Class are unknown donors; Defendants, their subsidiaries, affiliates, and employees;[12] all persons who make a timely election to be excluded from the Class; governmental entities; the Special Discovery Master appointed in this case; and the Judge to whom this case is assigned and his/her immediate family.

**IT IS FURTHER ORDERED** that the following subclass is certified to pursue claims for fraud, unjust enrichment, and violations of the ADTPA under Arkansas law:

> All persons in Arkansas who donated money to GFA from January 1, 2009 through the date the Class is certified for Project Codes 1000-4900. Excluded from the Class are unknown donors; Defendants, their subsidiaries, affiliates, and employees; all persons who make a timely election to be excluded from the Class; governmental entities; the Special Discovery Master appointed in this case; and the Judge to whom this case is assigned and his/her immediate family.

**IT IS FURTHER ORDERED** that Plaintiffs Garland D. Murphy, III, M.D. and Phyllis Murphy are designated as Class Representatives for both defined classes.

**IT IS FURTHER ORDERED** that, in consideration of the affidavits and CVs that were attached to Plaintiffs' Motion to Certify Class, and in light of the lack of objection by

---

[12] Again, this minor change to the proposed classes is made to explicitly exclude any GFA member who, like the Dicksons, is potentially subject to an arbitration agreement that would affect their ability to join the class action.

Defendants, the Court designates the Stanley Law Group as Lead Class Counsel and the Bassett Law Firm as Class Counsel.

**IT IS FURTHER ORDERED** that no later than **October 10, 2018**, Lead Class Counsel must submit a motion for approval of a proposed plan of notice and the proposed notice forms, in accordance with Rule 23(c)(2)(B). According to the Rule, the proposed notice should be "the best notice that is practicable under the circumstances" and should "clearly and concisely state in plain, easily understood language" all the information set forth at subsection (c)(2)(B)(i)-(vii).

**IT IS SO ORDERED** on this ___10th___ day of September, 2018.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE
