IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GARLAND D. MURPHY, III, M.D., and
PHYLLIS MURPHY, Individually and on
behalf of all others similarly situated                                    **PLAINTIFFS**

v.                                            **CASE NO. 5:17-CV-5035**

GOSPEL FOR ASIA, INC.; GOSPEL FOR ASIA-INTERNATIONAL;
K.P. YOHANNAN; GISELA PUNNOSE; DANIEL PUNNOSE;
DAVID CARROLL; and PAT EMERICK                                    **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER APPOINTING SPECIAL MASTER

Having given notice of its intent to appoint a Special Master in its Memorandum
Opinion and Order of June 4, 2011 (Doc. 125), having offered both parties the chance to
be heard, and having considered the Affidavit (attached as Exhibit 1) attesting that there
are no grounds for disqualification under 28 U.S.C. § 455, the Court hereby appoints
David R. Cohen[1] as Special Master in this case pursuant to Rule 53(a)(1)(C). The
following Order briefly gives context for the current ruling, considers—and overrules—the
numerous objections raised by Defendants, and details the Special Master's duties.

### I. BACKGROUND

At its core, this eleven-month long discovery dispute, stretching back to September
2017, centers on Plaintiffs' attempts to learn whether Defendants, or organizations that
they substantially control, have information in their possession responsive to whether
solicited donations were spent in the field in accordance with donor designations.

---

[1] The parties were given the opportunity to offer suggestions as to whom the Court should
appoint as Special Master. The suggestions, however, did not overlap, and so the Court
undertook its own research to locate an individual with the appropriate background and
expertise who had no prior relationship with any of the parties or counsel.

Defendants have consistently maintained that "[g]oing to the heart of [Plaintiffs']
allegations, we believe that we will be able to show that the monies that were designated
went to the particular items that were specified." (Doc. 26, p. 34). At the time Defendants'
lead counsel made that statement, he indicated that the donated money may not have
gone *directly* from donor to GFA to end user. Indeed, he remarked that:

> "What was happening, your Honor, is that – just to take one example, you
> have a – let's say a thousand dollars is given to a Jesus Well, and that
> thousand dollars went to GFA-India, but it may not have gone to GFA-India
> direct. It may have gone to an account in Hong Kong. That money—this
> was happening in the past. That money was then sat there. GFA-India, from
> its funds, used a thousand dollars of their monies to fulfill the request that
> had been made by the—by the U.S. donor. So I believe that we will be able
> to show that, in fact, the monies that were designated went to all the various
> things that people gave designations for."

(Doc. 26, pp. 34-35).

Following the case management hearing during which these statements were
made, discovery proceeded without delay until Plaintiffs sought evidence that would prove
that donated money was in fact sent to the field and spent on the specified purposes.
After two largely unsuccessful rounds of discovery revealed how much GFA collected but
was silent as to how much was spent in the field, Plaintiffs sought leave of Court (Docs.
32, 33) to approach the impasse from a different angle—the combined use of requests
for admission ("RFA") and requests for production ("RFP"). In short, for those donors who
had specifically directed that their money should be used in the field, there were 179
unique designation codes representing different field expenditures (e.g. Jesus Wells and
water buffaloes). For each code, Plaintiffs proposed to serve six separate RFAs and one
RFP. This discovery set was designed to determine whether money had in fact been sent

to the field and, if so, how (i.e. by requesting evidence that would show, *inter alia*, proof of purchases, financial transmittals, etc.).

Defendants objected to Plaintiffs' Motion to serve this discovery set on numerous grounds. *See* Doc. 39. The Court subsequently overruled those objections and granted Plaintiffs leave to serve the discovery set. (Doc. 44). After reviewing the Defendants' discovery responses, Plaintiffs sensed that Defendants were giving evasive answers and repeating objections that had been rejected by the Court. They requested that Defendants amend their responses. After multiple email exchanges, Defendants refused to amend their answers and Plaintiffs requested a telephonic discovery dispute conference with the Court. Because this conference did not resolve the impasse, Plaintiffs ultimately filed their first Motion for Sanctions. *See* Doc. 54. Sensing the need to take a more active role in policing the discovery process in this case, the Court set a formal hearing on the Motion for Sanctions to occur on February 16, 2018, and required all named parties and at least lead counsel for each party to appear in person.

After reviewing the briefing and engaging in lengthy discussions with counsel, the Court determined that Defendants' answers were deficient and ordered Defendants to amend their responses. Despite Defendants' representation that they had given Plaintiffs the documents showing the expenditures, the Court found that Defendants' responses obscured whether Defendants were in possession of (or still searching for) *other* responsive documents that would ultimately prove that donations designated for the field and for specific purposes ultimately were spent on those items. Therefore, the Court gave Defendants specific instructions regarding the RFPs. For each RFP, the Court required that the answers be split into two categories: general evidence and specific evidence. As

the Court has noted before, general evidence would consist of documents showing that donated money had been spent in the field generally, but it would either not correspond to a designation code or would not be a document specifically showing how much money was spent for each item. Specific evidence would be those types of documents, including receipts, transmittal letters, request letters from the diocese, etc., that would help Plaintiffs track how much money was ultimately spent on these field projects. Four weeks later, when Defendants were to supplement their responses by either providing additional responsive documents or pinpointing the documents that had already been produced, they instead filed a Motion for a Protective Order (Doc. 85) asking yet again to be relieved from the burden of providing answers to these core discovery questions.

The Court has explained at great length in its prior Opinion (Doc. 125) why a protective order was not justified and why Defendants would still be required to turn over documents responsive to Plaintiffs' requests or admit that they simply had no additional proof to verify their alleged promises. *See* Doc. 125, pp. 2-13. Moreover, as the Court remarked at the sanctions hearing, the fact that these responsive documents were in India was not the Plaintiffs' problem at this point given the long string of dilatory tactics Defendants had employed throughout this litigation to avoid providing simple answers to simple, yet crucial, questions.

In short, Defendants' task now, as it has been since August 2017, is to provide the paper trail showing how the donated money was disbursed. The Court simply refuses to permit Defendants to continuously assert that donated money went to the field for the items specified and then hide behind ambiguous responses when asked to hand over documentation to verify those representations. If, as Defendants have consistently

4

maintained, donated money earmarked for the field went to the field and if GFA or its affiliated entities made disbursements in keeping with its alleged promises to donors, *some* paper trail that has yet to be fully documented is bound to exist. *See* Doc. 125, pp. 11-12.

Given the above and after numerous hearings and conferences, the Court also found that Defendants' discovery conduct warranted the imposition of sanctions. Indeed, much of what Defendants listed in their specific evidence section, unlike receipts or transmittal letters, was any document that even mentioned an individual designation code, whether responsive or not. For instance, advertisements soliciting donations for particular projects were included in this section. While those documents confirm the extent of GFA's solicitation of funds for particular field items, they are not responsive to the central question of whether Defendants have proof that the monies designated for these items were subsequently spent on them. They certainly are not *proof* of such expenditures. Additionally, Defendants' vaunted spreadsheets, which they represented to be accurate compilations of expenditures, appear to be merely "spending targets" that were the same across different regions because of the similar number of churches in those regions. (Doc. 125, p. 16). Finally, despite representing that they had already given Plaintiffs all documents showing expenditures, they also admitted that responsive documents, in particular, hardcopy receipts of expenditures, existed in India but had not yet been produced. Indeed, Mr. Mowrey, Lead Defense Counsel, stated that "[t]hese documents are in hardcopy. They are not electronic. I've seen many of them. They are in these notebooks, hundreds of them, hundreds of them, of receipts, hardcopy receipts." (Doc. 65, p. 45: 2-6). Because of the number of unsuccessful discovery attempts Plaintiff

had made and because the other documents that Defendants identified as showing the expenditures had not in fact provided answers, the Court denied Defendants' request for a protective order and ordered that these receipts and other responsive documents in India be produced in the United States. It remains unclear whether Defendants have, following the Court's denial of their motion for a protective order, produced these documents to Plaintiffs.

Thus, as opposed to providing a clear view of the extent to which GFA and its affiliates fulfilled donor designations, these documents and Defendants' skillful parsing only clouded an already obscured terrain. For example, each time they were confronted with charges of sanctionable discovery conduct and, worse, fabrication of documents, they were able to acquire from their field partners and produce in court filings previously-unseen documents and additional explanations about the intricate process by which GFA contends it fulfills donor designations. Despite these purported explanations, the procedure(s) Defendants use to marshal donations from donor to end user and the extent to which they have produced documentation to verify the accuracy of their representations about this process have not become any clearer.

That is why the Court found that there was a pressing need for the appointment of a Special Master who could investigate whether Defendants have complied with the letter and spirit of this Court's discovery orders and the Rules of Civil Procedure or whether they, as Plaintiffs contend, have concealed otherwise fraudulent activity by fabricating numbers and offering post-hoc justifications to explain a procedure (spending money in the field in accordance with donor designations) that simply never happened. Moreover, given Defendants' recalcitrance in complying with the Court's prior Orders, a Special

Master who can oversee the discovery process and ensure that Defendants begin to faithfully comply with their obligations is more than warranted.

## II. LEGAL STANDARD

Under Rule 53(a)(1)(C), a court may appoint a Special Master to "address pretrial and post-trial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Courts commonly invoke this rule in two sets of circumstances that are particularly relevant to the present dispute.

First, courts often appoint a Special Master to oversee discovery or accountings when the cases involve extraordinary, complex, or time-consuming discovery disputes. *See, e.g., Lundy v. Hilder*, 289 F. App'x 135, 140 (8th Cir. 2008) (noting that the district court appointed a Special Master to perform an accounting, oversee discovery related to damages, and perform other tasks); *Castle Aero Fla. Int'l, Inc. v. Mktg. & Fin. Servs., Inc.*, 2013 WL 12149691 (D. Minn. Apr. 5, 2013) (appointing a Special Master to oversee the production of concealed bank records); *Omnium Lyonnais D'Etancheite Et Revetement Asphalte v. Dow Chem. Co.*, 73 F.R.D. 114, 117, 188 (C.D. Cal. 1977) (appointing a Special Master to oversee discovery in a complicated case involving thousands, perhaps hundreds of thousands, of documents located abroad and parties who grew increasingly suspicious of the veracity of the documents they were receiving).

Additionally, courts have appointed a Special Master where a party or parties exhibit inability or unwillingness to comply with discovery orders. *See, e.g., Moreland v. State Farm Mut. Auto Ins. Co.*, 2007 WL 1033453, at *4 (D. Colo. Apr. 3, 2007) (appointing a Special Master to oversee discovery when both parties exhibited an inability "to proceed in an orderly fashion in conducting discovery"); *Wachtel v. Health Net, Inc.*, 239 F.R.D.

7

81, 112-13 (D.N.J. 2006) (appointing a Special Master to "monitor discovery compliance" to ensure that defendants complete required document production and comply with other discovery orders).

This discovery dispute has needlessly squandered the resources of the parties, prejudiced Plaintiffs' attempts to uncover information central to their claims, and put an "extraordinary drain on the Court's resources," *Wachtel*, 239 F.R.D. at 113. As noted above, courts have found that Special Masters are particularly appropriate in cases where complex discovery disputes involving thousands of documents are involved and where there has been a considerable amount of recalcitrance on the part of a party in complying with court orders. Both are present here.

## III. DISCUSSION

### A. Objections

Pursuant to Rule 53(b)(1), the Court previously gave notice of its intent to appoint a Special Master and set forth a briefing schedule that provided each side an opportunity to be heard. The Court subsequently received Objections from Defendants (Doc. 130). The Court **OVERRULES** these objections for the following reasons.

#### 1. Supplanting the Role of the Judge and Jury By Making Findings of Fact

Defendants suggest that the proposed appointment of a Special Master would supplant the role of the trial judge (and jury) because the Special Master will be tasked with determining, at trial, the ultimate liability issue in this case—whether Defendants and their international partners have spent donated (and designated) money in accordance with the promises they made throughout the class period and in keeping with the donors' designations. This objection is completely unsupported by the authority Defendants cite,

fundamentally mischaracterizes the nature of the Court's prior Order, and reflects a misunderstanding of the types of masters authorized by Rule 53.

Initially, the Court notes that every authority Defendants cite related to this objection (and indeed—in support of every objection they lodged) was decided before 2003. However, as Defendants are likely well-aware, Rule 53 was extensively revised in 2003 to bring the Special Master rule in-line with modern litigation practice and the expanded role that Special Masters had begun to play in all aspects of federal litigation. *See, e.g.,* 9C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 2601 (3d ed. Apr. 2018) ("To reflect changing practices in the use of masters, Rule 53 was revised substantially in 2003. In contrast to the previous version of the rule, which addressed only the use of masters to perform trial functions, the revision reflected their increased employment in a variety of pretrial and post-trial functions and regularized the process and standards for the appointment of masters to serve in such capacities.").

Nevertheless, even considering Defendants' authority in the light most favorable to them, these cases do not support their objection. For instance, Defendants cite *In re Armco* for the proposition that the appointment of a Special Master in this case would essentially represent the abdication of the undersigned's role in presiding at trial over the merits of the case. 770 F.2d 103 (8th Cir. 1985). Unlike here, in *In re Armco*, the Order appointing a Special Master had in fact enabled the Special Master to conduct trial on the merits. *Id.* at 105. The Eighth Circuit held that while the Special Master could not preside over the trial, the district court "acted properly in granting the master the broad authority to supervise and conduct pretrial matters, including discovery activity, the production and

arrangement of exhibits and stipulations of fact, the power to hear motions for summary judgment or dismissal and to make recommendations with respect thereto." *Id.* The authority of the Special Master in this case will be much more circumscribed than the authority upheld by the Eighth Circuit in *In re Armco*.

Defendants also misunderstand the Court's prior order. Nowhere did it purport to even *suggest* that the Special Master would have the authority to preside over trial or to make findings which would be subject to no further review and which would be taken as admitted for trial purposes. In fact, such an order would have been directly contrary to Rule 53, which requires the Court to conduct a *de novo* review of the factual findings in the Special Master's report, after giving each party a chance to lodge any objections they have to that report. *See generally* Rule 53(f). Thus, Defendants' suggestion that the Court was in effect proposing to appoint a Special Master who would make binding findings of fact, thereby usurping the role of the jury, is plainly incorrect.

The Court is also not outsourcing its role of supervising proceedings to the Special Master. What the Court *is* doing, however, is appointing a Special Master to review and verify the numerous discovery representations that have been made by Defendants in this case, given the Court's finding that Defendants' representations about what has currently been produced and what has *in fact* been produced appear to be very different. Moreover, Defendants' conduct has consistently obscured the mechanics of Defendants' disbursement of funds to the field and undermined their own assertions that such disbursements were made. At every step, Defendants have avoided providing concrete answers or evidence—either to the requests for admissions or through the numerous rounds of discovery—showing how funds were disbursed and spent in the field or even

*whether* funds were disbursed in the field. They have also asserted that they lack control over producing the *really* responsive documents (i.e. receipts, letters of transmittal, etc.) despite the fact that they 1) know that such documents exist, 2) have seen such documents in notebooks in India,[2] 3) have accountants currently in India reviewing such documents, 4) as named Defendants occupy prime roles within these organizations and/or have family members who do so, 5) have explicitly authorized financial transactions to/from these entities, and 6) have been able to produce documents to defend themselves—albeit unsuccessfully—against Plaintiffs' allegations that these documents are, at best, misleading/incomplete or, at worst, fabricated.

Given the protracted nature of this discovery dispute and Defendants' repeated failure to provide clear answers, the appointment of a Special Master is warranted.

### 2. Appointment of a Special Master under Rule 53(a)(1)(C)

Defendants' second objection fares no better. They assert that Rule 53(a)(1)(C) is not the proper rule under which to appoint the Special Master. Defendants argue that the Court really proposes to appoint a trial master under Rule 53(a)(1)(B). But, as just

---

[2] For this reason, the Court continues to reject Defendants' assertion that they have made good-faith attempts to make known the universe of relevant documents showing expenditures in the field. For instance, during the February sanctions hearing, while pushing back against the Court's suggestion that there might be more documents to come, Defendants represented that they had *already* given Plaintiffs the documents that show the expenditures. (Doc. 65, p. 50). Yet, they had just admitted that they knew about—and were in fact having their own forensic experts currently examine—receipts in India that indisputably had not yet been produced to Plaintiffs. *Id.* at p. 48-49. Moreover, Defendants' offer to have Plaintiffs inspect certain documents only solves half the problem—one must still know what there is to be inspected. Unfortunately, given the amount of foot-dragging by Defendants, Plaintiffs don't yet know *what* responsive documents there are, much less *where* they are. That is why the Court ordered that responsive documents in the possession, custody, or control of the named Defendants or entities that they control, whether located here or abroad, *must* be produced to Plaintiffs.

explained above, that is not the case. Defendants assume that the Court's prior Order meant that the Special Master would be tasked with verifying that each donation (or category of donation) was in fact spent in the field. But, that is never something the Court said. That is a matter for trial—one on which the jury, not the Special Master, will be required to return an answer. The Court merely noted that a Special Master was necessary here to conduct (or oversee) a forensic accounting of the evidence that has been produced, to establish the paper trail between donations and expenditures, and to finally get to the bottom of whether records that purportedly exist but that have not yet been produced will finally provide an answer to the central question in this case. In short, the Special Master will be tasked with determining whether a paper trail exists and, if so, its categorical content, the control Defendants possess over such documents, and whether all such documents that exist and that Defendants have control over have been produced. A forensic accounting is a means of knowing the extent to which responsive documents exist and have been produced.

Thus, the first task will be to establish the process GFA used (during the period encompassed by the class allegations) to send donations from the United States to the field, and from the field to the end-user. As part of determining what this process entails, the Court expects that the Special Master will ensure Defendants produce all documentation, such as ledgers, accounting records, bank records, transmittal letters, receipts, records of expenditures, etc., that will very clearly reveal how money is moved from point A to point B to points C-Z in the process. This process may also reveal that, at some point in the chain, Defendants pass the money along to an entity or entities over whom they do not exercise a significant or even marginal level of control. But, it defies

logic to believe that there is no record of these transmittals, given the extent of the donations at issue in this case and Defendants' consistent representations that they believe that the donated money went to the field and to the specified purposes.

Once the money trail is established, the Special Master's duties will be to compare the documentation generated through GFA's actions (i.e. that does depict how raised money is ultimately spent) against the information that has been produced thus far. This is because Defendants have argued that they had given to Plaintiffs, as long ago as February 2018, all documents that show the expenditures. (Doc. 65, p. 50: 18-20). Therefore, should information—requested in no fewer than three rounds of discovery— have been in the possession of the named Defendants or entities that they control *and* should they have failed to produce it, the Special Master may report on what is still missing. That is why the Court noted that the Special Master, at least in part, will be tasked with "getting to the bottom of whether records that purportedly exist but that have not yet been produced will finally provide an answer to the central question in this case." (Doc. 125, p. 18).

While performing the tasks described above, the Special Master's work product should be broad enough in scope to allow him to make findings and opine to the Court as to the veracity of the numerous representations that GFA has made throughout this case—especially its representations as to the extent of its compliance with this Court's orders to turn over responsive documents showing expenditures in the field. As a necessary consequence of this assignment, there will be, effectively, an investigation of the processes that GFA has used to fulfill donor designations. Thus, the Court's appointment of a Special Master under Rule 53(a)(1)(C) falls squarely within what the

Advisory Committee notes is appropriate under this section. *See, e.g.*, Fed. R. Civ. P. 53(a)(1)(C) advisory committee's note to 2003 amendment ("A master's pretrial or post-trial duties may include matters that could be addressed by a judge, such as reviewing discovery documents for privilege, or duties that might not be suitable for a judge. Some forms of settlement negotiations, *investigations*, or administration of an organization are familiar examples of duties that a judge might not feel free to undertake." (emphasis added)).

### 3. Cost of Special Master Under Rule 53(g)(3)

Defendants next object that the Court's sanction of appointing a Special Master at Defendants' sole expense, pursuant to Rule 53(g)(3), is unwarranted and disproportionate. The Court has already explained at length in its prior Order (Doc. 125) why Defendants' conduct in this case has necessitated the appointment of a Special Master. This is especially the case given that many of Defendants' prior representations to the Court have proven to be unfounded. At the hearing on February 16, 2018, the Court addressed the individual defendants directly and explained to them the potential consequences of not fully complying with the Court's discovery orders.[3] (Doc. 65, pp. 33-34, 91-92). Thus, any expense that Defendants incur resulting from their own failure to respond in good-faith to numerous rounds of discovery is more than warranted. Moreover,

---

[3] Among other admonitions, the Court stated: "[T]his is one of the reasons why I wanted to have all of the defendants here today. You've got one more chance to provide the information and amended answers that the Court has ordered. If you don't do that within the parameters that I have ordered today, then the full range of sanctions available under Rule 37(b)(2) will be on the table. Potentially that could include – and I'm not saying that it would – but it could include striking your answer and entering a default judgment against each of you individually." (Doc. 65, pp. 91-92). Thus, the Court would also observe that the appointment of a Special Master is a much less onerous result than what might otherwise be warranted here.

as the Court will note below, in keeping with the requirement of Rule 53(a)(3), the Court will require that the Special Master minimize expenses in whatever way possible. Additionally, given the nature of this case and the amount in controversy, which the parties agree totals around $375 million,[4] the Court continues to conclude, for the reasons stated in its prior Opinion, that imposing the cost of the Special Master as a sanction on Defendants is warranted. *See generally* Doc. 125.

### 4. No Class Has Been Certified

Defendants' objection on the basis that no class has yet been certified is now moot (Doc. 134). However, the Court would add that the parties' positions in this case have always been that whether Defendants are complying with their discovery obligations and with this Court's prior orders are matters fundamentally removed from the decision of whether a class action should be certified. Nevertheless, the certification of a nationwide class and an Arkansas subclass does bolster the Court's conclusion that the appointment of a Special Master is warranted. No individual, much less the 180,000 putative class members, should be forced to the expense and headache of re-litigating these same issues with these Defendants. The tremendous waste of party and judicial resources to date is reason enough to reject this objection.

### 5. Special Master's Ability to Hire Other Professionals

Defendants next object that the Court intends to allow the Special Master to appoint a forensic accountant or other professional to assist in this investigation. The Court *will* allow the Special Master to employ such personnel if reasonably necessary to

---

[4] *See* Doc. 65, pp. 41, 42.

carry out the duties explained herein, which the Court assumes to be quite likely.[5] Again, it bears repeating: had Defendants simply produced this information to Plaintiffs in the first instance or, indeed, at any point in the past eleven months, no Special Master would have been necessary. Defendants have only themselves to blame for the long string of conduct that has made a Special Master necessary in this case. Because it is Defendants' misconduct that necessitates the appointment of a Special Master, Defendants shall be responsible for 100% of the cost of the Special Master. This allocation of cost is made both pursuant to Fed. R. Civ. P. 53(g)(3)—considering the factors listed therein—and as a sanction issued under the Court's inherent authority and Rule 37 for Defendants' misconduct detailed throughout this Opinion and its prior Opinions on these matters. *See, e.g.*, Docs. 67, 125.

Thus, the Court **OVERRULES** all of Defendants' objections.

### B. Appointment of the Special Master

As the Court has said before, the appointment of a Special Master is necessary in this case to ensure fairness to Plaintiffs and to protect the judicial process from discovery abuse that conceals relevant information. Through the discovery abuses detailed in this and the Court's prior Opinion (Doc. 125), the Court finds it much more likely than not that Defendants have deprived Plaintiffs of information essential to their case, despite having had several rounds of discovery to clarify their prior responses. Based on these repeated

---

[5] As early as September 2017, Defendants had already represented that they had "retained one of the big four accounting firms" to find responsive documents showing expenditures. *See* Doc. 37, pp. 22:24-25, 23:1-8. Yet, almost a year later, the Court is still hearing that these documents are beyond their ability to produce. Thus, the likelihood that the Special Master would need to employ, at a minimum, a forensic accountant to trace and determine what likely remains un-produced is quite high.

failures, the Court finds that only with the Special Master's oversight and investigation can it be confident that Defendants' production of responsive documentation will be complete, fair to Plaintiffs, and consistent with a system of justice premised on the presentation to a jury of genuine evidence produced through truthful discovery.

Therefore, pursuant to Rule 53 and its inherent authority,[6] the Court now appoints as Special Master David R. Cohen, Esq., of the following law firm:

David. R. Cohen Co. LPA
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
216-831-0001 tel
866-357-3535 fax
E-mail: david@specialmaster.law

The Special Master's duties are generally described for context above, and will necessarily include the following more specific tasks:

1. The Special Master must proceed with all reasonable diligence. Fed. R Civ. P. 53(b)(2)(A).

2. The Special Master will primarily be tasked with investigating and documenting the evidentiary trail that connects the known donations from initial donor to end user in the field. In particular, the Special Master should:

   - establish a firm understanding of how GFA and its officers fulfill donor designations. This will require the Special Master to gain an intimate knowledge of the internal procedures and processes that GFA and its affiliates use to track and ensure fulfillment of donor designations. If GFA's representations are accurate, it is expected that this investigation will reveal accounting records, banking records, financial documents, transfers of monies, paper and electronic transmittal/receipt communications, receipts for expenditures, pertinent communications from local churches in the field, etc.

---

[6] "Beyond the provisions of [Fed. R. Civ. P. 53] for appointing and making references to Masters, a Federal District Court has 'the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential.'" *Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir. 1956) (quoting *In re Peterson*, 253 U.S. 300, 311 (1920)).

17

- determine and report on the universe of documents that are created in the process of fulfilling donor designations and explain whether these documents are consistently created and where these documents are maintained or stored.

3. Once the Special Master determines the universe of relevant documents/evidence created along the way from initial donation to end user, he should compare what has previously been produced against these relevant documents to determine whether GFA has, as consistently represented, "given [Plaintiffs] the documents that show the expenditures."[7] If not, the Special Master should identify what deficiencies in production remain. These findings shall be intermittently reported to the Court.

4. To the extent that the Special Master's investigation reveals that documents relevant to the verification of GFA's representations have not yet been produced, the Special Master will supervise the production of these documents to ensure that truly responsive documents to Plaintiffs' several rounds of discovery requests are produced before discovery ends (including any extensions of the discovery deadline that the Special Master may advise is necessary). This duty will necessarily require the Special Master to determine whether and to what extent other entities are effectively controlled by Defendants and whether these entities are in possession of responsive documents.

5. The Special Master will have the authority to complete all tasks reasonably necessary to further completion of his listed duties. This includes, but is not limited to:

- accessing Defendants' financial records, accounting records, banking records, tax records, corporate records, and internal donation/expenditure databases;

- interviewing Defendants' managers, directors, employees, officers, owners, accountants (internal and external), suppliers of goods and services, consultants, and any other person who exercises effective control over Defendants;

- meeting with the parties and attorneys as needs may arise in order to permit the full and efficient performance of his duties;

---

[7] *See* Doc. 65, p. 50: 18-20; Statement of Lead Defense Counsel Rob Mowrey at Sanctions Hearing.

- employing professionals, after obtaining Court approval, to assist in performing his duties;

- the authority outlined by Fed. R. Civ. P. 53(c)(1)(A)-(B), and (c)(2).

6. The Special Master may communicate *ex parte* with any party or their counsel, as the Special Master deems appropriate, for the purposes of fulfilling the duties listed herein, ensuring the efficient administration, management, and oversight of this case, and for the purpose of mediating or negotiating a resolution of any dispute related to this case. In particular,[8] he may communicate *ex parte* with the parties to:

- obtain access to internal databases and documents, including Plaintiffs' database of discovery documents and Defendants' internal databases, accounts, and records.

- identify and communicate with the "Big Four accounting firm" reportedly retained by Defendants in 2017 to audit its distribution of donations to the mission field, and determine whether said firm has knowledge or possession of documents relevant to the Special Master's duties, and whether it has generated any findings or reports that should be subject to discovery.

- verify the authenticity of any documentation that has been produced. For instance, if a particular document is discovered, he may approach Plaintiffs' counsel to ascertain whether the same document has in fact been received by Plaintiffs in discovery thus far.

- determine whether the "notebooks" full of receipts (as represented to the Court by Mr. Mowrey) have been produced yet, or whether they remain in India. And if the latter, then to report to the Court any reasons why it would not be reasonable and feasible for Defendants to have produced them to the Plaintiffs by now.

- focus the Special Master's inquiry on documents or categories of documents that are especially important, troubling, unsubstantiated, etc. For instance, he may seek input from the parties as to what types of documents should have been produced that haven't yet been produced.

7. The Special Master may communicate *ex parte* with the Court at the Special Master's discretion, without providing notice to the parties, regarding logistics, the nature of his activities, management of the litigation, other appropriate procedural matters, and also to assist the Court with legal analysis of the parties' submissions,

---

[8] The Special Master may otherwise communicate *ex parte* with the parties when, in his opinion, such communication is warranted.

if requested. The Special Master shall not communicate to the Court any substantive matter the Special Master learned during an *ex parte* communication between the Special Master and any party.

8. The Special Master shall keep track of his time and expenses for billing purposes. The Special Master will preserve records relating to his work until relieved of this obligation by order of the Court.

9. The Special Master shall issue a final report summarizing his findings. At a minimum, the report should:

    - provide an in-depth discussion of the process(es) that GFA and its affiliates use to move money from initial donation to end user;

    - indicate what types of documents are produced during this process;

    - indicate how much of this information had—as of the date of this Order—already been produced to Plaintiffs;

    - indicate whether the "expenditure" documents identified in previous filings by Defendants are accurate representations of expenditures and summaries of the information that Defendants had in their possession, custody, or control;[9]

    - indicate what additional not-previously-produced documentation has been produced to Plaintiffs under the Special Master's supervision;

    - detail the nature and extent of the relationship between Defendants and between any other entity that Defendants substantially control; and

    - indicate when in this process—if at all—Defendants cease to exercise reasonable control over these affiliated entities.[10]

---

[9] One of Defendants' most recent representations was that the various spreadsheets that had been produced, especially by Believers' Church ("BC"), were not fabricated even though they contained nearly identical numbers for income and expenses across many dioceses because of the way that BC's budgeting process works. Thus, to the extent that the Special Master's investigation provides insight as to the authenticity of these documents and their relevance to documenting GFA's *actual expenditures* (rather than mere budgetary targets), the report should contain this information as well.

[10] This will be especially critical given the pending Motion to Stage Alter Ego Issues after Verdict (Doc. 60).

10. The Special Master shall file his report on the record as soon as it is reasonably possible. The parties shall then have **10 DAYS** to offer any objections to the Special Master's findings, which the Court will review in accordance with Fed. R. Civ. P. 53(f). Fed. R. Civ. P. 53(b)(2)(D).

11. The Special Master will immediately report to the Court if Defendants or entities that they reasonably control exhibit anything less than full cooperation with his investigation. This includes, but is not limited to, withholding access to their employees, agents, affiliates, suppliers, or records.

12. As noted above, Defendants will be responsible for the cost of the Special Master and/or any additional personnel necessary to complete the above-described duties. The Special Master shall be compensated at his rate of $750 per hour. The Special Master shall incur only such fees and expenses as may be reasonably necessary to fulfill his duties under this Order, or such other Orders as the Court may issue. If necessary, and after obtaining Court approval, the Special Master may hire additional professionals to assist in his duties. Any expenses incurred by these individuals should be recorded and reported as expenses of the Special Master.

13. The Court will require Defendants to make interim payments for the Special Master's services. Fed. R. Civ. P. 53(b)(2)(E). On a monthly basis, the Special Master shall file a summary invoice for the total amount billed. After filing this invoice, the Special Master shall email an itemized invoice of his fees and expenses (including the fees of any necessary personnel and excluding overhead) to all parties and the Court. **Good-faith objections**[11] to the invoice or to particular charges shall be filed under seal with the Court, with copies to the Special Master and opposing party, within fifteen (15) days of the submission of the invoice. Any party that does not object to an invoice within fifteen (15) days of its submission shall be deemed to have waived any objection. Entire invoices, or portions of such invoices that are not objected to, shall be paid within this same fifteen (15) day period. The Court will consider good-faith objections to the invoices and will strive to enter an order either sustaining or overruling the objections as soon as possible. Any objected-to sums that the Court later approves should be paid by Defendants within fifteen (15) days of the Court's ruling on the objection(s), unless otherwise directed.

---

[11] For instance, explicitly excluded from the category of "good-faith objections" would be a monthly, recurring objection by Defendants to the invoice because they continue to oppose the appointment of a Special Master.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that David R. Cohen is appointed as a Special Master in this case pursuant to Rule 53 and the inherent power of the Court, with the powers and duties described herein.

**IT IS SO ORDERED** on this 10th day of September, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE